FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JAN -2 AM 9: 59

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TERREBONNE PARISH SCHOOL BOARD | ) | CASE NO.: 00-0319 |
| VERSUS | ) | SECTION: "B" |
| KOCH TRANSMISSION COMPANY, and KOCH GATEWAY PIPELINE COMPANY | ) ) ) ) | MAGISTRATE: 5 |

## TERREBONNE PARISH SCHOOL BOARD'S MEMORANDUM IN OPPOSITION TO KOCH'S MOTION FOR SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT:**

Defendant, Columbia Gateway Pipeline Company ("Koch") has filed for summary judgment on the grounds that the "Right of Way and Servitude Agreement" entered into with plaintiff, Terrebonne Parish School Board ("TPSB"), places no obligation upon Koch to either backfill the pipeline canal/floatation ditch or to in any way maintain said pipeline canal/floatation ditch and its adjacent spoil banks/levees. Alternatively, Koch argues that a "Damage Release" executed on the same date as the "Right of Way and Servitude Agreement" insulates it from *any and all present or future known or unknown claims* that may arise as a result of or following the construction of the pipeline and its floatation ditch. Finally, in the event that this court denies Koch's motion on the aforementioned grounds, Koch claims that any

1



such claims asserted by TPSB are prescribed.  For the reasons that follow, even assuming that the facts recited by Koch are undisputed, the law is contrary to Koch's position on these issues. Accordingly, Koch is not entitled to judgment as a matter of law.

**HISTORICAL BACKGROUND:**

A historical note on the marsh area at issue is appropriate.  Louisiana's dwindling wetlands, described by the United States Environmental Protection Agency as "national treasures" comparable to rainforests, provide innumerable benefits, including food and habitat for fish and wildlife; flood protection; shoreline erosion control; natural products for human use; water quality improvement; pollution control; and opportunities for employment, recreation, education, and research for millions of people.[1]  Our wetlands are homes to endangered or threatened species, such as the bald eagle and brown pelican, and the migratory arctic peregrine falcon.  Suzanne R. Hawes, U.S. Army Engineer District, Planning Division, *Construction of a Marsh in the La Branche Ponds of Louisiana*.  They are also the breeding grounds that ensure the survival of Louisiana's huge fishing and seafood industry, which provides jobs and food for millions of people.

For decades, Louisiana has allowed oil and gas companies fairly unrestricted access to its mineral reserves.  As a result of decades of unhindered exploration and a lack of environmental concern on the part of the oil and gas exploration and production companies, the inland marshes of Southeast Louisiana have suffered immense losses, not only in terms of land mass but also in terms of their contribution to the environment as a whole.  Although these marshes provide our

---

[1]    Environmental   Protection   Agency,   *Values   and   Functions   of   Wetlands*,   published   at http://www.epa.gov/owow/wetlands; *Southeast Wetlands, Status and Trends, mid 1970's to mid 1980's*, a 1994 cooperative publication by United States Department of the Interior  Fish and Wildlife Service and United States Environmental Protection Agency, published at http://www.nwi.fws.gov/sewet.

first line of defense when Louisiana is threatened by hurricanes, they also provide habitat on a daily basis to an abundant menagerie of flora, fauna, marine, reptilian, mammalian and native and migratory avian species that have resulted in Louisiana's well deserved, although self imposed, moniker of Sportsman Paradise.[2]  Every year, hundreds and thousands of acres of Louisiana's marshes are lost, not because of natural erosion processes, but because of the legacy of oilfield canals dug to facilitate oil and gas exploration and production in these marshes.  These access canals have artificially and dramatically changed the natural hydrology of Louisiana's marshes.[3]  North-south channels and canals bring salt water into fresh marshes where the salinity and sulfides kill the vegetation.[4]  East-west canals impede sheetflow, pond water on the marsh causing stress and eventual loss.[5]  In either case, the net result is the same, a massive loss of marshland mass where little or none would otherwise have occurred but for the activities of the oil and gas exploration and production companies.

The property owned by TPSB and located within Section 16, Township 18 South, Range 13 East ("§16/T18/R13") is a "floating" marsh, *i.e.*, a marsh comprised of a floating mat of vegetation over a relative firm substrate.  Erosion actually comes from the bottom of the mat, between the mat and the firm marsh substrate.  The eroded materials are actually small pieces of "organic debris" which can easily move with the current.  The damage can ***not*** necessarily be seen ***until severe damage*** to the mat has occurred.  While erosion can, and does, occur adjacent to breaks or cuts in a canal levee, ponds formed some distance from the actual levee can be the result of erosion of the mat below the surface. The pond simply forms where the mat was the thinnest.

Tulane Professor Oliver Houck, in a well-documented article summarizing scientific research on the cause of recent rapid loss of our wetlands, stated that approximately 89% of Louisiana's

---

[2]     See e.g. Louisiana Department of Natural Resources, Louisiana Wetland Facts at http://www.savelawetlands.org/newwetlandprod.html.

[3]     See, Coast 2050: Toward a Sustainable Coastal Louisiana at p. 40, Louisiana Department of Natural Resources, 1998.

[4]     Id.

[5]     Id.

wetland losses have most likely been caused by the enormous web of oil and gas exploration canals on our coastal plains.[6]   These canals, which are rarely filled, expand in size geometrically as the years pass.  These canals, with their eroding levees, permit water inundation and intrusion into the marshes, and are also the cause of vast amounts of subsidence.  Unfortunately, from 1970-1980 alone, Louisiana has lost 518,000 acres of wetlands, or 28% of its total.[7]      Indeed, citing the virtually unanimous conclusions drawn by scientists over many years, Professor Houck, in his extraordinarily well-documented article, notes that man-made canals, the vast majority of which are attributable to the oil and gas industry, are likely responsible for approximately 89% of the loss of Louisiana's wetlands, and that the oil and gas industry is "a dominant, if not the predominant, factor in coastal land loss."[8]   More importantly, the erosion and damage caused by the canals has been gradual and imperceptible, occurring at a rate of 1% per year.[9]

## SCOPE AND DUTIES ASSOCIATED WITH THE "RIGHT OF WAY AND SERVITUDE AGREEMENT"

The "Right of Way and Servitude Agreement" between TPSB and Koch provides in pertinent part:

> Grantor does hereby Grant and Convey unto UNITED GAS PIPE LINE COMPANY (herein styled Grantee), its successors and assigns, a right of way and easement one hundred feet in width to construct, **maintain**, operate, repair, replace, change the size of and remove pipe line and **appurtenances thereto, including**...open ditches or **canals not to exceed forty feet in width**, which may be filled in or left open at the option of Grantee....

