FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JAN -2 AM 2:44

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TERREBONNE PARISH SCHOOL BOARD** | § | **CIVIL ACTION NO. 00-0319** |
| **VERSUS** | § | **SECTION: B** |
| **COLUMBIA GULF TRANSMISSION COMPANY AND KOCH GATEWAY PIPELINE COMPANY** | § § | **MAGISTRATE: 5** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### OPPOSITION TO COLUMBIA GULF TRANSMISSION COMPANY'S MOTION IN LIMINE TO EXCLUDE VALUATION TESTIMONY OF PLAINTIFF'S EXPERT PENLAND

**MAY IT PLEASE THE COURT:**

Plaintiff, Terrebonne Parish School Board ("TPSB"), submits this opposition to Columbia Gulf Transmission Company's ("Columbia Gulf"), Motion in Limine to partially exclude the testimony of Plaintiff's expert, Shea Penland.

### Facts

The general facts of this case are provided in TPSB's memorandum in support of motions in limine to exclude Koch Gateway Pipeline Company's experts. For the sake of brevity, those general facts are adopted by reference herein.



Regarding Columbia Gulf's motion in limine to exclude TPSB's expert, Shea Penland has worked extensively in valuing and restoring wetlands in the publicly funded programs commonly known as Coast 2050 and Coastal Wetlands Protection Preservation and Restoration Act. Columbia Gulf has moved to partially exclude the testimony of Shea Penland on the issue of valuation of TPSB's property. For the reasons outlined herein, it is apparent that Columbia Gulf's motion in limine is without merit and must be denied.

## LAW

The law applicable to Columbia Gulf' motion in limine is stated in TPSB's Opposition to Koch Gateway Pipeline Company's Motions in Limine to exclude the testimony of Plaintiff's experts and will not be restated but is adopted by reference herein.

## ANALYSIS

TPSB provided a detailed analysis explaining the methodology used and qualifications of Dr. Shea Penland in its Opposition to Koch's Motions in Limine to exclude the testimony of Plaintiff's experts, including Dr. Penland. For the sake of brevity, TPSB will not restate its prior arguments and analysis, but TPSB adopts by reference herein the section of its Opposition to Koch's Motions in Limine to Exclude Plaintiff's Experts addressing the qualifications and methodology of Dr. Penland, said section being contained in pages 3-9 of TPSB's Opposition.

Next, Columbia Gulf refers to the deposition of Leonard Shabman, its economist expert, as authority for the argument that only a traditional market analysis applies in determining the value of TPSB's Section 16 marsh property. Shabman opines that the Costanza paper, "The Value of the World's Ecosystem Services and Natural Capital," has "received significant and universal

negativecomment from within the economics profession."[1] However, Shabman notes in his report that there were "<u>two economists</u>" who were co-authors of the Costanza article.[2] Apparently, the criticism is not as "universal" as Columbia Gulf would have this Court believe if "traditional" economists participated in authoring the Costanza paper. The two economists are Steven Farber and Ralph D'Arge. Mr. D'Arge is emeritus professor at the University of Wyoming, and according to Shabman, is in the filed of "resource and environmental economics," <u>i.e.</u>, the same field of Shabman.[3] Farber has worked extensively in the wetlands of Louisiana.

Shabman also admitted that Costanza has received "positive responses within the economics profession."[4] Shabman acknowledged that criticism of Costanza's work is limited to those who work in the "traditional" economic realm and that many scientists within the field of "ecology" subscribe to Costanza's valuation analysis.[5]

The "traditional" economic experts of defendants have opined that social values are not appropriate in this case to value TPSB's land, while TPSB's submits that there is widespread acceptance from scientists in the ecological realm who commonly use social values when determining the value of wetlands for purposes of restoration. Hence, the Court is presented with a situation where a technical or specialized field is criticizing the work of a scientific field. TPSB submits that the legal conclusions of defendants' economic experts are not admissible under F.R.E.

---

[1] See ¶ 3, pg. 5 of report of Leonard Shabman, a copy is attached to this Opposition as Exhibit "A."

[2] See ¶ 3, pg. 5 of report of Leonard Shabman, a copy is attached to this Opposition as Exhibit "A."

[3] See pg. 114, lines 18-25, pg. 115, lines 1-9, of deposition of Leonard Shabman, a copy of the relevant portion of his deposition is attached to this Opposition as Exhibit "B."

