

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JAN -2  AM 2: 44

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TERREBONNE PARISH SCHOOL BOARD** | § | **CIVIL ACTION NO. 00-0319** |
| **VERSUS** | § | **SECTION: B** |
| **COLUMBIA GULF TRANSMISSION COMPANY AND KOCH GATEWAY PIPELINE COMPANY** | §<br>§ | **MAGISTRATE: 5** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## OPPOSITION TO KOCH GATEWAY PIPELINE COMPANY'S MOTIONS IN LIMINE TO EXCLUDE PLAINTIFF'S EXPERTS ROBERT CHABRECK, ALEX McCORQUODALE, CHARLES CAMP, AND SHEA PENLAND

**MAY IT PLEASE THE COURT:**

Plaintiff, Terrebonne Parish School Board ("TPSB"), submits this opposition to Koch Gateway Pipeline Company's ("Koch"), Motions in Limine to exclude the testimony of all of Plaintiff's experts.

### Facts

The general facts of this case are provided in TPSB's memorandum in support of motions in limine to exclude Koch Gateway Pipeline Company's experts. For the sake of brevity, those general facts are adopted by reference herein.

Fee_____
Process_____
X  Dktd ○○○
___ CtRmDep_____
Doc.No.__○○__

Regarding Koch's motions in limine to exclude TPSB's experts, TPSB has four experts. Robert Chabreck is a wetlands specialist who has worked in the marshes of Louisiana, including Terrebonne Parish, for over forty years. Shea Penland is a geomorphologist who has also worked extensively in valuing and restoring wetlands in the publicly funded programs commonly known as Coast 2050 and Coastal Wetlands Protection Preservation and Restoration Act. Charles Camp is a registered land surveyor who assisted Dr. Chabreck in preparing a restoration plan for Section 16, T18S, R13E. Camp provided similar expert testimony in this Court in the matter of "*St. Martin v. Mobil Exploration & Producing U.S. Inc., et al*". That case resulted in a Judgment awarding $240,000 in restoration damages against the defendant oil companies for their failure to maintain canals under servitude agreements. Alex McCorquodale is a hydrologist. Koch has moved to exclude the testimony of all of these witnesses in whole or part. For the reasons outlined herein, it is apparent that Koch's motions in limine are completely without merit and must be denied.

## LAW

In *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court revised the standards for admitting scientific evidence under the Federal Rules of Evidence. The Court began with the "baseline" principle that "all relevant evidence is admissible" unless excepted by the Constitution, a statute or rule. The U.S. Supreme Court further directed that the standard of relevance "is a liberal one." Fed.R.Evid. 402; *Daubert*, 509 U.S. at 585-589, 113 S.Ct. at 2793-2794.

The Court found that Rule 702 obliges the trial judge to act as a "gatekeeper" and screen scientific evidence for reliability and relevance. Regarding reliability, the Court said:

> The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or

unsupported speculation ...

*Daubert*, 509 U.S. at 589-590, 113 S.Ct. at 2795.

The Court, stressed that the standard under Rule 702 is a "flexible one." The Court emphasized also that the focus of the inquiry is "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2797.

The Court favored admission of evidence on the borderline. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional, and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798. The U.S. Supreme Court expanded the screening test established by *Daubert* in *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167 (1999), when it held that *Daubert*'s "gatekeeping" obligation, requiring an inquiry into both relevance and reliability, applies not only to "scientific" testimony, but to all expert testimony.

The *Daubert* and *Kumho* cases have now been adopted in amended Federal Rules of Evidence, Rule 702, effective December 1, 2000, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

## ANALYSIS

### Dr. Shea Penland

First, it should be noted that Koch does not contest that Penland is an expert in geomorphology, photogrammatry, and hurricane damage. Instead, Koch's attacks the methodology used and qualifications of Penland to opine on the value of TPSB's Section 16 marsh. Koch's

argument on Penland's alleged lack of qualifications centers on the fact that Penland is not an economist. However, Penland's' qualifications derive from his experience and knowledge in his *scientific* work, not from the non-scientific field of economics. Koch also claims that Penland's methodology and principles relied upon are unsound because Koch claims that the work of Dr. Robert Costanza serves as the "primary basis"[1] for Penland's conclusions and that Penland did not confirm that the values provided for in the work of Costanza apply to T18S, R13E in this case.

Regarding Penland's qualifications, Koch focuses on Penland's lack of "education" as an economist. However, F.R.E. 702 provides that a person may be qualified as an expert based upon "knowledge, skill, experience, training, or education . . ." and does not mandate that a person must meet each of these elements to become an expert. Penland's report and testimony at trial will be based on his first hand "knowledge" and real world " professional experience" due to "participation in the Coastal Wetland Planning, Protection, and Restoration Act of 1990 ("CWPPRA") and Coast 2050 programs."[2] It should be noted that these coastal restoration and protection programs are not "soft science" studies. CWPPRA provides $40 million per year for wetland protection and restoration projects. As these projects were being implemented, the CWPPRA Task Force recognized that a parallel program of massive public work projects had to be authorized and funded by the U.S. congress if the responsible state and federal agencies were going to be successful in restoring Louisiana's vanishing wetlands ecosystems. As a result, in 1998 these government agencies proposed Coast 2050, a new initiative of $14 billion in massive ecosystem restoration

---

[1]  See ¶ 2, pg. 3, section entitled "Dr. Shea Penland," of "Defendant Koch Gateway Pipeline Company's Memorandum In Support Of Motions In Limine Regarding Plaintiff's Experts, Robert Chabreck, Alex McCorquodale, Charles Camp and Shea Penland".

