UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JAN -3  AM 8: 59

LORETTA G. WHYTE
CLERK

|  |  |  |
|---|---|---|
| **TERREBONNE PARISH SCHOOL BOARD** | * | CASE #00-0319 |
|  | * |  |
|  | * | SECTION "B" |
| VERSUS | * |  |
|  | * | MAGISTRATE 5 |
| **COLUMBIA GULF TRANSMISSION COMPANY and KOCH GATEWAY PIPELINE COMPANY** | * |  |
|  | * |  |
|  | * |  |
|  | * |  |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANT KOCH GATEWAY PIPELINE COMPANY'S
## MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE

**MAY IT PLEASE THE COURT**:

Plaintiff has moved to strike the entire testimony of two of Koch's experts, Dr. Kenneth Boudreaux, an economist, and Dr. Richard DeVries, a hydrologist, and partially exclude the testimony of two of Koch's experts, Mr. Irvington J. Eppling, a certified real estate appraiser, and Dr. Luther Holloway, an expert on marshes and damages thereto.

### I. SUMMARY OF ARGUMENT

Koch respectfully submits that plaintiff's motions are without merit.  As to Dr. Boudreaux, his testimony is both relevant and based upon appropriate scientific background, from the standpoint that the economic value of the property, and particularly those benefits captureable by plaintiffs, is a key factual issue in this case.  Applicable Louisiana law states that a person whose property has been damaged is limited in recovery to the value of that property where the cost of restoring same is disproportionate

8621

Fee
Process
X Dktd  OLD
CtRmDep
Doc.No. 85

to the value of the property or economically wasteful.  See, e.g., _Roman Catholic Church_

_v. Louisiana Gas Service Company, 618 So.2d 874._  Dr. Boudreaux is eminently qualified

to explain to the court the economic differences between "private value" and "societal

value," all of which are to be considered by the trier of fact in determining whether or not

restoration damages are sought.[1]

In similar fashion, the testimony of Koch's expert real estate appraiser Irv Eppling

is completely admissible, including that portion which criticizes Dr. Shea Penland's

assessments of coastal wetland values.   Koch submits that Mr. Eppling will testify at trial

regarding his experience in overall values of property, including wetland values. This very

area touches upon the same issues discussed by the Louisiana Supreme Court in _Roman_

_Catholic Church, supra._  That is, if the cost of restoring property is wholly disproportionate

to its value to the owner, then those restoration damages will not be allowed, and the

plaintiff is limited to only the difference between the value of the property before and after

the harm.

Plaintiff seeks to exclude the entire testimony of Dr. DeVries regarding the alleged

cause of damage to plaintiff's property.  This is not surprising, as Dr. DeVries was the only

expert to take measurements **_inside_** the marsh area so as to give an opinion on whether

or not flows inside the marsh could transport and/or erode the marsh's materials. As will

be explained in detail, Dr. DeVries' training, education, and experience allow him to testify

---

[1]    It should be noted that plaintiff has not deposed Dr. Boudreaux in this case, as was their right and opportunity.  Those portions of Dr. Boudreaux's testimony which are cited by plaintiff's Motion In Limine are from another case, and to the extent not applicable herein, Koch objects to references thereto.

**8621**                                        2

regarding erosion as the alleged cause of damage to plaintiff's property. Further, it is ludicrous for TPSB to suggest that because Dr. DeVries is not an engineer licensed in the State of Louisiana he cannot give expert testimony in this case.

Finally, TPSB's Motion to Partially Exclude Testimony of Dr. Holloway, relative to hurricane damage, salinity issues or Corps approval, is also without merit. Dr. Holloway is an expert on marshes, which would include hurricane damage issues. Further, while he did not take salinity measurements himself, these were taken by Dr. DeVries and/or referenced in Dr. DeVries' reports. Lastly, Dr. Holloway help write the federal statute requirements which necessitate a Corps permit in the first instance, i.e., Section 404 of the Clean Water Act, 33 U.S.C.A. § 401, et. seq.

