UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2000 DEC 28  PM 5: 20

LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| **TERREBONNE PARISH SCHOOL BOARD** | * | CASE #00-0319 |
| | * | |
| | * | SECTION "B" |
| **VERSUS** | * | |
| | * | MAGISTRATE 5 |
| **COLUMBIA GULF TRANSMISSION COMPANY and KOCH GATEWAY PIPELINE COMPANY** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### DEFENDANT KOCH GATEWAY PIPELINE COMPANY'S MOTIONS IN LIMINE REGARDING PLAINTIFF'S EXPERTS, ROBERT CHABRECK, ALEX McCORQUODALE, CHARLES CAMP AND SHEA PENLAND

**NOW INTO COURT**, through undersigned counsel, comes defendant, Koch Gateway Pipeline Company ("Koch"), who moves this Honorable Court for Motions In Limine, either striking or limiting the testimony of plaintiff's purported experts Robert Chabreck, Alex McCorquodale, Charles Camp and Shea Penland. The reasons in support of these Motions In Limine are more fully set out in the attached memorandum in support hereof.

Respectfully submitted,

ROBERT J. YOUNG, JR (#13763)
ROBERT J. YOUNG, III (#19230)
YOUNG, RICHAUD & MYERS
1100 Poydras Street, Suite 1515
New Orleans, LA  70163
(504) 585-7750

Attorneys for defendant,
*KOCH GATEWAY PIPELINE COMPANY*

8621

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been forwarded to all counsel of record via hand-delivery, facsimile and/or by placing a copy of same in the U.S. Mail, postage pre-paid, on this 28th day of December, 2000.

ROBERT J. YOUNG, III

8621                                    2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| **TERREBONNE PARISH SCHOOL BOARD** | * * * | CASE #00-0319 |
| **VERSUS** | * * | SECTION "B" |
| **COLUMBIA GULF TRANSMISSION COMPANY and KOCH GATEWAY PIPELINE COMPANY** | * * * * * | MAGISTRATE 5 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## NOTICE OF HEARING

**PLEASE TAKE NOTICE** that Koch Gateway Pipeline Company's Motions In Limine are set for hearing in the United States District Court, Eastern District of Louisiana, New Orleans, before the Honorable Ivan L. R. Lemelle at 500 Camp Street, New Orleans, Louisiana, on **JANUARY 10, 2001**, at **9:00 A.M.**, or as soon thereafter as counsel may be heard.

Respectfully submitted,

**ROBERT J. YOUNG, JR. (#13763)**
**ROBERT J. YOUNG, III (#19230)**
**YOUNG, RICHAUD & MYERS**
1100 Poydras Street, Suite 1515
New Orleans, LA   70163
(504) 585-7750

Attorneys for defendant,
***KOCH GATEWAY PIPELINE COMPANY***

8621

**CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the foregoing has been forwarded to all counsel of record via hand-delivery, *facsimile* and/or by placing a copy of same in the U.S. Mail, postage pre-paid, on this 27th day of December, 2000.

                                     ROBERT J. YOUNG, III

8621                            2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| **TERREBONNE PARISH SCHOOL BOARD** | * | CASE #00-0319 |
|  | * |  |
|  | * | SECTION "B" |
| VERSUS | * |  |
|  | * | MAGISTRATE 5 |
| **COLUMBIA GULF TRANSMISSION COMPANY and KOCH GATEWAY PIPELINE COMPANY** | * |  |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### DEFENDANT KOCH GATEWAY PIPELINE COMPANY'S MEMORANDUM IN SUPPORT OF MOTIONS IN LIMINE REGARDING PLAINTIFF'S EXPERTS, ROBERT CHABRECK, ALEX McCORQUODALE, CHARLES CAMP AND SHEA PENLAND

**MAY IT PLEASE THE COURT:**

Plaintiff, Terrebonne Parish School Board ("TPSB") is the owner of Section 16 properties property located in Township 18, Range 13. Defendant Koch Gateway Pipeline Company ("Koch") is an interstate natural gas pipeline company, which has a 16" natural gas pipeline located on plaintiff's property. The pipeline was placed there pursuant to a right-of-way agreement executed between TPSB and Koch's predecessor, United Gas Pipe Line Company.[1] This right-of-way was granted in December, 1958, and subsequent thereto Koch laid its pipeline in a flotation canal.[2]

In addition to Koch's pipeline, co-defendant Columbia Gulf Transmission Company ("Columbia"), has a natural gas pipeline also located in the same Section 16 property, which

---

[1]    Koch purchased all of United's assets in 1992, and hereinafter they will be referred to collectively as "Koch."

[2]    Attached hereto as Exhibit 1 is a copy of the right-of-way agreement between TPSB and United, dated 12/18/57.

**8621**

pipeline was laid in 1965 pursuant to a right-of-way agreement between TPSB and Columbia.

TPSB has sued both Koch and Columbia, alleging that they have breached implied duties under their respective right-of-way agreements, thereby causing damage to plaintiff's property. The gist of plaintiff's damage claim are two-fold: (1) the respective flotation canals have widened beyond their permissible widths, causing direct loss of plaintiff's marshland; (2) cuts or openings have developed between the spoil banks or levees alongside the defendant' canals, allowing water to move in and out of the adjacent marsh, causing damage to the adjacent, interior marshland in the form of erosion through a surging or flushing action. This surging or flushing action has allegedly caused the organic materials in the marshland, as well as the root mats themselves to be deteriorated, resulting in the transportation of sedimentary material through the openings and cuts, and loss of marshland as a result thereof.

TPSB has designated four experts to testify in this case:

(1)    Dr. Robert Chabreck, a marsh specialist, who will purportedly testify how the "surging" or "flushing" action has caused damage to and deterioration of the interior marshland.

(2)    Dr. Alex McCorquodale, a hydrologist and hydraulic engineer, who will purportedly testify regarding certain, but very limited, erosive effects of water exchange between the two canals and the adjacent marshland property.

(3)    Mr. Charles Camp, a licensed surveyor, who, in conjunction with Dr. Chabreck, has proposed a total of three restoration plans, two associated with the Koch and Columbia canals, and one with the adjacent/interior marshland.

(4)    Dr. Shea Penland, a marsh expert who will purportedly testify as to the " societal value" of wetland properties in general, and hence why this court should consider restoration plans of Camp, Chabreck, et al, that cost a minimum of $3-$4 million up to and including $10-$11 million, when in fact the property is actually only worth approximately $260.00 per acre fair market value."

**8621**                                          2

For the reasons as set forth below, Koch submits that Dr. Chabreck's testimony should be stricken in its entirety; Dr. Alex McCorquodale's testimony should either be stricken in its entirety, or limited in scope as to any issue of erosion of the spoil banks; Mr. Camp's testimony should be stricken in its entirety, or limited to damages which are reasonable in accordance with applicable law; and Dr. Shea Penland's testimony should be stricken relative to "wetland societal values." The testimony of Drs. McCorquodale, Chabreck and Penland should be stricken because their expert opinions fail to satisfy the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), on remand 43 F.3d 1311 (9th Cir. 1995), and its progeny. Likewise, Mr. Camp's testimony not only fails to satisfy *Daubert* requirements, but, more importantly, is wholly at odds with Louisiana law regarding the amount of damages that may be recovered when property is allegedly destroyed or loss by another party's actions and/or inactions.

