FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JAN -3  PM 4: 32

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TERREBONNE PARISH SCHOOL BOARD** | § | **CIVIL ACTION NO. 00-0319** |
| **VERSUS** | § | **SECTION:   B** |
| **COLUMBIA GULF TRANSMISSION COMPANY, KOCH GATEWAY PIPELINE COMPANY** | §<br>§ | **MAGISTRATE:      5** |
| **FILED:**_____ | § | _____<br>**DEPUTY CLERK** |

### MOTIONS IN LIMINE
### TO EXCLUDE TESTIMONY OF
### KOCH GATEWAY PIPELINE COMPANY'S EXPERTS

**NOW INTO COURT,** through undersigned counsel, enters Plaintiff, Terrebonne Parish

School Board ("TPSB"), which hereby respectfully moves this Honorable Court to completely

exclude the testimony of Richard N. DeVries and Kenneth J. Boudreaux, and to partially exclude

the testimony of Irvington J. Eppling and Luther Holloway, for the reasons outlined in the

Memorandum attached with these Motions.  In support of its Motions in Limine to the exclude the

proposed expert testimony of the four (4) aforementioned witnesses, Plaintiff submits the following

exhibits which are more fully discussed in its Memorandum in support of these Motions in Limine,

which are attached hereto and incorporated herein *in extenso*, should also be excluded from

Fee_____
Process_____
X  Dktd_____
✓  CtRmDep_____
Doc. No.___92___

evidence:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Report of Kenneth Boudreaux |
| B | CV of Kenneth Boudreaux |
| C | Deposition of Kenneth Boudreaux |
| D | "Commentary" by Irvington J. Eppling |
| E | CV of Irvington Eppling |
| F | CV of Richard N. DeVries |
| G | Report of Richard N. DeVries |
| H | Deposition of Richard N. DeVries in the captioned matter |
| I | CV of Luther Holloway, Ph.D. |
| J | Copy of the original Petition for Damages filed by Plaintiffs' in this case |
| K | Deposition of Luther Holloway in the captioned matter |
| L | Deposition of Irvington Eppling in the captioned matter |
| M | Report of Luther Holloway |
| N | Deposition of Richard Devries, taken in the matter of **"Michael X. St. Martin v. Quintana Petroleum Corporation, McMoran Oil & Gas Co., And Union Oil Company of California,"** Docket No. 98-2095, in this Court |

**WHEREFORE,** Terrebonne Parish School Board moves this Court to exclude the testimony of Koch Gateway Pipeline Company's proposed experts for the reasons provided in the Memorandum in Support submitted with these Motions.

Page 2

THE GRAY LAW FIRM, APLC

A. J. GRAY, III            #6253
WADE T. VISCONTE        #24734
Post Office Box 1467
Lake Charles, LA 70602-1467
(337) 494-0694        Telephone
(337) 494-0697        Facsimile

MICHAEL X. ST. MARTIN #12365
JOSEPH G. JEVIC III        #23145
ST. MARTIN & WILLIAMS, APLC
Post Office Box 2017
Houma, LA 70361
(504) 876-3891        Telephone
(504) 851-2219        Facsimile

**Attorneys for Terrebonne Parish School Board**

## CERTIFICATE OF SERVICE

I CERTIFY that a copy of the preceding Motions in Limine has been served on all counsel of record by ~~placing same in the United States mail~~ hand delivery, ~~delivery, postage prepaid and properly addressed~~, on this 28th day of December, 2000.

WADE T. VISCONTE

Page 3

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **TERREBONNE PARISH SCHOOL BOARD** | § | **CIVIL ACTION NO. 00-0319** |
| **VERSUS** | § | **SECTION:   B** |
| **COLUMBIA GULF TRANSMISSION COMPANY, KOCH GATEWAY PIPELINE COMPANY** | §  § | **MAGISTRATE:     5** |
| **FILED:**_____ | § | _____ |
| | | **DEPUTY CLERK** |

**ORDER**

Considering the foregoing Motions in Limine to Exclude Testimony of Koch Gateway Pipeline Company's Experts filed by plaintiff, Terrebonne Parish School Board:

**IT IS ORDERED, ADJUDGED AND DECREED** that the testimony of Kenneth J. Boudreaux, Ph.D. is excluded in its entirety.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the testimony of Richard N. DeVries, Ph.D., P.E. is excluded in its entirety.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the testimony of Irvington J. Eppling, MAI, CCIM is excluded as to those matters contained in his "Commentary on Assessment of Coastal Wetland Values."

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the testimony of Luther Holloway, Ph.D., is excluded as to the issue of damages caused by salinity intrusion and

hurricanes, is excluded from testifying on his water enhancement plan and benefits allegedly derived

therefrom, and is excluded from testifying as to the likelihood of the U.S. Army Corps. of Engineers

approving or denying the proposed restoration plan prepared by Camp.

THUS RENDERED AND SIGNED this _____ day of _____, 2000,

at New Orleans, Louisiana.

_____
U.S. DISTRICT JUDGE

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TERREBONNE PARISH SCHOOL BOARD** | § | **CIVIL ACTION NO. 00-0319** |
| **VERSUS** | § | **SECTION:   B** |
| **COLUMBIA GULF TRANSMISSION COMPANY, KOCH GATEWAY PIPELINE COMPANY** | § § | **MAGISTRATE:      5** |
| **FILED:**_____ | § | _____ **DEPUTY CLERK** |

## MEMORANDUM IN SUPPORT OF
## MOTIONS IN LIMINE TO EXCLUDE TESTIMONY
## OF KOCH GATEWAY PIPELINE COMPANY'S EXPERTS

**MAY IT PLEASE THE COURT:**

Terrebonne Parish School Board ("TPSB"), plaintiff in this case, files this memorandum in support of TPSB's Motions in Limine to Exclude Testimony of Koch Gateway Pipeline Company's ("Koch") Experts.

**FACTS**

TPSB is the owner of Section 16, Township 18 South, Range 13 East, ("School Board property") in Terrebonne Parish, Louisiana, originally comprising 640.92 acres of freshwater coastal marsh. Prior to the activities complained of herein, the marsh was healthy with consistent marsh

vegetation. Virtually no surface ponds nor surface streams existed on the School Board property. The marsh was a stable hydrologic ecosystem.

On December 18, 1957, Terrebonne Parish School Board granted a Right-of-Way to United Gas Pipeline Company that is recorded in the Terrebonne Parish Courthouse under COB 253, Folio 646, Entry No. 173617. The Right of Way gave United Gas the authority to construct and operate a natural gas pipeline ("Koch pipeline canal") on the School Board property. The right of way also gave United Gas the authority to dredge a pipeline canal "not to exceed forty feet in width." The right of way is considered a predial servitude under Louisiana law and attaches to the land and is transferrable to United Gas' successor or assignee. As such, the servitude allowed Koch to take over operations of the natural gas pipeline in 1992.

The Koch pipeline was constructed and the pipeline canal dredged in 1958. Since that time, the pipeline has been continuously operated. Despite the clear limiting provision in the December 18, 1957, right of way allowing a pipeline canal "not to exceed forty feet in width," Koch has taken no actions to maintain its pipeline canal. As a result, the pipeline canal has eroded significantly and now averages over seventy (70) feet in width. Moreover, due to Koch's lack of maintenance, breaks or breaches have developed in the spoil banks of the pipeline canals and have continued to widen and deepen thereby creating a hydrologic connection that has damaged the marsh.

Columbia Gulf did not even bother to obtain a right of way before constructing its natural gas pipeline and pipeline canal across the School Board's property. On February 18, 1964, gave public notice of an application by Columbia Gulf for a servitude across TPSB's land. On March 17, 1964, TPSB adopted a resolution setting a minimum fee of $25.00 per rod for any pipeline right of way granted across the School Board property. On April 3 & 8, 1964, representatives from Columbia Gulf complained of the $25.00 rate. Subsequent to these dates and with conscious

indifference to the landowner rights of TPSB, Columbia Gulf dredged its pipeline canal and constructed the pipeline on the School Board property even though it had not been granted a right of way thereby giving rise to a trespass. Subsequently, Columbia Gulf was granted a right of way that is recorded in the Terrebonne Parish Courthouse under COB 403, Folio 313, Entry No. 284018, dated August 4, 1965. The pipeline has been continuously operated since it was constructed and the pipeline canal was dredged.

Based on the only document available, Columbia Gulf's canal was fifty (50) feet in width when dredged. Columbia Gulf's right of way is limited to one hundred feet. Columbia Gulf also has taken no actions to maintain its pipeline canal. As a result, the pipeline canal has eroded significantly and now averages over one hundred (100) feet in width in violation of the limits established in the August 4, 1965, right of way. Furthermore, due to Columbia Gulf's lack of maintenance, a break or cut has developed in the spoil banks of the pipeline canal and has continued to widen and deepen thereby creating a hydrologic connection that has damaged the marsh.

