FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JAN -8 AM 9: 32

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TERREBONNE PARISH SCHOOL BOARD * | * | CASE NUMBER: 00-0319 |
| VERSUS * | * | SECTION: "B" |
| COLUMBIA GULF TRANSMISSION  * <br> COMPANY AND KOCH GATEWAY  * <br> PIPELINE COMPANY  * | * | MAGISTRATE: 5 |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\*

**COLUMBIA GULF'S OPPOSITION TO PLAINTIFF'S MOTION
IN LIMINE TO EXCLUDE TESTIMONY OF COLUMBIA GULF'S EXPERTS**

Columbia Gulf Transmission Company ("Columbia Gulf") opposes the Motion in Limine of the Terrebonne Parish School Board ("TPSB") to exclude or limit the testimony of two of Columbia Gulf's experts, Dr. Wade Ragas and Dr. Joseph Suhayda, for the following reasons.

A -   **Dr. Wade Ragas**

In attempting to limit the scope of the testimony of Dr. Wade R. Ragas, TPSB describes him as "a Louisiana State Certified General Real Estate Appraiser who prepared a market value appraisal of TPSB's property using the comparable sales approach. However, the testimony of

1

Dr. Wade Ragas should be partially excluded on several other issues outside of Ragas' expert capacity as a real estate appraiser."[1] TPSB's arguments with respect to Dr. Ragas' expertise are disingenuous at best, and are substantially misleading.

First, as demonstrated by Dr. Ragas' curriculum vitae,[2] his training, experience and expertise, while prominently including the appraisal of real estate (and specifically south Louisiana wetlands), is by no means limited to that one area. The Court can review Dr. Ragas' impressive curriculum vitae, but suffice it to point out for purposes of this opposition that he is a Ph.D. economist from Ohio State University, serves as an endowed professor of economics and finance at the University of New Orleans, and has the authorship, professional memberships and other credentials that beyond question qualify him not only as an expert real estate appraiser, but also as an economist, all with a special expertise in the wetlands of south Louisiana.

Thus, when Dr. Ragas offers opinions on the pseudo-economic theories of Shea Penland, based in part on "social value assessments" made by Stephen Farber[3] and on other theories of "ecological economics," they are the opinions of an expert economist and should be considered by the Court as such.

---

[1] Memorandum in Support of TPSB's Motion in Limine, p.2 (footnote omitted).

[2] Attached as Exhibit B to TPSB's Motion in Limine.

[3] TPSB's Memorandum in Support, pp. 12-13.

Second, what can only be described as TPSB's snide references to Dr. Ragas' alleged opinions as a "legal expert" or as an expert in wetlands geology or restoration,[4] also are inaccurate and completely miss the point of Dr. Ragas' testimony. Dr. Ragas is not offered as, and does not profess to be, an expert in those areas.[5] Accordingly, he did not offer any independent expert testimony in these areas. However, he *is* both an expert real estate appraiser and an expert economist, and he has a special expertise in the wetlands of south Louisiana. He therefore needs to have and does have an understanding of both the nature of the lands he is appraising and any legal restrictions affecting them.

**B -      Dr. Joseph Suhayda**

Joseph N. Suhayda, Ph.D. is an internationally recognized expert in hydrology[6], a professor of civil and environmental engineering at Louisiana State University (Baton Rouge) and director of the Louisiana Water Resources Research Institute ("LWRRI"). The activities of the LWRRI are summarized on attached Exhibit "A", which were printed from its web page. The two page detailed summary of its activities has been marked to indicate activities of particular relevance to this case.

---

[4]      *Id.* at pp. 4-12.

[5]      See, *e.g.*, Ragas Deposition, pp. 94-95, Exhibit C to TPSB's motion.

[6]      "Hydrology includes all of the processes affecting the quantity and quality of water at the site, and the processes affected by the water movement and its properties such as salinity and sediment concentration." Dr. Suhayda's report of November 16, 2000, p. 1. (Exhibit D to plaintiff's motion.)

