

PLEASE FILE
IN RECORD

U.S. FILED
EASTERN DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JAN -9 PM 2: 19

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TERREBONNE PARISH SCHOOL BOARD | § | CIVIL ACTION NO. 00-0319 |
| VERSUS | § | SECTION:   B |
| COLUMBIA GULF TRANSMISSION COMPANY, KOCH GATEWAY PIPELINE COMPANY | § § | MAGISTRATE:   5 |
| FILED:_____ | § | _____ DEPUTY CLERK |

### MOTIONS IN LIMINE
### TO EXCLUDE TRIAL AND DEPOSITION TESTIMONY OF
### MALCOLM POIENCOT ON THE ISSUE OF NUTRIA DAMAGE

**NOW INTO COURT,** through undersigned counsel, enters Plaintiff, Terrebonne Parish School Board ("TPSB"), which hereby respectfully moves this Honorable Court to exclude the trial and/or deposition testimony of Malcolm Poiencot for the reasons outlined in the Memorandum attached with this Motion. In support of its Motion in Limine to the exclude the testimony of Mr. Poiencot, Plaintiff submits the following exhibits, which are attached hereto and incorporated herein *in extenso*, should also be excluded from evidence:

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Deposition of Malcolm Poiencot |

Fee_____
Process_____
X  /Dktd  U4O
✓  CtRmDep_____
Doc.No. 100

     B      March 4, 1998, field notes taken by Malcolm J. Poiencot in association with survey for seismic damage

**WHEREFORE,** Terrebonne Parish School Board moves this Court to exclude the testimony of Malcolm Poiencot for the reasons provided in the Memorandum in Support submitted with this Motion.

          Respectfully submitted,

          ST. MARTIN & WILLIAMS (APLC)

          _____

          **MICHAEL X. ST. MARTIN**  **#12365**
          **JOSEPH G. JEVIC, III**   **#23145**
          Post Office Box 2017
          Houma, Louisiana 70361-2017
          (504) 876-3891   Telephone
          (504) 851-2219   Facsimile

          **A. J. GRAY, III**     **#6253**
          **WADE T. VISCONTE**   **#24734**
          **THE GRAY LAW FIRM (APLC)**
          Post Office Box 1467
          Lake Charles, LA 70602-1467
          (337) 494-0694   Telephone
          (337) 494-0697   Facsimile
          **Attorneys for Terrebonne Parish School Board**

## CERTIFICATE OF SERVICE

  **I HEREBY CERTIFY** that a copy of the foregoing Motion in Limine has been mailed to all counsel of record via facsimile and United States mail, postage prepaid on this ____8th____

day of ____January____, 2001.

          _____

          **JOSEPH G. JEVIC, III**

# In The Matter Of:

## TERREBONNE PARISH SCHOOL BOARD   v.
## COLUMBIA GULF TRANSMISSION COMPANY, ET AL

---

### MALCOLM J. POIENCOT
### December 14, 2000

---

### GAUDET, KAISER & PEPPER
### BOARD-CERTIFIED COURT REPORTERS
### 601 Poydras Street, Suite 2300
### Pan-American Life Center
### New Orleans, LA  70130
### (504) 525-9100    FAX: (504) 525-9109

Original File 01214POI.ASC, 38 Pages
Min-U-Script® File ID: 1998179278

## Word Index included with this Min-U-Script®



EXHIBIT

tabbies

A

[1]     UNITED STATES DISTRICT COURT
[2]     EASTERN DISTRICT OF LOUISIANA
[3]
[4]
[5]
[6] TERREBONNE PARISH        CASE NUMBER:
    SCHOOL BOARD             00-0319
[7]
    VERSUS                   SECTION "B"
[8]
    COLUMBIA GULF TRANSMISSION   MAGISTRATE 5
[9] COMPANY AND KOCH GATEWAY
    PIPELINE COMPANY
[10]
[11]    Deposition of Malcolm J. Poiencot,
        843 Bayou Dularge, Houma, Louisiana
[12] 70360, 872-2860, taken at the law offices
     of St. Martin & Williams, 4084 Highway
[13] 311, Houma, Louisiana, on Thursday, the
     14th day of December, 2000.
[14]
[15] APPEARANCES:
[16]    THE GRAY LAW FIRM
        (By: Wade T. Visconte, Esq.)
[17]    Hibernia Tower
        One Lakeshore Drive - Suite 900
[18] Lake Charles, Louisiana 70602
[19]        ATTORNEYS FOR PLAINTIFF
[20]
     SIMON, PERAGINE, SMITH &
[21] REDFEARN, L.L.P.
        (By: Herman C. Hoffmann, Jr.,
[22]        Esq.)
     1100 Poydras Street
[23] 30th Floor - Energy Centre
     New Orleans, Louisiana 70163-3000
[24]
        ATTORNEYS FOR COLUMBIA GULF
[25]    TRANSMISSION COMPANY

[1] APPEARANCES: (Cont.)
[2]
     YOUNG, RICHAUD & MYERS
[3]     (By: Robert J. Young, III, Esq.)
     1515 Energy Centre
[4]  1100 Poydras Street
     New Orleans, Louisiana 70163-1515
[5]
        ATTORNEYS FOR KOCH GATEWAY
[6]     PIPELINE COMPANY
[7]
[8]
REPORTED BY:
[9]
     CATHY PEPPER
[10] Certified Court Reporter
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]        INDEX OF EXAMINERS
[2]              Page
[3]
     EXAMINATION BY MR. HOFFMANN............ 5
[4]        REEXAMINATION..........., 34
[5]
     EXAMINATION BY MR. YOUNG.............. 27
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

**Page 4**

[1]                    **STIPULATION**
[2]
[3]        It is stipulated and agreed by and
[4] between counsel for the parties hereto
[5] that the deposition of the aforementioned
[6] witness is hereby being taken under the
[7] Louisiana Code of Civil Procedure, Article
[8] 1421, et seq., for all purposes, in
[9] accordance with law;
[10] That the formalities of reading,
[11] signing, and filing are specifically
[12] waived;
[13] That all objections, save those as
[14] to the form of the question and the
[15] responsiveness of the answer, are hereby
[16] reserved until such time as this
[17] deposition, or any part thereof, may be
[18] used or sought to be used in evidence.
[19]
[20]
[21]        CATHY PEPPER, Certified Court
[22] Reporter, in and for the State of
[23] Louisiana, officiated in administering
[24] the oath to the witness.
[25]