---

[6] See Oliver A. Houck, Symposium on Land Loss in the Louisiana Coastal Zone, *Land Loss in Coastal Louisiana: Causes, Consequences and Remedies*, 58 Tul. L. Rev. 3, 69-70 (October 1983).

[7] *Southeast Wetlands, supra* n. 2, at http://www.nwi.fws.gov/sewet/introd.html.

[8] Houck, *supra*, 58 Tul. L. Rev. at pp. 69-70.

[9] Houck, *supra*, 58 Tul. L. Rev. at pp. 69-70.

See Exhibit "1" To Koch's Motion for Summary Judgment. (emphasis added).[10]

While interpretation of a contract is the determination of the common intent of the parties, if the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code arts. 2045 & 2046; *Vizinat v. Transcontinental Gas Pipeline Corp.,* 552 So.2d 1237, 1239 (La. App. 3d Cir. 1989). Additionally, the words of a contract must be given their generally prevailing meaning. La. Civ. Code art 2047; *Vizinat* 552 So.2d at 1239. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter. *Vizinat* 552 So.2d at 1239.

Although the term "appurtenances"[11] is not defined by the "Right of Way and Servitude Agreement", interpretation of said term in light of its common meaning would include "accessories" such as the pipeline canal/flotation ditch which was clearly anticipated by Koch within the "Right of Way and Servitude Agreement" as a necessary accessory/appurtenance to the construction, operation and maintenance of said pipeline. Rights that are accessory to the servitude are acquired at the time the servitude is established and shall be exercised in a way least inconvenient for the servient estate. La. Civ. Code art. 743. Although the holder of the servitude has the right to enter upon the servient estate for the purpose of constructing or maintaining works required for the use and preservation of the servitude, he is obligated to conduct said activities in the manner causing the least possible damage. La. Civ. Code art. 745.

---

[10] United Gas Pipe Line Company is the undisputed predecessor in interest to Koch.
[11] "Accessory" is a common synonym for the word "appurtenance."

5

In *St. Martin v. Mobil,* 1998 WL 474211 at p. 4 (USDC E.D. La. 1998), *affirmed by,* 224 F.3d 402 (5th Cir. 2000), the court was faced with interpreting a servitude agreement that provided in pertinent part:

> Grantor does hereby convey to Grantee, its successors and assigns, the right and servitude to dredge, construct and maintain and use a canal...

*St. Martin,* 1998 WL 474211 at p. 4.[12]  In *St. Martin,* both the district court and court of appeals held that the inclusion of the term "maintain" within the right of way agreement created a continuing duty to maintain both the canal and the spoil banks/levees necessary to contain them. *St. Martin,* 1998 WL 474211 at p. 4-5, *affirmed by,* 224 F.3d at 409-410.

In the present case, Koch has acquired "a right of way and easement one hundred feet in width to construct, **maintain**, operate, repair, replace, change the size of and remove pipe line and **appurtenances thereto, including**...open ditches or **canals not to exceed forty feet in width**...."  As the flotation ditch is clearly anticipated by Koch within the "Right of Way and Servitude Agreement" as a necessary accessory/appurtenance to said pipeline and/or construction necessary to the exercise of a right accessory to the exercise of Koch's right of way, said flotation ditch and its accompanying spoil banks is correctly treated as an appurtenance to said pipeline as contemplated by the "Right of Way and Servitude Agreement."  Accordingly, Koch has a continuing duty to maintain its pipeline canal/flotation ditch and the spoil banks/levees

---

[12]    Although Koch and Columbia Gulf will claim that the Fifth Circuit relied upon a provision of the applicable right of way which provides that "Grantee further agrees to pay Grantor for any damages occasioned to Grantor's lands as a result of the construction, use and maintenance of the canal" as the basis for imposing a continuing duty to maintain said canal and spoil bank, the true import of said provision was that it extended the contractual obligation to a subsequent purchaser of the land.  In reading the right of way in its entirety (see *St. Martin,* 1998 WL 474211 at p. 4) it is clear that the right of way created a duty to maintain regardless of the inclusion of this language.  Moreover, said language is superfluous as the rights and obligations arising from a contract are heritable and assignable and the right to collect damages for a breach of contract is provided by law unless either provision is otherwise modified by the agreement.  La. Civ. Code arts. 1984, 1994 and 2004.  In other words, a duty to maintain is meaningless without any corresponding liability for damages resulting from a breach of said duty.

6

necessary to contain said canal and Koch's motion must be denied in this respect. *St. Martin,*

1998 WL 474211 at p. 4, *affirmed by,* 224 F.3d at 409-410.

## INAPPLICABILITY OF THE "DAMAGE RELEASE"

The "Damage Release" executed by TPSB and Koch prior to the actual construction of

the pipeline and canal provides in pertinent Part:

> This will acknowledge receipt of...cash in hand paid by UNITED GAS
> PIPE LINE COMPANY in full and complete settlement and satisfaction in
> advance for all damages caused to crops, timber, fences, lands or other
> improvements owned...by the undersigned along and in the vicinity of
> that certain pipe line to be constructed, operated and maintained by United
> Gas Pipe Line Company,...**which said damages may be caused by
> reason of the *construction* of said line or operations in connection with
> the *construction* thereof.**
> The undersigned hereby acknowledges and declares that the above
> mentioned payment is made in full consideration of all damages which
> may be occasioned...by either United Gas Pipe Line Company or
> Contractor engaged in ***the building and construction of said pipe line.***

See Exhibit "2" to Koch's Motion for Summary Judgment. (emphasis added).

A settlement agreement is a contract and, as such, is subject to the rules governing

interpretation of contracts. La. Civ. Code art 3071; *Vizinat,* 552 So.2d at 1239; *Stern v. Williams,*

365 So.2d 1128 (La. App. 4th Cir.) *writ denied,* 368 So.2d 143 (La. 1979). While interpretation

of a contract is the determination of the common intent of the parties, if the words of the contract

are clear and explicit and lead to no absurd consequences, no further interpretation may be made

in search of the parties' intent." La. Civ. Code arts. 2045 & 2046; *Vizinat* 552 So.2d at 1239.

Additionally, the words of a contract must be given their generally prevailing meaning. La. Civ.

Code art 2047; *Vizinat* 552 So.2d at 1239. Words of art and technical terms must be given their

technical meaning when the contract involves a technical matter. *Vizinat* 552 So.2d at 1239.