[4] See pg. 72, lines 1-10, of deposition of Leonard Shabman, a copy of the relevant portion of his deposition is attached to this Opposition as Exhibit "B."

[5] See pg. 72, lines 13-25, pg. 73, lines 1-7, of deposition of Leonard Shabman, a copy of the relevant portion of his deposition is attached to this Opposition as Exhibit "B."

702 and 704. Nonetheless, TPSB submits that, for the reasons outlined in the Opposition to Koch's motions in limine, Dr. Penland is qualified and followed a reliable methodology is reaching his opinions on the valuation of TPSB's property. Hence, Penland's testimony is admissible, and it is left to this more than capable Court to determine to the weight to be given to Dr. Penland and/or Columbia Gulf's expert, Leonard Shabman.

                Respectfully submitted,

                **THE GRAY LAW FIRM (APLC)**

                */s/ Wade Visconte*
                A. J. GRAY, III    #6253
                **WADE T. VISCONTE**  #24734
                Post Office Box 1467
                Lake Charles, LA 70602-1467
                (337) 494-0694    Telephone
                (337) 494-0697    Facsimile

                **MICHAEL X. ST. MARTIN  #12365**
                **JOSEPH G. JEVIC III**    #23145
                ST. MARTIN & WILLIAMS, APLC
                Post Office Box 2017
                Houma, LA 70361
                (504) 876-3891    Telephone
                (504) 851-2219    Facsimile
                **Attorneys for Terrebonne Parish School Board**

## CERTIFICATE OF SERVICE

I CERTIFY that a copy of the preceding Opposition together with the aforementioned supportive pleadings and exhibits, have been served on all counsel of record via hand delivery, facsimile transmission or by placing same in the United States mail delivery, postage prepaid and properly addressed, on the _2nd_ day of _January_, 2001.

_____
WADE T. VISCONTE

**Privileged and Confidential**

## Valuation of Coastal Louisiana Wetlands for the case of Terrebonne Parish School Board v. Columbia Gulf et. al.

Statement prepared by

Dr. Leonard Shabman
PO Box 47
Reedville VA 22539
Blacksburg VA 24060

November 13, 2000

      I am a full professor in the Department of Agricultural and Applied Economics, and am director of the Virginia Water Resources Research Center at Virginia Tech. In 1972 I earned a Ph.D. in Agricultural Economics from Cornell University, with a specialization in resource and environmental economics. I have been on the faculty at Virginia Tech since 1972. My principal teaching responsibilities in the past 25 years have been M.S. and Ph.D. courses in environmental economics and in the methodology of economics. The productivity and professional credibility of my resource and environmental economics research program, as well as my extensive consulting and advisory experience, is documented in the abbreviated and in the comprehensive professional curriculum vitae included with this statement.

      I have expertise in the design of economic evaluation procedures for water project analysis, in applied benefit cost analysis and in wetlands policy and program design. In my work on economic valuation of wetlands services I have stressed the importance of employing conceptually correct economic frameworks. In this comment, I will describe a professionally appropriate economic framework for wetlands valuation in this case. I also will comment on the valuation estimates the plaintiffs for the present lawsuit have made for the marshland property located in Township 18 South, Range 13 East, Section 16, Terrebonne Parish, Louisiana which is owned by the Terrebonne Parish School Board. I will conclude that the plaintiffs valuation claims are logically and technically flawed.

I. Background

      A pipeline canal constructed, operated and maintained by the Columbia Gulf Transmission Company crosses a square mile section of wetlands in Terrebonne Parish, Louisiana. In the Terrebonne Parish School Board v. Columbia Gulf et. al., the plaintiffs are requesting monetary compensation for damages ascribed to a loss of wetlands caused by the construction, operation and maintenance of the pipeline canal. Should the court determine that Columbia Gulf Transmission Company's pipeline caused wetland loss in a measurable amount, a proper measure of compensatory monetary damages would need to calculated as the award to the school board.

      The school board argues that the Columbia Gas Transmission Company pipeline caused a change in the hydrologic regime with resulting conversion of wetlands to open

1


EXHIBIT A

**Privileged and Confidential**

water, resulting in a loss of the income producing potential of the marsh. The type of wetlands in the area of the pipeline has been described as a "floating mat marsh". A floating mat marsh is plant material that may at places be several feet thick. The water depth to the soil below the floating mat may also be several feet. This marsh type cannot support commercial activities such as construction or agriculture.