[2]  See pg. 12, "Opinion" section, Penland report entitled "Assessment of Louisiana Coastal Wetland Values," attached to Koch's Motions in Limine as "Defendant's Exhibit 10".

projects to save coastal Louisiana through the Water Resources Development Act ("WRDA"). The Louisiana Coastal Wetland Conservation and Restoration Task Force ("Task Force") and the Wetlands Conservation and Restoration Authority ("Authority") are the primary agencies involved in CWPPRA and Coast 2050. The government agencies that are represented in the Task Force and Authority include the La. Dept. of Natural Resources, the Louisiana Governor's Office, the U.S. Dept. of Agriculture, the U.S. Dept. of the Interior, the U.S. Dept. of Commerce, the U.S. Environ. Protection Agency, and the COE. Coast 2050 and CWPPRA have placed a value between $86,040 (5% discount rate) and $143,400 (3% discount rate) per acre on each acre of Louisiana wetland.[3]

Koch attacks the methodology used by Penland claiming Costanza's report is the "primary basis" of his opinions. This is a blatant misrepresentation of fact. Costanza's article on wetland values serves as "one of several articles" relied on by Penland in forming his opinions.[4] Penland's opinion is also based on his past work experience where he has regularly valued wetlands for purposes of restoration and protection with the CWPPRA and Coast 2050 programs. In fact, Koch cites a passage from Penland's deposition where he makes it clear that his opinion is based on his "working experience with Coast 2050 and with CWPPRA in doing wetland valuation assessments and watching how we place the values on projects that are built in the coastal wetlands . . . ."[5] Penland's prior work experience used in reaching his opinions is set forth in more detail his report:

> In my participation within the CWPPRA and Coast 2050 ecosystem restoration programs has given me considerable experience in wetland valuation

---

[3] See ¶ 2, pg. 11, "Discussion" section, Penland report entitled "Assessment of Louisiana Coastal Wetland Values," attached to Koch's Motions in Limine as "Defendant's Exhibit 10".

[4] See pg. 178, lines 3-7, of deposition of Penland, relevant portion attached as Exhibit "A" to this Opposition.

[5] See also pg. 143, lines 6-20, of deposition of Penland, relevant portion attached as Exhibit "A" to this Opposition.

assessment. Within CWPPRA, I serve as a member of the Environment Working Group (EWG) and the Complex Project Working Group (CPWG). The EWG evaluates the projects nominated each year, creates a short list, makes site visits, and conducts wetland valuation assessments (WVA). The WVA uses models for swamp, fresh marsh, intermediate marsh, brackish marsh, and salt marsh. Currently, I am developing a barrier island assessment (BVA) model for the EWG. In the CWPPRA, I am evaluating barrier island and wetland projects in St. Bernard Parish, Plaquemines Parish, Lafourche Parish, Terrebonne Parish, Orleans Parish, and other southeast Louisiana Parishes. Within Coast 2050, I am a member of the team conducting a feasibility study of barrier shoreline and wetland restoration in the Barataria Basin.[6]

Not surprisingly, Koch does not focus these crucial elements of Penland's qualifications and methodology. Instead, Koch raises the smoke screen that Penland is not educated and has no degree in economics. However, as stated previously, Penland's opinions are not based on his education in a non-scientific field, but rather, are based on his experience and knowledge gathered from working first hand in the scientific arena of wetlands restoration and preservation.

Koch also misrepresents that Penland did not try to assess individual values such a storm protection, wildlife management, etc. specific to TPSB's property. The following passage from Penland's deposition makes clear that he did consider and apply specific individual values of marsh in reaching his opinion:

> Q.    Now, using Costanza's figures here, have you tried to translate Costanza's values to be values of the, that could be applied to this particular area of wetlands, namely Section 16?
>
> A.    Yes.
>
> Q.    But you said that you thought that gas regulation could be one, right?
>
> A.    Uh-huh (affirmative response).
>
> Q.    What about disturbance regulation, would that be applicable?

---

[6]    See ¶ 1, pg. 12, "Discussion" section, Penland report entitled "Assessment of Louisiana Coastal Wetland Values," attached to Koch's Motions in Limine as "Defendant's Exhibit 10".