## A. Dr. Kenneth Boudreaux

First and foremost, Koch strenuously objects to plaintiff's reliance upon the report of Dr. Penland and his "expert opinion" regarding the "societal value" of wetlands. As Koch has previously addressed in its Motion In Limine, Dr. Penland's testimony is wholly unsupported, in particular when applied to the facts of this case. Koch will further address these issues in its Supplemental Memorandum In Support of Motions In Limine, citing to specific portions of Dr. Penland's testimony. Therefore, to the extent that plaintiff's Motion In Limine regarding Dr. Boudreaux relies upon or asserts as a given the expected testimony of Dr. Penland, then Koch objects to same and notes that unless and until this Court has made a ruling regarding Dr. Penland's testimony and the scope thereof, Dr. Boudreaux's economic analysis of plaintiff's property is clearly pertinent and relevant.

Koch submits that Dr. Boudreaux's qualifications as an economist, without regard

to the specific area of "social values" of wetlands, is pertinent in this case. Dr. Boudreaux's report distinguishes between private value and social value in the context of TPSB's property. In this situation, the applicable case law limits any recovery of the plaintiffs to the value of the property and any diminution therein.[2] In *Roman Catholic Church v. Louisiana Gas Service Company*, 618 So.2d 874 (La. 1993), the Louisiana Supreme Court addressed in detail the issue of restoration costs of damaged property, where said costs are disproportionate to the value of the property or economically wasteful. The *Roman Catholic Church* stated the rule as follows:

> "Accordingly, we conclude that, as a general rule of thumb, when a person sustains property damage due to the fault of another, he is entitled to recover damages including the cost of restoration that has been or may be reasonably incurred, or, at his election, the difference between the value of the property before and after the harm. If, however, the cost of restoring the property in its original condition is disproportionate to the value of the property or economically wasteful, unless there is **a reason personal to** the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs, damages are measured only by the difference between the value of the property before and after the harm." *Roman Catholic Church*, at 879, 880. (Emphasis added.)

In this instance, as Mr. Eppling's undisputed appraisal makes clear, and as TPSB has conceded for purposes of their Motion In Limine, TPSB's property has a fair market value of $250.00 per acre, or less. Plaintiffs are claiming that a total of just under 215 acres have been damaged by the combined actions of Koch and Columbia. Under Mr. Eppling's undisputed real estate appraisal value, this translates into a total value of

---

[2]      Koch has briefed this particular issue in regards to its Motion for Summary Judgment, and adopts all arguments contained therein.

$55,000.00 or less for the 215 acres at issue. Notwithstanding, plaintiff's experts Dr. Chabreck and Mr. Camp have proposed a restoration plan which would cost each defendant over $10 million to "restore" the damaged property, including either filling in or bulkheading the canals.[3]

Plaintiff's Petition makes no claim that the damage to or deterioration of the surface marsh has in any way affected plaintiff's ability to earn revenue from the property itself. In this instance, the bulk of the revenue earned by this property has been through surface leases, and occasional seismic testing. There has not been an active well on the site in over twenty (20) years. Further, few, if any, of the School Board members have actually ever visited the property or expressed any "special interest" in the property other than for economic reasons. In fact, plaintiff's own expert on supposed marshland values, Dr. Shea Penland, admitted that the School Board is limited in what it can do with the property for purposes of earning income.

In this regard, the *Roman Catholic Church* court states: "In choosing between the costs of repair measure and some other measure of damages, it is important to know how the property is used and what interest in it is asserted, so that the measure can be adopted that will afford compensation for any legitimate use that the owner makes of his property." *Roman Catholic Church, at 880*. In fact, in awarding restoration damages, as opposed to value of property damages, the *Roman Catholic Church* specifically noted that the Arch Diocese did not buy the property as an investment with an eye towards speculation, and did not hold the property solely for the production of income.

---

[3]    For a more detailed analysis of Mr. Camp's restoration plan and its cost per acre, please refer to Koch's Motions In Limine, previously filed herein.