## I. ARGUMENT AND APPLICABLE LAW

In the past decade, the United States Supreme Court has issued several decisions which directly address the role of experts in civil litigation, and in particular, the Court's role in monitoring and excluding the admission of certain "scientific" evidence, which is, in reality, unsupported in either fact or theory. The most notable of these cases has been *Daubert,* supra. More recently, the Supreme Court again looked to the role of scientific evidence in *Kumho Tire Co. Lt. V. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). The following non-exclusive factors were enumerated in *Daubert* to determine the reliability of an expert's testimony:

(1)    Whether the theory or technique can or has been tested;

(2)    Whether the theory or technique has been published or subjected to peer review;

(3)    Whether the potential rate of error is acceptable in the existence or maintenance of standards;

(4)    Whether the theory or technique is generally accepted in the scientific community; and

(5)    Whether the expert is proposing to testify about matters growing naturally and

directly out of research he has conducted independent of the litigation or whether he has developed his opinions expressly for purposes of testifying.

*Daubert*, 509 U.S. 579, on remand, 43 F.2d., 1311, 1317 (9th Cir. 1995).

## DR. ROBERT CHABRECK

**1. Dr. Chabreck fails the *Daubert* test.**     Dr. Chabreck is the only one of TPSB's experts who will testify as to how the Koch and Columbia canals have allegedly caused erosion to the School Board's marsh property.  Dr. Chabreck's opinion can be summed up by quoting from his report[3]:

> The openings in the levees of the Koch canal and Columbia Gulf Canal provide a connection that hydrologically links the waters of the lower Atchafalaya River to delicate, floating freshwater marsh in Section 16.  The strong surging or flushing action associated with tides in the lower Atchafalaya River and weather events gradually eroded the organic soil of the marsh and flushed it out through the levee openings of the Koch Canal and Columbia Gulf Canal.  As a result of the erosive action, healthy freshwater marsh in Section 16 has been converted to open water and has allowed nonproductive vegetation to spread over much of the Terrebonne Parish School Board property.[4]
>
> \* \* \*.
>
> Water has moved into and out of the canals and adjacent marshes due to the breaks and cuts in the levees.   Continuous water movement over a period of months and years has caused the levee breaks to enlarge and drainage channels to form.[5]

Dr. Chabreck is not a hydrologist, nor a hydraulic engineer.  Moreover, he has not published any articles or studies which specifically deal with the issue of wetland marsh erosion because of "flushing" or "hydrological" events such as moving water.[6]

---

[3]     A copy of Dr. Chabreck's report entitled "Evaluation of Damages to Property of the Terrebonne Parish School Board in Township 18 South, Range 13 East," is attached as Exhibit 2.

[4]     See Exhibit 2 p. 1.

[5]     See Exhibit 2, pp. 5, 6.

[6]     The only case in which Dr. Chabreck has testified as an expert regarding surging or flushing actions is *St. Martin v. Mobil*, 224 F.3d 402 (E.D. LA. 2000).  However, that case involved surges or flushing due to passing boat traffic, not tidal influences or other moving water such as is the case here.  Moreover, Dr. Chabreck's opinion in *St. Martin v. Mobil* was not accepted

In fact, Dr. Chabreck's deposition testimony in this case summarizes the extent of his background and experience, or rather lack thereof, which purportedly qualifies him to testify as an expert in this case.

> "Q. All right. In all the cases that you've described, No. 1, 2, 3, 4 and 6, there were no flow studies or velocity measurements taken, correct?
>
> A. No, right.
>
> Q. And that would include the most recent one where you testified in the Fina case, the Forty Acre case?
>
> A. Right."[7]
>
>            * * *
>
> "Q. Did you rely upon Dr. McCorquodale's information regarding his flow studies in this case, 18-13, in generating your opinion?
>
> A. Yes.
>
> Q. Did you - - I'll get into that in a moment. Putting aside this case here - - and let me ask you, the bibliography that we talked about when you mentioned those two studies, the Waterfowl Vegetation, there was no flow studies that were studied in there?
>
> A. No.
>
> Q. Okay. What is it, then, about your education and your background and your training that you feel qualifies you to testify in this case about how water velocities and water flows have, as you put in it in your opinion, eroded the organic materials in the 18-13 marsh property?
>
> A. Well, it's, to me, it's very obvious, what's going on with the

_____

*per se* by the two-judge majority decision in _St. Martin v. Mobil_, but rather the appellate court simply ruled that the trial court did not abuse its discretion. In fact, the dissenting judge, Judge Barksdale, wrote a strong and well-reasoned opinion as to why Dr. Chabreck should not have been permitted to testify. Koch will address the _St. Martin v. Mobil_ decision in a separate part in this memorandum.


[7]     See Exhibit 3, deposition of Dr. Robert Chabreck, Volume I, p. 80. (Note: wherever deposition testimony is cited in this memorandum, Koch has attached only those pages as cited by Koch, and in condensed form. Should the court desire the entire transcript and/or desire standard format, Koch will be happy to provide same.)

erosion, that there is erosion taking place. When you go out and examine the marsh and you can see the water rushing out of the marsh or rushing into the marsh, and when this water is filled with organic material, you know that organic material is the soil parts that are being exported, and that the material is the substrate from which this - - that makes up the marsh.

Q. Okay. Now, you said, "it's obvious when you go out into the marsh," are you talking about 18-13, in this particular case?

A. Yes, right."[8]

\* \* \*

"Q. All right. And I'm going to get in the specifics of your report probably after we take a break for lunch, but what I still want to find out, maybe you think you answered it fully, and if you think you have, that's fine, but my question: What is it about your background, training or experience, other than what you've testified to, that you assert will let you testify what water flowing into the Section 16 property, in the 18-13 area, through cuts in Koch's Canal or Columbia's Canal, is of sufficient force to erode and cause organic deterioration and erosion of the marsh, other than what you said about going out there and seeing the particles coming out, anything else in your training, background or experience?

A. Well, I think that's the only way you would be able to determine that, would be to go out there and observe what's happening. I don't think you could make a determination without doing that, you know, you'd have to observe it to draw conclusions.

Q. Okay. But, that's fine. Anything else, other than your observations?

A. No, but I do know that there is a considerable amount of organic material that is held in suspension in this moving water."[9]

Funk & Wagnall's International Dictionary of the English Language defines hydrology as:

"The branch of physical geography that treats of the waters of the Earth, their distribution, characteristics and effects." It is obvious that Dr. Chabreck's "flushing" or "surging" theory is based upon the effects of waters of the Earth, and, specifically, how water flows in the Koch Canal have allegedly caused erosion of and damage to TPSB's adjacent marshland. Notwithstanding Dr.