The canals dredged on the School Board property have altered the hydrology of the marsh and have adversely impacted the marsh's ecology through the physical removal of marsh terrain and creation of spoil banks. The property has also been damaged by erosion caused by breaches in the canal levee system/spoil banks.

Defendants have allowed the numerous breaks or cuts in the spoil banks to enlarge which continue to cause erosion and destruction of the marsh. Tidal activity causes significant water movement through the breaks in the spoil banks into and out of the marsh. The dying of marsh vegetation results in increased erosion and leads to open water, and/or submergence of marsh vegetation and root mat. Native vegetation is replaced with pest plants like water hyacinths. Accordingly, due to the erosion and/or submergence of the School Board property as a result of the

canals dredged by Defendants, the ecological regime of School Board marsh property changed.

Koch and Columbia Gulf had every opportunity to properly maintain their canal spoil banks/levees. Since beginning operations, they have conducted inspections of their pipelines located in the pipeline canals once a year, at a minimum. Despite these inspections and notice that their canals are eroding, defendants never took steps to restore their canals.

Trial is scheduled for January 16, 2001. The experts for Koch Gateway Pipeline Company have been deposed. It is apparent that several of Koch's proposed experts were unqualified to render the opinions rendered in their reports. Koch has five (5) expert witnesses. Luther Holloway is Koch's purported expert on environmental assessments and wetland evaluations. Kenneth Boudreaux is Koch's economist. John Mattingly is a land surveyor. Richard Devries is an engineer that has been retained by Koch as a hydrologist. Irvington Eppling is a real estate appraiser who was retained to determine the alleged market value of the property at issue. TPSB seeks to partially exclude the testimony of Irvington Eppling and Luther Holloway, and TPSB seeks to completely exclude the testimony of Richard Devries and Kenneth Boudreaux.

## LAW

Under ***Daubert v. Merrell-Dow Pharmaceuticals, Inc.***, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court has made it clear that the "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." ***Daubert***, 509 U.S. at 589, 113 S.Ct. at 2795.[1] Furthermore, ***Kumho Tire Co., Ltd. v. Carmichael,*** 526 U.S. 137, 119 S.Ct. 1167 (1999), held that ***Daubert***'s "gatekeeping" obligation, requiring an inquiry into both

---

[1]   This has been the prevailing view in the Fifth Circuit for some time. See, e.g., ***Berry v. Armstrong Rubber Co.***, 989 F.2d 822 (5th Cir.1993), *cert. denied*, 510 U.S. 1117, 114 S.Ct. 1067, 127 L.Ed.2d 386 (1994); ***Christophersen v. Allied-Signal Corporation***, 939 F.2d 1106 (5th Cir.1991) (en banc), *cert. denied*, 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992); ***In re Air Crash Disaster at New Orleans, La.***, 795 F.2d 1230 (5th Cir.1986).

relevance and reliability, applies not only to "scientific" testimony, but to all expert testimony.

The *Daubert* and *Kumho Tire* reliability inquiry is grounded in Federal Rule of Evidence 702, which requires that the expert testimony be admitted if it consists of "scientific, technical or other specialized knowledge," and that such knowledge is relevant in the sense that it "will assist the trier of fact to understand the evidence or to determine a fact in issue."[2]  *Id.*; *U.S. v. Posado*, 57 F.3d 428, 432 (5th Cir.1995).

The first inquiry is whether a witness is qualified as an expert.  See F.R.E. 702, 104(a). Federal Rule of Evidence 104(a) provides that "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court."

Next, the Court must assess whether or not the testimony Koch's witnesses seek to offer qualifies as "scientific, technical or other specialized knowledge."  The Supreme Court noted in *Daubert* that the "scientific knowledge" requirement establishes a standard of evidentiary reliability. *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795.  The Court stated that the "adjective 'scientific' implies a grounding in the methods and procedures of science," and that the "word 'knowledge' connotes more than subjective belief or unsupported speculation."  *Id.*  While there is no requirement that the subject of scientific testimony be "known" to a certainty, "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method."  *Id.*  All proposed testimony therefore must be supported by appropriate validation;  in other words, there must be "

---

2        Federal Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible."  "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  F.R.E. 401.

'good grounds', based upon what is known" supporting it. *Id.*

The *Daubert* requirements provide a "flexible" inquiry driven primarily by Federal Rules of Evidence 401, 402, 403, and 702. *Posado*, 57 F.3d at 432. Under Rule 104(a), the trial judge must:

> make initial determinations ... that the proffered evidence possesses sufficient evidentiary reliability to be admissible as 'scientific, technical, or other specialized knowledge' and that the proffered evidence is relevant in the sense that it will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'

*Id.* at 432 (footnote omitted) (citing *Daubert*, 509 U.S. at 591-93, 113 S.Ct. at 2796). Whether evidence assists the trier of fact is essentially a relevance inquiry. *Id.* at 432-33 (citing *Daubert*, 509 U.S. at 589-93, 113 S.Ct. at 2795-96). In order to be "helpful" under Rule 702, the evidence must possess validity when applied to the pertinent factual inquiry. *Id.* at 433. The purpose for which the testimony is proffered must be evaluated. *Id.* at 433 & n. 4.

In addition, *Daubert* and *Posado* establish that to determine admissibility of experts' opinions, the party proffering the evidence must establish its "evidentiary reliability" or trustworthiness. Thus,

> [f]or scientific knowledge, there should be proof that the principle supports what it purports to show, i.e., that it is valid.... Validity can be measured by several factors, including whether the theory or technique can be tested and whether it has been subjected to peer review or publication.... [T]he known or potential rate of error may be helpful in making the validity determination.... Finally, although it is not dispositive, the extent to which a particular theory or technique has received general acceptance may be relevant to whether it is scientifically valid.

*Posado*, 57 F.3d at 433 (citing *Daubert*, 509 U.S. at 589-95, 113 S.Ct. at 2794-98).

These non-exclusive factors serve to guide the courts in evaluating whether the particular scientific testimony is reliable. These factors are neither exhaustive nor applicable in every case, but serve as "indicia of the reliability" of the theory or technique underlying the expert's testimony. In determining admissibility under Rule 702, a Court's focus is "solely on principles and methodology"

of the expert, and not on the conclusions that such principles and methods generate. *Daubert*, 509

U.S. at 595, 113 S.Ct. at 2797.

The Fifth Circuit, even before *Daubert*, urged trial judges to exercise their gatekeeper

function:

> [T]he trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument.... Our customary deference [to trial judges] ... assumes that the trial judge actually exercised his discretion. In saying this, we recognize the temptation to answer objections to receipt of expert testimony with the shorthand remark that the jury will give it 'the weight it deserves.' This nigh reflexive explanation may be sound in some case, but in others it can mask a failure by the trial judge to come to grips with an important trial decision.

*In Re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir.1986).

## ANALYSIS

## NOTE: AT THE TIME OF MAILING THIS MEMORANDUM FOR FILING, TPSB HAD NOT RECEIVED THE DEPOSITION OF RICHARD DEVRIES. IF THE COURT ALLOWS, TPSB WILL SUPPLEMENT THIS MEMORANDUM BEFORE THE JANUARY 10, 2001, HEARING WITH THE RELEVANT PORTIONS OF THE DEVRIES DEPOSITION.

### Testimony of Kenneth Boudreaux

TPSB submits that the testimony of Koch's economist, Kenneth Boudreaux, on the value of

TPSB's marsh property made the subject of this case must be excluded in its entirety.[3] His opinion

is confined to two general points. One, "social value" cannot be applied in this case when

determining the value of TPSB's property because TPSB can only capture "private value." Second,

Boudreaux adopted the traditional market value assigned by Eppling in his report without conducting

---

[3]    See copy of report of Kenneth J. Boudreaux, Ph.d., attached as Exhibit "A" to TPSB's motion in limine.

any sort of independent analysis to confirm the accuracy of Eppling's conclusions. It is important to note that Boudreaux's analysis assumes that a traditional market analysis applies. The conclusions of Boudreaux are as follows:

> The statement of valuation per acre of plaintiff's property as provided by Shea Penland, Ph.D., even if correctly measured, is not relevant to any claim for economic damage by plaintiff. The valuation offered by Dr. Penland for plaintiff's property is an attempt at *social valuation* or value of the property to society as a whole rather than a value that plaintiff own or owned and could have received for the property (which is a *private* value) as described below.

> Though by no means universally accepted, the valuation mechanisms used by Dr. Penland have found certain applications in estimating social values of assets for which there exists no market pricing mechanism. That situation is clearly not the case in this litigation. Plaintiff's *private* ownership rights to the property at issue are evidently subject to valuation by free and open markets, and market quotes for the *private* valuation of such property are readily available. That there does not exist a fair market pricing mechanism for the *social* value of plaintiff's property is irrelevant, because plaintiff in this litigation can only be damaged to the extent of their private ownership claim on the property.