3

As shown by Dr. Suhayda's curriculum vitae ("CV"), attached to TPSB's motion as Exhibit E, he has taught a number of courses in hydrology, several of which bear directly on the issues presented in this case. For instance, plaintiff claims that tides from the Gulf of Mexico influence the waters located on TPSB's property involved in this case ("Section 16"), causing them to flow back and forth through breaks in the spoil banks of the pipeline canals, which in turn caused marsh in the adjacent areas to erode. Whether the current generated by such tidal action is sufficient to erode the marshes on the subject property is an area of significant dispute between the parties. Dr. Suhayda has taught several courses which are relevant to this inquiry, to-wit: Special Topics in Civil Engineering (sediment transport), Gravity Waves in Shallow Water and Hydraulics, among others.

As also shown by his CV, Dr. Suhayda has conducted considerable research in his field pursuant to grants from various governmental and academic sponsors over the years. The following are of particular relevance (identified by the item number, title and sponsor given on the CV) to the opinions he expresses in this case:

    A.    As to the effect of hurricanes on wetlands:

        10.    "Hurricane Flooding Prediction" for the Cameron Parish Police Jury.

        35.    "Hurricane Flood Forecasting for Southeastern Louisiana" for the Louisiana Office of Emergency Preparedness.

        38.    "Hurricane Flood Forecasting" for the Louisiana Office of Emergency Preparedness.

    B.    As to the ability of the tidal action to erode the marsh in Section 16:

      18.    "Marsh Deterioration" for U.S. Geological Survey.

      23.    "Errodability of Cohesive Sediments in Wetlands" for U.S. Army Corps of Engineers.

C.    As to the subsidence of Section 16:

      12.    "Outer Continental Shelf Development and Potential Habitat Alteration, Task 9 - Subsidence," Minerals Management Service.

      16.    "Modification - Sea Level and Subsidence" for Minerals Management Service.

      19.    "Morphostratigraphic Framework and Processes of Subsidence" for U.S. Geological Survey.

D.    As to the effect generally of hydrologic processes on Louisiana wetlands:

      22.    "Hydrologic model of the Barrataria - Terrebonne Estuary" for the National Estuaries Program - EPA.

      25.    "Development of a Long-Term Water and Sediment Distribution Plan for the Lower Atchafalya River" for Morgan City, Louisiana.

      28.    "Hydrologic Modeling of Coastal Restoration Projects" for the Louisiana Department of Natural Resources.

      39.    "Mapping Future Wetlands in the Louisiana Coast" for the Louisiana State University's Marine Consortium.

      42.    "Coastal System Modeling - Linkage Between Landloss and Hydrologic Processes" for the Board of Regents, State of Louisiana.

Further, as can be seen from Dr. Suhayda's publications, conference proceedings and technical reports found at pages 15-19 of his CV, he has authored a number of publications relevant to the issues in this case.

5

A reading of Dr. Suhayda's report of November 16, 2000 (Exhibit D to plaintiff's motion), shows that plaintiff's criticisms are completely unfounded and that he is very well qualified to express the opinions given. Plaintiff first criticizes the section entitled "Marsh Loss Data" found at page 2 of Dr. Suhayda's report. This section deals solely with a history of marsh loss in the area of Section 16 and on Section 16 itself as disclosed by the references given in Dr. Suhayda's report. This section is nothing more than a summary of the data regarding marsh loss that Dr. Suhayda relied on in analyzing the hydrologic factors affecting the marsh on TPSB's property.

Plaintiff next criticizes Dr. Suhayda's statements in section 3.1 of his report regarding subsidence. From a reading of plaintiff's memorandum, one would think that there was a controversy as to whether subsidence was occurring in Section 16 at the rate given in Dr. Suhayda's report. In fact, there is no such controversy. Plaintiff's own expert, Dr. Shea Penland, agreed that subsidence was occurring at this site, as is shown by his deposition testimony of November 27, 2000[7]. As to subsidence, see Dr. Penland's testimony at pp. 162-177, and the following:

> Q:   Now, you, yourself, have investigated subsidence and the rate of relative sea level rise in the area that includes Section 16; have you not?
>
> A:   I have.

---

[7]   Attached as Exhibit "B" are pages 162-248 of Dr. Penland's deposition of November 27, 2000, condensed transcript. The entire deposition is available upon request.

6

Q: Here is a document that I'm going to mark as Penland Exhibit 9. This is purportedly taken from one of your studies of several years ago. And are you familiar with this chart, Doctor?

A: I am.

Q: And would you agree that this chart accurately predicts long-term subsidence rates?

A: That's correct.