---

**Page 5**

[1]        MALCOLM J. POIENCOT,
[2] after having been first duly sworn by the
[3] above-mentioned court reporter, did
[4] testify as follows:
[5]        **EXAMINATION BY MR. HOFFMANN:**
[6]    Q: Mr. Poiencot, I'm sorry for
[7] butchering your name. Bear with me on
[8] that. My name is Herman Hoffmann. I
[9] represent Columbia Gulf in connection with
[10] this suit that was brought by the School
[11] Board. I've got a few questions for you
[12] today.
[13]        First off, give me a little
[14] idea of your background. I understand
[15] you've done some consulting work for the
[16] School Board, but tell me what you've done
[17] for a living.
[18]    A: I started out in 1947 with GSI
[19] seismograph crew. That was before, way
[20] before y'all time. And I went to work for
[21] LL&E in 1954. And I worked with them
[22] until I retired in '86. And I was
[23] surveying and marked every bit of that
[24] property. And then after we got through
[25] surveying and marking all of that

---

**Page 6**

[1] property, they put me as an inspector for
[2] LL&E, marshland inspector. Whenever there
[3] was any kind of activity going on in the
[4] land, I would go out and inspect it and
[5] make sure that they wasn't tearing up the
[6] marshes and that sort of thing. Wouldn't
[7] leave no debris on the lands and stuff
[8] like that.
[9]        And they also put me more or
[10] less in charge of all seismic activities
[11] on their property, and I was looking after
[12] that, too, until I retired in 1986.
[13]    Q: Back up just a little bit.
[14] Prior to '86, how long was this period of
[15] time that you were doing this work of
[16] inspecting LL&E properties for any damages
[17] as a result of activities out there?
[18]    A: Well, that, I don't recall
[19] exactly. I don't remember when we were
[20] put, when we finished marking the property
[21] lines. I don't remember.
[22]    Q: How many years do you think
[23] you may have done that? The inspection
[24] services, I'm talking about?
[25]    A: Oh, the inspection? '74.

---

**Page 7**

[1] About 10 years.
[2]    Q: Until '86 when you retired,
[3] right?
[4]    A: Correct.
[5]    Q: And you also, as I understand
[6] it, during that same period of time,
[7] oversaw the seismic, any seismic activity
[8] on the LL&E properties?
[9]    A: That's correct, yeah.
[10]    Q: Did LL&E have properties here
[11] in Terrebonne Parish?
[12]    A: Quite a bit, yes, sir. I
[13] don't know exactly how much, but they had,
[14] I was told 600,000 acres in Southeast
[15] Louisiana. And that included Plaquemines
[16] Parish, Jefferson Parish, St. Charles
[17] Parish, Lafourche Parish, Terrebonne
[18] Parish and St. Mary Parish.
[19]    Q: During this 10-year period, do
[20] you recall whether or not you were
[21] required to inspect any properties, any
[22] marshland properties here in Terrebonne
[23] Parish?
[24]    A: Oh, yeah.
[25]    Q: Properties similar to the

---

Page 8

[1] Section 16 lands that are administered by
[2] the School Board?
[3]     A: That's correct.
[4]     Q: Similar locations?
[5]     A: Correct.
[6]     Q: This is a very general
[7] question, but during that period of time,
[8] the 10-year period ending in '86, do you
[9] have any general observations you can give
[10] us with your great deal of experience as
[11] to what the marshland conditions were in
[12] the sense of was there a change in the
[13] marshland conditions?
[14]     A: Quite a bit, yes, sir.
[15]     Q: What was that change?
[16]     A: It's a long story. When I was
[17] hired, when I was hired by LL&E in 1954,
[18] they sent me to the Timbalier Bay area to
[19] meander all the islands that was out
[20] there. There was a number of islands in
[21] the Timbalier, Barataria Bay area —
[22] Timbalier Bay area, I'm sorry. And
[23] namely, Costet Island, Filabruce Island,
[24] Pelican Islands, Bull Island — I forget
[25] all of them, but there is quite a few

Page 9

[1] islands, and they wanted me to meander
[2] them to see how many acres they had in
[3] each island. Now, this was in '54.
[4] Today, there is no more islands. They are
[5] all gone.
[6]     And the shorelines in a lot of
[7] different places, on the north shore
[8] especially up by Timbalier Bay, Terrebonne
[9] Bay, it's all eroding very fast. And it's
[10] getting, it's getting scary. I'm going to
[11] tell you that for a fact, because I see
[12] it.
[13]     I don't go flying any more too
[14] often, but when I used to go when I was
[15] flying, you would get up in Houma in a
[16] plane and you didn't have to go nowhere
[17] until you see nothing but water. And it's
[18] a lot of it.
[19]     I'm going to tell you this: I
[20] feel like there is three reasons why South
[21] Louisiana is disappearing. And that's on
[22] account of your nutrias eating all of your
[23] vegetation because they are a vegetarian
[24] animal; the pipeline companies because
[25] they dug pipeline canals 40-foot, some of

Page 10

[1] them 50-feet wide to lay a pipeline in,
[2] which was unnecessary because they could
[3] have floated a pipeline in a 10-foot
[4] ditch. And the location, the oil
[5] companies with the location canals.
[6]     Your marsh is about, I would
[7] say, 80 percent water. You take a piece
[8] of marsh and you squeeze it out, you ain't
[9] got put a little handful of material. The
[10] rest is all water. And that's my
[11] experience with being out there for 40
[12] something years.
[13]     Q: And you say that, can I assume
[14] that that experience would relate to the
[15] Terrebonne Parish marshes that we're
[16] talking about here today, right?
[17]     A: I'm talking about the
[18] Terrebonne Parish marshes, all Southeast
[19] Louisiana.
[20]     Q: Now, looking specifically at
[21] the section that we're talking about
[22] today, that's Section 16?
[23]     A: 18-13.
[24]     Q: 18-13, thank you. Have you
[25] observed the condition of that section