In *Vizinat* 552 So.2d 1237, the court was faced with a virtually identical "Damage Release" whereby the defendant therein, as is Koch herein, attempted to argue that the release covered ***all present or future known or unknown claims***[13] that may arise at any time during or following the activities initially permitted. Like the Koch "Damage Release" the release in *Vizinat*, purported to be in full settlement and discharge of any and all claims:

> for all the items of injury and damage hereinafter designated to property of any kind owned or rented by the undersigned or in which the undersigned have (has) or claim(s) to have an interest, located in [Evangeline] Parish, State of [Louisiana], which have been incurred by reason of or incidental to the construction, operation or maintenance of Transcontinental Gas Pipe Line Corporation's pipe line and appurtenances for which Transcontinental Gas Pipe Line Corporation, its agents, employees, contractors and subcontractors are or might be liable.

*Vizinat* 552 So.2d at 1238. However, the *Vizinat* court held that the purported release only applied to those claims existing at the time the release was executed and not to any claims arising thereafter, despite the broad general language of the release. In so holding the court stated:

> The agreement signed by the parties to this matter was a standard form contract provided by [Koch]. The contract is ambiguous, in light of the circumstances, as to what it intends to compensate [TPSB] for, since no damages had as yet occurred. However, any ambiguities in a standard form contract must be interpreted against the party who provided it and in favor of the other party. La. Civ. Code art. 2056. Therefore, [TPSB] retained its action for damages arising thereafter as a result of the defendant's actions.

*Vizinat* 552 So.2d at 1239 (party names substituted to reflect the current litigation).

TPSB's claim are based in contract and tort based on Koch not maintaining its pipeline canal. This breach of contract and negligence has resulted in the pipeline canal eroding far beyond its original width and in destruction of adjacent marsh where the pipeline canal has

---

[13]    Although Koch claims that the referenced release covers ***all present or future known or unknown claims***, the release contains no such language and is therefore ambiguous in scope and properly limited to those claims existing at the time of the release as is shown below.

8

developed breaks or breaches.  Despite Koch's attempt to rewrite the scope of said "Damage Release" after the fact, these claims were not part of the release at the time of its execution because the release was specifically designed to cover damages for the construction of the pipeline canal.  Accordingly, as in *Vizinat*, the "Damage Release" relied upon by Koch is inapplicable to TPSB's current claims and Koch's motion must be denied in this respect.

## PRESCRIPTION & CONTINUING BREACHES OF CONTRACTUAL AND DELICTUAL DUTIES:

TPSB has brought claims against Koch based in tort and contract.  Although the rules governing contract disputes and breaches are separate and apart from those governing offenses and quasi offenses, these domains can and do overlap where delictual duties arise separate and apart from the contractual duties. *Healthcare Management Services, Inc. v. Vantage Healthplan, Inc.,*32,523 (La. App. 2nd Cir. 12/8/99)*;* 748 So.2d 580, 583.  It has long been recognized by the Louisiana Supreme Court that the same acts or omissions may constitute a breach of both delictual duties and contractual duties thereby giving rise to actions based in both tort and contract. *Short v. Griffin,* 96-0361 (La. 8/21/96); 682 So.2d 249, 253; *United Gas Pipe Line Co., v. Cargill, Inc.*, 612 So.2d 783, 785-86 (La. App. 1st Cir. 1992).  "[W]hen a party has been damaged by the conduct of another arising out of a contractual relationship, the former may have two remedies, a suit in contract [and] an action in tort" and he may seek to recover damages in either or both of the two action. *Federal Ins. Co. v. Ins. Co. of N.A.,* 263 So.2d 871, 873 (La. 1972).

As has been previously stated herein, in *St. Martin v. Mobil,* 1998 WL 474211 at p. 4 (USDC E.D. La. 1998), *affirmed by,* 224 F.3d 402 (5th Cir. 2000), the court was faced with interpreting a servitude agreement that provided in pertinent part:

9

> Grantor does hereby convey to Grantee, its successors and assigns, the right and servitude to dredge, construct and maintain and use a canal...

*St. Martin,* 1998 WL 474211 at p. 4. In *St. Martin*, both the district court and court of appeals held that the inclusion of the term "maintain" within the right of way agreement created a continuing duty to maintain both the canal and the spoil banks/levees necessary to contain them. *St. Martin,* 1998 WL 474211 at p. 4, *affirmed by,* 224 F.3d at 409-410.

In addition to relying on the "Right of Way and Servitude Agreement" TPSB also relies upon a negligence theory based upon articles 667 and 2315 of the Louisiana Civil Code. Pursuant thereto, a servitude Grantee may be liable in tort for damages caused to the servient estate by constructions and/or activities within the right of way. Where, as in the present case, "the damage alleged is not the mere presence of the canals or a static condition related to their existence (e.g. diversion of water as part of their normal course of operation), but an ongoing and cumulatively increasing deterioration of plaintiffs' property adjoining the canals due to defendants' continuing conduct in their failure to maintain the canal banks" the tort is continuous and prescription does not run. *St. Martin,* 224 F.3d at 409 n.8.

In the present case, Koch obtained a right-of-way/use from TPSB, for the purpose of constructing a pipeline, including the right to lay such pipeline in a canal, "not to exceed forty feet in width" across that property owned by TPSB and designated as §16/T18/R13. It is undisputed that Koch's pipeline canal exceeds the forty foot limitation contained in the "Right of Way Agreement" and that several breaks have developed in said canal's levees, thereby allowing the continuous exchange of water into and out of the marsh located within §16/T18/R13. Whether Koch's duty to maintain and restore their canal and the adjacent levees is contractual or delictual, the breach is a continuous one and thus prescription has not begun, because both the

conduct -- the failure to maintain the pipeline canals and restore the property -- and the damages continue to this date. *St. Martin,* 224 F.3d at 409-410 and n.8; *See also Badalamenti v. Chevron Chemical Co.,* 1995 WL 386868, (E.D. La. 1995). The holder of a canal right-of-way, such as Koch, has a duty to abide by the terms of said agreement and more importantly, has continuing contractual and delictual duties not to cause damage to the property subject to said right-of-way/use. *St. Martin,* 224 F.3d at 409-410 and n.8. These obligations include the duty to maintain the spoil banks/levees in such a fashion as to be free of breaks and to maintain said canal within the boundaries set forth therein. *St. Martin,* 224 F.3d at 409-410 and n.8; *Duet v. Louisiana Power and Light Company,* 169 F.Supp. 184 (E.D.La.1958); *Accord, Board of Comm'rs of Port of New Orleans v. Illinois Cent. Gulf R. Co.,* 379 So.2d 838 (La.App. 4 Cir. 1980) *writ denied* 380 So.2d 1210 (La. 1980). Stated another way, just as Koch has a duty to inspect their pipeline and make sure the pipeline is in good repair and not causing damage to TPSB's property, so is Koch under the same duty to repair and maintain the canals and levees used in operation of their pipeline.