The school board seeks compensation for alleged damages as a result of the loss of the marsh The plaintiffs submitted two statements in support of their compensation claim. One statement was prepared by Dr. Shea Penland on September 13, 2000. Dr Penland's statement relies on the work of Dr. Robert Costanza, rather than on his own research, for making an economic value estimate. In addition, the plaintiffs submitted a statement prepared by Charles C. Camp on September 12, 2000. That statement provides three estimates of the cost for restoring the open water areas to wetlands.

## II. Correct procedures for calculating the plaintiffs damage claim

The plaintiffs seek compensation for the income opportunities that are lost if marketable services of the wetlands are lost. A *marketable wetlands service* has two characteristics: 1) users of the wetlands service are willing to make a cash payment to the wetlands owner rather than go without the service, and 2) the owner of the wetlands is able to prevent those who do not make a payment from benefiting from the marsh service. For floating mat marsh, marketable services might include any of the following: hunting lease rights sold to private individuals or hunting clubs; sales to persons or groups of individuals for exclusive recreational use; rights to harvest of fish and wildlife for commercial purposes; the right to explore for oil, gas or other minerals (I understand that rights to oil and gas beneath the wetlands may accrue to the state of Louisiana if the wetlands are lost). Given the location and structural character of floating mat wetlands, there is no prospective future development value for housing or commercial activity.

Valuation of the marketed services for a specific wetlands acre can be based on either of two different approaches. The first approach is termed a rent capitalization calculation in the economics literature and is called the net income approach in the real estate appraisal profession. In the net income approach the anticipated annual net income from each of the services provided by the wetlands is projected for future years and discounted, at a suitable market interest rate, to present value. For example, one service might be annual hunting lease sales. If such leases could be sold at $10 per acre each year and if this were the only marketed service, at a 10 per cent discount rate, the present value of the future income stream would be $100. This present value is the future income loss from forgone hunting lease sales. If some other service could be provided by the wetlands acre then the annual value of that service could be calculated, its present value determined and the result added to the value of the hunting leases.

A second approach to valuation of marketed services uses land price information. It is understood that land market traders recognize the different marketable services provided by a wetlands area. Therefore, the land-market price paid for floating mat wetlands would reflect the present value of the future income stream that can be earned

2

**Privileged and Confidential**

from the wetlands. One means of land price valuation is to use a statistical analysis of wetlands sales data from the land market. The statistical analysis (called hedonic-price analysis in the economics literature) recognizes the effects of different variables (for example, location to population centers) that influence prices paid for a wetlands. The resulting statistical model is then used to predict what the lost wetlands acre would have sold for in the land market. A second means for land price valuation relies on a professional land appraiser to collect prices paid for comparative wetlands in the area. These professional appraisers, employing the comparable sales approach, match the attributes of the site in question with similar properties nearby. They then, in consideration of the common attributes among sites, make an estimate of the market price that might have been paid for the wetlands. Most real estate appraisals for local property tax assessment purposes follow the comparable sales approach.

A marketed services approach is the technically valid approach for the plaintiff's damage claim. Such an approach could be based on a net income procedure, a comparable sales method or a blending of information from the two approaches. A professional appraiser who is familiar with the area in close proximity to the wetlands in question would be in the best position to select the valuation approach and provide a definitive value estimate.

### III. The plaintiff's valuation estimates are neither relevant to their claim nor professionally credible

Marketed wetland services are not the only services that might arise from a wetland site. *Non-marketed* services are those that accrue to the society at large, but a wetland owner has difficulty excluding those who do not pay from enjoying the service. An example of a non-marketed service of wetlands is fishery habitat. A wetlands acre might provide a nursery ground for fish that are harvested miles away in the Gulf of Mexico. Commercial fishing businesses in the Gulf receive the benefit of that wetlands nursery ground, but they do not need to make a payment to the wetland owner for that service. Therefore, a loss to the commercial fishery that may result from the loss of a specific acre of wetlands is a damage to the commercial fishing firm, but *not* to the wetlands owner. More generally, when non-marketed services are compromised, there may be some loss to society at large, but not a loss to the wetlands owner. The value estimates reported by Dr. Penland to support the damage claims of the plaintiffs are for social values. These are not damages to the owners of the marsh.