**A.**     Uh-huh (affirmative response).  All of those would be applicable.

**Q.**     Recreation is applicable?

**A.**     Absolutely.

**Q.**     Cultural is applicable?

**A.**     Absolutely.

**Q.**     Food production?

**A.**     Yes.

**Q.**     Raw materials?

**A.**     Uh-huh (affirmative response).

**Q.**     What is refugia?

**A.**     Refuge.  A place for animals to hide.

**Q.**     We have deleted waste treatment?

**A.**     Right.

**Q.**     How about water supply, how does the Section 16 assist water supply?

**A.**     Water supply essentially, you know, there is no groundwater drinking.  This is more like water supply into the wetlands, it's kind of more of a hydrologic kind of a functional kind of water supply in terms of retaining water in the system.  If they are in droughts, it potentially could, you know, minimize droughts, at least for a certain period time, so it's more of a -- it's a --the wetlands do have a storage capability.[7]

Koch claims that Penland's opinion fails to meet the ***Daubert*** "known or potential rate of error" element.  In ***Daubert v. Merrell Dow Pharmaceuticals Inc.***, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court developed a five-factor test for district courts to consider when assessing whether the methodology is scientifically valid or reliable.  These

---

[7]     See pg. 174, line 25, pgs. 175-177, lines 1-2, of deposition of Penland, relevant portion attached as Exhibit "A" to this Opposition.

factors include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. The Daubert factors are <u>non- exclusive and need not be rigidly applied</u> in every case. See ***Kumho Tire Co., Ltd. v. Carmichael***, 526 U.S. 137, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999) ("the test of reliability is 'flexible,' and ***Daubert***'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case"); see also ***Tanner v. Westbrook***, 174 F.3d 542, 546 (5th Cir.1999). Although Penland has not published his opinion in this case, Penland did rely on published and peer reviewed scientific literature in forming is opinion. Penland's opinion is "generally accepted in the scientific community" as is proven by the fact that his valuation numbers are consistent with wetland values assessed by various government agencies employing a wide variety of scientists. Furthermore, Penland's valuation has grown "naturally and directly out of" work experience "he has conducted independent of [this] litigation".[8]

Dr. Penland prepared his report based on past studies he personally conducted in his work experience with CWPPRA and Coast 2050. He relied on secondary sources with economic values generally accepted in the scientific community. He synthesized these sources to prepare what he determined was an average value considering all wetlands serve some of the same functions. His methodology conformed to generally accepted standards within the field of ecological economics and in the scientific arena concerned with wetland preservation and restoration. Koch's Motion in Limine must be denied.

---

[8]   See ***Daubert v. Merrell Dow Pharmaceuticals Inc.***, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**Dr. Robert Chabreck**

Koch argues that Dr. Chabreck's opinion should be excluded because he is testifying as a hydrologist. Koch states that the U.S. Fifth Circuit Court of Appeals "did not classify Dr. Chabreck as an expert hydrologist."[9] This assertion is ludicrous. The issue is not whether the U.S. Fifth Circuit accepted Dr. Chabreck as an expert in hydrology; the issue is whether the U.S. Fifth Circuit found that Dr. Chabreck was qualified to render the opinions he did in "***Michael X. St. Martin & Virginia Rayne St. Martin v. Mobil Exploration & Producing U.S., Inc., et al***" ( "the Mobil case"), 1999 WL 5671, ***affirmed***, 224 F.3d 402 (5th Cir. (La.) Aug 16, 2000).[10] Like Koch in this case, Mobil also attacked Dr. Chabreck's opinions and testimony on appeal and claimed that (1) Chabreck was testifying in the field of hydrology despite the fact that he had no education, training, or experience; (2) Chabreck was testifying on a hypothesis he had never tested; (3) Chabreck's opinions were not subjected to peer review; (4) Chabreck's opinions had no support in the scientific community; and (5) this district court clearly was wrong in concluding that the St. Martins proved their case based upon the opinion testimony of Dr. Chabreck.[11] Obviously, the U.S. Fifth Circuit saw through the transparent arguments of Mobil and rejected Mobil's meritless arguments. Refusing to face the fact that Koch's arguments are virtually the same as those made by Mobil, Koch asserts that the U.S. Fifth Circuit did not "per se" accept Chabreck as an expert, but rather found no "abuse

---

[9]    See ¶ 3, pg. 7, of "Defendant Koch Gateway Pipeline Company's Memorandum In Support Of Motions In Limine Regarding Plaintiff's Experts, Robert Chabreck, Alex McCorquodale, Charles Camp and Shea Penland".

[10]   A copy of the U.S. Fifth Circuit Court of Appeals decision in ***Michael X. St. Martin & Virginia Rayne St. Martin v. Mobil Exploration & Producing U.S., Inc., et al*** 224 F.3d 402 (5th Cir. (La.) Aug 16, 2000), is attached to this Opposition as Exhibit "F" for the Court's convenience.

[11]   A copy of the relevant portion of the original appeal brief by Mobil which attacks Chabreck's qualifications, methodology, and conclusions is attached to this Opposition as Exhibit "B". TPSB submits that a review of Mobil's original appellant brief and the Mobil case will put to rest the issue of Chabreck's qualifications, methodology, and conclusions in this case.

of discretion" in admitting his testimony.  This representation is absolutely incorrect.  To the

contrary, the U.S. Fifth Circuit noted that: "Defendants' arguments on this point fail for several

reasons.  First, Dr. Chabreck's expertise in marshland ecology and in the erosion of vegetative mats

in particular, along with his personal observation of the St. Martins' property, *sufficiently qualified*

*him to testify as an expert*."[12]  (emphasis added).