**8621**                                            5

In addition, and contrary to plaintiff's assertions, Dr. Boudreaux has given deposition testimony regarding "economic values" of wetlands, and intends to testify regarding same at trial herein. Dr. Boudreaux testified as follows:

> " Q.   Okay.   Now, what is it in your background, your education, your training and experience that suits you to deal with the difference between the private and social issues here?
>
> A.   My training as an economist dealt in part with the distinction between private and social values of assets in society. It's one of the standard areas that economists are trained in.
>
> Q.   Okay. Help me be a little more specific as to how economists deal with that distinction in matters other than in this case.
>
> A.   In general, the notion of property in economics dissolves down the concept of property rights from an economic point of view, and property rights are essentially distinctively different in private holding as opposed to public interest; that is private ownership rights of property endow the private owner with certain capabilities of capturing benefits of private property. Those benefits are not the same, necessarily, and typically are different as to the social benefits of property."[4]

Further, Dr. Boudreaux does in fact have sufficient expertise from an economic standpoint to comment on the theories of Dr. Penland regarding the alleged "societal value" of wetlands:

> "   I think that there exists enough controversy in that literature for me to be able to state with some confidence that that social valuation is at best uncertain and that there would be some significant dispute if experts in that area were ranged against

---

[4]      See Exhibit 1 attached hereto, pp. 11-12 of deposition of Dr. Kenneth Boudreaux, taken in the matter entitled *Michael X. St. Martin v. Quintana*, USDC #98-2095, Sec. "C", Mag. 5. Again, the fact that Koch cites to this deposition testimony from another matter does not mean that Koch waives its object to TPSB's reliance upon that deposition testimony to the extent that it is not applicable herein.

each other as to what that value would be. And even within that field, there is a broad range of opinion as to the proper methods of measurement and standards to use and a broad range of ultimate conclusions as to value in that context.

\* \* \*

A. I have commented in my report that there are aspects of the measurement characteristic that are suspect, at least from my point of view from what I read in the literature about the measurement of values in non-market situations; in other words, where there is no market that quotes prices for that property. It's a controversial area in economics, and I guess my best description of it would be that the values could vary by as much as 40 to 80 percent depending on which researcher that you're looking at.

I also have some comments on the discounting processes that they use for valuation purposes."[5]

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 126 L. Ed. 2d 469 (1993), permits any expert testimony that consists of "...specialized knowledge," that will "...assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, at 509 U.S. at 591. Dr. Boudreaux's expertise in the area of economics, and his commentary regarding the controversial nature of evaluating wetlands for "societal purposes" are sufficient to, first, meet the requirements of *Daubert* regarding specialized knowledge and, second, assist the trier of fact in weighing the issues applicable in this case. In particular, the trier of fact will have to determine whether *Roman Catholic Church* supports an award of restoration costs ranging upwards of $10 million per defendant for a piece of property that the School Board itself never actually purchased, but instead received pursuant to donation from the United States Government. This is

---

[5]      Exhibit 1, Boudreaux deposition, pp. 17-18.

especially true considering that the alleged damage portion of the property at issue, i.e., just under 215 acres, has a market value of less than $55,000.00 , and the entire piece of property (600 acres) has a fair market value of less than $150,000.00.

In fact, when the alleged expertise of Dr. Penland is taken into account, it is clear that Koch should be permitted to have Dr. Boudreaux as set forth in his report.  In particular, Dr. Penland relies primarily upon reports of one Dr. Costanza, who has a minor degree in economics.  As such, Dr. Penland is relying, albeit in a second-hand, hearsay fashion, upon expert testimony which requires economic analysis.  As such, an economist's input and opinion are applicable in this case, and without regard to whether that economist has particular training in wetland issues. The overriding issue is not the fact that these are wetlands, but instead the fact that plaintiff is using some elevated, scientifically unacceptable principal of "societal value" to justify Mr. Camp's restoration plans, in spite of the contrary language of _Roman Catholic Church_, _supra_, and _Weeks v. T.L. James & Company, Inc._, _626 So.2d 420 (La. App. 3d Cir. 1993)_. This "societal value" theory is completely economic in nature, in that it relies not upon the fair market value of a piece of property, but instead upon what values that property provides to society. As such, Dr. Boudreaux's area of expertise, which includes calculation of monetary values, application of discount factors, and, in general, estimating the overall worth of a piece of property is permissible.

For these reasons, plaintiff's Motion in Limine to strike the testimony of Dr. Boudreaux should be denied in its entirety.