---

[8]    See Exhibit 3, deposition of Dr. Robert Chabreck, Volume I, pp. 81-82.

[9]    See Exhibit 3, deposition of Dr. Robert Chabreck, Volume I, pp. 85-86.

Chabreck's admitted lack of experience or training in studying water flows and how they affect materials in general, or even marshes in specific, Dr. Chabreck nonetheless purports to give an expert opinion about how cuts in the Koch and Columbia canals have allowed flowing water to cause damage to TPSB's marshland property.  Under any reasonable interpretation of *Daubert*, *Kumho*, et al, Dr. Chabreck simply does not possess the required background (education, training and experience) to give the opinions which he purports to set forth in this case.  As Dr. Chabreck's testimony cited above indicates, the extent of his training, while perhaps sufficient to testify about marshlands in general, and even Louisiana marshlands, is not sufficient to testify about how surging or flushing water has purportedly eroded these marshlands.

For these reasons, Koch respectfully submits that Dr. Chabreck's testimony be stricken in its entirety.  With all due respect to his credentials, Dr. Chabreck simply does not possess sufficient education, training or experience to give expert opinion testimony regarding the hydrological effects of the Koch and Columbia canals on the School Board's T18-R13 Section 16 property.

Undoubtedly, plaintiff will point to the Fifth Circuit's decision in *St. Martin v. Mobil, 224 F.3d 402 (E.D. La. 2000),* in support of its claim that Dr. Chabreck is an expert in marsh damage, including hydrological causes thereof.  However, the Fifth Circuit did **not** classify Dr. Chabreck as an expert hydrologist.  Rather, the Fifth Circuit simply held that the district court "...did not abuse its discretion in finding Dr. Chabreck qualified to testify as to the dynamics within the St. Martins' flotant marsh." *St. Martin*, at 406.  In fact, the *St. Martin* decision was decided by a 2-1 panel, and a brief reading of the majority's decision on this issue demonstrates that the appellate court simply found that the trial court did not abuse its discretion, or that if there was any abuse, the erroneous submission of such expert testimony was subject to a harmless error analysis. *St. Martin*, at 405. In sum, therefore, the two-judge majority opinion simply found that the trial court did not abuse its discretion in accepting Dr. Chabreck in the *St. Martin* case.

**8621**                                                 7

In contrast, the dissenting opinion in *St. Martin* clearly sets forth why Dr. Chabreck, while perhaps having an impressive background studying Louisiana's marshes, does not have the necessary expertise at hand for the specific issue herein: the destruction or damage of TPSB's marshland through erosive effects of water coming into and out of the marshland in cuts in the Koch and Columbia canals. *St. Martin, at 412-414.*

Accordingly, to the extent that plaintiff may attempt to rely upon to rely upon the *St. Martin* decision for the *per se* proposition that Dr. Chabreck is an expert in the area of marsh damage, including hydrologically caused damage, Koch respectfully requests that this court reject any such attempt. In addition to the above difference, it should finally be noted that the theory of damage in the *St. Martin* case is different from that herein. The St. Martin property was adjacent to the Intracoastal Waterway, where dozens of barges traveled by the plaintiffs' property on a daily basis. Dr. Chabreck's opinion in that case was that the wave action from these barges entered and exited the plaintiffs' property at a severe rate, causing the erosion in question. In contrast, the property at hand herein is not affected by any barge traffic whatsoever. Rather, Dr. Chabreck's theory is that natural occurrences such as the daily tidal cycle are what caused the water to move into and out of the School Board's property from the Koch and Columbia canals, thereby causing the damage therein. As such, this court should look at Dr. Chabreck's opinion in that light, and not under the circumstances described in the *St. Martin* case.

**2. Dr. Chabreck's methodology fails under *Daubert*.**    Even if Dr. Chabreck is qualified to testify that some sort of hydraulic action via the Koch and Columbia canals has caused damage to TPSB's marshland property, he fails the second requirement of *Daubert*: a methodology which is scientifically valid and reliable. The factors enumerated in *Daubert* to test such scientific validity and reliability include: (1) whether the expert's theory can be or has been tested; (2) whether the

**8621**                                         8

theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. See, *Daubert, supra*, and *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 275 (5th Cir. 1998) (en banc).

The entirety of Dr. Chabreck's "scientific methodology" relied upon in reaching his conclusions consisted of:

(1)    Reviewing aerial photographs taken of the property between the 1930's and 1998;

(2)    Inspecting the property on three occasions (8-14-00; 9-1-00; 09-9-00), including inspecting the marsh and taking root mat samples of the marsh; and

(3)    A limited discussion with Dr. Alex McCorquodale, hydrologist and hydraulic engineer, as to what Dr. McCorquodale found by measuring water flows at certain locations.

In this regard, Dr. Chabreck's methodology, or more accurately the lack thereof, fail any reasonable application of *Daubert, Ashland, et al.* As cited in Dr. Chabreck's testimony above, he himself performed no scientific testing of the water flows or velocities in the Koch canal, the Columbia canal, or the adjacent marshland which has allegedly been damaged because of hydrological influences. Rather, Dr. McCorquodale, who is in fact a hydrologist, performed certain measurements. However, and as will be set forth in the section hereinafter dealing with Dr. McCorquodale's opinion, these measurements were taken at three sites, none of them within the marsh itself in order to determine if there was sufficient flow inside the marsh to erode the marsh or the organic root material.[10] What is very important to note in Dr. McCorquodale's hydrological

_____

[10]    Attached hereto as Exhibit 4, is a photograph from Dr. McCorquodale's report, showing the three test sites. As can be seen, one was taken at the Little Horn Bayou as it enters the Section 16 property (site #2), in order to determine the total volume of water flowing from the adjacent Atchafalaya River area. The second site, site #1, was taken at an opening between the Koch canal and the adjacent marsh property, in the northeast corner of the property. The third site,

opinion is that he only took measurements at two cuts between the canals and the property, one on Koch's canal and one on Columbia's canal. He took *absolutely no measurements inside the marsh itself*. Dr. McCorquodale testified that he was limited in what he was told to do, which was only to measure flow velocities in the cuts between the marsh property and the Koch and Columbia canals. More importantly, Dr. McCorquodale's report is, at best, inconclusive. The most he would testify to during the course of his lengthy deposition was that it "is possible" that the flow in the cut between the Koch canal and the adjacent marshland would be sufficient to erode the organic materials ***in the spoil banks themselves***. He took no measurements, and therefore gives absolutely no opinion regarding whether there was sufficient flows of velocities ***inside*** the marsh as a result of the cut in Koch's canal such that marsh materials would be transported out of the marsh or in fact eroded in the first instance because of the exchange of water between the Koch canal and the marsh property.[11]

Dr. Chabreck's testimony itself reveals the clear limitations of his methodology in this case, and in fact the inability of any objective, third party to verify his methodology through comparable scientific testing:

> "Q. And we've got another one dated August 3rd. And my question is: As you testified earlier, you relied upon some of his [Dr. McCorqoudale's] studies or information, is that correct?
>
> A. Yes.
>
> Q. Do you recall what specifically you relied upon in reaching your conclusion in your report?