> In addition to being economically irrelevant to the potential damage claimed by plaintiff, the attempts at valuation of the TPSB property in the Penland opinion are technically questionable. Over and above the recognized shortcomings of these approaches cited in the literature of environmental economics, the Penland valuation estimates lack particularity to plaintiff's property. I can detect only gross attempts to associate an existing literature in the *social* valuation of general property types and locations to the particular property of plaintiff.

> The opinion of Irvington J. Eppling, MAI, CCIM, states that a reasonable fair market valuation of the *private* value of ownership to the TPSB property is currently $250.00. There is evidently no opposing opinion on this issue. The economic evidence therefore indicates that if defendants damaged plaintiff's property, plaintiff's loss is approximately $250.00 per acre. (Footnote omitted).

## Boudreaux Is Not Qualified to Give Expert Testimony

The first hurdle Koch must overcome is whether Mr. Boudreaux is qualified to be an economic expert in valuing coastal wetlands. A quick scan of Mr. Boudreaux's CV illuminates the fact that Boudreaux has no training, work experience, teaching experience, or education in dealing

with coastal wetlands, their values, or the economic analysis inherent in determining the mitigation, preservation or restoration costs for coastal wetlands.[4]  More amazingly, Boudreaux could not remember a single case where he was accepted and gave an expert opinion on the value of any type of land.  Indeed, in another marsh damage case against Koch pending before Judge Berrigan of this Court, ***Michael St. Martin and Virginia Rayne St. Martin v. Quintana Petroleum Corporation, McMoran Oil & Gas Co. and Union Oil Company of California***, Docket No. 98-2095, Boudreaux readily acknowledged that he is not qualified to render opinions on land values:

> **Q:**    Now, have you previously rendered opinions or testified in matters dealing with land values?
>
> **A:**    Goodness.  I can't bring to mind a particular case that had land valuation as its primary issue, but I would hesitate to say I've never done that . . . .
>
> **Q:**    Looking at what you've done in the last four years, sure.  And you are not an appraiser?
>
> **A:**    No, I'm not.
>
> **Q:**    And you're not a realtor?
>
> **A:**    I'm not a realtor.
>
> **Q:**    You don't buy and sell real estate other than for your personal use, I assume?
>
> **A:**    That's correct.
>
> **Q:**    And you don't hold yourself out to be an expert in land values or appraisals?
>
> **A:**    Not in the sense of assigning dollar values to those.[5]

---

[4]    See copy of Kenneth Boudreaux's CV attached as Exhibit "B" to TPSB's Motions in Limine.

[5]    See compressed version of the deposition of Kenneth J. Boudreaux taken in the case of ***Michael St. Martin v. Quintana Petroleum Corporation, McMoran Oil & Gas Co. and Union Oil Company of California***, Docket No. 98-2095, pg. 7, lines 23-25, pg. 8, lines 1-4, and 9-21 attached as Exhibit C to TPSB's Motions in Limine.  Should the Court prefer the full-size transcript prior to hearing, Mover will so provide.

Yet, in his expert report, Boudreaux does exactly what he acknowledges he is not qualified to do, i.e., opine on the value of TPSB's land.[6] Moreover, Boudreaux acknowledged that he has not done any research on social valuations of property, nor has he published anything directly or indirectly addressing the value of coastal wetlands:

**A:**    . . . but I'm not a person that does base research and social valuations of property. That's not my area.

**Q:**    And you haven't done it here?

**A:**    I have not.[7]

Boudreaux does not belong to any professional organization interested in furthering the cause of wetlands preservation nor valuing natural resources like coastal wetlands. To the contrary, Boudreaux has been a professor of Economics at Tulane since very early in his career. Indeed, Boudreaux is a professor in Tulane's "School of Business," not in Tulane's Geology, Biology, Botany departments or any other "hard science" department. His experience is limited solely to issues dealing with economics in general and specifically in the areas of corporate finance and business economics.

Boudreaux is not even an expert in the area of economics in cases valuing land that are subject to a traditional market analysis. Indeed, Boudreaux acknowledged that 90% of his testimony is in personal injury or wrongful death cases.[8] More importantly, Boudreaux "usually" testifies as

---

[6]    The value of the TPSB's land is relevant to the issue of whether TPSB, as a political subdivision of Louisiana and government entity, can claim social value as the land is held in trust for the public.

[7]    See compressed version of the deposition of Kenneth J. Boudreaux, taken in the case of *Michael St. Martin v. Quintana Petroleum Corporation, McMoran Oil & Gas Co. and Union Oil Company of California*, Docket No. 98-2095, pg. 18, lines 16-21 attached as Exhibit "C" to TPSB's Motions in Limine.

[8]    See compressed version of the deposition of Kenneth J. Boudreaux, taken in the case of *Michael St. Martin v. Quintana Petroleum Corporation, McMoran Oil & Gas Co. and Union Oil Company of California*, Docket No. 98-2095, pg. 6, lines 13-25, pg. 7, lines 1-2 attached as Exhibit "C" to TPSB's

to "earning capacity" in these cases.[9] Boudreaux has no qualifications which conceivably qualify him as an expert in valuing land, much less coastal wetlands, when the issue is restoration.

Koch did not obtain an opinion from an expert in the field of ecological economics or who has practical wetlands social valuation experience that disputed the valuation amount established or methodology used by TPSB's expert, Shea Penland. To the contrary, they retained a economist who went completely outside the realm of his training, experience and education to make an unsupported and completely irrelevant opinion. It follows that since Boudreaux is not an expert in coastal wetlands or their values for purposes of restoration, his testimony must be excluded in its entirety.

Boudreaux's complete lack of qualifications are best illustrated when his analysis is compared to that of TPSB's expert Shea Penland. Consistent with the $14,000,000,000 Coast 2050 program and yearly $40,000,000 CWPPRA program, Penland offers what the social value of land is for purposes of preservation and restoration. His methodology makes clear that a traditional market approach does not apply because such a methodology results in wetlands being undervalued and has led to the erosion of the Louisiana coastal wetlands. In other words, in order to protect and restore Louisiana's coastal wetlands, the attitude of environmental indifference that forms the foundation for a traditional market approach must be abandoned. As Penland points out in his expert report entitled "Assessment of Louisiana Coastal Wetland Values", the U.S. Congress has adopted plans which value Louisiana's wetlands far in excess of a value which would be assessed under a market value approach:

_____

Motions in Limine.

[9]     See compressed version of the deposition of Kenneth J. Boudreaux, taken in the case of *Michael St. Martin v. Quintana Petroleum Corporation, McMoran Oil & Gas Co. and Union Oil Company of California*, Docket No. 98-2095, pg. 7, lines 13-19 attached as Exhibit "C" to Plaintiffs Motions in Limine.

Between 1930 and 1990, coastal Louisiana lost more than 690,000 acres, or about 1,000 square miles of wetlands (Dunbar et al, 1992). With the recognition of the value of Louisiana's wetlands and the catastrophic loss of wetlands, the U.S. Congress passed the Coastal Wetland Planning, Protection, and Restoration Act (CWPPRA) of 1990. CWPPRA provides $40 million per year for wetland protection and restoration projects. As these projects were being implemented, the CWPPRA Task Force recognized that a parallel program of massive public work projects had to be authorized and funded by the U.S. Congress if the responsible state and federal agencies were going to be successful in restoring Louisiana's vanishing wetlands ecosystems. As a result, in 1998 these government agencies proposed Coast 2050, a new initiative of $14 billion in massive ecosystem restoration projects to save coastal Louisiana through the Water Resources Development Act (WRDA). The Louisiana Coastal Wetland Conservation and Restoration Task Force and the Wetlands Conservation and Restoration Authority justified the Coast 2050 initiative value between $86,040 (5% discount rate) and $143,400 (3% discount rate) per acre. The government agencies that are represented in the Task Force and Authority include the Louisiana Department of Natural Resources, the Louisiana Governor's Office, the U.S. Department of Agriculture, the U.S. Department of the Interior, the U.S. Department of Commerce, the U.S. Environmental Protection Agency, and the U.S. Army Corps of Engineers. This endorsement by these state and federal government agencies and the most recent information published in peer reviewed scientific journals supports the concept of the value of an acre of Louisiana coastal wetlands exceeding $100,000.

In my participation within the CWPPRA and Coast 2050 ecosystem restoration programs has given me considerable experience in wetland valuation assessment. . . . Based on professional experience, participation in CWPPRA and Coast 2050, and the endorsement of the state and federal agencies working within CWPPRA and Coast 2050, an acre of Louisiana wetland is worth between $86,040 (5% discount) and $143,400 (3% discount).