Q: And that would exclude eustatic sea level rise, correct?

A: No, that would not.

Q: So this is just what? Tell me what it means then.

A: This diagram actually includes both eustacy and subsidence.[8] So I think the term "subsidence" right here should be relative sea level rise rate. So what you would do would be subtract off .12 centimeters per year to get a true subsidence rate.

Q: Did you prepare this chart?

A: Uh-huh (affirmative response).

Penland Deposition p. 171, line 23 through p. 173, line 1.

Q: Which one of these readings on this Exhibit-9 would most approximate the relative sea level rise for the area that includes Section 16?

---

[8] Eustacy or eustatic sea level rise refers to the increase in sea levels occurring worldwide. Relative sea level rise at a particular site includes eustacy (.12 centimeters per year) and local subsidence (actual sinking of the land). See Penland Deposition, pp. 165-166.

7

> A: The one that's labeled 1.17.[9]

Penland Deposition p. 173, line 17 through line 21.

> Q: Now, I have seen a number somewhere that indicates that relative sea level rise in the area of Section 16 is as much as 1.43 centimeters a year. Have you ever seen a figure that high?
>
> A: Sure.
>
> Q: And what would you be comfortable with in terms of relative sea level rise in the area of Section 16, what number?
>
> A: I would just use a centimeter a year, you know, or possibly 1.2 centimeters a year in that type of range. It depends on what lunar epic you look at. You can get lower rates; and you get higher rates.
>
> Q: Well, let's just assume that the sea level rate, relative sea level rise is at a rate of 1.2 centimeters per year.
>
> A: All right.
>
> Q: Over 35 years, if it remained constant, that would be, my multiplication shows, 42 centimeters?
>
> A: Uh-huh (affirmative response).
>
> Q: And 42 centimeters is about a little less than a foot and a half?
>
> A: Uh-huh (affirmative response).

---

[9] A copy of Exhibit 9 attached to Dr. Penland's deposition is attached hereto as Exhibit "C".

> Q: So if the Columbia Gulf Canal was built 35 years ago, then the relative sea level rise in the area where its constructed across Section 16 would be about one point, roughly one-and-a-half feet, would that be correct?
>
> A: Yes, sir.

Penland Deposition, p. 176, line 13 through p. 177, line 22.

The following deposition testimony of Dr. Robert Chabreck, plaintiff's principal expert, is also very revealing as to the impact of subsidence on the marsh in Section 16:

> Q. Well, the subsidence of the area that Section 16 is located in is an irreversible geologic process, is that not true?
>
> A. Pretty much, yes.
>
> Q. And at the rate of a foot and a half every 35 years, in 35 years, what's Section 16 going to look like?
>
> A. I don't know, we'll have to come back and see.
>
> Q. If I'm around and you're around. We'll go together, all right?
>
> A. All right.
>
> Q. But the Barrier Islands will be sinking, too, won't they?
>
> A. Yes, they won't be here, I'm sure.
>
> Q. And the coastline will be much closer to Morgan City and Houma than it is now, wouldn't it?
>
> A. Sure will be.

9

> Q. And that line of freshwater marsh that you show on that map that you drew in 1988, that will all be brackish water, won't it, or it may even be saline?
>
> A. Right.
>
> Q. So we may have the crystal, blue waters of the Gulf of Mexico lapping up on Section 16, itself, wont' we?
>
> A. Probably so.
>
> Q. And that is whether you go ahead and spend fourteen million dollars to pump this stuff into the marsh or not, isn't that true?
>
> A. Maybe so.

Chabreck deposition, p. 148 line 16 - p. 149 line 17.[10]

Sections 3.2 and 3.3 of Dr. Suhayda's report ("Sedimentation" and "River Flooding", respectively), are straightforward and explain lucidly and concisely the impact that these phenomena have had on Section 16. Plaintiff's criticisms are nothing more than an attempt to make cloudy what is crystal clear. In any event, Dr. Suhayda has more than 20 years experience studying the factors that influence the hydrology of Louisiana's wetlands, including those in Terrebonne Parish, and is well qualified to express the opinions and conclusions found in these sections.

---

[10] Attached as Exhibit "D" are pages 145-150 of Dr. Robert Chabreck's deposition of December 19, 2000, condensed transcript. The entire deposition is available upon request.