Page 11

[1] over the years?
[2]     A: Well, the last time I was over
[3] there was when a seismograph crew,
[4] Geco-Prakla was doing work down there, and
[5] I went over there to make my inspection,
[6] and I hadn't been there a couple years
[7] before that, and, but I just wrote in my
[8] report about how I have noticed there is
[9] no more vegetation across the marshes
[10] because, and the reason is because the
[11] nutria, they ate it all up.
[12]     Q: You referred to a report. I
[13] am going to show you a document which we
[14] have already marked as Carreker
[15] Exhibit-13, a March 4, 1998 handwritten
[16] letter, apparently from you to the
[17] Terrebonne Parish School Board. Is that
[18] the report you've referring to?
[19]     A: Yeah. Yeah.
[20]     Q: And you did inspect 18-13 on
[21] that occasion; is that correct?
[22]     A: I inspected 18-14 and also
[23] 18-15.
[24]     Q: And 18-13, too?
[25]     A: Yeah. Yeah.

**Page 12**

[1] **Q:** Now, looking in the middle of
[2] the report there, it seems like "Section
[3] also is all in water; the marsh has been
[4] eaten up by the nutria rats." That was
[5] what you saw at that time; is that
[6] correct?

[7] **A:** Uh-huh (affirmative
[8] response). Uh-huh (affirmative response).

[9] **Q:** Now, this report was given to
[10] the School Board?

[11] **A:** Yeah. This was mailed to the
[12] School Board.

[13] **Q:** Did you observe the pipeline
[14] canals in that section at that time?

[15] **A:** No. I didn't. I just knew
[16] that they were there. I did not really
[17] observe it because I was just there for
[18] one particular reason.

[19] **Q:** And that reason being?

[20] **A:** That reason being checking on
[21] the seismograph crew. If I would have
[22] gone out there to inspect the pipelines, I
[23] would have really made a report on the
[24] pipelines. The School Board, well, the
[25] oil companies pay the School Board for my

**Page 13**

[1] services. And I look after certain things
[2] that I'm out there for. I don't look
[3] after everything else.

[4] **Q:** But in addition to reporting
[5] on the seismic in this case, it appears
[6] that you saw fit to make the comment that
[7] the marsh has been eaten by the nutria
[8] rats?

[9] **A:** Yes, there was a section of
[10] Terrebonne Parish School Board property so
[11] that's what I was looking after.

[12] **Q:** But that wasn't caused by the
[13] seismic operations, the nutria rats?

[14] **A:** Oh, no. No.

[15] **Q:** It's just some observation you
[16] wanted to make. You saw the marsh had
[17] been eaten by the nutria rats, and you
[18] thought it was important to make that
[19] comment?

[20] **A:** Right.

[21] **Q:** Why did you think it was
[22] important to make that comment?

[23] **A:** Because the nutrias are
[24] getting rid of a lot of marsh.

[25] **Q:** I don't see any comment in

**Page 14**

[1] here that the pipeline canals are causing
[2] erosion of this particular section?

[3] **A:** No, because I didn't, like I
[4] said before, I wasn't worried about the
[5] pipelines. I was worried about one
[6] particular thing and that was the Section
[7] 16 on the marsh.

[8] But I do know, I do know the
[9] pipeline companies with the big flotation
[10] canals, 40 and 50 feet wide or now some of
[11] them are three times its width, you've
[12] got, what you have, I'm going to tell you
[13] right now, when I was with LL&E, every
[14] five years I would take a strip map of
[15] every pipeline company across that LL&E
[16] property, and I would get with the company
[17] and they would give me a man, one of their
[18] men, a company man, and I would make a
[19] survey of that pipeline, that one
[20] particular pipeline, and I would make a
[21] report because we used to make them put a
[22] bulkhead at every crossing, at every
[23] bayou.

[24] We'd have the bayou going and
[25] a pipeline going across. We would make

**Page 15**

[1] them put a bulkhead on each side of the
[2] bayou, to stop any kind of traffic going
[3] through the pipeline or — you follow me?

[4] **Q:** I'm following you. So a boat
[5] couldn't go through there?

[6] **A:** So a boat couldn't go through
[7] there because a boat will go through, and
[8] it may speed and make waves and erode the
[9] land. But anyway, every five years I
[10] would make this survey, and I would also
[11] write a report to report on the pipeline
[12] company.

[13] And they would then proceed to
[14] maintain the bulkheads because a lot of
[15] bulkheads would wash around, you know, you
[16] get a hurricane or something, the water
[17] come up all over, and that water had to
[18] get out somewhere, you see, and eventually
[19] all it takes is one little trickle of
[20] water for a little channel and that's all
[21] it takes, and then, once that's formed,
[22] well then it creates a big, because the
[23] water comes up and goes out, tide come up
[24] and it go out.

[25] And then, since I retired in

JAH. 8.2001 11:53AM POENCO LAW FIRM NO.747 P.25/35

TERREBONNE PARISH SCHOOL BOARD vs. Document 100 Filed 01/09/2001 Page 8 of 21 MALCOLM J. POIENCO

COLUMBIA GULF TRANSMISSION COMPANY, ET AL December 14, 2000



Page 16

[1] '86, and, of course, I've seen a lot of
[2] places where it's been washed around, they
[3] don't make that survey no more. And boats
[4] tend to get in there to take a shortcut to
[5] go to somewhere, you see, in the pipeline
[6] canal. And that erosion, that wave action
[7] is eroding, making the canals wider and
[8] wider.
[9]     But there is no more
[10] foundation from the oil companies and the
[11] pipelines and the nutria and the sportsmen
[12] too, they are involved, too, because they
[13] don't slow down. I mean, you know, they
[14] don't think about wave action.
[15]     Q: Do you know if the Board has a
[16] policy, the School Board I'm talking
[17] about, a policy that requires such a
[18] bulkhead on pipeline canals?
[19]     A: No, I don't know if they have
[20] a policy of that thing. I really don't
[21] know. Because, like I say, I was just
[22] worried about the seismic.
[23]     Q: You were never asked by the
[24] Board to go and check the pipeline canals
[25] to see their condition and determine