In an effort to defeat TPSB's action as prescribed, Koch alleges that TPSB had acquired extensive ***generalized*** knowledge regarding erosion problems in the marshes of Terrebonne Parish including those located within the various section 16's, and that within §16/T18/R13, owned by TPSB. However, such generalized knowledge is insufficient to defeat a continuing breach of a contractual or delictual duty much less put TPSB on notice that defendants, through their acts and/or omissions, have caused damage to the marshes located within §16/T18/R13. Despite Koch's desperate attempt to convince this court otherwise, whether or not TPSB was aware of erosion problems elsewhere that were caused by oil and gas activities or even aware in

11

general that §16/T18/R13 was experiencing erosion problems is immaterial to the issue of whether TPSB had knowledge that the activities of Koch and/or Columbia Gulf were causing erosion of the marsh located within §16/T18/R13. Generalized knowledge or suspicions that damages may be proximately caused by the act or omission of a defendant is insufficient to put a plaintiff on notice that he has a cause of action and that the prescriptive clock has begun running. *Encalade v. Coast Quality Construction Corp.*, 00-925 (La. App. 5th Cir. 10/31/00); 2000 WL 1637657 (plaintiff purchased a new home in 1985 and noticed settling in 1991 which was confirmed by a surveyor, in 1992 a representative for defendant inspected the house, and in 1995 plaintiff hired an engineer who determined the settling was the result of a defect caused by defendant) (copy attached as exhibit "B").

> Prescription does not commence to run until the plaintiff has actual or constructive knowledge of the tortuous act, the damage caused, ***and the causal relationship between the tortuous act and the damage*** .... Mere apprehension that something might be wrong is not sufficient.

*Encalade*, 2000 WL 1637657 at p. 2 (emphasis added); *Beth Israel v. Bartley, Inc.*, 579 So.2d 1066, 1072 (La. App. 4th Cir. 1991). Where expert evaluation is required to provide the link between the defendant's act/omission and the damage, knowledge sufficient to commence prescription cannot be inferred until such time as the expert evaluation is concluded. *Encalade*, 2000 WL 1637657 at p. 2. In the present case, the difficulties encountered in determining the processes involved in marsh erosion, much less whether any particular oilfield canal played a role in causing said erosion can best be explained plaintiff's expert, Dr. Robert Chabreck.[14] According to Dr. Chabreck, although one may have a general knowledge with regard to erosion

---

[14]    In *St. Martin*, the Fifth Circuit recognized Dr. Chabreck's expertise in marshland ecology and erosion. *St. Martin*, 224 F.3d at 405.

of marsh lands as a result of the presence of oil and gas location and pipeline canals, one cannot make a causative link without conducting extensive expert evaluation into the specific causes of said erosion. (See exhibit "A", copy of Affidavit of Robert Chabreck previously filed as Exhibit "J" in support of TPSB's Motion to Exclude Evidence of Studies and Plans on Other Section 16 Lands). Accordingly, TPSB cannot be held to have actual or constructive knowledge of any erosion problems caused by the acts/omissions of defendants on §16/T18/R13. *Encalade,* 2000 WL 1637657 at p. 2; *Beth Israel,* 579 So.2d at 1072.

Additionally, under Louisiana jurisprudence, prescriptive statutes are to be strictly construed against prescription and in favor of the obligation sought to be extinguished; of two possible constructions, that which favors maintaining, as opposed to barring, an action should be adopted. *Bustamento v. Tucker,* 607 So.2d 532, 537, (La. 1992), *Lima v. Schmidt,* 595 So.2d 624, 629 (La.1992) (collecting cases). When a breach of a continuing duty is involved, prescription does not commence to run until the breach is abated, ***and plaintiff's knowledge of the breach is irrelevant.*** *Estate of Patout v. City of New Iberia,* 97-1097, p.9 (La. App. 3rd Cir. 3/6/98), 708 So.2d 526, 531; *affirmed,* 98-0961 (7/7/99), 738 So.2d 544; *Bustamento,* 607 So.2d at 537; *Pearson v. Hartford Accident & Indemnity Co.,* 281 So.2d 724 (La.1973); *Strata v. Patin,* 545 So.2d 1180, 1189 (La.App. 4th Cir.), cert. denied, 550 So.2d 618 (La.1989); See also *Chaney v. State Through Dept. of Health and Human Resources,* 432 So.2d 256, 259-60 (La.1983) (applying similar rule regarding date on which it was alleged plaintiff acquired knowledge of tortious act).

When faced with a breach of a continuing duty, Louisiana courts have consistently ruled since ***South Central Bell Telephone v. Texaco, Inc.,*** 418 So.2d 531 (La. 1982), that prescription does not begin until the breach is abated. **In this case, the defendant's breach of their**

**continuing duty has never been abated not even to this day.** After their use of their canals ceased, defendants simply walked away. Defendants have made no effort to abate the problem. Not only has this case not prescribed; prescription has not yet started to run.

Accordingly, even accepting the irrelevant evidence presented by Koch as to erosion problems on other section 16's and the generalized knowledge regarding erosion problems in the marshes of Terrebonne Parish, Koch has failed in their burden of establishing knowledge sufficient to support a plea of prescription. Without sufficient knowledge to establish a *"causal relationship between the tortuous act and the damage*..., [m]ere apprehension that something might be wrong is not sufficient" to commence prescription. *Encalade,* 2000 WL 1637657 at p. 2 (emphasis added); *Beth Israel,* 579 So.2d at 1072. Therefore, Koch's motion must be denied in this regard.

WHEREFORE, the Terrebonne Parish School Board respectfully prays that this court deny Koch's Motion for Summary Judgment.

Respectfully submitted;

MICHAEL X. ST. MARTIN #12365
JOSEPH G. JEVIC III         #23145
ST. MARTIN & WILLIAMS, APLC
Post Office Box 2017
Houma, LA 70361
(504) 876-3891        Telephone
(504) 851-2219        Facsimile

**and**

**A. J. GRAY, III**         **#6253**
**WADE T. VISCONTE**      **#24734**
**THE GRAY LAW FIRM (APLC)**
Post Office Box 1467
Lake Charles, LA 70602-1467
(337) 494-0694        Telephone
(337) 494-0697        Facsimile
**Attorneys for Terrebonne Parish School Board**

hand delivery

## CERTIFICATE OF SERVICE

    I CERTIFY that a copy of the preceding pleading has been served on all counsel of record by ~~placing same in the United States mail delivery, postage prepaid and properly addressed,~~ on this 2d day of _____ Jan _____, 2000.