It is true that a number of possible non-marketed services can be listed for wetlands. The plaintiffs, in the statement of Dr. Penland, provide such a list. If a non-marketed service can be shown to be present for a specific wetlands acre then its social valuation in economic terms (money equivalent terms) requires analytical methods that determine what the demand for, and price of, the service would have been had it been possible to market the service. Because demand is the market expression of consumers' willingness to pay, valuation of non-marketed services in money equivalent terms requires carefully designed willingness to pay (and willingness to accept compensation for loss) studies.

Privileged and Confidential

Following standard economic logic, estimates of willingness to pay may be derived from either revealed preference or hypothetical choice valuation procedures. Revealed preference procedures use market price data for related goods and services to draw inferences about the demand and value of a non-marketed wetland service. For example, actual expenditures made to travel to visit a wetland area might be used to develop a measure of travelers' willingness to pay for the bird watching opportunities at the wetlands, even though the travelers do not pay for the bird watching service.

Hypothetical choice procedures, more commonly known as the contingent valuation method (CVM), do not derive demand and value estimates from actual consumer choices. Instead, a sample of survey respondents is offered a set of hypothetical circumstances and asked about their willingness to pay for a change in those circumstances. For example, a survey of a number of Louisiana residents might ask them their willingness to pay for the preservation of the area of floating mat wetlands, after telling them that the wetlands is in danger of being damaged. The survey respondents expressions of willingness to pay to save the described marsh area would be used to estimate the value of the marsh even though no actual payments are made.

Both revealed preference and hypothetical choice models are difficult to use to estimate the value of a particular marsh area. First, the contribution of the particular marsh area in question to providing the environmental service in the area must be established. For example, the analyst needs to determines the contribution of a single acre (or small area) of marsh among all of the marsh land in the area to the fish harvest. This is called the "marginal product" for the marsh area in question. Then the revealed or hypothetical choice techniques need to be applied to find the willingness to pay for this marginal product. Such valuation is data intensive and site specific.

Dr. Penland did not conduct original studies for the specific sites in question. Instead, his social value estimates were taken from published literature. In fact, in the references for his statement Dr. Penland does not cite a single paper he has authored. Instead, the estimates are based directly on the work of Dr. Robert Costanza and his colleagues. Dr. Costanza is not an economist by professional background. Dr. Costanza's resume reports that economics was a minor area of study during his graduate program at the University of Florida. Instead, his professional background and his primary expertise is in ecological sciences. Dr. Costanza has defined an area of work outside the mainstream economics profession that he has coined "ecological economics". He then co-founded and now edits a journal called *Ecological Economics*. I am familiar with Dr. Costanza's efforts to do economic valuation studies. For this statement, I reviewed the papers of Dr. Costanza that were referenced by Dr. Penland as well as several other papers authored or coauthored by Dr. Costanza.

Dr. Penland provides social value estimates that are not germane for this damage claim; nonetheless, I have four fundamental criticisms of the social valuation studies cited by Penland and the use he makes of those studies: 1) Costanza's valuation work has received no professional acceptance within the economics profession; 2) Energy Analysis

**Privileged and Confidential**

as originally proposed by Costanza has no credibility within the economics profession; 3) Costanza's paper on valuing nature's services that was used by Penland for his statement violates basic economic valuation principles; and, 4) Dr. Penland's efforts at benefit transfer are flawed.

      1) One striking feature of Dr. Costanza's valuation papers is that they are *not* published in the mainline journals that specialize in environmental and resource economics. Instead, most of his valuation papers were published in environmental management magazines intended to be read by generalists and not by economic scientists. A citation analysis of the mainline economic journals found no favorable references to his valuation work.

      2) Dr. Penland claims that estimates derived from valuation based on energy analysis are an upper bound on value. Energy analysis is a valuation approach proposed by Dr. Costanza that is analogous to the labor theory of value that was discarded by the economics profession in the 1850s. Energy analysis is a pseudoscientific valuation approach that has been rejected by the economics discipline.

      3) A principle reference used by Penland is the 1997 paper by Costanza et. al. published in *Nature*, "The Value of the World's Ecosystem Services and Natural Capital". *Nature* is a highly respected science journal, but not one known for its economic content. There were two economists among the many who authored that article, but the article has received significant and universal negative comment from within the economics profession.