TPSB submits that the following portions of the Mobil case decision are pertinent:

> Defendants assert that Dr. Chabreck fails all of the non-exclusive Daubert factors, in
> that he is not a trained hydrologist, hasn't published an article relating to his specific
> hypothesis in this case, his hypothesis has not been subject to peer review and is not
> supported by specific studies and he hasn't conducted tests to verify his hypothesis.
> But see *Rushing v. Kansas City Southern Ry. Co.*, 185 F.3d 496, 507 (5th Cir.1999)
> ("As long as some reasonable indication of qualifications is adduced, the court may
> admit the evidence without abdicating its gate-keeping function.").[13]

---------------------------------------------------

> Dr. Chabreck, a professor of wildlife at Louisiana State University, has studied
> marshland ecology extensively.  He has published over 130 scientific and popular
> articles on wetlands and wildlife management and has planned and evaluated marsh
> development programs for marsh wildlife refuges for the State of Louisiana.  He has
> professional experience with the U.S. Fish and Wildlife Service, as a refuge and
> research biologist, and has garnered significant acclamation for his work and
> publishing on marsh ecology and management.[14]

---------------------------------------------------

Defendants suggest that only a qualified hydrologist could have testified as to
whether canal water intrusion occurred at sufficient levels and speeds to erode the
vegetative mat.  Cf. *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir.1999) (in deciding
whether to admit expert testimony, the district court considers whether the witness

---

[12]    See *Michael X. St. Martin & Virginia Rayne St. Martin v. Mobil Exploration & Producing
U.S., Inc., et al*' 224 F.3d 402, 405 (5th Cir. (La.) Aug 16, 2000).

[13]    See *Michael X. St. Martin & Virginia Rayne St. Martin v. Mobil Exploration & Producing U.S.,
Inc., et al*' 224 F.3d 402, 405 (5th Cir. (La.) Aug 16, 2000).

[14]    See Footnote 2, *Michael X. St. Martin & Virginia Rayne St. Martin v. Mobil Exploration &
Producing U.S., Inc., et al*' 224 F.3d 402, 405 (5th Cir. (La.) Aug 16, 2000).

is qualified in an appropriate field).

While a hydrologist might be better trained than a marshland ecologist in the abstract physics of water forces, he would have less relevant expertise in the kinds and amounts of stresses on the organisms making up the vegetative mat that could cause degradation of the mat. A hydrologist could (and did) testify as to observed speeds of canal water intrusion into the marsh through the gaps in the defendants' canals' spoil banks; however, the significance of that information for the health and stability of the vegetative mat would be within the expertise of a marshland ecologist such as Dr. Chabreck. The district court did not abuse its discretion in finding Dr. Chabreck qualified to testify as to the dynamics within the St. Martins' flotant marsh. See *Watkins v. Telsmith Inc.*, 121 F.3d 984, 988 (5th Cir.1997) ("District courts enjoy wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal unless manifestly erroneous") (internal quotations omitted).[15]

------------------------------------------------------

Here, Dr. Chabreck's theory regarding damage to the St. Martins' marsh arose from his general understanding of the dynamics within flotant marshes and the environmental factors which can cause erosion of vegetative mats, combined with personal observation of the marsh in question.[16]

Each marsh will have different forces acting upon it, depending upon its specific location and its surroundings. Thus, a court could not rationally expect that a marshland expert would have published a peer-reviewed paper on each possible permutation of factors or each damaged area of marsh. Dr. Chabreck's testimony was based on his personal observation of the marsh in question and his general and undisputed expertise on marsh ecology and deterioration.[17]

The expert reports of Chabreck make clear that he is testifying as an expert on the issue of causation of damage to the TPSB's property based on root mat conditions, vegetative processes, effects of hydrology on these root mat conditions, and rebuttal of herbivory as a cause of damage.

---

[15]    See *Michael X. St. Martin & Virginia Rayne St. Martin v. Mobil Exploration & Producing U.S., Inc., et al*" 224 F.3d 402, 405-406 (5th Cir. (La.) Aug 16, 2000).

[16]    See *Michael X. St. Martin & Virginia Rayne St. Martin v. Mobil Exploration & Producing U.S., Inc., et al*" 224 F.3d 402, 406 (5th Cir. (La.) Aug 16, 2000).

[17]    See *Michael X. St. Martin & Virginia Rayne St. Martin v. Mobil Exploration & Producing U.S., Inc., et al*" 224 F.3d 402, 406-407 (5th Cir. (La.) Aug 16, 2000).

These areas are all addressed in the three expert reports of Chabreck, two of which were not submitted with Koch's motions in limine and are attached to this Opposition to address any unfounded concerns regarding Chabreck's methodology and conclusions.[18] The fact that Chabreck believes a hydrologic connection has led to erosion of TPSB's Section 16 property based on his analysis of soil/sediment conditions, root mat thickness, vegetative degradation and changes, and effect of herbivory does not mean he is testifying as a hydrologist.[19] Simply put, Chabreck is an expert in wetlands. Coastal wetlands by definition are formed and exist under water logged conditions. Hence, Chabreck has familiarity with the effect of water on the overall health of coastal wetlands, including their root mats and indigenous vegetation.