## B. Mr. Irvington J. Eppling

**8621**                                    8

For many of the same reasons that Dr. Boudreaux's opinion regarding the "economic value" of the property is pertinent, Mr. Eppling's appraisal of the property is pertinent, as well. Further, Mr. Eppling's commentary on Shea Penland's assessment is likewise admissible and relevant. Again, under the mandate of *Roman Catholic Church*, a property's value is to be considered when restoration costs are sought which are grossly disproportionate to the value of that property. In this case, should Dr. Penland be allowed to testify, it will be up to the trier of fact to determine whether his theories and opinions regarding the "societal value" of wetlands are appropriate to this particular piece of property. As noted, Dr. Penland has relied primarily upon studies performed by Dr. Costanza regarding "societal values" of wetlands from an economic standpoint. By Dr. Costanza's own admission, many of the surveys upon which he relied involve marshes that are not located in Louisiana and, in fact, are not even located in the United States:

" Q. What do you mean when you say you were using average values?

A. Well, there haven't been all that many, as you can see in Table 2, studies of the value of these wetlands, although there have been a lot of studies of wetlands, so we are relying on just a few estimates and applying those over very broad areas. So the level of detail on the analysis is not good enough to make those kinds of distinctions between that level of spatial pattern. You see what I mean?

Q. If I understand what you're saying, at least the numbers you derive from Table 2 were drawn from other studies, some not even within the USA, correct?

A. Right. I clearly identify in the table which ones were specific to Louisiana, which ones were specific to the U.S., which ones were outside the U.S.

Q. By my quick calculation, of the thirty areas where you calculated or that you relied upon to value the wetlands, Table

**8621**                    9

2, 17 of those were not specific to Louisiana, is that correct?

A. Assuming you counted correctly.

Q. And 13 of them were related to Louisiana?

A. Right.

* * *

Q. You talk about using certain values, I guess X valuation, and you extrapolate that to the Mandalay marsh. What if the Mandalay property here winds up being at the low end of the values that you considered in all these various areas listed on Table 2? Is that a possibility?

A. I guess it's a possibility. There is no way to know unless you do so me additional research.

Q. What additional research would you need to do to give that opinion?

A. Well, I'd have to do some of these sort of valuation studies specifically for that area, and also look at some of the other services that were not even estimated for any of the coastal wetlands for this particular area. There is also more research to do."[6]

Mr. Eppling has a MAI designation with the American Institute of Real Estate Appraisers, and has specifically testified regarding the value of both waterfront properties and wetlands.[7] This is in contrast to plaintiffs' allegations that Mr. Eppling has no training, experience or education which qualifies him as an expert on coastal wetlands. While this may be a matter of semantics, Koch submits that it is entirely reasonable to present both Mr. Eppling's opinion regarding the market value of the plaintiffs' property, as well as his opinion on why the theories of Drs. Costanza and Penland are inapplicable with respect

---

[6]      Exhibit 2, pp. 38-40 of Dr. Costanza's deposition in the matter entitled *St. Martin v. Quintana*, USDC #98-2095, Sec. "C", Mag. 5.

to the damages alleged in this case.

Further, it is ludicrous for plaintiffs to suggest that Mr. Eppling's opinions about whether the functions of the TPSB's property are captureable for private and/or public benefit are "...merely the opinions of a layman who is purporting to testify as an expert." These are the exact benefits of a piece of property which an expert appraiser takes into account in determining the value of that property.

For these reasons and for the reasons as argued in Section B. above regarding Dr. Boudreaux's testimony, Koch submits that the entirety of Mr. Eppling's testimony should be permitted, including his commentary on the so-called "societal" values of the plaintiff's property.

## C. Dr. Richard DeVries

Koch finds it amazing that TPSB would argue that Dr. DeVries, the only *hydrologist* to take flow measurements *inside* the marsh, does not meet *Daubert* requirements, or took measurements or relied upon data which cannot satisfy *Daubert*. Dr. DeVries then used these measurements to calculate maximum attainable water velocities *inside* the marsh, all of which support his theory that the marsh material cannot either be eroded or transported away from inside the marsh area through the cuts in the spoil banks adjacent to Koch's canal.