---

site #3, was taken at an opening between the Columbia canal and the adjacent marshland property in the southeast corner of the property.

[11]    Attached hereto as Exhibit 5, is Dr. McCorquodale's report. Again, please also refer to the section of this memorandum dealing with Dr. McCorquodale's opinions and Koch's argument why they are likewise inadmissible under *Daubert*.

**8621**                                    10

A.  Yes, he - - the information I had that there was a significant amount of water that was moving out and that the velocity was such that it would transport the soil, organic particles.

Q.  Okay.  How did this information get presented to you, was it through these reports here or was it something verbally?

A.  I don't remember.  I talked to him on the phone once or twice, and he did call me and give me some information about the results.

* * *

Q.  Do you recall when the conversations took place with him?

A.  No, no, I don't.

Q.  And this was verbal information he relayed about the amounts - -

A.  Right, that's correct.

Q.  Did you make any notes of that conversation?

A.  I don't think that I did.

Q.  Do you recall what he said specifically to you in those conversations?

A.  Yes, he - - I had asked him if he could make some measurements to determine the volume of material that was being exported.

Q.  And do you know if he came up with a result?

A.  Yes, he said that his - - he took some measurements of the movement of material going in and out of the water, but **that his results were inconclusive, that he didn't feel that he had a reliable measurement on it.**  There was so much material going both ways, and for the short-term nature of his study, he did this for a day or so, and **I guess he thought he would have to do it over a longer period of time to have any reliable results.**"  (Emphasis added.)

* * *

"Q.  Okay.  What else did you obtain from Dr. McCorquodale in connection with your preparing your three reports?

A.  I think that was all that I had, the fact that the velocity was adequate to - - the velocity moving out of the marsh was adequate to transport the soil particles.

Q. Okay. Did you discuss with him any considerations about whether the velocity into or out of the marsh was sufficient, not just to transport soil particles, but to erode or deteriorate soil particles for the marsh vegetation?

A. Well, I - - you know, I would assume that if it's adequate to transport them, it's adequate to erode it.

Q. Well, do you know that form a scientific basis or are you just assuming that?

A. Well, I don't - - I'm assuming that, yes.

Q. Okay.

A. I have no reason to believe otherwise.

Q. How about reason to believe that way, though, you have no reason for that either?

A. No.

Q. Do you know what velocities are necessary to not just transport organic materials, but to erode organic materials?

A. No, I don't have any information in that regard."[12]

Undoubtedly, TPSB will argue that Dr. Chabreck's observations, along with verbal input from Dr. McCorquodale, are sufficient to survive a _Daubert_ challenge. However, Dr. Chabreck's own testimony is contradictory, because he admits that if there is a net flow of materials into the marsh, then the cuts or openings along the Koch and Columbia canals cannot be the source of marsh erosion. Notwithstanding this admission, he also testified that he did not "observe" the water flow into the marsh to determine if the sedimentary import was greater than that being exported, and again admitted that Dr. McCorquodale's tests were inconclusive:

"Q. And you said you had one or two phone calls with him [Dr. McCorquodale] before you generated your own reports, right?

A. Right.

---

[12]     See Exhibit 3, deposition of Dr. Robert Chabreck, Volume I, pp. 87-90.

Q. And the only information he gave you was that his tests were inconclusive, correct?

A. No, he said that the velocity was adequate to export the material.

Q. Oh, that's right. But as to whether or not there was a net gain or loss, his tests were inconclusive, correct?

A. Right.

Q. So when you prepared your report in August, what were you relying on from Dr. McCorquodale, just the fact that he said the velocities were sufficient?

A. Yes, that's correct.

Q. Do you remember if his gave you a number, feet per seconds, so many inches per second?

A. No, I don't think he gave me a number.

Q. Do you think that's something that you need to know, that the water velocity is such that it carries out the organic materials?

A. No, I don't think so. I do know that it was being exported. I mean all you had to do was stand there and look at it, you could see the materials that was coming out of the marsh.

Q. And at what point are you talking about where you could see this?
A. It was very noticeable where I was. It was up in the Koch Canal up in the northeast corner on the south side of the Koch Canal, water was coming out of there and it was just filled with organic material.

Q. Did you stay there and observe it when it went back into that opening?

A. No, I did not.

Q. So you don't know if there was organic material going back in there, do you?

A. Well, yeah, I'm sure that some goes back in there, because the material is in suspension and it shifts back and forth.

Q. All right.

A.  But, like I said earlier, the ultimate flow is in the direction of the estuary.

Q.  Okay.  Is it fair to say, for your theory to be correct, Dr. Chabreck, that there does ultimately have to be a net loss of organic material from inside the marsh out of these openings and taken away?

A.  Yes.

Q.  And if you have a net gain or if sample of the fluids taken show more organic material flowing in, then your theory is without merritt, is that correct?

A.  That's correct.

Q.  Okay.  And is there anything that would have prevented you, or Dr. McCorquodale, or people at your instruction from taking, if not over a year's period, more than one day's worth of sampling of the suspended organic materials at the various sites that you've indicated are responsible for the transportation and removal of the organic materials, say for a 30 day period?

A.  Do it for a 30 day period?

Q.  Correct.

A.  I guess the more time you spend out there, the better it would be, there's no doubt about that."[13]

Finally, the complete lack of any scientific basis for Dr. McCorquodale's opinion is evidenced in the following deposition testimony:

"Q.  And this theory of yours that these cuts have allowed this flushing action to take place required, I believe, if I'm correct, that there be a net export of organic material from the marsh through the openings, correct?

A.  Yes.

Q.  All right.  If there's a net import, would it stand to follow that the openings are actually helping the marsh by putting organic materials back into the marsh?

A.  Well, that's what it would mean.

---

[13]    See Exhibit 3, deposition of Dr. Robert Chabreck, Volume I, pp. 205-207.

Q. All right. And you feel, even though Dr. McCorquodale told you his test on whether there was export or import of sediments and organic materials were inconclusive, you still feel that you can give an opinion that there is a net export of materials?

A. I feel very strongly that it is.

Q. And what do you base that on?

A. By the continuous, you know, the loss of - - the amount of erosion that has taken place and the number of - - the thinning of the root mats, the floats. And in here, in the way that this eroded marsh is associated with openings in levees that allow the material to be exported (Indicating).

Q. All right. But, again, Dr. McCorquodale's tests which would confirm this theory of yours were inconclusive, correct?

A. That's correct, but he, you know, he admitted it was a very short-term test, subject to lots of errors.

Q. If he did it on a longer term basis, we could either support or reject your theory?

A. That's correct.

Q. And part of your theory is that these velocities into and out of, not only openings, but the flows inside the marsh, themselves, would have to be sufficient to break up the marsh root, correct?

A. Yes.

Q. And there were no measurements, conclusive or inconclusive taken by you or anybody else inside the marsh area to determine what those flows were?