Although Dr. Boudreaux is a fine gentleman and a qualified economist in the traditional business sense, it is obvious that Boudreaux is not qualified as to opine on the value of coastal wetlands or the methodology used to reach such a value. Boudreaux's lack of qualifications and analysis are perhaps best illustrated by placing the "shoe on the other foot." Dr. Penland who has extensive work experience and first hand knowledge in valuing wetlands is not qualified to give expert testimony in a personal injury case on loss of earning capacity. Likewise, Dr. Boudreaux, an expert in business economics, is not qualified to give expert testimony in a case dealing with

preservation and/or restoration of property when ecological factors and social values are considered. Moreover, Boudreaux's analysis using a "traditional market value" case does not apply because this case deals with placing value on land held in trust by a government body for the benefit of the public through analysis of environmental factors that fall with the realm of a wetlands specialist.

**Boudreaux's Opinions Are Not Relevant and Lack Evidentiary Reliability**

Next, assuming Boudreaux can qualify as an expert in this case, his opinions are not relevant to the issue of valuing TPSB's land for purposes of restoration. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." F.R.E. 401.

Boudreaux's opinion is completely irrelevant to this case because market value does not apply. For purposes of this motion, Plaintiff is not disputing that its property could be valued at $250 an acre if it was seeking to sell the relevant land in an open market through a realtor in Terrebonne Parish. However, Plaintiff is not seeking to sale its property in the open market. Instead, Plaintiff is seeking restoration of its property.[10] The social valuation of coastal wetlands for purposes of determining the costs of restoration is obviously a completely different issue from valuation of property for the purpose of selling the property to a willing buyer in an open market. Boudreaux's analysis in this case did not involve determining the value of the property for purposes of restoration. Consequently, Boudreaux's testimony must be excluded because (1) he is not an expert in valuation of coastal wetlands and/or restoration of coastal wetlands; (2) his opinions lack evidentiary reliability as his analysis was superficial and founded upon inherently incorrect assumptions; (3) Boudreaux

---

[10]    See copy of TPSB's Petition for damages, ¶ 27, attached with TPSB's Motion in Limine as Exhibit "J".

did not undertake any property valuation of his own, but rather seeks solely to criticize the analysis of Mr. Penland.

TPSB is a political subdivision of the State of Louisiana. As such, the TPSB is a public body that holds the property in trust for the benefit of the school children and people of Terrebonne Parish. Consequently, restoration and preservation of TPSB's property benefits the public, and hence, social values do apply because the public benefits from the restored wetlands. Accordingly, since Boudreaux's analysis was limited to a traditional economic analysis based upon market value, his opinion is not relevant to the issue of the costs of restoration of the TPSB's property. The traditional market approach does not apply because this case involves a claim by a "political subdivision"[11] of the State of Louisiana for the protection and restoration of land which is held in trust for the benefit of the taxpayers and school children of Terrebonne Parish, i.e., the public. For example, the children of Terrebonne Parish benefit from proceeds gathered due to mineral leases, hunting leases, royalties, etc. Likewise, the protection and restoration of Section 16, Township 18 South, Range 13 East, benefits the taxpayers and school children of Terrebonne Parish. Pursuant to F.R.E. 401, 702 and *Daubert*, Boudreaux's testimony must be excluded.

Next, TPSB submits that the methodology used by Boudreaux does not establish that his opinions have evidentiary reliability. Boudreaux's methodology is inherently flawed because it assumes that comparable market value applies as TPSB's measure of "damages." However, TPSB is not seeking money damages, but rather, is seeking restoration of its property. The market value of property that has been damaged for the purpose of awarding money damages and the costs of restoring damaged property are two completely different matters. It follows that Boudreaux's

---

[11]        See La. R.S. 13:5102.

opinions have no "evidentiary reliability" because they are flawed in the initial assumptions as to what type of economic analysis applies.

Moreover, Boudreaux adopts the value of $250.00 per acre set forth in the Irvington Eppling report (Koch's proposed valuation expert) because Boudreaux concludes that "[b]eing apparently the only estimate of private ownership value put forward in this litigation, this value must form the proper economic basis for a damage calculation. . . ." Boudreaux performed no independent study or evaluation to verify the accuracy or inaccuracy of Epplings' report. He did not verify that the property sales contained in the Eppling report were based on sales of "comparable property", i.e., freshwater flotant marsh in Terrebonne Parish. Boudreaux never visited the property at issue in this case nor the properties contained in the Eppling report. Boudreaux did not verify that the sales which are listed in the Eppling report involved sales "without coercion between knowledgeable and informed buyers and sellers in a competitive market".[12] Rather, he simply adopted the market value proposed by Eppling. Accordingly, Boudreaux's testimony must be excluded.

## Analysis of Irvington Eppling Testimony

Irvington Eppling is a real estate appraiser who has provided a report outlining what purports to be his best estimate of the market value of the TPSB property. For purposes of this motion, TPSB does not seek to exclude the testimony of Eppling to the extent that Eppling opines that TPSB's property would have an "open market" value of $250 an acre if it was sold in Terrebonne Parish, Louisiana, in the near future. However, Eppling's second report, "Commentary on 'Assessment of Louisiana Coastal Wetland Values' by Shea Penland, PhD, September 14, 2000, 'As It Relates To The Value Of An Individual Wetland Tract Ownership'" must be excluded to the extent that Eppling

---

[12]    See ¶ 3, pg. 5 of report of Kenneth Boudreaux attached to TPSB's Motion in Limine to Exclude Koch's Experts as Exhibit "A."

will testify or "comment" on Penland's expert assessment of coastal wetland values in relation to the issue of restoration since Eppling is not qualified as an expert under *Daubert* standards to "comment" or opine as to the ecological functions of TPSB's wetlands nor to opine on the proper ecological economic analysis to exercise in valuing TPSB's property to the extent social values are used.[13]

Eppling partially summarizes the report of Penland on the valuation of coastal wetlands. Eppling's first "commentary" takes place in the fifth paragraph on page two (2) of his "Commentary" where he states:

> "The summary of these discounted values [for Louisiana Coastal Wetlands in Table 1 of Penland's Assessment of Wetland Values report] are so varied that it would be difficult to use this data for a proper indication of societal value for the subject marshland. For example in Table 1 the use of a discounted rate of 1% to 9%, which will relate a 9-fold variance of value depending upon what rate is selected. E.g. Service value $100 per year @ 1% discount =$10,000. Service value of $100.00 year @ 9% discount rate = $1,111." (Insert added).

In the first paragraph on page three (3), Eppling writes:

> "Table 2, Wetland Ecosystems Services and Function (Costanza, et al (1997), lists the Ecosystem Services that are valued in Table 3. Of the 10 services listed items, only 4, 7, 8, 9 & 10 could be partially captured by the Wetland owner. These are Food Production, Raw Materials, Recreation, and Cultural. With Items 1 through 6, Gas Regulation, Disturbance Regulation, Water Regulation, Water Supply, Waste Treatment and Refugia, no ownership may exclude (exclusion principal) the rest of society from enjoying the benefits nor can the owner capture them."

In the second and third paragraphs on page three (3) of his "Commentary," Eppling continues by writing:

> "In Table 3 Costanza computes the Annual Wetland Ecosystem Service Value per acre per year. Out of a $5,993/AC Annual Service Value, the only values assigned to those items that could be partially captured by an individual Wetland

---

[13]    A copy of the "Commentary" by Irvington Eppling is attached as Exhibit "D" TPSB's Motion in Limine.

ownership were (7) Food production @ $104/AC/Yr, (8) Raw Materials @ $43/AC/Yr, (9) Recreation @ $233/AC/Yr and Cultural @ $357/AC/Yr. Not to disparage the effort made by Costanza to estimate Service Values of the Wetlands to Society, these items may be more readily quantified in a Market Transaction for an Individual Wetland Ownership where such elements have been assessed by the Buyer and Seller.

Estimating the Value of a Wetland Ownership [requires] a different approach than Estimating the Value of A Wetland to Society or for the Public Good. Societal Value takes into consideration Wetland Services and Functions whose Benefits cannot be captured by the individual Wetland Owner. If an owner cannot receive the benefits other than as a member of society, he does not own it, nor can he be compensated for it in a sale or civil action. A Market Value Estimate takes into consideration All Elements that an Owner may capture . . . ."