Regarding hurricanes, Dr. Suhayda's report speaks for itself and, as is shown by his experience and academic work, he is well-qualified to express opinions as to the effect of hurricanes on south Louisiana's marsh land. There are no studies specific to Section 16 for any hurricane done immediately following the hurricane. The studies relied on by Dr. Penland regarding Hurricane Andrew which purported to show no marsh damage following that hurricane, were conducted at sites more than 25 to 30 miles to the east of Section 16, and so even farther away from the strongest hurricane force winds. See Penland Deposition p. 220. On the other hand, Dr. Suhayda, using the actual data for the hurricanes in question, has prepared maps generated by hurricane computer modeling developed at LWRRI which show the effects of flood waters from several hurricanes (hurricanes Hilda in 1964, Juan in 1985 and Andrew in 1992) on Section 16. The maps for Hilda and Andrew were shown to Dr. Penland and attached as Exhibits 13 and 14 to his deposition.[11] See Penland Deposition pp. 225-236. Dr. Penland testified that he was familiar with the hurricane modeling work done by Dr. Suhayda and believed it to be reliable. (Penland Deposition at pp. 223-227). In fact, Dr. Penland testified that "for what we have right now, Joe [Suhayda] has the best thing in town" regarding the ability to display the effects of hurricanes on Louisiana's coastal areas. *Id.* at p. 227.

Plaintiff criticizes Dr. Suhayda's conclusion as to the effect of the Columbia Gulf canal on the adjacent marshes. However, as shown in his report, what Dr. Suhayda did was pull

---

[11]   The map for Hurricane Hilda is attached hereto as Exhibit "E".

together all of the available information and based on his training, academic studies and practical experience, draw a conclusion as to the effect of the Columbia Gulf canal on those marshes. This is well within his area of expertise.

Further, Dr. Suhayda examined data generated by Dr. McCorquodale, plaintiff's hydrologist. Using that data, Dr. Suhayda has concluded that the water volume and currents measured by Dr. McCorquodale as passing through the cut in the spoil bank of the Columbia Gulf canal were not sufficient to erode either the bank itself, the marsh bottom or the floating vegetative marsh. Again, this is a straightforward examination of available data and an expression of opinion based on experience and expertise in the field.

Finally, it should be noted that following the submission of his initial report, Dr. Suhayda made a second visit to the site and submitted a supplemental report[12]. In that report, Dr. Suhayda reports on his site findings. He also performs a further calculation using Dr. McCorquodale's data and shows that the current that was likely to have been generated in the marsh adjacent to the cut in the spoil bank on the Columbia Gulf canal, was so minuscule as to have had no possible causative effect on the deterioration of the floating marsh mat. This is the crucial conclusion of Dr. Suhayda's work and stands in stark contrast to the hypothetical unsupported opinions of plaintiff's principal expert, Robert Chabreck.

---

[12]   A copy of this report, December 21, 2000, is attached hereto as Exhibit "F".

In conclusion, Dr. Suhayda is well qualified by education and experience to express the opinions found in his report. Although he has not performed any tests himself at the site, he has used data generated by plaintiff's own hydrologist, applied well-accepted principles of hydrologic science to that data, and concluded that the data did not support a finding that the Columbia Gulf canal is in any way related to the loss of adjacent marsh.

## CONCLUSION

For the foregoing reasons, Columbia Gulf respectfully submits that the Motion in Limine of Terrebonne Parish School Board to exclude or restrict the testimony of Dr. Wade Ragas and Dr. Joseph Suhayda is without merit and should be denied.

Respectfully submitted,

_Thomas R. Blum_

Thomas R. Blum, T.A. (3170)
James A. Burton (3708)
Christina H. Belew (1244)
SIMON, PERAGINE, SMITH & REDFEARN, L.L.P.
1100 Poydras Street, 30th Floor
New Orleans, Louisiana 70163-3000
Telephone: (504) 569-2030

Attorneys for Columbia Gulf Transmission Company

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing has been served on counsel for plaintiff, Wade T. Visconte and Michael X. St. Martin, via telecopier and Federal Express, and on all other counsel of record via telecopier and by depositing same in the U.S. mail, postage prepaid and properly addressed this 8th day of January, 2001.

_____
THOMAS R. BLUM

**SEE RECORD FOR EXHIBITS OR ATTACHMENTS NOT SCANNED**