Page 17

[1] whether they are causing any damage.
[2]     A: No.
[3]     Q: Is that correct?
[4]     A: That's correct.
[5]     Q: Did I assume that from the
[6] fact that you did note the nutria damage
[7] on this particular section on that same
[8] inspection, that if you saw similar damage
[9] caused by the pipeline canals you would
[10] have made note of it?
[11]     A: Well, I may have. I may
[12] have. But it wasn't my interest to do
[13] that. I mean —
[14]     Q: I understand. You understand
[15] my reason for my question is it wasn't
[16] your interest to make a note about nutria
[17] damage either, but you did?
[18]     A: Well, it was at that marsh. I
[19] was interested in the marsh.
[20]     Q: And the pipeline canals, as I
[21] appreciate it, are alleged to have
[22] affected the marsh and if you would have
[23] noticed some damage to the marsh caused by
[24] the pipeline canals, can I assume you
[25] would have made a comment?

Page 18

[1]     A: Maybe I would have, yeah.
[2]     Q: Now, do you know how wide the
[3] pipeline canal that was dug by Columbia
[4] Gulf is in this section?
[5]     A: No, I don't. I don't know. I
[6] really don't know how wide it was. But in
[7] my mind and memory, I remember they used
[8] to dig a 40-foot canal to lay the pipeline
[9] in.
[10]     Q: But you don't know in this
[11] particular case if they did that or not?
[12]     A: No, I don't recall.
[13]     Q: Is there a reason why the
[14] pipeline canal could not be filled in?
[15]     A: Yes, I could give you —
[16]                 MR. VISCONTE:
[17]     Objection as to form.
[18]                 MR. HOFFMANN:
[19]     In your experience.
[20]                 MR. VISCONTE:
[21]     Every once in a while I'm
[22] going to object, so just wait until I
[23] finish my objection, and then you go ahead
[24] and fire away your answer.
[25]                 THE WITNESS:

Page 19

[1]     Did you object to that?
[2]                 MR. VISCONTE:
[3]     I objected as to form. You
[4] can answer it.
[5]                 THE WITNESS:
[6]     Through my experience, I had
[7] a, I went to a meeting in Baton Rouge, and
[8] they were talking about backfilling
[9] location canals after, if it was a dry
[10] hole, and I told them they couldn't do
[11] that, for the simple reason you would wind
[12] up with a canal three times its width.
[13]     So they were willing to try.
[14] And they did. Then they did, and it was a
[15] canal through, more than three times its
[16] width. Because when you pull that spoil,
[17] when you stack that spoil up on the bank,
[18] and then you drag it back in the canal to
[19] try and fill in the canal, it's all water.
[20]                 EXAMINATION BY MR. HOFFMAN:
[21]     Q: And I take it the same would
[22] be true for a pipeline canal, too?
[23]     A: Right. Right.
[24]     Q: Let me show you a report that
[25] was prepared by Morris Hebert, Inc. Do

Page 20

[1] you know Morris Hebert, Inc.?

[2]   A: I know him very well.

[3]   Q: Okay. What experience have

[4] you had with him?

[5]   A: I just saw him grow up.

[6]   Q: This report was previously

[7] marked as Carreker Exhibit-12. So we have

[8] that for the record. Mr. Hebert is from

[9] this neck of the woods?

[10]   A: Uh-huh (affirmative response).

[11]   Q: Have you seen that report

[12] perhaps? Do you know, if you recall?

[13]   A: No, I have not seen this.

[14]   Q: Well, this was a report I'm

[15] going to represent to you that we obtained

[16] from the School Board. And it was some

[17] work that Morris Hebert had done in

[18] checking out a number of sections,

[19] including the section that we're dealing

[20] with here.

[21]   A: Yeah, okay.

[22]   Q: 18-13.

[23]   A: 18-13.

[24]   Q: And turn, if you will, to the

[25] third page of that report, which is marked

Page 21

[1] at the bottom TPSB Bates-1107. Okay? Do

[2] you have that in front of you? If you

[3] look at the second paragraph?

[4]   A: (Witness reviews the

[5] document.) Uh-huh (affirmative response).

[6]   Q: You've had the opportunity to

[7] read it?

[8]   A: Uh-huh (affirmative

[9] response).

[10]   Q: I'm particularly interested in

[11] the last two sentences of that paragraph.

[12]   "The spoil banks on each side of the two

[13] pipeline canals crossing the property are

[14] heavily vegetated. The adjacent marsh

[15] appears fairly stable with no obvious

[16] signs of significant erosion."

[17]   With your experience, reading

[18] those two sentences, what do you get from

[19] that?

[20]       MR. VISCONTE:

[21]   Objection as to form.

[22]       THE WITNESS:

[23]   You have a spoil there, but

[24] it's not up high. It's just above the

[25] waterline, the water level, and you do

Page 22

[1] have willow trees and grass growing on

[2] that spoil because it's a little bit above

[3] the water. And you have, you have

[4] bulkheads there on each side of the

[5] pipeline canal, on each side of the Koch

[6] pipeline canal. Used to be United Gas

[7] pipeline canal, I mean, yeah. United

[8] Gas. And it says no significant erosion.

[9] Well, that may be true. I don't know.

[10] Like I said before, I wasn't interested in

[11] the pipeline, but I do know when you

[12] traveling a pipeline canal, they got

[13] willow trees at that grow in the spoil and

[14] different kind of grass, but obviously

[15] he's right.

[16]       EXAMINATION BY MR. HOFFMANN:

[17]   Q: Let me put it in a laymen's

[18] viewpoint, I don't know too much about

[19] this, frankly, but it appears to me that

[20] he's saying that these two pipeline canals

[21] are not causing a problem, at least as of

[22] that date, back in April of '95. Am I

[23] making a fair reading of that?

[24]       MR. VISCONTE:

[25]   Objection as to form.

Page 23

[1]       THE WITNESS:

[2]   I don't see any, in that

[3] particular area, there may not be that

[4] much erosion.