JOSEPH JEVIC, III

15

| TERREBONNE PARISH SCHOOL BOARD | § | CIVIL ACTION NO. 00-0319 |
|---|---|---|
| VERSUS | § | SECTION:  B |
| COLUMBIA GULF TRANSMISSION COMPANY, KOCH GATEWAY PIPELINE COMPANY | §<br>§ | MAGISTRATE:   5 |

---

PARISH OF ORLEANS

**AFFIDAVIT OF ROBERT H. CHABRECK**

STATE OF LOUISIANA

BEFORE ME, the undersigned authority, personally came and appeared ROBERT H. CHABRECK, Ph.D. who, being first duly sworn did depose and say as follows:

I have been conducting research in Louisiana Coastal marshes for 40 years and have worked in Terrebonne Parish and the vicinity of Township 18 South, Range 13 East, Section 16 on many occasions. I type-mapped marsh all of southern Louisiana in 1968, 1978, 1988 and 1997 and classified the marsh at issue in this case as coastal fresh marsh. I have conducted marsh studies in other fresh and brackish marsh areas of Terrebonne Parish beginning in 1960 and continuing on to the present time. Attached to this affidavit are copies of my current resume, list of recent cases in which I provided expert testimony, and publications list, all of which are adopted herein by reference.

I am familiar with the Terrebonne Parish School Board property in Section 16, Township 18 South, Range 13 East ("Section 16" or School Board property"), in Terrebonne Parish at the site of natural gas pipeline operations by Columbia Gulf Transmission Company and Koch Gateway Pipeline Company (collectively referred to as "Defendants"). Canals have been constructed on the Terrebonne Parish School Board property. I have examined the site previously on several occasions, including August 14, 2000, and September 9, 2000, and I am generally familiar with it. I understand



EXHIBIT

*A*

that Terrebonne Parish School Board is the owner of property and has filed suit against Defendants for damages to that property. The property is bordered on all sides by land owned by Continental Land & Fur Company.

Prior to construction of the canal system dredged by the Defendants, much of the marsh in Section 16 could be classified as flotant or floating freshwater marsh. Floating marshes in Terrebonne Parish are a product of subsidence. These marshes actually began as wet prairies containing grasses, sedges, and other herbaceous plants growing on firm mineral soil (silts and clays) originally deposited as alluvial sediments by the Mississippi River. The plants were firmly rooted in the mineral soil and were able to resist water currents and erosion.

After the Mississippi River abandoned this region, including Terrebonne Parish, and active sedimentation ceased, the region was subject to fairly rapid subsidence. After many years, the mineral soil deposited by the river had subsided to a depth in some areas that plant roots were unable to reach for attachment. As the mineral soil subsided, residue from plants was deposited each year to form new soil. Wet soil produces anaerobic conditions that resist decomposition and allow plant residue to accumulate and form new soil. In the absence of river sediment, the new soil was highly organic and much lighter in weight than the original mineral sediment. In fact, plant debris is so light that it will only accumulate in an area that is free of tidal currents and water movement. With only a slight current, the plant particles will be carried away.

As the mineral soil continued to subside, the organic layer continued to build and a floating mat of plant residue developed. The depth to the mineral soil below floating mats in some areas of Terrebonne Parish was as much as several feet. A band of water often exists between the floating mat and the mineral soil.

The long-term maintenance of floating mats, like their creation, requires the absence of water

movement or currents that will erode the light-weight organic particles from the floating mats. The greatest erosion is from the bottom of the floating mats where particles are less consolidated, and plant roots are not present to hold the particles together. Within a period of several months to a year, a large floating mat can erode away when subjected to frequent and strong water currents.

Freshwater marsh and swamp on the Terrebonne Parish School Board property developed under wet and waterlogged conditions and with no water movement or currents to erode and export plant residue that fell to the marsh surface. As a result, organic matter accumulated in the soil and was the principal component of the upper layers of the soil.

Marsh is damaged or destroyed in two ways, by natural and man-made causes.   One of the man-made causes is pipeline canals. The canals cause loss in two general ways. Marsh is destroyed when marsh is actually dredged out to create a canal and when spoil from dredging is placed to create levees that destroy the area of marsh where the levees are formed. These types of marsh loss are known as direct impacts.

However, marsh loss can also be caused by indirect impacts. There are numerous natural and man-made causes that can lead to indirect impacts of wetlands. The specific cause or causes of damage to each piece of property or area of marsh are individual and unique.  In other words, just because one piece of property suffers from direct and indirect impacts due to one cause or causes does not mean that another piece of land will suffer direct and indirect impacts due to the same cause or causes.

For example, saltwater intrusion through breaks or breaches in pipeline canals may be the cause of destruction on one piece of land while waves from boat traffic through breaks or breaches in pipeline canals on another piece of marsh property may be the cause of marsh loss on that other piece of property.  Since every piece or area of marsh property owned by Terrebonne Parish School

Board may be destroyed or damaged in a unique way, field studies and investigations must be conducted to determine the exact causes of marsh damage and extent of damage. Even though historical aerial photographs may show that a piece of property is apparently eroding and damaged as the result of oil and gas activities, theories of damage must be tested or confirmed through field work. For example, saltwater intrusion cannot be confirmed until water samples are taken in a freshwater marsh.

The damages to Section 16 are related to the pipeline canals dredged by the Defendants through Section 16 for the purpose of natural gas operations. The purpose of canal levees is to prevent drainage and erosion of the adjacent marshes by a canal. The canals in Section 16 were not properly maintained, and levees along the canals were allowed to deteriorate, so that breaks or breaches were formed in the levees and allowed to remain over a period of several years.

The breaches in the levees along the canals provided a connection that hydrologically linked tidal waters of Little Horn Bayou, Atchafalaya River, and Gulf of Mexico to sensitive, floating freshwater marsh in Section 16. The surging or flushing action associated with tidal cycles has gradually eroded the organic soil of the marsh and flushed it out through the levee openings. As a result of the erosive action, healthy freshwater marsh in Section 16 has been converted to open water and has allowed water hyacinths, an exotic pest plants, to spread over much of the Terrebonne Parish School Board property. The results of my field work to determine the causes of damage and extent of damage on the School Board's property are outlined in the following attached reports which are adopted herein by reference: (1) "Thickness of the Marsh Root Mat in Section 16, T18S-R[1]3E, Terrebonne Parish, Louisiana, (2) "Evaluation of Damages

To Property of the Terrebonne Parish School Board in Township 18 South, Range 13 East," and (3) "Field Survey of Wetland Damage Associated with Pipelines in Section 16, T18S-R13E, Terrebonne

Parish, Louisiana."