      4) When Dr. Penland translates the Costanza results to the specific wetlands acres in this case he is performing a benefit transfer. Properly done benefit transfer will rely on studies of other areas to value the marginal product of the specific wetlands acres being valued. Studies from different areas are reviewed and those studies "most similar" to the wetlands of interest are selected. The assertion is then made that the value of the wetlands in question is the same as the wetlands in the selected studies. Those who apply benefits transfers bear the burden of showing that the resources being valued are physically similar to those that were valued in the original study and that the market conditions (population, income, access to the site, etc.) at the original study area and at the area being valued are similar. In this fundamental sense a benefit transfer for social valuation is analogous to a comparable sales approach for estimating land prices in the real estate market.

      Without regard to the technical merit of the particular studies Penland cites, he violates basic economic logic when attempting the benefit transfer. He uses value estimates for Louisiana but the estimates are for an average of all types of Louisiana marsh in all places. This case is about a particular type of marsh in a particular place and is about the possible loss of a small fraction of that marsh. It is incumbent upon the users of benefit transfer approach to recognize the

5

**Privileged and Confidential**

difference between marginal value (the value of a small change in the marsh acreage) and a change in large acreages of marsh. It is incumbent upon users of the benefit transfer approach to recognize that not all wetlands have the capacity or opportunity to provide the same services. The logical error is the same one that would be obvious if a real estate appraiser used the average price of all houses in Louisiana to estimate the value of a particular house in Baton Rouge.

Finally, Penland does not cite, but I would draw attention to, a 1995 paper titled "Issues in Ecosystem Valuation: Improving Information for Decision Making". The paper is a report on a forum sponsored by the US Environmental Protection Agency and is co signed by 15 authors, including Dr. Costanza. The paper highlights significant philosophical, conceptual and data barriers to making credible valuation estimates for ecosystems and their components such as specific wetlands. This paper undermines Dr. Costanza's pretense of being able to make precise calculations of the value of particular wetlands within complex ecosystems.

IV. The restoration cost estimates from the plaintiffs are not a basis for a damage award

As a complement to Dr. Penland's statement, Charles M. Camp also has submitted a statement on behalf of the plaintiffs. Camp provides his own cost estimates for three restoration plans. Presumably the plaintiffs would seek damages equal to restoration cost for the wetlands rather than for the values cited by Penland.

Under certain circumstances replacement cost can be used as an economic measure of damages, however the replacement cost estimate must be reasonable; specifically, there must be evidence that the cost of replacement does not exceed the value of the services that would be restored with the replacement; Camp makes no such argument. This requirement is critical because neither a private party or the society at large would pay more to restore a marsh than the economic values the marsh provides.

The plaintiffs might argue that the Penland statement demonstrates that the values warrant the replacement cost, but a) Penland's asserted wetlands values are based on technically flawed studies and interpretations of those studies and b) the asserted social values are not germane to awarding damages for a loss of marketable services to the school board. Furthermore, the restoration costs prepared by Camp can not be justified as a basis for a damage claim because they greatly exceed the private land market value of wetlands in the area and the net income possibilities for the marketable services.

From a technical standpoint it might be possible to argue that a properly designed replacement cost estimate might be needed to document values (and damages) in excess of the land market price or net income estimate. The premise of the argument would be that the school board derives services from the wetlands that are not reflected in the market price of the land or in a net income calculation. For example, the board might claim that the site has value as an educational field trip location for its schools. They might then argue for damages to replace this lost service. For this example, and using a comparable sales approach to valuation, the proper damage calculation would be the sum

Privileged and Confidential

of the cost of land acquisition in another area, the real estate transfer costs for that acquisition and travel costs to and from the purchased site as needed to secure the other values (perhaps the additional busing costs for school field trips).

## V. Conclusion

If I accept the possibility that the gas transmission pipeline has negatively affected the wetlands, damages awarded to the plaintiff in the case of Terrebonne Parish School Board v. Columbia Gulf Transmission Company should be for the forgone income from marketable wetlands services. These values could be captured in land prices or might be computed using a net income approach. I would favor selecting a professional appraiser and let that person choose whether to employ a comparable sales method, the net income approach or a blend of the two to arrive at a per acre value estimate for the damages incurred. The number of acres lost times the appraisers estimate would be the estimate of the damage. If the school board can document that it receives services from the wetlands that are not reflected in the market price then additional damages might be calculated. However, without documentation by the plaintiff of these additional services I can not suggest an approach for their valuation.