In the Mobil case, the theories of causation were virtually identical to this case. The damaged property made the subject of the Mobil case was floating freshwater marsh developed under low energy conditions free from high energy hydrologic forces. Like the Mobil case, Dr. Chabreck relied upon his extensive experience in this case in forming his conclusions. Like the Mobil case, Dr. Chabreck relied on historical aerial photography in this case to reach his conclusions. Like the Mobil case, Dr. Chabreck took root mat samples in this case to confirm that

---

[18] In order to avoid clutter of the record, TPSB is not attaching Chabreck's expert report "Evaluation of Damages to Property of the Terrebonne Parish School Board in Township 18 South, Range 13 East" which is attached to Koch's motion in limine as Exhibit 2. However, TPSB refers the Court to Exhibits "C" and "D" (Chabreck's "Field Survey" and "Thickness of the Marsh Root Mat" reports) attached with this Opposition which also outline Chabreck's methodology and conclusions.

[19] In another instance of grasping at straws Koch tries to distinguish Chabreck's conclusions in this case from his testimony in the Mobil case by claiming that the Mobil case dealt with waves from "passing boat traffic, not tidal influences or other moving water such as the case here." Koch also claims that the Mobil case is the "only case" where Chabreck has testified as an expert "regarding surging or flushing actions". Both arguments are without merit. Chabreck's testimony in this case and the Mobil case are both based on the effects that a hydrologic connection (whether boat wakes or tidal cycles) has on the root mat of flotant marsh. Further, the Mobil case is the only case Chabreck has testified in dealing with "surging or flushing actions" because the Mobil case was a case of first impression. Chabreck could not have testified in other cases because there have been no other cases like the Mobil case.

the root mat of freshwater marsh was being eroded by the hydrologic connection created through breaks in the levees of canals. Like the Mobil case, it is Dr. Chabreck's opinion in this case that the property damage was caused by breaks or cuts in canal levees that allowed a hydrologic connection to surge into and out of the marsh. In turn, as the water flowed out the vegetative mat and sediment/organic matter was sucked out of the marsh. Like the Mobil case, Dr. Chabreck used a "control" or "reference" area in this case to point to as stable and ideal marsh conditions. Like the Mobil case, Chabreck has noted changes in vegetation. Notwithstanding Koch's inherently incorrect "paraphrased"[20] version of Chabreck's testimony, Dr. Chabreck's methodology is virtually the same as in the Mobil case.

Dr. Chabreck has worked as a wetland scientist for forty (40) years. Dr. Chabreck has been a professor in the area of wetlands ecology, conducted research, and published extensively in the area of wetlands science.[21] Dr. Chabreck has conducted an extensive investigation in this case and was familiar with the property due to his investigative work in south Louisiana and Terrebonne Parish for the last forty years, including his accepted marsh type maps which have been prepared every ten years since the 1960s which map out areas of fresh, brackish, and salt marsh all over Louisiana. He has visited the premises at least three (3) times to investigate the damage to TPSB's property and causes of damage. Three reports have been prepared as a result of these visits. These reports all indicate the methodology used by Chabreck to reach his conclusions; again, the same methodology that was previously accepted by this Court and affirmed as scientifically sound

---

[20]    See ¶ 1, pg. 16, of "Defendant Koch Gateway Pipeline Company's Memorandum In Support Of Motions In Limine Regarding Plaintiff's Experts, Robert Chabreck, Alex McCorquodale, Charles Camp and Shea Penland".

[21]    See CV, Publications list, and Biographical Data sheet of Robert Chabreck, Ph.D., attached to this Opposition as Exhibit "E *in globo*".

pursuant to *Daubert* by the U.S. Fifth Court of Appeals.  TPSB submits that it is clear that

Dr. Chabreck is qualified under *Daubert*, its progeny, and F.R.E. 702, to provide expert testimony

in this case and Koch's motion in limine as to Dr. Chabreck should be denied.

## Charles Camp

Camp was retained by TPSB to assist Dr. Chabreck in drawing up a restoration plan.[22]  It

should also be noted that this Court accepted Camp as an expert on the issue of preparing and

carrying out the restoration plan in the Mobil case.  Mobil objected to Camp's testimony on appeal,

but the U.S. Fifth Circuit rejected Mobil's arguments and ruled that Camp's testimony was

admissible.[23]

Koch argues that Camp's testimony should be excluded as speculative since he has not

obtained a permit from the Corps of Engineers authorizing restoration.  However, Camp provided

testimony on how to carry out restoration and submitted a plan in the Mobil case.  This Court heard

Camp's testimony even though a permit from the COE had not been obtained from the COE at the

time of trial.  Koch's argument is based on an ignorance or lack of understanding of the COE

permitting process.