Moreover, TPSB is wrong in asserting that Dr. DeVries "consciously took his measurements at the lowest period of tidal velocity in the daily and monthly tidal cycle." The multiple velocities which Dr. DeVries measured at both cuts and inside the marsh itself were done simultaneously, with rates of 1.1 and over 1.2 feet per second. While these

8621                                    11

were somewhat less than the 2 feet per second which plaintiff's expert, Dr. McCorquodale, measured at the same cut, Dr. DeVries also opined that even if his measurements inside the canal were extrapolated to reach those velocities which Dr. McCorquodale had measured at the highest time of tidal cycle, they still would be insufficient to erode or transport the organic material in the marsh.[7]

TPSB also asserts that Dr. DeVries cannot testify because he incorrectly used velocities relative to inorganic clay materials, as opposed to organic root mat materials in providing his opinion as to whether or not there were sufficient velocities to erode or transport sediment from the marsh. However, TPSB fails to cite the specific testimony because Dr. DeVries' deposition was not available at the time the briefs were filed. At the time of this filing herein, said depositions are still not available. However, it is Koch's recollection that Dr. DeVries did not give any such opinion regarding the marsh root mat, but instead was referring to the underlying soil itself.

In partial support of this, TPSB's cites Dr. McCorquodale's purported reliance upon Ven Te Chow's publication on open-channel hydraulics. First, the publication which Dr. DeVries relied upon is universally accepted, and was in fact used by TPSB's expert, Dr. McCorquodale. Second, and more importantly, the part of Chow cited by Dr. DeVries relative to required velocities of 2.0 - 3.75 feet per second are all velocities ***below*** the velocity required to erode clay materials. Attached hereto as Exhibit 3 is a copy of Page 165 from Chow, setting the maximum permissible velocities, a/k/a the nonerodible velocity,

_____

[7]    In fact, Koch finds it somewhat ironic that TPSB asserts, even incorrectly, that Koch expert Dr. DeVries intentionally took measurements at the lowest tidal cycle. TPSB expert Dr. McCorquodale admitted that his own measurements were taken during the highest 25% of the tidal cycle, thus resulting in the highest possible water velocities.

8621                                    12

necessary to erode materials. As can be seen, the rates of 2.0 - 3.75 feet per second are all applicable to silt loam, alluvial silts and ordinary firm loams. They do not reference clays as TPSB claims Dr. DeVries has said.

Even if Dr. DeVries did testify as such, which is denied, then such issue goes not to whether or not he meets *Daubert* standards, but the overall weight to be given to his opinion.

TPSB also blatantly misstates Dr. McCorquodale's testimony and opinion by asserting that McCorquodale "...did take root mat samples which produced objective evidence contradicting the unsupported conclusions of DeVries." Dr. McCorquodale was deposed over a period of two days, and the only samples which he took were water samples to analyze the suspended sediments, which were taken *at a single cut* between the Koch canal and the interior marsh property, and a brief, visual observation of a "clump" of floating vegetation which was actually taken from the Koch canal side of the aforementioned cut, not from the marsh. Dr. McCorquodale did not analyze any of the root mat *itself*, as he testified on several occasions that this would beyond the scope of what he was asked to do.[8] Accordingly, any such suggestion by TPSB that Dr. McCorquodale took root mat samples is at best erroneous, and actually borders on outright misrepresentation.

Koch finds these arguments especially brash, given the fact that, by their own admission, neither of plaintiff's so-called "causation" experts, Dr. Shea Penland and Dr.

---

[8]     In general, please refer to Koch's previously filed Motion In Limine on this issue.

Robert Chabreck, performed any such measurements themselves,[9] yet somehow plaintiff suggests that Drs. Penland and Chabreck can give causation testimony notwithstanding their lack of any such measurements.

Finally, in what is obviously a desperate ploy to strike the only expert in this case who has in fact conducted hydrological studies *inside* the marsh, TPSB asserts that Dr. DeVries "is not qualified to provide an expert opinion because he is not licensed as an engineer in Louisiana and his opinion constitutes the unauthorized practice of engineering in Louisiana."

At the outset, Koch rejects any classification of Dr. DeVries' activities in this case as the unauthorized practicing of engineering in the State of Louisiana as purportedly set forth in La. R.S. 37:682(8). Clearly, such statute was intended to apply only to those individuals who might be "practicing engineering" in Louisiana in the sense that they hold themselves out to the general public as an engineer, and routinely accept engineering jobs in the State of Louisiana. Clearly, that is not what Dr. DeVries has done in this instance.