A. That's correct.

Q. Did you see DeVries' report, the hydrologist that Koch hired?

A. Yes, I did look over his report earlier.

Q. And did you see where he took velocity measurements 50 feet inside that "Opening No. 1" where Dr. McCorquodale took his same measurements along Koch's Canal?

A. As I recall, I did read that.

8621                                    15

Q. All right. And did you see where they had dropped off after 600 feet, the velocities he had taken, at the surface, not even at the root mat level, by some 60 to 70 percent at 600 feet?

A. I don't recall what the data indicated.

Q. Do you have an opinion as to what velocity at the root mat level would be needed, whether it's feet per second, or whatever, to erode and transport the organic materials to support your theory?

A. No, I do not."[14]

In sum, not only does Dr. Chabreck's opinion fail to provide a scientifically valid or reliable methodology upon which to base his opinions, but he also fails to provide sufficient objective testing, either through his own efforts or that of Dr. McCorquodale, which would allow Koch or any interested third parties to perform similar tests themselves in order to validate or repudiate Dr. Chabreck's theory. In fact, the last portion of Dr. Chabreck's testimony cited above can be paraphrased as follows: "Dr. Chabreck observes deterioration of the marsh in Section 16. He observes aerial photographs showing the history of the marsh. He observes cuts in the levees between the Koch and Columbia canals and the adjacent marsh. Therefore, the deterioration or damage to the marsh must be the result of water exchanged through the cuts."

In sum, Dr. Chabreck's methodology completely fails to satisfy even the simplest of _Daubert_ requirements. His theory cannot be tested, as the only test results which have been performed, even by TPSB's own experts, are "inconclusive." His theory has not been subject to peer review and publication, and there is no known or potential rate of error when applied. There are minimal, if any, standards and controls, and certainly they are not maintained at a level which would be sufficient to support Dr. Chabreck's theories. Finally, other than Dr. Chabreck's testimony in the _St. Martin v. Mobil_ case, his technique or theory has not been accepted in the scientific community. Or, at the least, he has failed to provide any publications or other materials which would support

---

[14]    See Exhibit 3, deposition of Dr. Robert Chabreck, Volume II, pp. 170-173.

such acceptance. For all of these reasons, Koch respectfully requests that this Honorable Court exclude the testimony of Dr. Chabreck in its entirety as to the cause or source of damage to TPSB's marshland property.

Finally, even if Dr. Chabreck himself can pass *Daubert* muster, whether because of his "expertise" in Louisiana marshlands or because of any previous rulings by the U.S. Fifth Circuit in *St. Martin v. Mobil, supra*, Koch respectfully submits that his testimony should be excluded in this case because the data obtained by Dr. McCorquodale, and upon which Dr. Chabreck relied for his nebulous opinion, is insufficient under *Daubert* and its progeny to satisfy minimum scientific standards. These will be discussed in the next section.

### DR. MCCORQUODALE

First, by virtue of the clear language in his report, as well as his deposition testimony, Dr McCorquodale's testing and opinions regarding any erosion in this case were limited to two areas: site #1, a cut in the spoil bank alongside Koch's canal in the northeast corner; and site #3, a cut in the Columbia canal in the southeast corner. Moreover, Dr. McCorquodale's report was limited to whether or not the velocities which he measured in those cuts were sufficient to erode the materials ***in the spoil banks***. He made absolutely no measurements inside the marsh, and thus gives no opinion as to whether the water velocities coming through the Koch or Columbia cuts were sufficient to erode, much less transport, any sediment or organic marsh material from inside the marsh into the adjacent canals, thereby causing loss of marsh property. Dr. McCorquodale testified:

> "Q. You indicated that you were not asked to and are not going to give an opinion as this trial as to wether the water flow inside the marsh area is sufficient to erode or cause damage to the organic vegetation in there, is that correct?
>
> A. The scope of my task was to establish whether or not there was a significant flow between the canal and the marsh and vice versa.

**8621**                                    17

Q.  And on the issue of sediment transport - - not erosion, but, transport - - that's one part of sedimentation as a hydrologist, correct?

A.  Yes.

Q.  You did not do any studies that could tell you as to whether the flows inside the marsh - - not the flow at the cut itself, but the flows inside the marsh, either going in or coming out, were of sufficient velocity to transport sediment materials, is that correct?

A.  That's correct, it's not part of my study.

Q.  So you have no opinion as to whether or not there is a net gain or net loss of sediment or material as a result of the cut at Site Number 1.  Either into or out of Site Number 1.

A.  I can't make any conclusion on that.  That's right."[15]

Further, when pressed as to whether or not the water velocities at even the spoil bank location was sufficient to cause, more probably than not, any erosion of the spoil bank (without regard to the interior marsh), Dr. McCorquodale was very clear that he only found that these velocities were either "sufficient" to cause any such erosion, and only that it was "possible:"

"Q.  But you went in at the high end [of the tidal cycle] and you found that there can be some erosion of the organic material in the spoil bank based upon the high velocities that you observed during the total two to three hour period in the tidal cycle.

A.  Found **it's possible**, yes.

Q.  Possible.  Okay."[16] (Emphasis supplied.)

Finally, and perhaps most telling of how lacking Dr. McCorquodale's testing was for purposes of satisfying *Daubert* requirements, he not only admitted that he was not asked to determine whether flows inside the marsh could transport and/or erode the marsh material, but incredulously, testified that such testing would be within the realm of his expertise, or at least in

---

[15]      See Exhibit 6, deposition of Dr. McCorquodale, Volume II, pp. 9-11.

[16]      See Exhibit 6, deposition of Dr. McCorquodale, Volume II, p. 44.

conjunction with Dr. Chabreck  However, it would involve additional testing which he was not asked to perform in this situation:

"Q.  You've testified that you are not a mash expert, and - - when you've been asked about whether the hydrology inside the marsh can transport or erode the marsh materials, and I appreciate that. But, in the field of hydrology, if you wanted to calculate whether there was sufficient flows inside the marsh to transport any loose sediment material, you would need to know what those flows were, correct?  Tell me what you would need - -

A.  You would need to k now the velocity field.

Q.  And you would need to know what the composition of the sediments was, correct?

A.  Yes.

Q.  Alright.  Is there anything else you would need to know as a hydrologist as to whether the flows inside the marsh can transport suspended sediments or particles?

A.  I would want to know the sediment velocity of the particles in the sediment.

Q.  But that would be done through an analysis of the particles, correct?

A.  It's not - - it's a supplementary analysis.

Q.  And that would tell you whether any flows coming into this Section 16 marsh, whether it's from Site 1, Site 3 or any other openings, can transport the materials that are already existing inside the marsh.

A.  It would give us an indication.

Q.  And that would be within your field of hydrology?

A.  I can - - Yes, I can deal with sediment transport and erosion and deposition once I've defined the material that's being eroded or transported.

Q.  And you didn't do that here and you have no opinion on that here.

A.   I'm not giving an opinion here because I don't have the

**8621**                                      19

background data to do it.