In the fourth paragraph on page three (3), Eppling cites the definition of Market Value provided in La. R.S. 47:2321, but this definition of market value is used in determining the value of property for assessing taxes. The value of Section 16, Township 18 South, Range 13 East, for purposes of assessing taxes is not at issue in this case. Furthermore, the value of land for purposes of sale on an open market, value for purposes of restoration and protection, and value of land for the purpose of assessing taxes are all different valuations. Hence, Eppling's definition of Market Value does not apply and is yet another example of his "Commentary" failing to meet *Daubert* standards. Eppling also cites the U.S. Government Comptroller of Currency for "value". Eppling fails to indicate how the Comptroller's definition of "value" is synonymous with "market value" or how the Comptroller's definition of "value" would apply in cases requesting restoration of marsh. Again, this inclusion of an irrelevant definition to support Eppling's "Commentary" on why the Penland valuation report reaches the incorrect valuation of the TPSB property underscores that Eppling's analysis fails to meet the requirements of scientific inquiry and analysis established by *Daubert* and *Kumho*.

Eppling's "Commentary" contains the following "summary" on pages 4 & 5 of his purported

Page -17-

"expert" report:

> The WTP and EA methods of economic valuations of Wetlands attempt to assess benefits not only to the owner but to society as well.

> The studies in Louisiana using WTP and EA coupled with conflicting discount rates have produced varied results. (See Table 1)

> Based on the varied results and inglobo application of values it would be impossible to assess a specific Section 16 marsh based on these analyses, also many of the external service benefits assessed in the studies may not be found in a specific wetland.

> Studies like these cited by Dr. Penland can be very effective in aiding environmental efforts. Despite serious difficulties in estimating the value of the external benefits from Wetlands, these benefits clearly exist and are systematically undervalued in our market economy. The cited studies however have no place in determining the value of damages in a civil suit between an owner and easement holder purported to have caused damage to the subject property in the past. While highly laudable in their purpose, studies on the value of the external wetlands benefits are irrelevant to this proceeding.

## Eppling Is Not Qualified To Give The Expert Testimony Contained In His "Commentary"

Eppling's "Commentary" is a foray into the field of science and economics (ecological economics) as they pertain to wetlands. Eppling's conclusions above also make clear that he is rendering a legal conclusion. Eppling's legal conclusions are the opinion of a layperson purporting to testify as an expert. Fed. R. Civ. P., Rule 702, provides that an expert witness may testify in the form of an opinion or otherwise if the witness is "qualified as an expert by knowledge, skill, experience, training, or education . . ." and if three other factor regarding methodology are met. Nothing in his CV indicates that Eppling has the knowledge, skill, experience, training, or education to render a legal conclusion in this case. Eppling obviously was retained by Koch to provide a market analysis value for the property since he is a real estate appraiser. Since Eppling does not qualify as a legal expert, his opinion declaring social values are "irrelevant" in this case must be excluded. Fed. R. Civ. P., Rule 704 provides that an *expert witness* may testify to an "ultimate issue

to be decided by the trier of fact." However, a *fact witness* is limited to testifying to opinions or inferences that are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Civ. P., Rule 701.

Next, a quick scan of Eppling's CV illuminates the fact that Eppling has no training, work experience, teaching experience, nor education which qualifies him as an expert in ecological economics nor coastal wetlands, including their functions, nor the value of the functions provided by coastal wetlands.[14] His experience and training as a real estate appraiser limit him to determining the market value of coastal wetlands by comparing similar sales in the recent past.[15] Indeed, Eppling acknowledged he is only qualified to perform a traditional market analysis and is not qualified to deal with social values at his deposition in this case:

> **Q:**    Now, don't be offended by what I'm going to ask you, but the question that comes to me is: What qualifies you as an MAI to critique or criticize the work of others in an area in which MAI's do not traditionally work?
>
> **A:**    I would say that, to answer your question, there are--to value a wetland--I value wetlands and this is an attempt to value wetlands. And as a result, I think I would have--I use discount rates and risk rates and they use discount rates and risk rates.
>
> *Now, as far as the societal values [and] their services, I'm not qualified to do that part of it*, but when it comes to the fact of discounting, risk rates, what risk rates are you going to assess, I mean, if you assess a risk

---

[14]    A copy of the CV of Irvington Eppling is attached with the TPSB's Motion in Limine as Exhibit "E."

[15]    A rough analogy may illustrate Eppling's lack of qualifications. Assume Eppling's background in real estate or wetlands is the equivalent of the knowledge of a general practitioner in medicine. Assume that the knowledge of Penland is the equivalent of the knowledge of a heart surgeon. Assume a medical malpractice case [restoration] has been filed due to a botched heart surgery, and plaintiff [TPSB] has hired a heart surgeon [Penland] as its expert. Surely, any "commentary" or testimony by a general practitioner [Eppling] on the standard of care owed or whether malpractice was committed [necessity of restoration and value] in rebuttal to the testimony of a heart surgeon [Penland] would not be allowed under *Daubert* and *Kumho Tire*. Similarly, Eppling's general background in real estate does not qualify him to testify or "comment," on the results reached by Penland who is an expert specializing in wetlands, including their restoration/preservation value.

rate or discount rate of one percent and nine percent in the same income stream, you have a nine-fold differential, which is pretty much differential. So I think that we do this every time we look at an income-producing property. . . . *So as a result, the discounting would be something that an MAI would be involved with, but not the actual societal value, taking the effect of a hurricane, for example, on a town.* (emphasis added).[16]

Eppling opined that for purposes of his analysis it did not matter whether the Section 16 land was a government entity or private individual because both are treated the same under a market value analysis.[17] Eppling acknowledged that wetlands have social value but opined that a private landowner cannot capture the social values. However, when confronted with the question of whether a governmental entity can recover for loss to society, Eppling had no answer. In fact, when confronted with his lack of an answer he explained that it was "difficult" for him to answer "because I think everybody here is going on new territories and new grounds".[18] He then acknowledged he had never appraised a societal value.[19] Eppling also acknowledged that wetlands have societal values that clearly exist and are systematically undervalues in the "market economy" because the "market economy does not take into consideration societal values."[20]

To the extent that Penland will opine as to the valuation of TPSB's property under the Coast 2050 and CWPPRA protection and restoration plans established by the U.S. Congress and state

---

[16]    See compressed version of the deposition of Irvington Eppling, taken in this case, pg. 21, lines 2-25, and pg. 22, lines 1-13, attached as Exhibit "L" to TPSB's Motions in Limine. Should the Court prefer the full-size transcript prior to hearing, Mover will so provide.

[17]    See compressed version of the deposition of Irvington Eppling, taken in this case, pg. 26, lines 1-10, attached as Exhibit "L" to TPSB's Motions in Limine.

[18]    See compressed version of the deposition of Irvington Eppling, taken in this case, pg. 28, lines 3-21, attached as Exhibit "L" to TPSB's Motions in Limine.

[19]    See compressed version of the deposition of Irvington Eppling, taken in this case, pg. 28, lines 22-25, attached as Exhibit "L" to TPSB's Motions in Limine.

[20]    See compressed version of the deposition of Irvington Eppling, taken in this case, pg. 41, lines 23-25, pg. 42, lines 1-3, attached as Exhibit "L" to TPSB's Motions in Limine.

government of Louisiana, Eppling's legal and economic "comments" that attack the conclusions of

Penland are unsupported by his lack of qualifications. His "Commentary" on whether the functions

of TPSB's property are capturable for private and/or public benefit and on any value of TPSB's

property considering the private and social value are merely the opinions of a real estate appraiser

(layman) who is purporting to testify as an expert in a highly scientific and specialized field

completely unrelated to real estate appraisals and open market sales. Since Eppling is not qualified

as an expert to make the legal conclusions and economic statements present in his "Commentary,"

his testimony of the matters contained in his "Commentary" must be excluded at trial under the

**Daubert** and **Kumho** cases.

Furthermore, Eppling's "commentary" or testimony at trial is unnecessary. His testimony

would be duplicative of the conclusions reached by Boudreaux since Eppling's "Commentary"

covers the same ground covered by Boudreaux in concluding that social values do not apply to

TPSB's case. Additionally, Eppling is even less qualified than Boudreaux because Eppling has

absolutely no training in economics that would qualify him to conduct an economic analysis in

general, much less in ecological economics.

**Analysis of Testimony of Richard Devries**

Richard Devries is an engineer who was hired as a hydrologist by Koch to measure tidal

velocities flowing from Koch's pipeline canal into the TPSB's marsh adjacent to a break in Koch's

pipeline canal.[21] TPSB submits that Devries' testimony must be excluded in its entirety because his

investigation and results do not meet the rigorous standards of scientific inquiry established by

---

[21]    A copy of the CV of Richard Devries is attached with the TPSB's Motion in Limine as Exhibit "F."

*Daubert* and *Kumho*. The following pertinent "opinions" are expressed in the report of Devries:[22]

1.      The Koch-Gateway and Columbia-Gulf pipeline canals that cross the subject property do not pose a hydraulic or hydrologic problem for erosion of the marsh.

2.      The two canals and the marsh are hydraulically connected to the Atchafalaya River system and the Gulf Intracoastal Waterway through the Little Horn Bayou drainage system.