[5]       EXAMINATION BY MR. HOFFMANN:

[6]   Q: I got you.

[7]   A: In that particular area.

[8]   Q: Well, he's dealing, if you

[9] look at the top of the page, he is looking

[10] at Section 16, Township 18, Range 13.

[11] That's the one we're talking about, right?

[12]   A: Uh-huh (affirmative

[13] response). Right.

[14]   Q: And if I'm reading, I just

[15] want to make sure my reading of it is a

[16] fair reading, that it appears that as of

[17] April '95, Mr. Hebert didn't find any

[18] problem with the canals. Is that a fair

[19] reading?

[20]       MR. VISCONTE:

[21]   Objection as to form.

[22]       THE WITNESS:

[23]   I would say it probably is a

[24] fair reading.

[25]       EXAMINATION BY MR. HOFFMANN:

**Page 24**

[1] **Q:** Now, Mr. Hebert, you said you
[2] watched him grow up. Would you respect
[3] his opinion?
[4] **A:** Yes, I would.
[5] **Q:** Now, do you know what might
[6] have happened between this April '95 time
[7] period and the end of 1998 when the School
[8] Board authorized the filing of a suit
[9] against these two pipeline companies that
[10] would have justified the filing of the
[11] suit?
[12] **MR. VISCONTE:**
[13] Objection as to form.
[14] **THE WITNESS:**
[15] I don't know all there is to
[16] know about this particular thing, this
[17] lawsuit. I was told that this firm was
[18] going to try to get money for the School
[19] Board from different companies for damages
[20] and so forth. And evidently he is trying,
[21] and I don't know all there is to know
[22] about it, but the only thing that I, like
[23] I said before, I was just an inspector for
[24] the School Board as far as seismic
[25] activities. I didn't, I wasn't worried

**Page 25**

[1] about nothing else.
[2] **EXAMINATION BY MR. HOFFMANN:**
[3] **Q:** I understand.
[4] **A:** I think all of this is
[5] ridiculous, as far as I'm concerned,
[6] because I don't get compensated for my
[7] time. I've got to go and, I feel like my
[8] time is valuable, just like yours and
[9] yours and everybody's.
[10] **Q:** Right.
[11] **A:** And especially me at my age
[12] and my condition and everything, my wife's
[13] condition, I feel like I'm just not
[14] getting compensated for my services. And
[15] really, I feel like the School Board — of
[16] course, I shouldn't say nothing bad about
[17] them because I've been trying to help them
[18] out and working and getting paid very
[19] little compared to what I should have been
[20] getting paid because it was just a public
[21] body. But I do know that a company comes
[22] on my land, I own a few acres, they pay me
[23] in advance for damages and so forth and so
[24] on.
[25] **Q:** I understand.

**Page 26**

[1] **A:** But I guess some people's got
[2] different views. So that is about it.
[3] **Q:** Let me just ask you this:
[4] Factually, do you know if the conditions
[5] out there have changed since this April
[6] '95 report by Mr. —
[7] **A:** Oh, yes, they change every day
[8] out there. Yes, sir.
[9] **Q:** I understand. But change to
[10] the extent that there is now something or
[11] go back to '98, now, when the suit was
[12] authorized, that prior to the filing of
[13] the suit or the authorization of the suit
[14] in late '98, okay, the School Board says
[15] to Mr. St. Martin: All right, you're
[16] authorized to go ahead and sue Columbia
[17] Gulf for the damages they've done to this
[18] Section 16, 18-13, do you know, do you
[19] personally know of something that may have
[20] occurred between this April '95 report and
[21] that late 1998 that would have justified
[22] filing a suit against —
[23] **A:** No.
[24] **MR. HOFFMANN:**
[25] I think that's all the

**Page 27**

[1] questions I have. Thank you, sir.
[2] **EXAMINATION BY MR. YOUNG:**
[3] **Q:** What was the company that did
[4] the seismic work in 1998 that you went out
[5] there afterwards?
[6] **A:** Geco-Prakla.
[7] **Q:** How do you spell that?
[8] **A:** G-E-C-O dash P-R-A.
[9] **MR. VISCONTE:**
[10] K, I think it's K.
[11] **THE WITNESS:**
[12] P-R-A-K-L-A, I believe.
[13] Prakla.
[14] **EXAMINATION BY MR. HOFFMANN:**
[15] **Q:** And is it your understanding
[16] that they had done some recent seismic
[17] work before March of '98 that resulted in
[18] your —
[19] **A:** Oh, yeah. Yeah.
[20] **Q:** — being retained by the Board
[21] to go out there —
[22] **A:** Right.
[23] **Q:** — and inspect it?
[24] **A:** Right.
[25] **Q:** Do you know what —

Page 28

[1] A: Not on this particular
[2] section.
[3] Q: Okay. What were you on 18-13
[4] for then in 1998?
[5] A: Well, they were working there,
[6] and I would have to go make my inspections
[7] while they were on that section.
[8] Q: Right. Maybe I misunderstood
[9] your answer then.
[10] A: Well, I misunderstood your
[11] question.
[12] Q: You only went out to inspect
[13] the School Board property after some
[14] seismic work had been done, correct?
[15] A: Yeah. And sometimes I would
[16] be there while they were working.
[17] Q: So the fact that you went out
[18] there in March of '98 meant that
[19] Geco-Prakla had been doing some seismic
[20] work recently on the sections that you
[21] looked at; correct?
[22] A: Correct.
[23] Q: And that included 18-13?
[24] A: Yes.
[25] Q: What was the nature of the

Page 29

[1] work that they were doing, do you know?
[2] A: Well, if, if you're not
[3] familiar with seismic work, the surveyors
[4] got to go and survey two lines, one for
[5] the receiving line and one for the shot
[6] point line where they shoot the dynamite.
[7] And they had different ways of doing
[8] this. Some companies would drill a hole
[9] with a portable drill, 75 feet; some of
[10] them would drill a hole 200 feet deep,
[11] depending whatever they were supposed to
[12] do. And then they had airboats.
[13] They used to use marsh
[14] buggies, but I had kind of talked them
[15] into trying to stop using marsh buggies
[16] because it was damaging the marsh too
[17] much, so they started using airboats. Air
[18] drills to drill holes and stuff hooked up
[19] on an airboat. And very, very seldom they
[20] would use a marsh buggy.
[21] Some of the places I've been
[22] on inspections, they had good marsh, real
[23] good hard marsh, I would let them use a
[24] marsh buggy because it would not show any
[25] tracks or nothing on the good hard marsh.