_s// Robert H. Chabreck, Ph. D._

**ROBERT H. CHABRECK, Ph.D.**

SWORN TO AND SUBSCRIBED before me in ___New Orleans___,

___Louisiana___ this 28th day of ___December___, 2000.

Original Signed By
~~Joseph G. Jevic III~~
Notary Public

I hereby certify that the foregoing is a true and correct copy of the
Affidavit of Robert H. Chabreck that was signed by Affiant on
December 28, 2000 and notarized by the undersigned on the
Same date.

Joseph G. Jevic III    1-2-01
Notary Public

5 of 5

2000 WL 1637657                                                                                      **Page 1**
**(Cite as: 00-925 (La.App. 5 Cir. 11/2/00), 2000 WL 1637657 (La.App. 5 Cir.))**

NOTICE: THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL
RELEASED, IT IS SUBJECT TO REVISION OR
WITHDRAWAL.

Court of Appeal of Louisiana,
**Fifth Circuit.**

Sandra Ancar ENCALADE, Leander Encalade and
Arika L. Ancar
v.
COAST QUALITY CONSTRUCTION
CORPORATION d/b/a Sunrise Homes, Inc.

No. 00-CA-925.

Oct. 31, 2000.

Current and former home purchasers filed petition for
breach of warranty, rescission of sale against vendor.
The Twenty-Fourth Judicial District Court, Parish of
Jefferson, No. 474-654, Ross P. Ladart, J., granted
vendor's exception of prescription, and purchasers
appealed. The Court of Appeal, Cannella, J., held that
purchasers did not have constructive knowledge of
home defect until second engineer's report showed that
12 inch differential in elevation caused home to be
**structurally** unsound, and thus, one year prescriptive
period for filing action in redhibition began to run on
date purchasers received engineer's report.

Reversed and remanded.

[1] Limitation of Actions ⬤⟲95(9)

241k95(9)

Home purchasers did not have constructive knowledge
of home defect until second engineer's report showed
that 12 inch differential in elevation caused home to be
**structurally** unsound, and thus, one year prescriptive
period for filing action in redhibition against vendor
began to run on date purchasers received report, where
prior report by engineer stated that home was
**structurally** functional, purchasers made effort to
investigate problem, and purchasers complied with
vendor's request to get expert opinion. LSA-C.C. art.
2534.

[2] Vendor and Purchaser ⬤⟲123
400k123

A builder/seller of a home is presumed in redhibition
action to know of the defects existing therein.

[3] Limitation of Actions ⬤⟲95(9)
241k95(9)

Prescription in an action in redhibition does not
commence until a home purchaser discovers the defect;
further, after the redhibitory defect is discovered by the
purchaser, prescription does not commence until the
seller abandons all attempts to remedy the defect. LSA-
C.C. art. 2534.

[4] Vendor and Purchaser ⬤⟲113
400k113

Before home purchasers could bring action in
redhibition against vendor, they needed to allege one of
the basic elements of the action, that is, that house was
either absolutely useless for its intended purpose or its
use was so inconvenient or imperfect that, judged by
reasonable person standard, had they known of defect,
they would never have purchased home. LSA-C.C. art.
2520.

[5] Limitation of Actions ⬤⟲95(3)
241k95(3)

Prescription does not commence to run until plaintiff
has actual or constructive knowledge of the tortious act,
the damage caused, and the causal relationship between
the tortious act and the damage.

[6] Limitation of Actions ⬤⟲95(3)
241k95(3)

A person cannot bring a tort suit until his cause of
action has accrued, and therefore, prescription cannot
run until that time; mere apprehension that something
might be wrong is not sufficient.
APPEAL    FROM    THE    TWENTY-FOURTH
JUDICIAL    DISTRICT    COURT    PARISH    OF
JEFFERSON,    STATE    OF    LOUISIANA    NO.
474-654, DIVISION "O" HONORABLE ROSS P.
LADART, JUDGE.

Stephen C. D'Antoni, Cronvich, Wambsgans &
Michalczyk, Metairie, Louisiana, Attorney for
Appellants Sandra and Leander Encalade.

Michael J. Gautier, Jr., LeBlanc, Miranda, Warwick &
Milazzo, Metairie, Louisiana, Attorneys for Defendant/
Appellees Coast Quality Construction Corporation d/b/

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works


EXHIBIT
B

a Sunrise Homes, Inc.

Panel composed of Judges JAMES L. CANNELLA, H. CHARLES GAUDIN, Pro Tempore and JAMES C. GULOTTA, Pro Tempore.

CANNELLA, Judge.

**1 *2 This an appeal by Plaintiffs, Sandra and Leander Encalade, from a trial court judgment which grants a defense motion of prescription and dismisses Plaintiffs' case. For reasons that follow, we reverse.

This matter began with a "Petition for Breach of Warranty, Rescission of Sale" filed by Plaintiffs and Arika Ancar. Named as Defendants were Sunrise Homes, Inc., and Coast Quality Construction Corporation d/b/a Sunrise Homes, Inc. (Sunrise). The petition alleges that Sunrise sold certain immovable property to Plaintiffs and specifically gave and conveyed to Plaintiffs a ten year **structural** warranty on the property. According to the petition, the home has a differential settlement caused from the failure of pilings supporting the concrete slab and superstructure which renders the building **structurally** unsound. The damage caused by the faulty construction is about $36,000.

In response, Sunrise filed an exception of prescription arguing that the claim is an action in redhibition which must be brought within one year of when the Plaintiffs knew or should have known of the defect. The exception maintains that since the house was sold in 1986 and the Plaintiffs discovered the damage in 1991, this action, filed in 1995, is prescribed. After hearing arguments and reviewing the record, the trial court granted the exception and dismissed Plaintiffs' case. It is from this ruling that Plaintiffs appeal.

The record reveals the following facts which are not in dispute. On March 15, 1985, Sunrise sold a house located at 3736 Sue Ker Drive in Harvey, Louisiana to Sandra Ancar and her sister, Arika Ancar. On August 18, 1986, Leander Encalade, Sandra Ancar's fiance, purchased the same property from the two sisters. Plaintiffs were subsequently married and have lived in the home continuously since it was purchased.