Submitted by

*[signature]*

Leonard Shabman, Ph. D.

7

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             EASTERN DISTRICT OF LOUISIANA
 3                   NEW ORLEANS DIVISION
 4
   TERREBONNE PARISH SCHOOL        CIVIL ACTION
 5 BOARD
 6 VERSUS                          NO. CV00-0319
 7 COLUMBIA GULF TRANSMISSION      DIVISION "B"
   COMPANY AND KOCH GATEWAY
 8 PIPELINE COMPANY
 9
10
           Deposition of LEONARD A. SHABMAN,
11 1901 Meadowlake Circle, Blacksburg, Virginia
   24060, taken in the offices of Simon,
12 Peragine, Smith & Redfearn, 1100 Poydras
   Street, on Tuesday, the 19th day of
13 December, 2000.
14
   APPEARANCES:
15
     THE GRAY LAW FIRM
16   (BY:  WADE T. VISCONTE, ESQ.)
     POST OFFICE BOX 1467
17   LAKE CHARLES, LOUISIANA  70602-1467
18      ATTORNEYS FOR THE PLAINTIFF
19
     SIMON, PERAGINE, SMITH & REDFEARN
20   (BY:  JAMES A. BURTON, ESQ.)
     30TH FLOOR - ENERGY CENTRE
21   1100 POYDRAS STREET
     NEW ORLEANS, LOUISIANA  70163-3000
22
        ATTORNEYS FOR COLUMBIA GULF TRANSMISSION
23      COMPANY
24
25
```

EXHIBIT B

Page 70

1  A. That's not the way I stated it. I
2  said I had a view of the profession's
3  response. We talked about the nature
4  article. That was the first one. I had a
5  view of how the profession responded to that
6  article when it came out. It was part of
7  Email correspondence. It was part of lists.
8  I read articles, but I hadn't gone to the
9  trouble of pulling it all together in one
10 place, and so in the process of creating my
11 documentation, my statement, I was fully
12 convinced, based on my participation in
13 professional dialogue, that that article did
14 not receive much acceptance within the
15 economics profession. But rather than
16 simply just say that I thought that, it
17 would be useful after I said it to go back
18 and pull together the materials that would
19 lead me to that conclusion. So this is a
20 further documentation of something which is
21 my statement, which is behind my statement.
22     Q. Maybe we are not communicating.
23     A. You are asking me which came
24 first. In both cases my opinion came before
25 and these two pieces were put together.

Page 71

1      Q. You are communicating. You
2  answered my question. I appreciate it. The
3  first article, the Professional Economic
4  Critiques of Robert Costanza, was this cited
5  in any particular source, or was it taken
6  from any particular source?
7      A. These are original documents that
8  were prepared.
9      Q. You prepared these?
10     A. These were prepared under my
11 direction. The references you see -- well,
12 it depends. The answer is: No, I did not
13 prepare these exactly. I had other people
14 work for me. This is library work and I had
15 other people do the library work.
16     Q. Basically what you did was you
17 gave a research assistant directions to go
18 find you critiques of the works of Robert
19 Costanza in this first document, and they
20 went and gathered these various critiques
21 such as Gary Smith and David Pierson?
22     A. Right. In other words, I gave
23 direction. Someone executed what was done
24 and found in that process perhaps things
25 that I wasn't aware of.

Page 72

1      Q. I assume that all of these
2  critiques are negative, is that correct,
3  that are contained within this report?
4      A. Yes, and it would be fair to say,
5  and I think that's documented in the second
6  document work published by Costanza and so
7  forth, that we do -- or there is a mention
8  in there of a couple of things that he has
9  written that he received positive responses
10 within the economics profession, and those
11 are noted, but they don't have anything to
12 do with the valuation.
13     Q. You are reading my mind again.
14 That was my next question: Was there
15 anything positive in the economics field or
16 environmental economics field that had been
17 published that referenced a Costanza article
18 or published work? And you are saying
19 that's contained in this second document
20 that you produced entitled Professional
21 Status of Robert Costanza Within the
22 Economics Profession; is that correct?
23     A. That is correct. I guess if your
24 question -- let me be clear here. These
25 documents are not intended to represent just

Page 73

1  the negative statements. These documents
2  are intended to be comprehensive, but within
3  that, they are intended to be comprehensive
4  statements within the economics profession.
5  There are many people in ecology who love
6  what that nature article says, but that's
7  not the issue here.
8      Q. Let me ask the question, and if I
9  misunderstood -- as I understand, economics
10 and environmental economics are not
11 necessarily synonymous; is that a fair thing