The overriding issue before this Court is Koch's liability.  The COE plays no role in reaching

that decision.  A complete adjudication can be made absent the COE.  The COE has no authority nor

jurisdiction to adjudicate property rights and obligations.  *Kliebert Educ. Trust v. Watson Marine*

*Services*, 454 So. 2d 855 (La.App. 5th Cir. 1984), *writ denied*, 457 So. 2d 682 (La. 1984), *cert.*

---

[22]    See CV and list of cases where Charles Camp provided testimony attached as Exhibit "G *in globo*" to this Opposition.

[23]    See Footnote 13, *Michael X. St. Martin & Virginia Rayne St. Martin v. Mobil Exploration & Producing U.S., Inc., et al*" 224 F.3d 402, 411 (5th Cir. (La.) Aug 16, 2000).

*denied*, 471 U.S. 1050, 105 S.Ct. 2108, 85 L.Ed.2d 474 (1985). In fact, the COE's regulations expressly forbid it to interfere with, authorize or grant property rights or privileges. See 33 C.F.R. § 320.4.

TPSB's seeks a decision as to whether Koch is required to restore land damaged by Koch. A permit from the COE for a restoration project in a coastal zone and/or wetlands is certainly not a requirement before this Court can find Koch liable for its tortious actions and breach of contractual obligations. TPSB is not seeking damages or a decision as the result of COE activity. TPSB is not seeking a remedy pursuant to federal law, such as the Federal Tort Claim Act.

To borrow a tired cliche, Koch is putting the "horse before the cart." The COE has authority to accept, alter, or reject the restoration project after this Court orders restoration of the pipeline canal and adjacent marsh. However, the COE has no authority to enforce the Right-of-Way and easement provisions requiring Koch to maintain its pipeline canal at a width not in excess of forty feet.

Turning to the specifics of Camp's restoration plan, Camp made calculations of the costs of materials, labor required, and equipment required in order to accomplish restoration. Simply put, Chabreck primarily designed the restoration plan, and Camp coordinated with Chabreck on the materials and costs of materials for the restoration plans. Camp performed this same function in the Mobil case. Camp's expertise that is relevant to this case was also the same expertise accepted by the Mobil court:

> **Q:**    Aside from the current case, and I guess other Terrebonne Parish School Board cases, have you been retained in the past at any time to provide estimates of restoration and damages to marshlands resulting from oil-and-gas type activities?

**A:**    Well, if I understand your question correctly, and if I don't respond to your question, please tell me so. I haven't actually been retained to do any restoration work per se except in these School Board cases.

Oh, I'm sorry, I have, yes. I'm forgetting. There was a case for Mr. St. Martin known as the St. Martin Mobil slash Phillips case that was in 1997, somewhere along there. It was tried in Judge Livaudais's court. And we won that case at that level and also have won the case in the Court of Appeals, where basically I did the same thing, which was to put together a restoration plan along with Dr. Chabreck, you know, carrying out Dr. Chabreck's instructions of doing the mechanics of putting together the restoration plan, yes, sir.

**Q:**    So basically what you did in the Mobil case, St. Martin versus Mobil, is the same kind of work that you are doing in this case; is that correct?

**A:**    That's correct, sir.[24]

---------------------------------------

**Q.**    But isn't the feasibility of this, and that is whether these barges can get in this area, whether they can pump the sand, the peat, the fill, the cost of it all, something that a contractor does, not a surveyor?

**A.**    No, sir. You have to write a set of plans and specifications whether it be a surveyor doing it, an engineer doing it. It doesn't matter. I'm capable of doing it and getting it passed and have been accepted as an expert witness in doing that type of thing, so therefore I feel that I'm capable of doing that.[25]

Camp defined what his role will be in this case. His role in this case is the same as that performed in the Mobil case:

**Q:**    What was your understanding then of your job with respect to this case?

**A:**    That along with the other expert, Dr. Penland, basically Dr. Penland and, Dr.

---

[24]    See pg. 79, line 25, pgs. 80-81, lines 1-10, of deposition of Charles Camp, relevant portion attached as Exhibit "H" to this Opposition.

[25]    See pg. 210, lines 8-21, of deposition of Charles Camp, relevant portion attached as Exhibit "H" to this Opposition.

Penland and Dr.Chabreck that I was to assist them in any way that they needed basically in terms of surveying or preparing maps, et cetera, of the area that had been damaged by oilfield activity.

**Q:**   Would it be fair to say that they would come up with the conceptual plans in terms of what damage has occurred and what should be done to cure it, and you would take those conceptual plans and execute them?

**A:**   That's correct, sir. Basically they would tell me what they wanted done in cases, like Dr. Chabreck and I would go in the field together, and he would stake out the filed that he considered damaged, and then I would tie it in, survey-wise, and calculate acreage, and he would give me instructions of what type of restoration plan he desired, and I would simply be the mechanic of putting together a few numbers as to what it would cost to do that.[26]

Camp has been retained as a surveyor to "execute" the plans for restoration of TPSB's property. With the assistance of the designer of the plans, Dr. Chabreck, he has done this task. His plans involve calculations and measurements that fall within his expertise as a surveyor, his calculations were carried out in accordance with the methodology used in the profession of surveying. Hence, Koch's motion in limine as to Camp should be denied.