Even if Dr. DeVries' actions herein have constituted the unlicenced practicing of engineering in the State of Louisiana within the meaning of La.-R.S. 37:700, et. seq., which is again denied, then that is a matter between Dr. DeVries and the enforcement arm of the Louisiana government. It has absolutely no bearing on whether or not Dr. DeVries' expert hydrological opinions in this case are valid or not valid. The only Louisiana case cited by TPSB is *Accountants' Association of Louisiana v. State*, 533 So.2d 1251 (La. App. 4th Cir. 1988). Even the briefest review of that case demonstrates the absurdity and weakness of

---

[9]    Please refer to Koch's Motions In Limine and supporting memorandum regarding the lack of expertise of Drs. Penland and Chabreck.

**8621**                    14

TPSB's position. In *Accountants' Association*, the issue is not whether the individuals at hand could give expert testimony in civil court proceedings. Rather, the only, limited issue is whether or not accountants who were not licensed, certified public accounts could issue "review reports" on a regular basis. The court specifically found that review reports were one of three distinct types of financial analyses defined by the American Institute of Certified Public Accounts, along with the audit and the compilation. There was absolutely no *Daubert* challenge involved in *Accountants' Association*. In contrast, there are multiple Louisiana cases which have looked at expert testimony from individuals who are not "licensed" within the State of Louisiana, but rather in other jurisdictions, and the court has permitted them to testify accordingly.

For instance, in *Piazza v. Behrman Chiropractic Clinic, Inc., 601 So.2d 1378 (La. 1992)*, the Supreme Court specifically held that the plaintiff's expert did not have to be licensed in the State of Louisiana, or even actively practicing in the State of Louisiana. In that case, the plaintiff filed a malpractice action against a chiropractor. The plaintiff's expert, Dr. Poinsett was excluded from testifying because he was not actively practicing at the time of the alleged malpractice, and because he had never practiced in Louisiana or a similar locale to that involved, i.e., Houma, Louisiana. The Supreme Court granted writs and reversed, looking at La.-R.S. 9:2794, which proscribes the standard required for a plaintiff to show malpractice. This statute is even more particularly directed to malpractice issues and the level of expertise necessary by an expert testifying for either side, as compared to the general licensing proscriptions set forth in La-R.S. 32:700, *et. seq.* relied upon by TPSB herein. The court noted that nowhere does La.-R.S. 9:2794

8621    .                              15

"...require the *expert* to be actively practicing." *Piazza, at 1382*, emphasis original. The court held that all the expert had to do was "...satisfy the trial judge that he or she is qualified to give tetimony regarding the applicable standard of care." *Piazza, at 1382*. Since the trial judge had determined that the expert was so qualified "...based upon his numerous years of experience, practice and consultation in the filed of chiropractic medicine....," the Supreme Court reversed the Fourth Circuit Court of Appeals' decision which had reversed the trial judge's ruling on that issue. *Piazza, at 1382*.

## D. LUTHER HOLLOWAY

Finally, TPSB seeks to exclude Koch's expert witness, Dr. Luther Holloway from testifying on three areas: (1) possible hurricane damage to the property in question; (2) the effect of salinity intrusions; and (3) whether the Army Corps would permit the restoration projects of Dr. Chabreck and Mr. Camp.

As to the issue of hurricane damage, while Dr. Chabreck admitted that he is not an expert on hurricanes, he is in fact an expert on Louisiana marshes. To the extent that any of the plaintiff's marsh property has been damaged by hurricanes, then Dr. Holloway is qualified to opine on that, even if he did not conduct specific studies relative to hurricane damage.

As to Dr. Holloway's opinions regarding salinity intrusion, while he himself took no salinity measurements, it is clear that Dr. DeVries, in connection with inspecting the property with Dr. Holloway, took such samples.[10] Further, the portion of Dr. Holloway's deposition cited by TPSB is not applicable to opinion #5 of Dr. Holloway's report. Dr. Holloway's opinion #5 is that water flows and structures to the west, with natural flows which go from west to east, have prevented salinity intrusion on a generally regular basis. Thus, plaintiff's "restoration" plan is not going to work because damming or filling the

---

[10]     Please refer to Exhibit 4, report of Dr. DeVries, Table 2, showing salinity measured at .30 ppt.

**8621**                    16

canals will prevent or reduce that water flow from the west to the east.