Q.  Sure.  And the same thing for not just transportation, but actual erosion of any materials inside the marsh; if you know what the materials are, if you know the flow rates and the shear factors, regardless of whether you ever studied marshes yourself, as long as you know what the materials are, the flow rates and the shear factors involved, you can calculate whether there is erosion taking place because of water velocities inside the marsh.

A.  Make an estimate of them.

Q.  And you weren't asked to do that and didn't do that here and have no opinion on that.

A.  I can't give you an answer on that.

Q.  But, those topics, both transportation and erosion, are within your area of expertise.

A.  Yes, that's a sediment transport problem."[17]

In fact, rather than Dr. McCorquodale going out to the site with an open mind and the idea of making whatever test he, as a scientist, felt necessary to support or refute the plaintiff's theories as set forth in its petition, Dr McCorquodale was instead instructed by counsel for TPSB as to where to take his measurements:

"Q.  So Dr. Penland is the one who, if not made the ultimate decision, sort of focused you all on this area?

A.  Yes, based on aerial observations that he discussed with me.

Q.  And when I say focused you in this area, I'm specifically meaning site 1 where the flow study was conducted.  Had he already sort of made up his mind that that's where it was going to be, and then you agreed with him, or how did that work?

MR. VISCONTE:
Let me interrupt you real quick, Robert, just to give you a frame of reference.  Everything that Shea discussed with Dr. McCorquodale ultimately was direction that I gave to Shea as far as taking the measurements and the cuts.  When he was talking about Shea, I had told She to take measurements and the cuts in the canals.  So

---

[17]     See Exhibit 6, deposition of Dr. McCorquodale, Volume II, pp. 93-95.

if you're trying to find out – I don't know where you are going, but to the extent that this information is relevant, you have it now."[18]

Finally, it should be noted that while both Dr. Chabreck and Dr. McCorquodale classified as "inconclusive" any studies which they performed, the testing which was done by Dr. McCorquodale in fact established a net flow **into** the marsh through Koch's cut, including greater suspended organic or sedimentary materials in that net flow.

> "Q. Now let's talk about what these measurements mean that you have taken here. If I'm wrong, tell me, but as I understand it, you've got two basic pieces of data that came out of here regarding section 1. The first is there is a net flow of water into the marsh from the section 1 measurements, correct?
> A. On that particular day.
>
> Q. On that particular day, and that was net flow of about .7 million cubic feet during that measured time?
>
> A. Yes."[19]

In other words, contrary to Dr. Chabreck's theory that more water comes out of the marsh, and thus transports more sediment and organic material out of the marsh than into the marsh, Dr. McCorquodale's limited scientific testing showed a net gain of .7 million cubic feet of water into the marsh. Moreover, Dr. McCorquodale's testing of the volatile or suspended sediments in the water which was going both into and out of the water demonstrated that the higher level of suspended sediments and organic material were measured when the water was flowing into the marsh. Again, while Dr. McCorquodale attempted to downplay these numbers, the facts speak for themselves:

> "Q. Let's look at the sample that would have been taken during the highest outflow when samples were taken. Would that be No. 4?
>
> A. I just referred to the - - you're saying the closest?
>
> Q. Closest in proximity timewise to when - -

---

18    See Exhibit 6, deposition of Dr. McCorquodale, Volume I, pp. 73-74.

19    See Exhibit 6, deposition of Dr. McCorquodale, Volume I, pp. 129-130.

A.  Closest to - -

Q.  The outflow, not the inflow.

A.  To the outflow would be where we had a concentration of 18 and that should have been - -

Q.  Is that No. 4?

A.  Yes, No. 4.

Q.  So if you look at Figure 5 at 5 p.m. or 5:01 p.m., which is the time No. 4 was taken, correct?

A.  Yes.

Q.  The outflow velocity is about, what, one to one and a quarter feet per second?

A.  A little more than one, yes.

Q.  Yet the total suspended solids in that sample, which would indicate whatever might be taken out of the marsh, is that correct?

A.  That's flowing out of the marsh, yes.

A.  Is 18 milligrams per liter, which is actually the least figure on that whole chart, correct?

A.  It is.  Before you leave that, I would say we have to look at the variability in these data, and it's highly variable.  One reading, I don't think we can prove too much.
                                    * * *
Q.  Is it fair to say though that looking at the inflow going into the opening during the peak periods, which appears to be maybe sample No. - - well, we can't use No. 5 because that's an anomaly.  No. 7?

A.  Seven, yes, that could be.

Q.  Taken at 10:54 a.m. on the 25th?

A.  Yes.

Q.  If you average out the error on Figure 5, the velocity as I interpolate it would be somewhere around three quarters of a foot per second?

**8621**                              22

A. Yes.

Q. In that you've got 26 milligrams per liter?

A. Yes.

Q. Of suspended solid of sediment actually going into the marsh, correct?

A. That's going in, yes."[20]

The above testimony is supported by the actual findings in Dr. McCorquodale's report, previously attached as Exhibit 5. Appendix I thereto shows that suspended solids in the water samples taken at the times of highest inflow into the marsh also demonstrate the highest amount of suspended solids. These are samples 1813-7 and 1813-9 and show that during times of highest inflow when such samples were taken, there were as many or more sediments being placed into the marsh than had been taken out of the marsh during the outflow.

It is obvious from the combined testimony of Drs. Chabreck and McCorqoudale that there is a complete lack of sufficient evidentiary basis to support Dr. Chabreck's theory that a "surging" or "flushing" action through cuts in the Koch and Columbia canals have caused deterioration to or damage of the interior marshland. First, as admitted by Dr. McCorquodale, and even to some extent by Dr. Chabreck, there are scientific measurements which can be taken, analyzing both the velocities inside the marsh, as well as the organic makeup of the marsh vegetation, to determine if those velocities are sufficient to: (a) erode the organic material in the first instance; or (b) transport any suspended organic or sedimentary materials from the marsh, through the cuts, and away from the School Board's Section 16 property such that there is a net loss of marshland as alleged by plaintiff. Notwithstanding the availability of all of this testing, neither of TPSB's experts (Dr. Chabreck or Dr. McCorquodale) undertook such testing, either because they felt it was unnecessary (as per Dr. Chabreck), or because they were instructed not to or were otherwise

---

[20]    See Exhibit 6, deposition of Dr. McCorquodale, Volume I, pp. 162-164.

limited in their investigation (as with Dr. McCorquodale).  Whatever the rationale for not performing the testing in question, the end result is the same: plaintiff's expert opinions must fail because they do not satisfy *Daubert* requirements and those of Federal Rule of Evidence, Rules 702, 703.

## MR. CHARLES CAMP

Charles Camp provides a set of restoration plans, the purpose of which is to (a) fill in or, alternatively, restore the Koch and Columbia canals to the width described in the right-of-way agreements; and (b) restore the interior marshland.  It is important to note that Mr. Camp is not an expert in marshland restoration, and freely admits this.  All of the input as to these plans was provided by Dr. Chabreck.  Moreover, Mr. Camp is not a licensed contractor or engineer, but only a licensed surveyor, and has qualified to testify in court only in that capacity.  Nonetheless, he purports to provide detailed contracting plans involving millions of dollars and significant engineering issues for the restoration plans.