3.      The property is subject to the ebb and flow of the coastal tide, particularly at low flows of the Atchafalaya River.

4.      Flow velocity measurements into and out of Section 16 show that the velocities are less than critical erodible velocities.

5.      The remedial action proposed by Camp, et al., will not solve the perceived problem.

6.      Adjacent properties have a larger influence on the ebb and flow of water into Section 16 than do the two pipeline canals.

## The Testimony Of Devries Is Not Relevant To The Issue of Causation

Whether evidence assists the trier of fact is essentially a relevance inquiry. *Daubert*, 509 U.S. at 589-93, 113 S.Ct. at 2795-96. In order to be "helpful" under Rule 702, the evidence must possess validity when applied to the pertinent factual inquiry. *Posado*, 57 F.3d at 432, 433. The purpose for which the testimony is proffered must be evaluated. *Posado*, 57 F.3d at 432, 433 & n. 4.

TPSB will prove the damage to their property occurred through breaks in the Koch pipeline canal that created the direct hydrologic connection with adjacent freshwater flotant marsh. The report of Devries attempts to establish that the Koch pipeline canal did not cause damage to TPSB's property because Devries concludes the tidal velocities into and out of the marsh are not sufficient

---

[22]      A copy of the report of Richard Devries is attached with the TPSB's Motion in Limine as Exhibit "G."

to erode the marsh's floating root mat. Devries testimony is not relevant to this case because Devries used an incorrect heavier clay soil type to reach his conclusions. Devries relied on Ven Te Chow's Open-Channel Hydraulics as a basis to opine that "erodible velocity for channels such as these canals is between 2.0 and 3.75 feet per second."[23] However, Devries opinion is based on the conclusion that the erodible velocities have not occurred because the marsh root mat is made up of clay particles. Devries' error as to the proper soil type is not surprising since Devries acknowledged he is not a freshwater flotant marsh expert and his only connection with freshwater marshes has been in the last year in the St. Martin case, this case, and another TPSB marsh damage case pending at the state court level.[24] Despite this fact, Devries' report clearly indicates that he did not bother to take soil samples to verify his conclusions that the marsh is made up of clays that can only be eroded at velocities of 2.0 to 3.75 feet per second. Devries explained that he did not take soil samples because he didn't need to as, based on his experience, he knew the marsh contained heavier clay particles.[25] As such, Devries' report and opinion do not meet the scientific standards established by *Daubert* and his report and opinion are not relevant as they apply to a soil that he has not verified as the only soil existing in the marsh root mat. Further, he did not eliminate the possibility that lighter peat and silt particles are present and subject to erosion at lower velocities.

Devries' opinion is exposed as unsupported by sufficient scientific inquiry when the report

---

[23]    See Section II "Bases For Opinions", subsection "Data Collected," ¶ 1 of Devries' report attached to TPSB's motion in limine as Exhibit "G."

[24]    At the time of filing, the deposition of Devries was not available. TPSB reserves the right to file a supplemental memorandum with relevant portions of Devries' testimony attached in support of TPSB's motion in limine.

[25]    At the time of filing, the deposition of Devries was not available. TPSB reserves the right to file a supplemental memorandum with relevant portions of Devries' testimony attached in support of TPSB's motion in limine.

of Koch's proposed marsh expert, Luther Holloway, is considered. Holloway's report concludes that the "freshwater marsh, deep peat soil type dominates the area over much of the property while the freshwater marsh and mucky clays type are located along Little Horn Bayou and possibly along some of the abandoned meander scars that can be seen from the aerial photography that course through the property."[26] The cut where Devries took his measurements adjacent to the Koch canal are not located in Little Horn Bayou and no meander scars are located in the spots where Devries took his measurements. Hence, the only conclusion is that Devries' testimony must be excluded because it has no scientific reliability nor relevance and is undermined by Koch's own purported wetland scientist, Luther Holloway.

Next, TPSB's hydrologist, Alex McCorquodale, did take root mat samples which produced objective evidence contradicting the unsupported conclusions of Devries. McCorquodale's analysis, supported by Robert Chabreck's report indicating the peat soils that compose the marsh, indicated that the marsh root mat is comprised of silty loam/peat with a high organic content, low bulk density and low settling density, not the heavier clay soil upon which Devries bases his opinion. Based upon velocity measurements and root mat samples taken, McCorquodale concluded that the "bed material with lower settling velocities and dry bulk densities will have a higher potential for resuspension and transport. This indicates that there is a strong possibility that erosion of the marsh bed material near [the cut where Devries took his measurements] will occur at the observed velocities . . ." recorded by McCorquodale.

**Devries' Opinions Do Not Have Evidentiary Reliability**

Moreover, Devries' methodology does not meet the *Daubert* standards of evidentiary

---

[26]    See report of Luther Holloway, pg. II-8, Section entitled "Soils," attached to TPSB's motion in limine as Exhibit "M."

reliability. He did not conduct any investigation or analysis to record the full range of tidal velocities to which the property is subject to at varying times.[27] Devries' tidal velocity measurements show no erodible velocity because Devries consciously took his measurements at the lowest period of tidal velocity in the daily and monthly tidal cycle.[28] Furthermore, Devries took velocity measurements for less than one full day at the break on the south side of the Koch pipeline canal near the east section line, and, as discussed previously, Devries used the wrong soil type to reach his conclusion that the marsh is not being subjected to erodible tidal velocities.

Devries also did not attempt to account for the effect of the width, length, shape and depth of the bottom of the channel which formed adjacent to the break Koch pipeline canal and whether these factors would mean that the velocities he relied upon as set forth in Ven Te Chow's Open Channel Hydraulics would need to be adjusted or corrected. He did not account for the width, length, and depth of the break in the Koch pipeline canal. Devries did not account or adjust his results for how the high tide conditions flowing into and out of the Koch pipeline canal and adjacent marsh would effect his findings. Devries did not consider any changes in water levels that would occur due to seasonal changes, weather conditions, or other factors that might affect water movement and tidal velocities. In other words, his investigation and evaluation did not consider the potential "rate of error". It follows that Devries' study is incomplete in scope as he did not account for basic factors which might affect his conclusions and, consequently, his report and trial testimony must be excluded pursuant to ***Daubert***.

---

[27]     At the time of filing, the deposition of Devries was not available. TPSB reserves the right to file a supplemental memorandum with relevant portions of Devries' testimony attached in support of TPSB's motion in limine.

[28]     . At the time of filing, the deposition of Devries was not available. TPSB reserves the right to file a supplemental memorandum with relevant portions of Devries' testimony attached in support of TPSB's motion in limine.

**Devries cannot provide expert testimony as an engineer due to his lack of a Louisiana license**

Furthermore, Devries is not qualified to provide an expert opinion because he is not licensed as an engineer in Louisiana and his opinion constitutes the unauthorized practice of engineering in Louisiana.[29]   At his deposition in a similar marsh damage case currently pending before the Honorable Ginger Berrigan captioned "**Michael X. St. Martin v. Quintana Petroleum Corporation, McMoran Oil & Gas Co., And Union Oil Company of California,**" Docket No. 98-2095, Devries admitted he is not licensed to practice engineering in the state of Louisiana:

> **Q:**   You are a land surveyor?
>
> **A:**   And a professional engineer.
>
> **Q:**   All in Oklahoma?
>
> **A:**   Well, professional engineer in Nebraska also.
>
> **Q:**   Not in Louisiana?
>
> **A:**   What?
>
> **Q:**   Not in Louisiana?

---

[29]     The *practice of engineering* is defined at La. R.S. 37:682 (8) as:

(8) "Practice of engineering" shall mean responsible professional service which may include consultation, investigation, evaluation, planning, designing, or inspection of construction in connection with any public or private utilities, structures, machines, equipment, processes, works, or projects wherein the public welfare, or the safeguarding of life, health, and property is concerned or involved, when such professional service requires the application of engineering principles and the interpretation of engineering data.

A person shall be construed to practice or offer to practice engineering, who practices in any branch of the profession of engineering; or who, by verbal claim, sign, advertisement, letterhead, card, or in any other way represents himself to be a professional engineer; or who represents himself as able to perform, or who does perform any engineering service or work or any other professional service designated by the practitioner or recognized by educational authorities as engineering. The practice of engineering shall not include the work ordinarily performed by a person who himself operates or maintains machinery or equipment.

A:    Not in Louisiana, no.  Could be.

Q:    But you are not?

A:    No.[30]

Mr. St. Martin filed a motion in limine to exclude Devries' testimony based on his providing an expert opinion in engineering without a Louisiana license.  Judge Berrigan has not ruled on Mr. St. Martin's motion in limine and St. Martin's motion in limine is scheduled for hearing on January 31, 2001.  Amazingly, Devries has taken no steps since his June 15, 2000, deposition in the St. Martin case to apply for a license or register with the Louisiana State Board of Registration for Professional Engineers and Land Surveyors .  The utter contempt and indifference by Koch and Devries for the laws of Louisiana and authority of this Court should be punished with the Court correctly excluding Devries' purported expert opinion in this case.