Page 30

[1] But anyway, then they would
[2] come along and than shoot that and with
[3] the instruments and stuff and shoot, and
[4] then they would, after they get through,
[5] well they would pick up and they'd clean
[6] the marsh. Pick up all the flags, all the
[7] poles and anything that they put out
[8] there, and that was mostly when I was
[9] checking on them to make sure they clean
[10] up the place. And a lot of times to drill
[11] a hole, they had to have water. And if it
[12] was dry marsh, they had to dig a hole with
[13] shovels to get water to where they could
[14] drill. And then I also made them backfill
[15] those little pits that they dig in the
[16] marsh. And that was my job.
[17] Q: So in this instance in March
[18] of '98 when you went out there, it was
[19] your understanding that previously in the
[20] few months before then, Geco-Prakla had
[21] been out there doing some seismic charges
[22] in connection with authority from the
[23] School Board?
[24] A: Uh-huh (affirmative response),
[25] right.

Page 31

[1] Q: You talked about the nutria
[2] that you observed in March of 1998. And
[3] in your experience, can they work pretty
[4] fast in working over a marsh, from what
[5] you've seen?
[6] A: Yes.
[7] MR. VISCONTE:
[8] Objection as to form.
[9] THE WITNESS:
[10] Yes.
[11] EXAMINATION BY MR. YOUNG:
[12] Q: Would that be one of the
[13] reasons that maybe when Smith went out
[14] there in 1995, the marsh appeared healthy
[15] but when you went out there three years
[16] later, you could see a lot of nutria eat
[17] out, you think?
[18] MR. VISCONTE:
[19] Objection as to form.
[20] EXAMINATION BY MR. YOUNG:
[21] Q: Do you think a three-year
[22] period?
[23] A: Well, he should have noticed
[24] the nutria eat out, which maybe he didn't
[25] even mention nothing, but maybe you-all

---

Page 32

[1] are not experienced like I am as far as
[2] nutria and muskrat. I could remember in
[3] '47, 1947 I was in Blue Hammett which is
[4] by Four Leaf Bay, and they had a marsh
[5] down there that was a beautiful marsh and
[6] they had a lot of three corner grass. A
[7] three corner grass is like three corners,
[8] a grass, green, beautiful grass. And it
[9] would grow up about this high (indicating)
[10] and they had a lot of muskrat in this
[11] area, in Blue Hammett Bayou and Four Leaf
[12] Bay. And a nutria, a muskrat will make a
[13] hill and have their young and everything
[14] in the hill.
[15]     Then the nutria came along and
[16] they would make their nest on top of the
[17] muskrat hill, and they would mash the
[18] muskrat hill down, and they had all of
[19] their young on top of the hill, you see.
[20]     And, but they were vegetarian
[21] and they would eat all the three corner
[22] grass; they ate all the marsh. So and
[23] I've been out there where you look across
[24] the marsh and there is nothing but marsh,
[25] mud flat like, but it's marsh. But no

---

Page 33

[1] vegetation. But all you'd see was a bunch
[2] of little hills out there, nothing but
[3] nutria on the hills, on the little hills.
[4]     Q: When you were there in March
[5] of '98 in addition to noticing the nutria
[6] eat-out that you wrote in your report, did
[7] you actually see a fair amount of nutria
[8] out there, do you remember?
[9]     A: Yes. Yes.
[10]     Q: From what you've seen in this
[11] part of Terrebonne Parish on the western
[12] side, Bayou Penchant area, over the years,
[13] have you been out there on a regular basis
[14] in connection with the work?
[15]     A: Just went there if they have a
[16] seismograph crew working over there.
[17]     Q: For the past 20 to 25 years
[18] have you been out there on several
[19] occasions?
[20]     A: Yes.
[21]     Q: Have you seen the nutria
[22] population decline in any way over those
[23] past 20 to 25 years?
[24]     A: No.
[25]     Q: Has it stayed the same or gone

---

Page 34

[1] up?
[2]     A: I've seen it increase.
[3]     Q: And this is what you
[4] personally observed being out there in the
[5] western part of Terrebonne Parish?
[6]     A: That's correct.
[7]     Q: This may not have been
[8] something that you observed, but when you
[9] were out there on the 18-13 property, did
[10] you happen to know which way the water was
[11] flowing in canals, whether it was going
[12] from the west, from the Atchafalaya area
[13] to the east?
[14]     A: I don't recall.
[15]     Q: Or east or west?
[16]     A: I never noticed.
[17]             MR. YOUNG:
[18]     That's all I have. Thanks.
[19]         EXAMINATION BY MR. HOFFMANN:
[20]     Q: I'm sorry, Mr. Poiencot, just
[21] a couple of questions. One, I'm curious
[22] about the nutria. Have you noticed them
[23] causing damage in marshland areas where
[24] there are no pipeline canals?
[25]     A: Where there aren't any

---

Page 35

[1] pipeline canals?
[2]     Q: Right.
[3]     A: South Louisiana is just
[4] nothing but pipeline canals. I'm trying
[5] to think. Because when I make my survey,
[6] I used to make my survey with the pipeline
[7] companies, they had pipelines all over on
[8] that LL&E property, and LL&E had property
[9] from Morgan City all the way to the mouth
[10] of the River.
[11]     Q: Let me ask you this —
[12]     A: I'm trying to think of a place
[13] maybe that I know of. One place, of
[14] course, it's in Lafourche Parish, and I
[15] was looking after Lafourche, too. Back of
[16] Lafite down in there, there is one place
[17] where I was, and that was a beautiful
[18] marsh, and I don't remember you had good,
[19] around there and, of course, you had good,
[20] good vegetation there, but I seen very few
[21] nutrias there. The nutrias, seems like
[22] they are on the coast more than they are
[23] further up.
[24]     Q: Let me ask you: You told us
[25] about the LL&E properties and when