Plaintiffs noticed settling of the house and on April 2, 1991obtained a slab or elevation survey from Wilton Dufrene, a land surveyor. He reported a seven inch differential from the front of the house to the rear. Plaintiffs tried to contact Sunrise to resolve the

situation, but received no response. Next, Plaintiffs contacted the Better Business Bureau (BBB) for help resolving their problems. On April 6, 1992, William Steinhardt, a representative of Sunrise, responded in writing to the BBB. In that correspondence he stated that he inspected the house, was unable to discern if there was a **structural** failure, and would need a **structural** engineering report to make a proper evaluation. To comply with Sunrise's request, Plaintiffs hired John Grieshaber, an engineer, to perform the **structural** engineering test. In a report dated October 2, 1992, he concluded that "(t)he building is **structurally** functional in its current condition at this time". Two weeks later Plaintiffs received a letter indicating that Sunrise would take no action to help.

*3 Time passed and Plaintiffs noticed more settling of their home and decided to get another survey. They commissioned a slab or elevation survey from Wilton Dufrene. His report, completed on December 13, 1994, showed a twelve inch differential from the front to the rear of the house. Plaintiffs hired an engineer, Daniel Pouwels, to offer an opinion as to the **structural** condition of the house. He inspected the house on January 20, 1995 and concluded that the one foot differential was "excessive and alarming". Plaintiffs filed this action against Sunrise on February 16, 1995.

**2 Sunrise does not contest the facts as presented by Plaintiffs. Sunrise contends that Plaintiffs knew or should have know of the sinking problem in 1991 when they received the first report and, therefore, this action in redhibition filed in 1995 is prescribed.

[1] LSA-.C.C. article 2520, in pertinent part, provides that:

A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.
A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price.

[2][3] It is well settled that a builder/seller of a home is presumed to know of the defects existing therein. Prescription does not commence in such cases until the

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

purchaser discovers the defect. Further, after the redhibitory defect is discovered by the purchaser, prescription does not commence until the seller abandons all attempts to remedy the defect. Panagiotis v. Gauthier- Matherne Homes, Ltd., 571 So.2d 881 (La.App. 3 rd Cir.1990). Thus, Plaintiffs had one year from the date the defect was discovered and Sunrise abandoned all attempts to remedy the defect. LSA-C.C. article 2534.

[4] Before Plaintiffs could bring an action in redhibition, they needed to allege one of the basic elements of the action, that is, that the house is either absolutely useless for its intended purpose or its use is so inconvenient or imperfect that, judged by the reasonable person standard, had they known of the defect, they would never have purchased it. Vincent v. Hyundai Corporation, 633 So.2d 240, 243 (La.App. 1 st Cir.1993), writ denied, 93-3118 (La.2/11/94), 634 So.2d 832.

[5][6] As explained in Beth Israel v. Bartley, Inc., 579 So.2d 1066,1072, (La.App. 4 th Cir.1991):

> Prescription does not commence to run until the plaintiff has actual or constructive knowledge of the tortious act, the damage caused, and the causal relationship between the tortious act and the damage. A person cannot bring suit until his cause of action has accrued and therefore prescription cannot run until that time. Mere apprehension that something might be wrong is not sufficient. (Citations omitted)

We believe that Plaintiffs did not have constructive knowledge of an element of the action until the second engineer's report showed that the twelve inch differential in the elevation caused the house to be **structurally** unsound. Plaintiffs made an effort to investigate a problem which they saw developing. They notified the builder of the situation, but were forced to seek help from the BBB to get an initial response. Plaintiffs complied with Sunrise's request to get an expert opinion on whether the elevation differential created a **structural** problem in the home. That engineer's report showed that in 1992, the home was **"structurally** functional in its current condition at this time". It was not until the January, 1995 report which stated that "if this house continues to settle, it may result in **structural** failure and/or and unsafe condition", that Plaintiffs had constructive notice of an essential element of redhibition.

**\*\*3** We find that the date of that report, January 20, 1995, is the commencement of the prescriptive period. Accordingly, this action, filed on February 16, 1995, less than one month later, is timely.

For the foregoing reasons the judgment of trial court granting the exception of prescription is reversed and Plaintiffs' action is reinstated. This matter is remanded for further proceedings. All costs of this appeal are assessed to Sunrise.

REVERSED AND REMANDED.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TERREBONNE PARISH SCHOOL BOARD | ) | CASE NO.: 00-0319 |
| VERSUS | ) | SECTION: "B" |
| KOCH TRANSMISSION | ) | MAGISTRATE: 5 |
| COMPANY, and KOCH GATEWAY | ) | |
| PIPELINE COMPANY | ) | |
| _____ | ) | |

## RESPONSE OF TERREBONNE PARISH SCHOOL BOARD TO UNDISPUTED STATEMENT OF FACTS SUBMITTED IN SUPPORT OF KOCH'S MOTION FOR SUMMARY JUDGMENT

TERREBONNE PARISH SCHOOL BOARD, ("TPSB"), responds as follows to Koch

Transmission Company's Statement of Undisputed Material Facts:

### STATEMENT NO.1:

The Terrebonne Parish School Board ("TPSB") alleges in its Petition that it has owned all

Section 16, Township 18 South, Range 13 East in Terrebonne Parish, Louisiana.

### RESPONSE TO STATEMENT NO. 1:

Admitted subject to the qualification that the Petition of TPSB speaks for itself and is the best

evidence of its contents.

**STATEMENT NO. 2:**

On December 18, 1957, TPSB granted a right-of-way and servitude agreement in favor of Koch, a copy of which is attached as Exhibit "1" in support of Koch's Motion for Summary Judgment.

**RESPONSE TO STATEMENT NO. 2:**

Admitted.

**STATEMENT NO. 3:**

Also on December 18, 1957, TPSB executed in favor of Koch a release document, a copy of which is attached as Exhibit "2" in support of Koch's Motion for Summary Judgment.

**RESPONSE TO STATEMENT NO. 3:**

Admitted only to the extent that on December 18, 1957, the School Board executed a "release" and not to the extent that said "release" settled TPSB's claims in this case.

**STATEMENT NO. 4:**

In connection with the right-of-way and servitude agreement, Koch paid TPSB $366.60 for same.

**RESPONSE TO STATEMENT NO. 4:**

Admitted subject to the qualification that the right-of-way and servitude agreement is the best evidence of its contents.

**STATEMENT NO. 5:**

Pursuant to the damage release, exhibit 2, Koch paid $1,466.40 to TPSB.

**RESPONSE TO STATEMENT NO. 5:**

Admitted only to the extent that on December 18, 1957, the School Board received the $1,466.40 provided for in the "release". Denied to the extent that said "release" and $1,466.40 received settled TPSB's claims in this case.

**STATEMENT NO. 6:**

Subsequent to execution of the right-of-way agreement and damage release, Koch and/or its contractor dredged a flotation canal on TPSB's Section 16 property, which flotation canal was approximately 40 feet in width.