12 to say?
13     A. Environmental economics is a
14 subfield. It's a field within economics.
15     Q. Let me ask the question this way:
16 Comprehensive citation of literature that
17 refers to works by Costanza, this is from
18 the economics and the environmental
19 economics field only?
20     A. There is a database which is
21 mentioned here called Economic Literature,
22 and it takes publications from 600 economics
23 journals and that's noted in Footnote 1, and
24 so what we did is went into that database
25 and that's our population, if you will, of

Page 114

1    anybody pays attention to it. Maybe they
2    do. I don't know.
3         I can't answer your question in
4    the sense that if you are asking me
5    whether -- let me put it this way: The
6    answer to your question, has any energy
7    analysis that's been done by this group of
8    people been used in economic evaluation on a
9    real project or in a real case, I'm not
10   aware of it ever being done.
11        Q. You may not know the answer to the
12   next question. If you will refer to
13   Paragraph 3 the last sentence. I'm
14   referring to the Costanza article. You said
15   there were two economists who were
16   co-authors?
17        A. Correct.
18        Q. Do you know if those persons were
19   standard, traditional economists or
20   environmental?
21        A. Ralph D'Arge is emeritus professor
22   at University of Wyoming, and the other
23   person -- I may be wrong on this but I'm
24   pretty sure Steven Farber has worked with
25   Costanza.

Page 115

1         Q. Right. I'm familiar with him.
2    Professor emeritus?
3         A. He was on the faculty at the
4    University of Wyoming for a number of years
5    and has since retired.
6         Q. Do you know what area of economics
7    he retired in?
8         A. I assume he would say in resource
9    and environmental economics.
10        Q. I may have asked this question
11   before, and if I did, I apologize. Are you
12   aware of any positive comments by any
13   persons such as yourself, experts in the
14   economics or environmental economics field
15   in regards to the conclusions which are
16   reached in the Costanza paper that's in
17   Paragraph 3 on Page 5 of your statement?
18        A. Well, I guess the factual answer
19   is: No, I'm not aware of any. There may be
20   some, but I'm not aware of them. It doesn't
21   mean there aren't any.
22        Q. Next line of questioning or area
23   that I would like to address, if you look at
24   Paragraph 4, Page 5 of your statement, you
25   refer to Dr. Penland essentially performing

Page 116

1    a benefit transfer. And as I understand it,
2    you are saying that the benefit transfer
3    that is relied upon by Penland, which is
4    using Costanza's numbers to value the
5    wetlands, does not apply in this particular
6    situation; is that correct?
7         A. The point is more subtle. I say
8    in the second paragraph of that No. 4:
9    Without regard to the technical merits of
10   the studies he cites, so I put that issue
11   aside. What I am saying is that even if
12   those studies were correct, which I do not
13   believe, there is yet another mistake he
14   makes and that is in transferring, he
15   estimates inappropriately from one location
16   to another.
17        Q. I'm going to get specific with you
18   now. We don't even want to get to without
19   the technical merit issue that you have
20   raised yet. What I'm asking you is:
21   Costanza in reaching his values has a table
22   which I'm sure you have seen dealing with
23   gas regulation, cultural, recreational
24   fisheries, hatcheries, that sort of thing?
25        A. Right.

Page 117

1         Q. My question is: Are you saying
2    that the specific elements that are valued
3    in the Costanza paper that are used by
4    Penland to assess the value of the property
5    in this case do not apply?
6         A. I'm saying two things. I'm saying
7    those numbers are spurious in and of
8    themselves, and then I'm saying that even if
9    some of those numbers happen to by some
10   calculation show to be correct for the
11   world's wetlands, to simply take that number
12   and apply it in this particular case is a
13   second error.
14        Q. I will break it down again. The
15   first element, as I understand you are
16   taking issue with, the fact that Penland
17   used average numbers and applied them to a
18   specific situation; is that correct?
19        A. That's my second issue.
20        Q. See now I have myself confused.
21   What I'm asking is this, Professor: You
22   said that the numbers that Costanza reached
23   are spurious, correct?
24        A. Right.
25        Q. And so, therefore, they shouldn't