**Alex McCorquodale**

Although Koch's argument is less than coherent, Koch presumably seeks to exclude or limit Dr. McCorquodale's testimony based on his methodology. Koch primarily focuses on three areas: (1) the results of the velocity measurements in one of the cuts in the Koch canal, (2) the lack of velocity measurements in the marsh, and (3) the results of some suspended solids samples.[27]

---

[26]   See pg. 54, lines 18-25, pg. 55, lines 1-21, of deposition of Charles Camp, relevant portion attached as Exhibit "H" to this Opposition.

[27]   As a preliminary note, Koch's counsel accuses undersigned counsel of influencing the results of McCorquodale's study. For the record, and without waiving any privileges provided by law, undersigned counsel misspoke in the deposition of McCorquodale. No commands were given to any experts as to where to take measurements in the Koch canal or its cuts! Rather, a conversation took place with Shea Penland involving where measurements were to be taken in the Columbia

First, Koch does not seem to attack the qualifications of McCorquodale.  Nonetheless, as shown in McCorquodale's CV attached with this Opposition, McCorquodale clearly qualifies as an expert in hydrology based on his knowledge, experience, training, and education.[28]  Instead, Koch attempts to attack the methodology of Dr. McCorquodale.  TPSB submits that even a cursory comparison between Dr. McCorquodale's expert report and both of defendants' hydrology expert reports shows that Dr. McCorquodale clearly followed a recognized scientific procedure and applied accepted scientific principles in reaching his conclusions.  Defendants' expert reports are cryptic to say the least and indicate little, if any, recognized methodology.

Dr. McCorquodale meticulously details his methodology in his report on November 3, 2000.[29]  First, Dr. McCorquodale describes the site where his data was collected, including the size of the cut in the Koch canal where his data was collected, the water temperature while data was collected, harmless salinity levels measured, and the types of marsh adjacent to the sites where data was collected.[30]  Dr. McCorquodale then describes the "purpose" of his study and explains why the

---

Gulf canal since prior attempts (as stated in McCorquodale's September 13, 2000 report), to take measurements at Columbia Gulf's bulkhead near Little Horn Bayou were unsuccessful.  Two options were raised by Dr. Penland, one at the cut in the Columbia Gulf canal and the other at the Columbia Gulf bulkhead near Little Horn Bayou.  After discussing relevant facts, severe time limitations, and limitations on personnel and equipment available, undersigned counsel suggested that measurements should be taken in the area of the Columbia Gulf cut near the east property line to which Penland agreed and informed he would discuss with McCorquodale.  Undersigned counsel, as an officer of this court, did not command or suggest to Penland or any other expert in any manner as to what the results of the McCorquodale velocity measurements in the Columbia Gulf canal should be.  Undersigned counsel with testify to this effect under oath if there remains any question of McCorquodale's study being tainted.

[28]    A copy of Dr. McCorquodale's CV is attached to this Opposition as Exhibit "I".

[29]    A copy of Dr. McCorquodale's November 3, 2000, report is attached to this Opposition as Exhibit "J".

[30]    See pg. 2, of the copy of Dr. McCorquodale's November 3, 2000, report attached to this Opposition as Exhibit "J".

3 areas where velocity measurements were taken were chosen.[31]  Specifically, McCorquodale chose

the cut in the Koch canal identified as "cut 18-13#1" in his report because of the visible exchange

of water, and "cut 18-13#2" in Little Horn Bayou was chosen for monitoring to establish the

"general tidal signature in the marsh and the non-tidal flow" in Little Horn.[32]  The Columbia Gulf

"cut 18-13#3" was included to assess flow exchange between the canal and adjacent marsh.

Dr. McCorquodale then identifies the flow meter and data logger model used to gather data,

including options on the meter such as "a pressure transducer and a velocity meter," and why these

instruments were used.[33]  He then describes how the meter was mounted to a frame and installed, and

he identifies that a hand held flow meter was used for spot velocity measurements.  McCorquodale

made sure the meters were calibrated prior to use and verified the continuous velocity measurements

with spot velocity measurements.  McCorquodale then states that a sample of marsh bed sediment

was collected, and settling velocity analyses were conducted.   McCorquodale describes the

procedure used to perform the settling velocity analyses.[34]

On pages 3-4 of his report, Dr. McCorquodale identifies the methodology used to gather the

data at the three sites where measurements were taken.  Basically, the cross-sections at the three sites

were measured, station elevations were taken at 18-13#1 and 18-13#2, and depth measurements were

---

[31]    See pg. 2, of the copy of Dr. McCorquodale's November 3, 2000, report attached to this
Opposition as Exhibit "J".

[32]    See pg. 2, of the copy of Dr. McCorquodale's November 3, 2000, report attached to this
Opposition as Exhibit "J".

[33]    See pg. 2, of the copy of Dr. McCorquodale's November 3, 2000, report attached to this
Opposition as Exhibit "J".