In contrast, the portion of Dr. Holloway's testimony cited by TPSB pertains to other sources of damage of the Section 16 property, with one of these being an issue of "produced water" in the past, which may have caused damage to the Section 16 property, and, especially, to that property to the east. Accordingly, a prior "kicking up" of the salinity regime in part of the area would explain why there are additional sources of damage to TPSB's property.

Next, Dr. Holloway is in fact more than qualified to give his opinion testimony regarding whether or not the Corps would approve the restoration plans of Dr. Chabreck, as formulated by Mr. Camp. Again, were TPSB not seeking upwards of $10 million from each defendant, such a critical posturing would be humorous. As Koch has outlined in its own Motion In Limine regarding Mr. Camp, he has admitted that the project cannot be started until the Corps gives its approval, yet he still feels more than qualified to testify that the Corps would give such approval. Based upon this, therefore, TPSB is seeking the millions of dollars at issue.[11]

Further, Dr. Holloway's statements in his deposition and in his report are not contradictory. It is his opinion that such a restoration plan would not be proposed based upon his experience, but also admits, as he must do when sworn under oath, that until the plan is actually submitted to the Corps, no definitive statement can be made.

Dr. Holloway also cited his previous experience with the U.S. Army Corps of

---

[11]    For a more detailed analysis of Mr. Camp's restoration plans, and why same cannot be admitted under _Daubert_ and/or are plans which should be rejected based upon summary judgment standards, please refer to Koch's previously filed Motions In Limine and/or Motion for Summary Judgment, In Whole or Part.

Engineers, particularly in helping to draft U.S.C.A. § 404 of the Clean Water Act, which pertains to the Corps' requirements necessary for issuance of a permit in such a situation as this. Certainly, Dr. Holloway's expertise and experience in this issue are sufficient to survive any *Daubert* challenges.[12]

Lastly, TPSB takes issue with Dr. Holloway's proposed restoration plan, again incredulously claiming that his report must be excluded because he "...conducted no field work analysis, whether through water samples or otherwise, to verify that TPSB is receiving insufficient sediments and nutrients, nor did he conduct field work to eliminate the fact that sufficient sediments and nutrients are transported to TPSB's property via Little Horn Bayou. In fact, this is not the case. Dr. Holloway visited the site on numerous occasions, inspecting all of the waterways which surround this marsh. In fact, the report of plaintiff's own expert, Dr. McCorquodale, established that there is a net flow of water **into** the marshland property through the Koch canal and the cut where Dr. McCorquodale took his measurements. As such, Dr. Holloway's opinion is based not only upon his own examinations of the property at issue, but upon those limited studies which were performed by Dr. McCorquodale.

TPSB also claims that Dr. Holloway's restoration plan should be stricken because

---

[12]    In contrast, Mr. Camp's restoration plan is being presented by an individual who is not an engineer or contractor, has not experience working with the U.S. Army Corps of Engineers, and has admitted in his deposition testimony that he would not recommend that a private client undertake any expenses associated with a Corps permit-required plan such as in this case, until the Corps approved the permit in the first instance. Again, please refer to Koch's Motions In Limine and Motion for Summary Judgment, In Whole or Part.

**8621**                              18

it is self-contradictory, which is denied. However, even if true, then that is not an issue for a *Daubert* challenge, but instead a credibility issue. In contrast, Koch has objected to the expert testimony of Drs. Chabreck and McCorquodale because their testimony is simply without sufficient scientific basis.

## CONCLUSION

For all the reasons cited above, Koch requests that TPSB's Motion In Limine regarding Koch's experts be denied in its entirety.

Respectfully submitted,

ROBERT J. YOUNG, JR. (#13763)
ROBERT J. YOUNG, III (#19230)
YOUNG, RICHAUD & MYERS
1100 Poydras Street, Suite 1515
New Orleans, LA 70163
(504) 585-7750

Attorneys for defendant,
*KOCH GATEWAY PIPELINE COMPANY*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been forwarded to all counsel of record via hand-delivery, facsimile and/or by placing a copy of same in the U.S. Mail, postage pre-paid, on this 2nd day of January, 2001.

ROBERT J. YOUNG, III

**8621**

19

**SEE RECORD FOR
EXHIBITS
OR
ATTACHMENTS
NOT SCANNED**