The proposed cost of filling in Koch's canal is $3.26 million; the proposed cost of bulkheading Koch's canal and "restoring" it to a 40' width is $4.8 million.  Finally, the cost of "restoring" the interior marsh is $9.258 million.[21]  Mr. Camp's own limitations regarding contracting and engineering issues are set forth in his deposition:

> ".  Right.  Were you designated or admitted as any other type of expert or having expertise in any other field other than land surveying in any of these cases?
>
> A.  No, sir.  Just as a land surveyor.
>
> Q.  So you have been throughout your career tendered as an expert land surveyor and admitted as such; correct?
>
> A.  That is correct, sir.
>
> Q.  Have you ever been tendered as an expert in any other field in any litigation to your knowledge?

---

[21]    Attached hereto as Exhibit 7, is a copy of Mr. Camp's report dated 10/31/00.

**8621**                              24

A. Not that I can remember, no, sir.

* * *

Q. Have you ever received any vocation or educational classes in any of the following areas - - now I'm not talking about degrees, I'm talking about any kind of education or classes in any of the following: Biology?

A. No, sir.

Q. Marine Biology?

A. No, sir.

Q. Geology?

A. No, sir.

Q. Hydrology?

A. Not formal classed, but, you know, obviously hydrology is a part of the up and down, the ebb and flow of the tide is a part of this South Louisiana area, but that's just strictly OJT, on-the-job training.

Q. Oceanography?

A. No, sir.

Q. Forestry?

A. No, sir.

Q. Wildlife management?

A. No, sir

Q. Civil engineering?

A. No, sir.

* * *

Q. I think I've asked you this in one way, but let me just pin this down. Have you ever acted as a contractor to actually make repairs or alterations to a pipeline flotation canal?

A. No, sir. Not that I, not that I recall.

Q. How about acting as a contractor to make repairs or restoration to marshland?

A.  No, sir."[22]

In order to formulate his restoration plans, Mr. Camp had to rely upon input from a variety of third parties, including dredging contractors, suppliers, etc.  Other than handwritten notes obtained by Mr. Camp during the course of conversations with these individuals, TPSB has provided no other information from them to support the cost of these restoration plans.  Mr. Camp's restoration plans are therefore based entirely upon hearsay, and areas which are outside of his own expertise.  For these reasons, his testimony should be stricken in its entirety.

Even if Mr.  Camp is qualified to give testimony regarding detailed engineering and contracting plans, including costs associated therewith, Koch submits that, as a matter of law, the restoration plans are not allowable, and therefore any testimony from Mr. Camp is inadmissible.  First, as noted above, plan #1, which purports to completely fill in the Koch canal is not acceptable, because Koch is given the unfettered right to leave open its canal.[23]  The alternative plan, restoration plan #2, calls for bulkheading Koch's canal to a width of 40', and then providing fill behind the bulkheaded area.  This would cost a total of $4.813 million, to "restore" what amounts to a total of 8.74 acres which have allegedly been eroded since Koch's canal was installed at its original width of approximately 40' to its present width of approximately 70'.  In effect, Camp's restoration plan #2 would seek to assess damages against Koch, even if via specific performance, at a rate of over $600,000.00 per acre of allegedly lost marshland.  Even plaintiff's marshland value expert, Dr. Shea Penland, places a maximum "societal value" of approximately $100,000.00 per acre for marshland.[24]

---

[22]    See Exhibit 8, deposition of Mr. Camp, pp. 61-64 & p. 81.

[23]    Koch's Motion for Summary Judgment sets forth in great detail the reason why Koch is permitted to leave open its canal.

[24]    The fact that Koch refers to Dr. Penland's economic opinion is in no way intended to indicate acceptance thereof.  Koch vehemently disputes Dr. Penland's marshland value theories, as set forth hereafter.  However, solely for purposes of this motion, Koch will accept the maximum

8621                              26

Louisiana law is clear that the general measure of damages for lost property is the fair market value. *Roman Catholic Church v. Louisiana Gas Service Company, 618 So.2d 874 (La. 1993)*. Only where the property owner has expressed a "special interest" in the property will the court be permitted to award restoration damages which are greater than the fair market value of the property, and even then a limit is recognized as to the amount in question. *Roman Catholic Church, supra*. In situation similar to this, a Louisiana court applying the *Roman Catholic Church* doctrine rejected cost proposals which were in fact even less than those involved herein. In *Weeks v. T.L. James & Company, Inc., 626 22 420 (La. App. 3d Cir. 1993)*, the plaintiff landowners sued the servitude owner for the servitude owner's alleged failure to fill in certain borrow pits. The plaintiffs had purchased the property for $383.00 per acre ($1.1 million for 2,876 acres). The landowners demanded damages of $954,000.00, which represented the cost of having a contractor fill in the land in question, almost identical to the plaintiffs' claims here. The appellate court rejected this argument, noting that while the failure to fill in the land may have caused diminution in its value, "...to award $954,000.00 for approximately .5 of 1 percent of property whose total purchase price less than 3 years ago was less than $1.1 million would be inordinately disproportionate to the damages caused." *Weeks, at 426*.

Finally, Koch submits that Mr. Camp's restoration plans, even if capable of surviving *Daubert* and Louisiana jurisprudence regarding restoration of damaged property, are not recoverable or admissible in this instance because they are too speculative. Mr. Camp's own testimony admits that Corps approval is necessary for any of his proposed plans, and while he purports to give hearsay testimony regarding what the Corps might do, the ultimate fact of the matter is that such plans cannot be implemented until they have been approved by the Corps:

> "Q. Mr. Camp, on the issue of the Corps having to approve this, have you been involved in situations in the past in your 40 years'

---

figure which any expert in this case has placed upon marshland values.

experience where a permit has been submitted and then approved by the Corps and for whatever reason the company did not go forward with the job?

A.  I've seen, I don't know how many times, but I've seen several times where oil companies would ask for a permit to dredge a canal. And for whatever reason, after they got the permit, decide, went broke or the geologist decided it wasn't a good prospect, have not dredged the canal, yes sir.

Q.  And if somebody does submit a permit in a proposed plan to the Corps and it gets approved, there is no requirement in the law that you're aware of that they go forward with that plan after it's been approved?

A.  Not by the Corps of Engineers or the coastal Zone; not to my knowledge, no, sir.

* * *

Q.  So what you're saying is, by your own testimony, this plan, #1, #2 and #3 is not enough for the Corps to give an opinion about whether it be permitted?

A.  Yes, sir, it is, it is.  They have already given that to me.

Q.   So if the School Board wanted to, they could go out there tomorrow and start doing this work?

A.  No, sir.  No, sir.

Q.  Why not?

A.  Because they don't have a permit.  If I understood you right, I have ran this by the Corps, and they said it sounds logical, but I think you, I misunderstood you or you misstated yourself.  You would have to do more work than this to be able to submit to the Corps of Engineers an application for a permit.  I think that's what we're trying to get at.