Devries' lack of a license makes him no different than any fireman, policeman, nurse, or engineering student who practices engineering by giving opinions and testimony.  See *Andrade Garcia v. Columbia Medical Center of Sherman*, 996 F.Supp. 617 (E.D.Tex. 1998) (district court ruled medical student could not testify in a medical malpractice trial because she was not licensed to practice medicine).  La. R.S. 37:682 (4) clearly establishes that an "engineer" is a person who "is qualified to practice engineering . . . as evidenced by his registration as such by the board."  Louisiana Revised Statutes Title 37, Section 681 forbids the practice of engineering in Louisiana by an unlicenced engineer and forbids that person from displaying or using the seal of an engineer.[31]

---

[30]    See pg. 6, lines 12-22 of Deposition of Devries taken in the case of "**Michael X. St. Martin v. Quintana Petroleum Corporation, McMoran Oil & Gas Co., And Union Oil Company of California**," Docket No. 98-2095, attached to Plaintiffs' Motion in Limine as Exhibit "N."

[31]    Specifically, La. R.S. 37:681 provides, with emphasis added:

In order to safeguard life, health, and property, and to promote the public welfare, any person in either

Indeed, Louisiana law specifically allows for engineers not licensed to practice in Louisiana, but licensed in another state, to obtain authority to practice engineering in Louisiana for a temporary and limited amount of time.  Specifically, La. R.S. 37:702 (2), in pertinent part provides, with emphasis added:

This Chapter shall not be construed to prevent or to affect:

... (2) *The practice of a person not a resident of and having no established place of business in this state, practicing or offering to practice herein the profession of engineering,* when such practice does not exceed one hundred twenty consecutive days in any calendar year, *provided such person is legally qualified by registration to practice the said profession in his own state,* territory, or possession of the United States, or the District of Columbia, *in which the requirements and the qualifications for obtaining a certificate of registration are not lower than those specified in this Chapter, and provided further, that before beginning such temporary practice in this state, the person shall have applied to the board, paid the prescribed fee, and received a temporary permit,* and upon the conclusion of such work he shall advise the board as to the period of time that he has practiced in the state under such temporary permit.

Devries' report and testimony constitute rendering of engineering services in Louisiana. Devries took water level measurements, collected hydrologic measurements, calculated tidal velocity distances.  The conclusions in his report are based on actions taken by a defendant in Louisiana and are the result of field work on property located in Louisiana.

Louisiana enacted the aforementioned statutes to protect engineers who are qualified to practice law in Louisiana.  Louisiana has a strong interest in regulating the practice of professionals.

---

public or private capacity, or foreign or domestic corporation, practicing or offering to practice professional engineering or professional land surveying, shall be required to submit evidence that he is qualified to so practice and shall be registered as hereinafter provided; and *it shall be unlawful for any person to practice or to offer to practice in this state, engineering or land surveying, as defined in this Chapter,* or to use in connection with his name or otherwise assume, use, or advertise any title or description tending to convey the impression that he is a professional engineer or a professional land surveyor, *unless such person has been duly registered under the provisions of this Chapter.*

The U. S. Supreme Court recognizes that states "have a compelling interest in the practice of professions within their boundaries and that . . . they have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792, 95 S.Ct. 2004, 2016, 44 L.ED.2d 572, 588 (1975).

In *Accountants' Ass'n of Louisiana v. State*, 533 So.2d 1251, 255 (La. App. 4 Cir. 1988), the court held that the rendering of opinions and reports is the manner in which a professional expresses himself in the practice of his profession. Devries' rendering of his report about Louisiana property based on his engineer constitutes the "practice of engineering" in Louisiana. In *Accountants' Ass'n of Louisiana v. State*, accountants who were not licensed nor registered CPAs were forbidden to perform in Louisiana those activities included in the practice of public accounting defined at La. R.S. 37:77.

At the time the report of Devries was submitted and even at the time of his deposition on December 8, 2000, Devries had not obtained a temporary or permanent license to practice engineering in Louisiana. It follows that since his report and deposition testimony were not the actions of an "engineer" licensed to "practice engineering" in the State of Louisiana, Koch has not submitted an expert report in accordance with this Court's November 15, 2000, defense expert report deadline. The Court's April 6, 2000, Order in this case provides that the "Court will not permit any witness, expert or fact, to testify or any exhibits to be used unless there has been compliance with this Minute Entry . . .", i.e., expert reports had to be submitted in a timely manner. Moreover, pursuant to the provisions of La. R.S. 37:700, Devries' actions may be subject to criminal prosecution. Consequently, Devries' trial and deposition testimony and report must be excluded because any subsequent actions to seek a temporary license cannot undo the fact that he has committed an "unlawful" act by simply failing to take the time to acquire a license in Louisiana and

Koch has not submitted a timely expert report on the issue of hydrology by a qualified expert.

TPSB anticipates that Koch may argue that Devries' lack of a license is a non-issue because Devries qualifies as an expert under **Daubert** standards. The TPSB points out that this case is a diversity action. Hence, state substantive law applies and federal procedural law applies. The engineering statutes dealing with license requirements have nothing to do with civil procedure. They are substantive laws designed to protect the citizens of Louisiana and engineers licensed to practice law in Louisiana. This conclusion is supported by the fact that La. R.S. 32:700 makes it a criminal offense to practice engineering without a license. Consequently, the Court should not even reach a **Daubert** analysis as to the qualifications of Devries.

Devries' opinion is a conclusion and interpretation of a defendant's actions in Louisiana. His opinion, formed after an "investigation" and "evaluation", constitutes rendering of engineering services in Louisiana and an application of facts under Louisiana law. Consequently, Defendant respectfully submits that the testimony of Devries and any reports or testimony by him must be excluded from the record of this matter.

**Testimony of Luther Holloway**

The following pertinent opinions are expressed by Holloway:

1.    The Koch and Columbia Gulf pipelines have not contributed to the deterioration of the marshes in Section 16.

2.    Freshwater flows with sediments and nutrients passing through the Koch and Columbia Gulf canals from the Atchafalaya River are sustaining the marsh in many areas of Section 16 and marshes to the south and east of the property.

3.    Marsh deterioration was caused by pulses or episodic nutria herbivory plus likely hurricane damage resulted in eat outs of the vegetation and led to break up of the floating marsh.

4.    The marsh community in much of Section 16 is today experiencing heavy nutria herbivory in areas where decolonization and regrowth of the marsh is occurring.

Page -30-

5.      Due to the Old River Control Structure and navigation projects in the area, flows from the Atchafalaya River have resulted in more hydric conditions in the marshes to the east and have prevented salinity intrusions into the area.

6.      Plans by the plaintiff's experts to fill the pipeline canals would cut off or greatly reduce flows of water and would lead to a further degradation of the marsh.

7.      Barging river sand and other materials to the pipeline canals and proposed construction activities would result in serious impacts to the canals and surrounding marshes and would require a permit from the U.S. Army Corps of Engineers that very likely would not be granted.

8.      The only way to maintain the marsh in Section 16 in a healthy state is to enhance freshwater flows from the Atchafalaya River by removal of bulkheads in the Columbia Gulf and Koch pipeline canals and implementation of a nutria control program for the area.

**Holloway does not qualify as an expert in the effects of hurricanes or salinity intrusion**

In Opinion three (3), Holloway concludes that it is "likely hurricane damage" has occurred on the property. However, at his deposition, Holloway admitted that he is not qualified to give an expert opinion on hurricane damage.[32]

Likewise, in Opinion five (5), Holloway concludes that various sources have prevented "salinity intrusion" into the property. Again, Holloway admitted in his deposition that he took no salinity measurements on the TPSB property and that he did no analysis allowing him to provide an expert opinion on the effects of salinity intrusion into the marsh.[33]

Under ***Daubert v. Merrell-Dow Pharmaceuticals, Inc.***, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court has made it clear that the "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." ***Daubert***, 509

---

[32]    See pg. 76, lines 3-10, pg. 86, lines 4-17, of deposition of Luther Holloway attached as Exhibit "K" to TPSB's motion in limine.

[33]    See pg. 86, lines 4-10, lines 19-25, pg. 87, lines 1-6, of deposition of Luther Holloway attached as Exhibit "K" to TPSB's motion in limine.