---

**Page 36**

[1] pipeline canals were dug on LL&E property,
[2] they required certain measures taken by
[3] the pipeline companies to protect their
[4] lands?
[5]   A: Correct.
[6]   Q: In those situations, did you
[7] see instances where even though LL&E
[8] required the pipeline companies to take
[9] these measures that the nutria still
[10] caused damage to the marsh that resulted
[11] in erosion?
[12]   A: Oh, yeah. Right.
[13]   Q: And one other thing, before we
[14] started talking here, in your deposition,
[15] you did indicate some concerns about your
[16] availability for the January trial that
[17] Robert told you about?
[18]   A: Right.
[19]   Q: And I don't want to get into
[20] details, but I understand your wife is
[21] having a particular medical problem right
[22] now, and you're concerned that you might
[23] not be available?
[24]   A: That's correct.
[25]   Q: Thank you, sir.

**Page 37**

[1]   A: Like I said before, she had
[2] developed ovarian cancer the same time I
[3] developed colon cancer in 1998.
[4]     August 14, I was operated on,
[5] And I took treatment and everything, and
[6] so far I'm in remission. And my wife at
[7] the same time she developed ovarian
[8] cancer. And she was taking treatment for
[9] two years and she was looking forward to
[10] the end of it, but then her blood kind of
[11] went out, jumped up on her on reports and
[12] so they started investigating and they
[13] found out that it come back on her, and
[14] she has another rumor. So I don't know
[15] whether I'll —
[16]         MR. HOFFMANN:
[17]     Thank you, sir, and please,
[18] she's in our prayers. Thank you.
[19]     (This concluded the deposition)
[20]
[21]
[22]
[23]
[24]
[25]

**Page 38**

[1]     REPORTER'S CERTIFICATE

[2]

[3]     This certification is valid

    only for a transcript accompanied

[4] by my original signature and by my

    original seal on this page.

[5]

[6]     I, CATHY PEPPER, Certified

    Court Reporter, as the officer

[7] before whom this testimony was

    taken, do hereby certify that the

[8] above-named witness, after having

    been first duly sworn by me upon

[9] the authority of R.S. 37:2554, to

    testify to the truth, did testify

[10] as hereinabove set forth;

[11]

    That the testimony was

[12] reported by me in the stenotype

    reporting method and transcribed

[13] under my personal direction and

    supervision, and is a true and

[14] correct transcript, to the best

    of my ability and understanding;

[15]

[16]     That I am not of counsel,

    not related to counsel or the

[17] parties hereto, and not in any

    way interested in the outcome of

[18] this matter.

[19]

[20]

[21]

[22]     CATHY PEPPER

    CERTIFIED COURT REPORTER #79010

[23] REGISTERED PROFESSIONAL REPORTER

    GAUDET, KAISER & PEPPER

[24] 601 POYDRAS STREET, SUITE 2003

    NEW ORLEANS LA 70130

[25] (504) 525-9100

March 4-1998

Terrebonne Parish School

Houma, Louisiana


ATT: Mr. Hebert Voirreber


Gentleman:

On Tuesday March 3-1998 I drove To Max's Welders Landing in Gibson To go out To the Quarterboat Mindy. I Then left The Landing in Gibson at 8:00 AM in a crewboat and got To The Quarterboat at 9.00 in Bayou Penchant. We Then left in an Airboat and Went out To Sec 16 of T18S-R12E. This Sec is allmost all water and was cleaned up very good. I did not Take any pictures because iT was all water where The Seismic Lines were. We Then went To Sec 16 of T18S-R13E and This Sec also is all in water, The marsh has been eaten by the nutra rats. I will make my Post Inspection of Sec 16 of T18S-R14E and Sec 16 of T18S-R15E after They do The repair work on the airboat runs. Thoes Two Sec are real good pyphene marsh. I Then returned To the Quarterboat and Then returned To the Landing in The crewboat. I Then drove home and got There at 5.45.


EXHIBIT
B

TPSB 0036

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TERREBONNE PARISH SCHOOL BOARD** | § | **CIVIL ACTION NO. 00-0319** |
| | | |
| **VERSUS** | § | **SECTION:   B** |
| | | |
| **COLUMBIA GULF TRANSMISSION COMPANY, KOCH GATEWAY PIPELINE COMPANY** | §<br>§ | **MAGISTRATE:    5** |
| | | |
| **FILED:**_____ | § | _____<br>**DEPUTY CLERK** |

## ORDER

Considering the foregoing Motion in Limine to Exclude Trial and Deposition Testimony of Malcolm Poiencot on the Issue of Nutria Damage filed by plaintiff, Terrebonne Parish School Board:

**IT IS ORDERED, ADJUDGED AND DECREED** that the testimony of Malcolm Poiencot is excluded in its entirety on the issue of nutria damage to TPSB's marsh property.

THUS RENDERED AND SIGNED this _____ day of _____, 2001, at New Orleans, Louisiana.

_____
U.S. DISTRICT JUDGE

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **TERREBONNE PARISH SCHOOL BOARD** | § | **CIVIL ACTION NO. 00-0319** |
| **VERSUS** | § | **SECTION:   B** |
| **COLUMBIA GULF TRANSMISSION COMPANY, KOCH GATEWAY PIPELINE COMPANY** | § § | **MAGISTRATE:   5** |
| **FILED:**_____ | § | _____ |
| | | **DEPUTY CLERK** |

<u>**MEMORANDUM IN SUPPORT OF
MOTION IN LIMINE TO EXCLUDE TRIAL AND DEPOSITION TESTIMONY
OF MALCOLM POIENCOT ON THE ISSUE OF NUTRIA DAMAGE**</u>

**MAY IT PLEASE THE COURT:**

Terrebonne Parish School Board ("TPSB"), plaintiff in this case, files this memorandum in

support of the TPSB's motion in limine to exclude the trial and/or deposition testimony of Malcolm

Poiencot.

<u>**FACTS**</u>

The facts of this case are contained in TPSB's memorandum in support of motions in limine

to exclude Koch Gateway Pipeline Company's experts and will not be restated in this memorandum

but are adopted herein by reference.