**RESPONSE TO STATEMENT NO. 6:**

Admitted only to the extent that the pipeline was "laid" in a pipeline canal and that the pipeline canal is still being used as it contains the Koch pipeline, which is currently transporting natural gas.

**STATEMENT NO. 7:**

During dredging of this flotation canal, Koch and/or its contractors deposited material removed from the ditch onto either side of the canal, creating "spoil banks."

**RESPONSE TO STATEMENT NO. 7:**

Admitted subject to the qualification that the spoil was placed along the banks of the pipeline canal, not a ditch.

**STATEMENT NO. 8:**

Since Koch and/or its contractor originally dredged the canal in approximately 1958, neither Koch nor any contractors working therefore have done any additional dredging of the canal located in TPSB's property, nor deposited any additional materials onto the "spoil banks," or otherwise performed any activities in connection with the spoil banks located on TPSB's property.

**RESPONSE TO STATEMENT NO. 8:**

Admitted.

**STATEMENT NO. 9:**

Prior to filing this lawsuit in October 1999, TPSB never made demand, whether formal or informal, judicial or otherwise, upon Koch to backfill Koch's canal located on TPSB's property, or maintain or perform any work in connection with the spoil banks adjacent thereto.

**RESPONSE TO STATEMENT NO. 9:**

Denied as written.  TPSB was under no obligation to "ask" that Koch honor its contractual

obligations and comply with the obligations imposed on Koch by Louisiana law.  See La. C.C. arts.

743 and 745.

Respectfully submitted,

_____
**MICHAEL X. ST. MARTIN  #12365**
**JOSEPH G. JEVIC III           #23145**
ST. MARTIN & WILLIAMS, APLC
Post Office Box 2017
Houma, LA 70361
(504) 876-3891          Telephone
(504) 851-2219          Facsimile

**A. J. GRAY, III             #6253**
**WADE T. VISCONTE      #24734**
**THE GRAY LAW FIRM (APLC)**
Post Office Box 1467
Lake Charles, LA 70602-1467
(337) 494-0694          Telephone
(337) 494-0697          Facsimile
**Attorneys for Terrebonne Parish School Board**

**CERTIFICATE OF SERVICE**

I CERTIFY that a copy of the preceding pleading has been served on all counsel of record by
~~placing same in the United States mail delivery, postage prepaid and properly addressed,~~ hand delivery on this 2d

day of ____Jan_____, 2000.

_____
JOSEPH JEVIC, III

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TERREBONNE PARISH SCHOOL BOARD | ) | CASE NO.: 00-0319 |
| VERSUS | ) | SECTION: "B" |
| KOCH TRANSMISSION | ) | MAGISTRATE: 5 |
| COMPANY, and KOCH GATEWAY | ) | |
| PIPELINE COMPANY | ) | |
| | ) | |

## STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXIST A GENUINE ISSUE TO BE TRIED IN OPPOSITION TO KOCH GATEWAY PIPELINE COMPANY'S MOTION FOR SUMMARY JUDGMENT

TERREBONNE PARISH SCHOOL BOARD, ("TPSB"), submits the following Statement of Material Facts As To Which There Exist A Genuine Issue To Be Tried In Opposition To Motion For Judgment on the Pleadings filed by Koch Gateway Pipeline Company ("Koch").

1.	There is a genuine issue of material fact as to whether or not the Koch pipeline canal and breaches in the pipeline canal have caused erosion and other damage to the Terrebonne Parish School Board's property located in Section 16, Township 18 South, Range 13 East, Terrebonne Parish, Louisiana.

2.     There is a genuine issue of material fact as to the extent the Koch pipeline canal system, including the levees and any breaks or cuts in the levees, should be repaired and maintained to prevent further erosion/damage to the TPSB property.

3.     There is a genuine issue of material fact as to the obligation of Koch to restore TPSB's property to its original condition prior to the dredging of the Koch pipeline canal.

4.     There is a genuine issue of material fact as to the extent to which the Koch pipeline canal system is necessary for operation of the Koch pipeline.

5.     There is a genuine issue of material fact as to the extent of damage caused to the TPSB property by improper maintenance of the Koch pipeline canal system, including marsh adjacent to both sides of the Koch pipeline canal system, subsequent to the dredging of the Koch pipeline canal.

6.     There is a genuine issue of material fact as to the extent of damage from other sources, if any, caused to the TPSB property prior to the dredging of the Koch pipeline canal and pipeline canal system.

7.     There is a genuine issue of material facts as to the "value" of the TPSB property and the elements to consider in determining "value."

8.     There is a genuine issue of material facts as to the proper method of restoring the property and reasonableness of the restoration plan proposed by TPSB's experts.

9.     There is a genuine issue of material fact in determining the value of benefits Koch received from transporting gas through the pipeline on the TPSB property as balanced against the damage caused to the TPSB property as a consequence of the operations of the Koch gas pipeline.

10.    There is a genuine issue of material fact whether the Koch pipeline canal has benefited the TPSB property.

11.    There is a genuine issue of material fact whether tidal flows into and out of the marsh are strong enough to damage and/or destroy the flotant marsh.

12.    There is a genuine issue of material fact as to the width of the Koch pipeline canal at the time the pipeline canal was dredged and whether the canal has eroded and is a greater width than when originally dredged.

13.    There is a genuine issue of material fact as to the amount of widening of the Koch pipeline canal that has occurred.

14.    There is a genuine issue of material fact whether Koch pipeline canal is being used to conduct operations of Koch's natural gas pipeline.

15.    There is a genuine issue of material fact regarding the extent and scope of the "Damage Release" and whether it encompassed and settled the claims of TPSB in this case.

Respectfully submitted,

_____

**MICHAEL X. ST. MARTIN  #12365**
**JOSEPH G. JEVIC III        #23145**
ST. MARTIN & WILLIAMS, APLC
Post Office Box 2017
Houma, LA 70361
(504) 876-3891        Telephone
(504) 851-2219        Facsimile

**and**

**A. J. GRAY, III**        **#6253**
**WADE T. VISCONTE**        **#24734**
**THE GRAY LAW FIRM (APLC)**
Post Office Box 1467
Lake Charles, LA 70602-1467
(337) 494-0694        Telephone
(337) 494-0697        Facsimile

**Attorneys for Terrebonne Parish School Board**

### CERTIFICATE OF SERVICE

hand delivery  I CERTIFY that a copy of the preceding pleading has been served on all counsel of record by ~~placing same in the United States mail delivery, postage prepaid and properly addressed,~~ on this 2d day of ____Jan_____, 2001.

_____
JOSEPH JEVIC, III