[34]    See pg. 3, of the copy of Dr. McCorquodale's November 3, 2000, report attached to this
Opposition as Exhibit "J".

taken at 18-13#1 and 18-13#3. H-Frames were constructed and the probes were mounted on the horizontal beams of the frames. The frames were installed in the central part of each of the selected cross-sections with the probe at approximately mid-depth to ensure maximum velocity measurements which were expected to occur mid-way between the surface canopy and the marsh bottom when a canopy was present, and in the upper half of the depth when no canopy was present.[35] Dataloggers were placed in safe places near the probes to ensure accurate data retrieval. Dr. McCorquodale then identifies that a technician was present during daylight hours on August 24-25, 2000, to perform various data collections.

Pages 4-6 of Dr. McCorquodale's report discusses his analysis of the data gathered at cuts 18-13#1, 18-13#2, and 18/13#3. Dr. McCorquodale explains how he "flow corrected for the lateral and vertical boundary layer effects" resulting in reductions in the magnitude of the measured velocities. Dr. McCorquodale also accounted for possible probe fouling resulting in underestimation of actual velocity magnitudes. His discusses the results of his analysis of data gathered on the quantity of water flowing into and out of the marsh on August 24-25, 2000, as well as the results of samples of bed sediment that were collected.

On pages 6-7 of his report, Dr. McCorquodale generally discusses the results considering all of the data gathered. Koch claims McCorquodale's opinions are limited to two areas. TPSB submits that the opinions of McCorquodale are contained on pages 7-8 of his report and speak for themselves:

1.    The field data indicate that there is a significant exchange of water between

---

[35]    See pg. 3, of the copy of Dr. McCorquodale's November 3, 2000, report attached to this Opposition as Exhibit "J".

the United Gas Canal and the adjacent marsh property owned by Terrebonne Parish School Board via the cut (18-13#1) studied in this report. The exchange was dominated by the tidal range of approximately 8 inches during the study. The flow exchange that can be attributed to the astronomical tide was more than 1 million ft$^3$ for the period of study. There was also a net flow from the United Gas Canal into the marsh during the period of measurement.

2.    The velocities at cut 18-13#1 can exceed 2 ft/sec and are sufficient to erode and transport the organic material into or out of the marsh bottom.

3.    The results from the analysis of the bed sediment sample for cut 18-13#1 indicated a high organic content, low bulk density and low settling velocity which shows that the bottom material may be susceptible to erosion and transport.

4.    The flow exchange at cut 18-13#3 was dominated by the astronomical tide with tidal inflow and outflow of 165,000 ft$^3$ over the single tidal cycle on the date of the field measurements. The tidal response at cut 18-13#3 was very similar to that found earlier at cut 18-13#1.

The above summary of McCorquodale's methodology and opinions in this case make clear that his testimony passes the test established in F.R.E. 702. His testimony is "based upon sufficient facts or data" gathered through accepted procedures in the field of hydrology. His opinions and conclusions are the product of reliable principles and methods, including accounting for and adjusting his results for possible factors that might have affected the accuracy of the data gathered. Finally, Dr. McCorquodale has applied the principles and methods reliably to the facts of the case.

Dr. McCorquodale testified at his deposition that the scope of his task "was to establish whether or not there was a significant flow between the canal and the marsh and vice versa."[36] The alleged questions raised by Koch, if anything, go the weight this Court may give to Dr. McCorquodale's trial testimony, but the alleged questions raised do not indicate any faulty or lack

---

[36]    See pg. 9, lines 13-15, Volume II of Dr. McCorquodale's deposition, a copy of which is attached to this Opposition as Exhibit "K".

of recognized methodology was utilized to reach the opinions expressed by Dr. McCorquodale.

Consequently, Koch's motion in limine as to Dr. McCorquodale should be denied.

## CONCLUSION

Considering the reasons provided herein, Plaintiff, Terrebonne Parish School Board, submits

that Koch's Motions in Limine to exclude the testimony of Dr. Alex McCorquodale, Charles Camp,

Dr. Shea Penland, and Dr. Robert Chabreck must be denied.

Respectfully submitted,

**THE GRAY LAW FIRM (APLC)**

_(signature)_

**A. J. GRAY, III**                    **#6253**
**WADE T. VISCONTE**            **#24734**
Post Office Box 1467
Lake Charles, LA 70602-1467
(337) 494-0694          Telephone
(337) 494-0697          Facsimile

**MICHAEL X. ST. MARTIN        #12365**
**JOSEPH G. JEVIC III              #23145**
ST. MARTIN & WILLIAMS, APLC
Post Office Box 2017
Houma, LA 70361
(504) 876-3891          Telephone
(504) 851-2219          Facsimile
**Attorneys for Terrebonne Parish School Board**

## CERTIFICATE OF SERVICE

**I CERTIFY** that a copy of the preceding Opposition together with the aforementioned

supportive pleadings and exhibits, have been served on all counsel of record via hand delivery,

facsimile transmission or by placing same in the United States mail delivery, postage prepaid and

properly addressed, on the _2nd_ day of ___January___, 2001.

**WADE T. VISCONTE**

**SEE RECORD FOR
EXHIBITS
OR
ATTACHMENTS
NOT SCANNED**