Q.  So even though the Corps would need more information that what you've got in Plan #1, #2 or #3, they've told you that this sounds logical and they probably approve it?  Is that what your testimony is today?

A.  Yes, sir.  They said that it sounds logical and that we can't tell you till you give us an application with plans and specifications, but it sounds logical that we would issue a permit for marsh restoration.

Q.  And I know you've answered this question in another lawsuit

8621                           28

where I've deposed you, but until the Corps approves the permit, you can't do any of this work here, correct?

A.  Absolutely not, no, sir.

Q.  If a client came to you and said, "Draw me up a rough plan, Mr. Camp, I want to do" something similar to this, let's say, and you did this, and you said "Okay," and you will called mr. Serio, just like you said, and he said, "Sounds logical, Charlie, go ahead and finalize it," and then the clients says, "I want to get started so I'm going to order the peat and I'm going to order the bulkhead materials and I'm going to do this and that," would you recommend this they do that?

A.  Based on those estimates there?  Yes, sir.  Uh-huh (affirmative response).

Q.  You would recommend that even before the Corps formally permitted the plan that they start and incur expenses of $3 million worth of bulkhead materials?

A.  Well, when I, when I answered that question, it was with the though that the Corps is going to grant them a permit.

Q.  Right.  But it hadn't been formally submitted yet?

A.  Well, no, certainly I would not advise them to.  In other words you don't go throwing good money after bad."[25]

In other words, Mr. Camp is giving unsupported, hearsay testimony about an issue which, by his own admission, is speculative.  Such testimony clearly fails to satisfy the requirements of *Daubert*, *Kumho*, etc.  In fact, if plaintiff was not seeking upwards of $10 million from each defendant, it would almost be humorous when one realizes that Mr. Camp would not advise a private client to extend funds on the restoration plans at issue until the Corps has approved it, but in fact is prepared to give testimony in ths court that such a judgment against the defendants is viable notwithstanding lack of Corps approval.

For all of these reasons, Koch requests that this Honorable Court exclude in its entirety any testimony from Mr. Camp regarding the purported cost of the restoration plans which Dr. Chabreck

---

[25]    See Exhibit 8, deposition of Mr. Charles Camp, pp. 185-190.

has proposed regarding the interior marsh, as well as the restoration plans regarding filling in and/or "restoring" the Koch canal to a width of 40 feet.

## DR. SHEA PENLAND

The issue with which Koch takes exception is Dr. Penland's purported testimony on the "societal value" of marshlands, in order to justify the enormous cost of Mr. Camp's restoration plans. Koch submits that Dr. Penland fails to meet *Daubert* requirements for various reasons. At the outset, Koch first notes that co-defendant Columbia is preparing a Motion In Limine regarding Dr. Penland's "economic expertise," and for the purpose of judicial efficiency, Koch adopts the factual and legal argument of Columbia with respect to Dr. Penland's failure to satisfy *Daubert* requirements regarding "societal values" of marshlands.

The reasons why Dr. Penland fails to satisfy *Daubert* include the fact that he is not qualified as an economist, nor has he taken any economic courses. Also, the primary basis for Dr. Penland's calculations consist of work performed by other individuals who are or, at least, have economic training, such as Dr. Robert Costanza and others. By Dr. Penland's own admission, his economic analysis is primarily limited to work performed by others:

> "Q. My understanding is that this report was prepared by yourself based on your review of economic literature in the field, particularly that authored by Robert Costanza; is that correct?
>
> A.   Yes, this is basically a review of the history of wetland evaluations that occurred over the last couple of decades.
>
> Q. Just to put all of this together in one place, you are not educated as an economist; is that right?
>
> A. That's correct.
>
> Q. And you have not taken any courses in economics; right?
>
> A. That's correct.
>
> Q. You have no degree in economics?

**8621**                                          30 .

A. I have no degree.

Q. And you do not hold yourself out as an expert in economics or economic theory, correct?

A. Correct.

Q. So this simply represents your review of the literature that you deemed to be relevant to the subject; is that right?

A. It includes that as well as my working experience with Coast 2050 and with CWPPRA in doing wetland valuation assessments and watching how we place the values on projects that are built in the coastal wetlands in terms of habitat units per dollar, these types of things "[26]

Moreover, many of the marshes which were studied to report Dr. Penland's findings that marshland has societal value ranging up to $100,000.00 per acre were marshes which were not even in Louisiana, much less in the vicinity of this particular project.[27]

Finally, Dr. Penland admitted in his deposition that those "societal values" which are assigned to wetlands, such as storm protection, wildlife management, fisheries, etc., may or may not in fact have even been impacted in this particular piece of property, T18-R13, Section 16:

"Q. So up to, and these figures in Table 3 are assuming 100 percent value, correct?

A  Yes.

Q. Can you give us an opinion as to what is the percentage that has been lost as a result of the deterioration in this marsh?

A. I cannot.

Q. Is that because that's not your area of expertise or because you don't have enough data to give an opinion on that?

A. I would say that that would not be my area of expertise to calculate out how the individual sub, you know, classes and how that

---

[26]    See Exhibit 9, deposition of Dr. Shea Penland, Volume II, pp. 142-143.

[27]    See Exhibit 10, Dr. Penland's report entitled "Assessment of Louisiana Coastal Wetland Values."

would calculate, no.

Q.  You mean the values assigned?

A.  Yes."[28]

It is therefore clear that Dr. Penland has simply taken economic studies performed by other individuals on marshlands in general, come up with a general "societal value" for marshlands as a whole, and attempted to shoehorn those assessments to this particular piece of property, when in fact those economic values for this particular piece of property may or may not have been impacted at all because of the alleged marsh deterioration.  Such an opinion fails to satisfy *Daubert* requirements, particularly those relative to the known or potential rate of error of a technique or theory when applied, as in this instance to the specific T18-R13 property, as well as the existence and maintenance of standards and controls.

## CONCLUSION

In conclusion, and for the reasons set forth above, Koch requests that this Honorable Court grant Motions In Limine, striking: the testimony of Dr. Chabreck in its entirety; the testimony of Dr. McCorquodale in its entirety, or, alternatively, limiting it to the issue of erosion of spoil banks; the testimony of Mr. Camp in its entirety; and the testimony of Mr. Penland regarding economic values of wetlands.

Respectfully submitted,

ROBERT J. YOUNG, III (#19230)
YOUNG, RICHAUD & MYERS
1100 Poydras Street, Suite 1515
New Orleans, LA  70163
(504) 585-7750

---

[28]    See Exhibit 9, deposition of Dr. Penland, Volume II, pp. 240-241.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been forwarded to all counsel of record via hand-delivery, *facsimile* and/or by placing a copy of same in the U.S. Mail, postage pre-paid, on this 28th day of December, 2000.

ROBERT J. YOUNG, III

# SEE RECORD FOR
# EXHIBITS
# OR
# ATTACHMENTS
# NOT SCANNED