U.S. at 589, 113 S.Ct. at 2795. Furthermore, ***Kumho Tire Co., Ltd. v. Carmichael,*** 526 U.S. 137, 119 S.Ct. 1167 (1999), held that ***Daubert's*** "gatekeeping" obligation, requiring an inquiry into both relevance and reliability, applies not only to "scientific" testimony, but to all expert testimony. The first inquiry is whether a witness is qualified as an expert. See F.R.E. 702, 104(a). Federal Rule of Evidence 104(a) provides that "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court." By his own admission, Holloway does not qualify as an expert in hurricane damage in this case, nor did Holloway conduct any field work to address whether the property was damaged by hurricanes or salinity intrusion. Consequently, pursuant to ***Daubert***, the Court must exclude his testimony on these subjects.

Opinion seven (7) of Holloway's report concludes that the U.S. Army Corps of Engineers would "very likely" <u>not</u> grant TPSB a permit to carry out the restoration plan set forth in Camp's report. However, this conclusion conflicts with the body of Holloway's report which states that the "projects as proposed by Camp (2000A, 2000B) would require submission of a permit application and subsequent review through the administrative process. Until this process has run, no definitive statements can be made regarding the actual granting of a permit for these activities."[34] Holloway confirmed at his deposition that he could not say with certainty that the restoration plan would be rejected by the COE.[35]

The Supreme Court noted in ***Daubert*** that the "scientific knowledge" requirement establishes a standard of evidentiary reliability. ***Daubert***, 509 U.S. at 590, 113 S.Ct. at 2795. The Court stated

---

[34] See report of Holloway, Section entitled "Discussion," ¶ 2, pg. II-21, attached to TPSB's motion in limine as Exhibit "M."

[35] See pg. 90, lines 1-15, of deposition of Luther Holloway attached as Exhibit "K" to TPSB's motion in limine.

that the "adjective 'scientific' implies a grounding in the methods and procedures of science," and that the "word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* As Holloway's own contradictory statements in his reports prove, Holloway's Opinion seven (7) is unsupported and based on speculation. Holloway is not an employee of the U.S. Corps. of Engineers who works in the wetlands permitting division, and Holloway cannot opine on the possible future action on a third party government body merely because he was once employed by that government body. Accordingly, pursuant to *Daubert*, Holloway's speculative testimony that Camp's restoration plans will be denied by the U.S. Corps. of Engineers must be excluded.

Opinion eight (8) of Holloway concludes that the "only way to maintain the marsh" is to "enhance freshwater flows" by "removal of bulkheads in the Columbia Gulf and Koch pipeline canals" and to control nutria. However, Holloway's own report shows that his "water enhancement" proposals are unnecessary and not relevant. On page II-9 of his report, Holloway notes that "routings through natural bayous and pipeline canals have facilitated the flow of water back to the east and have maintained the freshwater marshes in the areas in and around Section 16. These flows provide for a sediment source and a nutrient pool to maintain and stabilize the marsh conditions in these areas." On page II-16 of his report, Holloway notes that Camp's restoration plan "would shut off all flows from Little Horn Bayou and its tributaries that now enter into the Columbia Gulf and the Koch pipeline canal and would not allow any flows out into the areas on either side of these canals." On page II-17 of his report, Holloway states that the "drain from the Koch canal to the southeast and the drains from the Columbia Gulf canal to the south are extremely important in allowing freshwater with nutrients and sediments from the Atchafalaya River to flow into the marsh communities to sustain these areas." On page II-12 of his report, Holloway notes that a "water enhancement plan to maintain freshwater conditions in the marshes of Section 16 was prepared to

allow present flow routings and sediment input into the marsh to be increased to prevent saltwater intrusion from the southeast."

Holloway's water enhancement plan is not scientifically reliable nor relevant to these proceedings since Holloway has concluded that the canals and breaks are allowing sufficient sediments and nutrients to be transported to the Section 16 marsh. Holloway conducted no field work analysis, whether through water samples or otherwise, to verify that TPSB is receiving insufficient sediments and nutrients, nor did he conduct field work to eliminate the fact that sufficient sediments and nutrients are transported to TPSB's property via Little Horn Bayou. Holloway does not conclude in his report that the marsh is being damaged or has been damaged in the past by salinity intrusion. Yet, he proposes a protective "water enhancement" plan for a salinity problem that does not exist. Holloway's report is based on his finding that the property is allegedly being destroyed by nutria herbivory, but Holloway acknowledges that his "water enhancement" plan will not benefit the property unless the purported nutria population is controlled. Finally, Holloway acknowledged in his deposition that water flow into TPSB's property under his plan may need to be controlled or established by a hydrologist who can determine the proper input.[36] Holloway's water enhancement plan is based on speculation as he acknowledge a hydrologist would be necessary to confirm the design validity of his plan. Consequently, Holloway's testimony as to his "water enhancement" plan contained in Opinion eight (8) should be excluded as not relevant and not scientifically reliable. In truth, Holloway's "water enhancement" plan is a "cost cutting" restoration plan submitted in the hopes that Koch can evade its costly obligation to restore the property to the property's original condition.

---

[36]     See pg. 93, lines 14-25, pg. 86, lines 4-17, of deposition of Luther Holloway attached as Exhibit "K" to TPSB's motion in limine.

**WHEREFORE**, Terrebonne Parish School Board moves this Court to completely exclude the testimony of Richard Devries and Kenneth Boudreaux and to partially exclude the testimony of Irvington Eppling and Luther Holloway, all tendered as expert witnesses of Koch Gateway Pipeline Company, for the reasons outlined in the above memorandum.

Respectfully submitted

**THE GRAY LAW FIRM (APLC)**

By:

**A. J. GRAY, III        #6253**
**WADE T. VISCONTE       #24734**
Post Office Box 1467
Lake Charles, LA 70602-1467
(337) 494-0694        Telephone
(337) 494-0697        Facsimile

**MICHAEL X. ST. MARTIN  #12365**
**JOSEPH G. JEVIC III        #23145**
ST. MARTIN & WILLIAMS, APLC
Post Office Box 2017
Houma, LA 70361
(504) 876-3891        Telephone
(504) 851-2219        Facsimile
**Attorneys for Terrebonne Parish School Board**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing Memorandum In Support of Motions in Limine to Exclude Testimony of Koch Gateway Pipeline Company's Experts has been served upon all counsel of record by ~~placing same in the U.S. Mail, properly addressed with First Class postage prepaid~~ *hand delivery* this 28th day of *December*, 2000.

_____
WADE T. VISCONTE

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TERREBONNE PARISH SCHOOL BOARD** | § | **CIVIL ACTION NO. 00-0319** |
| **VERSUS** | § | **SECTION:   B** |
| **COLUMBIA GULF TRANSMISSION COMPANY, KOCH GATEWAY PIPELINE COMPANY** | §<br>§ | **MAGISTRATE:     5** |
| **FILED:**_____ | § | _____<br>**DEPUTY CLERK** |

## NOTICE OF HEARING

**TO:**   Robert J. Young, Jr.
Robert J. Young, III
Young, Richaud & Myers
1515 Energy Centre
1100 Poydras Street, Suite 1515
New Orleans, LA 70163
**Attorneys for Koch Gateway Pipeline Company**

Thomas R. Blum
James A. Burton
Christina H. Belew
Simon, Peragine, Smith & Redfearn, L.L.P.
1100 Poydras Street
Energy Centre - 30th Floor
New Orleans, LA 70163-3000
**Attorneys for Columbia Gulf Transmission Company**

**PLEASE TAKE NOTICE** that Terrebonne Parish School Board's Motion in Limine to Exclude Testimony of Koch Gateway Pipeline Company's Experts is **set** for hearing in the United States District Court, Eastern District of Louisiana, New Orleans, before the Honorable Ivan Lemelle at 500 Camp Street, New Orleans, Louisiana, on **January 10, 2001 at 9:30 a.m.**, or as soon

thereafter as counsel may be heard.

Respectfully submitted,

**THE GRAY LAW FIRM (APLC)**

_____

**A. J. GRAY, III**                    **#6253**
**WADE T. VISCONTE**              **#24734**
Post Office Box 1467
Lake Charles, LA 70602-1467
(337) 494-0694          Telephone
(337) 494-0697          Facsimile

**MICHAEL X. ST. MARTIN**      **#12365**
**JOSEPH G. JEVIC III**            **#23145**
ST. MARTIN & WILLIAMS, APLC
Post Office Box 2017
Houma, LA 70361
(504) 876-3891          Telephone
(504) 851-2219          Facsimile
**Attorneys for Terrebonne Parish School Board**

## CERTIFICATE OF SERVICE

I **CERTIFY** that a copy of the preceding Notice of Hearing has been served upon all known counsel of record via ~~the United States mail, postage~~ hand delivery ~~prepaid and properly addressed~~.

Lake Charles, Louisiana this 28th day of December _____ 2000.

_____
WADE T. VISCONTE

# SEE RECORD FOR
# EXHIBITS
# OR
# ATTACHMENTS
# NOT SCANNED