## LAW & ANALYSIS

The deposition or trial testimony of Malcolm Poiencot on the issue of nutria damage should not be introduced into evidence or referred to on grounds that it is the opinion of a lay person purporting to testify as an expert. Fed. R. Civ. P., Rule 702, provides that an expert witness may testify in the form of an opinion or otherwise if the witness is "qualified as an expert by knowledge, skill, experience, training, or education . . ." and if three other factors regarding methodology are met. Mr. Poiencot was an outside consultant hired by TPSB to check for <u>seismic damages</u> on various TPSB properties after seismic operations were completed. Mr. Poiencot makes the following cryptic statement relied on by defendants in his March 4, 1998, field notes, "We then went to Sec 16 of T18S-R13E and this Sec allso [sic] is all in water, the marsh has been eaten by the nutra [sic] rats."[1]

First, there is no evidence to suggest that Mr. Poiencot is qualified to testify as a wetlands specialist or is qualified to testify as to the possible effects of herbivory on the TPSB property. Additionally, the fact that Mr. Poiencot was hired to check for seismic damage does not make him a marsh expert or nutria expert. Nor does the fact that Mr. Poiencot has worked in the oil industry or lived around marshes all his life make him an expert. With no disrespect intended, the fact that Mr. Poiencot is not an expert is supported by the fact that he did not even know how to correctly spell the word "nutria".

Second, assuming Poiencot does qualify as an expert, there is no methodology in his field notes that indicates he conducted a valid scientific or technical analysis proving his conclusions are based upon sufficient facts or data, that the conclusions are a product of reliable principles and

---

[1] See March 4, 1998, field notes of Malcolm Poiencot attached to TPSB's motion in limine as Exhibit "B".

methods, and that Poiencot applied the principles and methods reliably to the facts of the case. Poiencot's lack of methodology is best illustrated by his statement in his deposition that he did not look for any damage on the property caused by the pipeline canals as that was not within the scope of his work for the TPSB.[2]  Consequently, Poiencot's opinion is unsupported because he failed to consider all the possible causes of marsh erosion and failed to conduct any field work to exclude all other types of destructive impacts.

Third,  since Poiencot does not qualify as an expert, his opinion bearing on the ultimate issue of causation must be excluded. The Federal Rules of Evidence are crystal clear.  Fed. R. Civ. P., Rule 704 provides that an *expert witness* may testify to an "ultimate issue to be decided by the trier of fact."  However, a *fact witness* is limited to testifying to opinions or inferences that are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Civ. P., Rule 701.  In order for Mr. Poiencot's trial or deposition testimony of nutria damage to be admissible in evidence, he must qualify as an expert.  Mr. Poiencot is not being tendered as an expert by the defendants.  Consequently, his opinion on the ultimate issue of what has caused damage to TPSB's property is inadmissible pursuant to F.R.E. 702 as his testimony is based on "scientific, technical, or other specialized knowledge".  To conclude otherwise, it to eliminate the need for  experts of both parties as Mr. Poiencot will be testifying in the realm these experts have studied and researched as part of their profession.

---

[2] See pg. 12, lines 1-25, pg. 13, lines 1-3, of deposition of Malcolm Poiencot, relevant portion attached to TPSB's motion in limine as Exhibit "A".

Respectfully submitted,

**ST. MARTIN & WILLIAMS (APLC)**

| **MICHAEL X. ST. MARTIN** | **#12365** |
| **JOSEPH G. JEVIC, III** | **#23145** |

Post Office Box 2017
Houma, Louisiana 70361-2017
(504) 876-3891       Telephone
(504) 851-2219       Facsimile

| **A. J. GRAY, III** | **#6253** |
| **WADE T. VISCONTE** | **#24734** |
| **THE GRAY LAW FIRM (APLC)** | |

Post Office Box 1467
Lake Charles, LA 70602-1467
(337) 494-0694       Telephone
(337) 494-0697       Facsimile

**Attorneys for Terrebonne Parish School Board**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing Memorandum has been mailed to all

counsel of record via facsimile and United States mail, postage prepaid on this ___8th___

day of _____January_____, 2001.

_____
**JOSEPH G. JEVIC, III**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TERREBONNE PARISH SCHOOL BOARD** | § | **CIVIL ACTION NO. 00-0319** |
| **VERSUS** | § | **SECTION:   B** |
| **COLUMBIA GULF TRANSMISSION COMPANY, KOCH GATEWAY PIPELINE COMPANY** | §  § | **MAGISTRATE:    5** |
| **FILED:_____** | § | _____ |
| | | **DEPUTY CLERK** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### NOTICE OF HEARING

**PLEASE TAKE NOTICE** that the plaintiffs will bring their Motion in Limine to Exclude Trial and Deposition Testimony of Malcolm Poiencot on the Issue of Nutria Damage for hearing before the Honorable Ivan L. R. Lemelle, United States District Judge for the Eastern District of Louisiana, 500 Camp Street, New Orleans, Louisiana on the 10th day of January, 2001, at 9 o'clock a.m., or as soon thereafter as counsel may be heard.

Houma, Louisiana, this 8th day of January 2001.

Respectfully submitted,

**ST. MARTIN & WILLIAMS (APLC)**

_____

**MICHAEL X. ST. MARTIN**     **#12365**
**JOSEPH G. JEVIC III**       **#23145**
Post Office Box 2017
Houma, Louisiana 70361-2017
(504) 876-3891       Telephone
(504) 851-2219       Facsimile

**A. J. GRAY, III**           **#6253**
**WADE T. VISCONTE**          **#24734**
**THE GRAY LAW FIRM (APLC)**
Post Office Box 1467
Lake Charles, LA 70602-1467
(337) 494-0694       Telephone
(337) 494-0697       Facsimile

**Attorneys for Terrebonne Parish School Board**


## CERTIFICATE OF SERVICE

   **I HEREBY CERTIFY** that a copy of the foregoing Motion and Memorandum has been
mailed to all counsel of record via facsimile and United States mail, postage prepaid on this
_____8th_____ day of _____January_____, 2001.

_____