

P⎯ ⎯ ⎯ ⎯ FILE
⎯ ⎯ ⎯RD

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TERREBONNE PARISH SCHOOL BOARD | * | CASE NUMBER: 00-0319 |
| | * | |
| VERSUS | * | SECTION: "B" |
| | * | |
| COLUMBIA GULF TRANSMISSION | * | MAGISTRATE: 5 |
| COMPANY AND KOCH GATEWAY | * | |
| PIPELINE COMPANY | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\*

## MOTION IN LIMINE TO EXCLUDE
## TESTIMONY OF PLAINTIFF'S EXPERT CHABRECK

Columbia Gulf Transmission Company ("Columbia Gulf") files this motion in limine and would show the Court as follows:

Columbia Gulf respectfully moves pursuant to Rule 702, et. seq. of the Federal Rules of Evidence for an order striking the testimony of Dr. Robert Chabreck it in its entirety or, alternatively, restricting his testimony to the areas of his expertise and training; botany, forestry and wildlife management, for the reasons more fully set forth in the memorandum in support filed herewith. In support of this motion, Columbia Gulf adopts by reference, as if incorporated herein,

1

⎯⎯⎯ Fee⎯⎯⎯⎯⎯
⎯⎯⎯ Process⎯⎯⎯
X⎯ Dktd ⎯⎯ ○6○
⎯⎯ CtRmDep⎯⎯⎯
⎯⎯ Doc.No. 107

portions of co-defendant Koch Gateway Pipeline Company's ("Koch") motion in limine relative to Dr. Chabreck.

In addition, Columbia Gulf moves to exclude all testimony by Dr. Chabreck pertaining to restoration plans, on the grounds that he did not furnish a report on his proposed plans.

Respectfully submitted,

_____

Thomas R. Blum, T.A. (#3170)
James A. Burton (#3708)
Herman C. Hoffmann, Jr. (#6899)
Christina H. Belew  (#1244)
M. Davis Ready (#24616)
SIMON, PERAGINE, SMITH & REDFEARN, L.L.P.
1100 Poydras Street
30th Floor - Energy Centre
New Orleans, Louisiana 70163-3000
Telephone: (504) 569-2030

Attorneys for Columbia Gulf Transmission Company

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing has been served upon all counsel of record by telecopier or by depositing same in the U.S. mail, postage prepaid and properly addressed this

_J_ day of January, 2001.

_____

K.\DATA\L\09700066\PLEADING\inlimine.mot2.wpd                    2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TERREBONNE PARISH SCHOOL BOARD | * | CASE NUMBER:  00-0319 |
| | * | |
| VERSUS | * | SECTION: "B" |
| | * | |
| COLUMBIA GULF TRANSMISSION | * | MAGISTRATE:  5 |
| COMPANY AND KOCH GATEWAY | * | |
| PIPELINE COMPANY | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * ** | | |

## MEMORANDUM IN SUPPORT OF MOTION IN LIMINE
## TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT CHABRECK

Columbia Gulf Transmission Company ("Columbia Gulf") has moved the Court for an

order in limine to strike the expert testimony of Dr. Chabreck in its entirety, one of the experts

expected to testify on behalf of Terrebonne Parish School Board ("TPSB") or, in the alterative,

restricting his testimony to the areas of his training and expertise; botany, forestry and wildlife

management.

Columbia Gulf adopts by reference, as if incorporated herein, the portions of Koch's

motion in limine relative to Dr. Robert Chabreck.  Without going into detail, Koch's motion in

1

limine as to Dr. Chabreck focuses on the fact that his expert opinion fails to satisfy the

requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786,

125 L.Ed.2d 469 (1993), *on remand*, 43 F.3d 1311 (9th Cir. 1995), and its progeny. More

specifically, Koch's motion in limine established that Dr. Chabreck's opinions as to his "flushing"

theory were patently unreliable. In the deposition testimony cited by Koch, it can be seen that Dr.

Chabreck's "flushing" theory has not been subject to peer review, cannot be replicated, has

nothing to do with his areas of expertise, research or knowledge, and has not been accepted by the

scientific community.

Dr. Chabreck's "flushing" theory and opinions relative to causation should be stricken for

their failure to comply with the minimal requirements of *Daubert*, and its progeny. Additional

testimony of Dr. Chabreck from his continuation deposition underscores the fact that his

"flushing" causation theory has not been subjected to peer review.

> Q.    Okay. Can you site me to any article that you published
>        dealing with the flushing action theory between a canal and
>        an adjacent marsh through a cut in a canal bank?
>
> A.    No.
>
> Q.    Can you point me to any published article by anyone else
>        dealing with that subject?
>
> A.    Not specifically on that topic, that I can recall.

2

Chabreck Deposition, Vol. 2, pp. 50-51.[1]

In addition to the lack of peer review, Dr. Chabreck's "flushing" theory is untested and unreliable.

> Q.    Okay.  So you - - but in answer to my question as to whether you had tested your theory by measurement, the answer is "No," other than observing how deep a particular cut in the levee might be, as an indication of the volume of water passing back and forth?

> A.    Well, almost - - well, invariably, if you have an opening in a levee with an adjacent area of marsh that is eroded, large ponds that have begun forming, I think if you measure that opening, you'll find that the depth of that opening is considerable, rather than - - you know, it would be a considerable depth rather than a shallow.  If you have an area with a break in the levee and the adjacent marsh is not opened, it's been my opinion that the measurement of the depth of that opening in the levee would be real shallow.  So the movement of water that's required to open up that marsh causes that break in the levee to deepen.  I think there's a strong relationship there.

> Q.    Other than that, you have not tested this theory, have you sir?

> A.    No, I have not.

Chabreck Deposition, Vol. 2 (1219/00) pp. 52-53.

---

[1]    Copies of deposition transcript excerpts cited herein are attached as Exhibit "A". A complete copy of Dr. Chabreck's depositions will be provided upon request of the Court.

Q.    . . . is there a way for you to verify through measurements, or if
      you will allow me, through scientifically conducting tests, the
      flushing action theory that we have been talking about?

A.    Well, I am sure there must be ways that you can do this
      . . . .

Chabreck Deposition, Vol. 2 (12/19/00), p. 53.

Q.    And this theory of yours that these cuts have allowed this flushing
      action to take place required, I believe, if I'm correct, that there be
      a net export of organic material from the marsh through the
      openings, correct?

A.    Yes.

Q.    All Right. If there's a net import, would it stand to follow
      that the openings are actually helping the marsh by putting
      organic materials back into the marsh?

A.    Well, that's what it would mean.

Q.    All right. And you feel, even though Dr. McCorquodale
      told you his test on whether there was export or import of
      sediments and organic materials were inconclusive, you still
      fee that you can give an opinion that there is a net export of
      materials?

A.    I feel very strongly that it is.

Q.    And what do you base that on?

A.    By the continuous, you know, the loss of - - the amount of
      erosion that has taken place and the number of - - the
      thinning of the root mats, and floats. And in here, in the
      way that this eroded marsh is associated with opening sin
      levees that allow the material to be exported (Indicating).

4

Q.    All right. But, again, Dr. McCorquodale's tests which would confirm this theory of yours were inconclusive correct?

A.    That's correct, but he, you know, he admitted it was a very short-term test, subject to lots of errors.

Q.    If he did it on a longer term basis, we would either support or reject your theory?

A.    That's correct.

Q.    And part of your theory is that these velocities into and out of, not only openings, but the flows inside the marsh, themselves, would have to be sufficient to break up the marsh root, correct?

A.    Yes.

Q.    And there were no measurements, conclusive or inconclusive taken by you or anybody else inside the marsh area to determine what those flows were?

A.    That's correct.

Chabreck Deposition, Vol. 1 (12/19/00) pp. 170-172.

As can be seen from Dr. Chabreck's testimony, his opinion as to the "flushing" action theory has no reliability whatsoever. Dr. Chabreck's opinion is not based on a consistent methodology, which has been subjected peer review. In fact, based on his deposition testimony, Dr. Chabreck did not perform the limited tests he suggested. Most of his suggestions are mere speculation. Given the lack of methodology, peer review and testing, Columbia Gulf requests that this Honorable Court preclude Dr. Chabreck from testifying on his "flushing" theory of causation.

5

In addition to his testimony relative to causation, it appears that Dr. Chabreck intends to offer opinions relative to repair and/or restoration damages. More specifically, the School Board's expert on repair and/or restoration of damages, Charles Camp, referenced a proposed restoration project by Dr. Chabreck in Mr. Camp's report, dated September 12, 2000. A copy said report is attached as Exhibit "B". Mr. Camp indicated that Dr. Chabreck recommended an ambiguous additional restoration plan, but failed to provide any further facts of his involvement, aside from the fact that the cost would be substantial.

Dr. Chabreck provided three written reports prior to the cut off date of September 15, 2000, provided by this Court. Yet, Dr. Chabreck's three reports provide no opinions or information whatsoever on mitigation and/or restoration of the marsh, despite the fact that he conceived of and plans to testify about three such plans. Dr. Chabreck's failure to provide a report on his repair and/or restoration plans prior to this Court's cut off date require that any prospective testimony from Dr. Chabreck relative to repair and/or restoration plans be excluded from the trial. Columbia Gulf requests that this Honorable Court limit Dr. Chabreck's testimony and not allow Dr. Chabreck to testify as to repair and/or restoration.

## CONCLUSION

For the foregoing reasons, Columbia Gulf requests that this Honorable Court grant its motion in limine, striking the testimony of Dr. Chabreck in its entirety. In the alternative, in the event that this Court refuses to preclude Dr. Chabreck's testimony in its entirety, Columbia Gulf

6

requests that this Honorable Court grant its motion in limine, restricting Dr. Chabreck's testimony

to his areas of expertise and preclude testimony relative to his "flushing" action theory. Finally,

also in the alternative, in the event Dr. Chabreck's testimony is not completely stricken, Columbia

Gulf requests that this Honorable Court grant its motion in limine precluding any testimony

relative to repair and/or restoration plans.

                  Respectfully submitted,

                  Thomas R. Blum, T.A. (#3170)
                  James A. Burton (#3708)
                  Herman C. Hoffmann, Jr. (#6899)
                  Christina H. Belew (#1244)
                  M. Davis Ready (#24616)
                  SIMON, PERAGINE, SMITH & REDFEARN, L.L.P.
                  1100 Poydras Street
                  30th Floor - Energy Centre
                  New Orleans, Louisiana 70163-3000
                  Telephone: (504) 569-2030

                  Attorneys for Columbia Gulf Transmission Company

7

## CERTIFICATE OF SERVICE

I hereby certify that copies of the foregoing has been served upon all counsel of record by telecopier or by depositing same in the U.S. mail, postage prepaid and properly addressed this ___5___ day of January, 2001.

Christon Belew

## Page 49

(1)  Q.  Okay.  And in this case, there is no erosion
(2)  from boat waves, as far as you can tell, is that correct,
(3)  sir?
(4)  A.  Very minimal, I would say.
(5)  Q.  And so whatever erosion has taken place would be
(6)  as a result of tidal evenflow during the natural course of
(7)  hydrologic action in the marshland?
(8)  A.  Yes.
(9)  Q.  Have you published any articles on tidal action
(10)  causing vegetative marsh loss in a freshwater marsh area?
(11)  A.  I'm not sure.  I've worked a lot in the floating
(12)  freshwater marshes.  I think there may be one article that
(13)  may –
(14)  Q.  My question was, have you published any article
(15)  on this subject, just now?
(16)  A.  Yes, well, I was a coauthor.
(17)  Q.  Okay.  Sorry.  Fine, fine.
(18)  A.  For instance, this one article here in 1980 on
(19)  – it was titled "Smooth beggartick; its distribution,
(20)  control, and impact on nutria in coastal Louisiana."
(21)  Q.  Who was the principal author there?
(22)  A.  Kinler, N.W. Kinler.
(23)  Q.  Okay.
(24)  A.  And in that paper, we discussed the changes in
(25)  the marsh vegetation, in the freshwater marshes, and how,

## Page 50

(1)  with the flood of 1973, the great flood on the Mississippi
(2)  River, how it caused a change in the plant communities and
(3)  caused an invasion of this particular plant, smooth
(4)  beggartick, and how this change in the plants effected
(5)  nutria.  And in that article, there was some discussion of
(6)  erosion of the marshes.
(7)  Q.  As a result of the great flood?
(8)  A.  Yes, and changes in the plant, plant abundance.
(9)  Q.  Okay.  Any other articles that you published –
(10)  well, let me go backup just a step, though.  This article
(11)  from 1980, that you coauthored with Kinler, did not deal
(12)  with the flushing action between a dredge canal and
(13)  adjacent marshes, did it?
(14)  A.  No.
(15)  Q.  But it did deal with hydrologic changes
(16)  resulting from this flood and its effect on the marshes,
(17)  is that right?
(18)  A.  Right.
(19)  Q.  Okay.  Can you site me to any article that you
(20)  published dealing with the flushing action theory between
(21)  a canal and an adjacent marsh through a cut in a canal
(22)  bank?
(23)  A.  No.
(24)  Q.  Can you point me to any published article by
(25)  anyone else dealing with that subject?

## Page 51

(1)  A.  Not specifically on that topic, that I can
(2)  recall.
(3)  Q.  Other than the work done by Dr. McCorquodale in
(4)  this case that you discussed with Mr. Young in your first
(5)  deposition, you have not conducted any studies to verify,
(6)  through measurement, the flushing action theory that we've
(7)  been discussing, have you?
(8)  A.  I find there are some other methods of
(9)  evaluating the amount and the flushing actions that, to
(10)  me, provides some valuable information.  And one of these
(11)  is to measure the depth of these, so-called, cuts or
(12)  breaks in the levees, and the depths of the channels which
(13)  lead from those cuts out into the marshland.  The depths
(14)  that these channels, to which they erode is, to me,
(15)  indicative of the amount of water that moves back and
(16)  forth through the channels.  So that channels with a lot
(17)  of water movement are normally the channels which cause
(18)  the most erosion.  And channels with the most water
(19)  movement will generally be deeper.  The channels also
(20)  erode, not only do they erode the adjacent marshland, but
(21)  the drainage channels also erodes and deepens, so that the
(22)  depths is an indication of the amount of water that moves
(23)  back and forth through that channel.
(24)  Q.  But in this case, you have actual measurements
(25)  of, at least two such locations, where there has been a

## Page 52

(1)  break in the levee and an exchange of water, right?
(2)  A.  Yes.
(3)  Q.  And that gives you a precise measurement there,
(4)  doesn't it, rather than a, sort of like, intuitive sense
(5)  that the deeper it is, the more water?
(6)  A.  Yes, right, it kind of verifies my observations,
(7)  you know.
(8)  Q.  Okay.  So you – but in answer to my question as
(9)  to whether you had tested your theory by measurement, the
(10)  answer is "No," other than observing how deep a particular
(11)  cut in the levee might be, as an indication of the volume
(12)  of water passing back and forth?
(13)  A.  Well, almost – well, invariably, if you have an
(14)  opening in a levee with an adjacent area of marsh that is
(15)  eroded, large ponds that have begun forming, I think if
(16)  you measure that opening, you'll find that the depth of
(17)  that opening is considerable, rather than – you know, it
(18)  would be a considerable depth rather than shallow.  If you
(19)  have an area that is eroded in the levee and the adjacent
(20)  marsh is not opened, it's been my opinion that the
(21)  measurement of the depth of that opening in the levee
(22)  would be real shallow.  So the movement of water that's
(23)  required to open up marsh causes that break in the
(24)  levee to deepen.  I think there's a strong relationship
(25)  there.

## Page 53

(1)  Q.  Other than that, you have not tested this
(2)  theory, have you, sir?
(3)  A.  No, I have not.
(4)  Q.  And the only measurement of the force and volume
(5)  of water moving through the cuts in the levees in this
(6)  Section 16 were done by Dr. McCorquodale and Dr. DeVries,
(7)  the hydrologist hired by Koch, is that right?
(8)  A.  Yes.
(9)  Q.  And you testified that you relied on Dr.
(10)  McCorquodale's reports, through reading his reports and
(11)  several telephone conversations you've had with him, is
(12)  that right?
(13)  A.  Yes, that's correct.
(14)  Q.  And I'm going to talk to you about that a little
(15)  bit later.
(16)  Is there a way for you to verify through
(17)  measurements, or if you will allow me, through
(18)  scientifically conducting tests, the flushing action
(19)  theory that we've been talking about?
(20)  A.  Well, I'm sure there must be ways that you can
(21)  do this.  I think one of the ways you can is to look at
(22)  the material that is being carried in suspension in the
(23)  water column as it moves, whether the water is clear or
(24)  whether it contains abundances of these organic soil
(25)  particles.

## Page 54

(1)  Q.  Well, you explained that last time.
(2)  A.  Yes.
(3)  Q.  And my understanding was that even though
(4)  current may be sufficient to move particles, you don't
(5)  know whether that same current would be sufficient to
(6)  erode particles, do you?
(7)  MR. JEVIC:
(8)  I'm going to object.  If you got that out of
(9)  the last deposition, it's obviously been asked and
(10)  answered.  Let's move along.
(11)  MR. BLUM:
(12)  All right.
(13)  MR. JEVIC:
(14)  I mean –
(15)  EXAMINATION BY MR. BLUM:
(16)  Q.  You're not going to answer the question?
(17)  MR. JEVIC:
(18)  Well, let me just say, I don't want to waste
(19)  anybody's time, because if this goes on
(20)  another day and you want to go a third day, we
(21)  will probably object to a third day of Dr.
(22)  Chabreck's deposition.  There's been one full day
(23)  of deposition already; we're going to have another
(24)  full day, it looks like.  And it just looks like
(25)  we're just wasting everybody's time right now.

# Exhibit "A"

## Page 169

(1) Q. And then the other two, the "4 25" and "1.49"
(2) are attributable to the Little Horn Bayou, correct?
(3) A. That's correct.
(4) Q. Since we're here, on "Exhibit 27," circle, if
(5) wouldn't mind, using that same blue Marks-A-Lot, the
(6) opening on the northern side.
(7) A. (Witness complies.)
(8) Q. There we go.
(9) And then, lastly, there was an area in the
(10) southwest corner, "7.38," that you attributed to an
(11) opening in Koch's Canal?
(12) A. Yes.
(13) Q. Is that correct?
(14) A. Yes.
(15) Q. Would you circle, on that map, that opening for
(16) me, please?
(17) A. (Witness complies.)
(18) Q. And you're using the blue marker again?
(19) A. Yes.
(20) Q. And that's on the western side of the property
(21) — it's actually —
(22) A. It's actually a little off.
(23) Q. It's off the property line?
(24) A. Yes.
(25) Q. Okay. Do you know, or have you reviewed any

## Page 170

(1) documents that pertain to right of way as to the
(2) landowner on the western side of Koch's Canal?
(3) A. No.
(4) Q. Now, I think you testified in the first portion
(5) of your deposition last week, that the general flow in
(6) this area is from east to west, is that correct?
(7) A. Yes.
(8) Q. Okay. What did you rely upon for that opinion,
(9) is that just your overall experience?
(10) A. Yes, what I observed during my trips out to the
(11) area, the water has either been flowing east or west.
(12) Q. Okay. What about —
(13) A. Although there is some flow —
(14) Q. In the easterly direction?
(15) A. Yes.
(16) Q. Well, what about the net flow, do you have an
(17) opinion as to that?
(18) A. I guess most of the flows is generally — the
(19) drainage is to the west.
(20) Q. And this theory of yours that these cuts have
(21) allowed this flushing action to take place required, I
(22) believe, if I'm correct, that there be a net export of
(23) organic material from the marsh through the openings,
(24) correct?
(25) A. Yes.

## Page 171

(1) Q. All right. If there's a net import, would it
(2) stand to follow that the openings are actually helping the
(3) marsh by putting organic materials back into the marsh?
(4) A. Well, that's what it would mean.
(5) Q. All right. And you feel, even though Dr.
(6) McCorquodale told you his test on whether there was export
(7) or import of sediments and organic materials were
(8) inconclusive, you still feel that you can give an opinion
(9) that there is a net export of materials?
(10) A. I feel very strongly that it is.
(11) Q. And what do you base that on?
(12) A. By the continuous, you know, the loss of — the
(13) amount of erosion that has taken place and the number of
(14) — the thinning of the root mats, the floats. And in
(15) here, in the way that this eroded marsh is associated with
(16) openings in levees that allow the material to be exported
(17) (Indicating).
(18) Q. All right. But, again, Dr. McCorquodale's tests
(19) which would confirm this theory of yours were
(20) inconclusive, correct?
(21) A. That's correct, but he, you know, he admitted it
(22) was a very short-term test, subject to lots of errors.
(23) Q. If he did it on a longer term basis, we could
(24) either support or reject your theory?
(25) A. That's correct.

## Page 172

(1) Q. And part of your theory is that these velocities
(2) into and out of, not only openings, but the flows inside
(3) the marsh, themselves, would have to be sufficient to
(4) break up the marsh root, correct?
(5) A. Yes.
(6) Q. And there were no measurements, conclusive or
(7) inconclusive taken by you or anybody else inside the marsh
(8) area to determine what those flows were?
(9) A. That's correct.
(10) Q. Did you see DeVries' report, the hydrologist
(11) that Koch hired?
(12) A. Yes, I did look over his report earlier.
(13) Q. And did you see where he took velocity
(14) measurements 50 feet, 100 feet, 200 feet, all the way out
(15) to 600 feet inside that "Opening No. 1" where Dr.
(16) McCorquodale took his same measurements along Koch's
(17) Canal?
(18) A. As I recall, I did read that.
(19) Q. All right. And did you see where they had
(20) dropped off after 600 feet, the velocities he had taken,
(21) at the surface, not even at the root mat level, by some 60
(22) to 70 percent at 600 feet?
(23) A. I don't recall what the data indicated.
(24) Q. Do you have an opinion as to what velocity at
(25) the root mat level would be needed, whether it's feet per

## Page 173

(1) second, or whatever, to erode and transport the organic
(2) materials to support your theory?
(3) A. No, I do not.
(4) Q. You said there are a lot of nutria in this
(5) particular Section 16, because of the current or the
(6) changing vegetation out there. How do those numbers in
(7) this area compare to what was present in the '60s? And,
(8) relatively speaking, are there more out there now, less
(9) out there now?
(10) A. I think there are probably less now. The major
(11) — most of the nutria out there are concentrated on these
(12) thin floats with the pennywort and spikerush.
(13) Q. And how is that compared to, say the last fifty
(14) years, when did they decrease in number, was it in the
(15) '60s, '70s, '80s, '90s?
(16) A. I think the nutria population hit a peak about,
(17) probably about in the mid '60s.
(18) Q. All right.
(19) A. And then began a gradual decline after that.
(20) Q. All right. When you started to testify today,
(21) you said something that you particularly related to the
(22) Koch Canal, and that is by connecting to the Little Horn
(23) Bayou, the canals have formed a storage basin,
(24) particularly the Koch Canal, what do you mean by that?
(25) A. A storage basin or a reservoir for water. When

## Page 174

(1) water rushes in on a high tide, if it doesn't have —
(2) unless it has some place to store the water, it will come
(3) to a certain level and then stop.
(4) Q. Yes.
(5) A. But with this Koch Canal, it acts as a reservoir
(6) for incoming water; it will hold a lot of water because
(7) it's wide and deep and long. And then, when the water
(8) falls, there's a lot of water to be discharged. So this
(9) discharge of a lot of water, or the influx of a lot of
(10) water, means more water is able to flow through the Little
(11) Horn Bayou, and thereby scours it out deeper and enlarges
(12) the channel of it.
(13) Q. The Little Horn bayou?
(14) A. The Little Horn bayou, because of the reservoir
(15) provided by the Koch Canal.
(16) Q. Does that play any role in the areas of damage
(17) that we've talked about, that you feel are attributable to
(18) the opening in the Koch Canal?
(19) A. I think it probably does contribute to those
(20) openings and maybe helps enlarge those openings.
(21) Q. All right. Do you have an opinion as to the two
(22) openings in the suspicious area along the Koch Canal that
(23) you've identified, as to what caused them?
(24) A. No, I have no idea what caused them.
(25) Q. Do you have an opinion as to whether manmade

# CHARLES M. CAMP, INC.

*Registered Land Surveyor*
*Expert Witness In Court*

**PHONE 504-868-4417**

205 Raywood Dr.
Houma, LA 70360

September 12, 2000

Charles M. Camp
*President*

Mr. Wade Visconte
The Gray Law Firm
One Lakeshore Drive, Suite 110
P. O. Box 1467
Lake Charles, LA  70602-1467

RE:    Terrebonne Parish School Board vs.
Columbia Gulf Transmission Company and
Koch Gateway Pipeline Company
Section 16, T18S-R13E
Terrebonne Parish, LA

Dear Wade:

This is my written report along with listed exhibits for subject lawsuit.  The report also includes an aerial photograph flown 2/23/98 showing my restoration plans.

There were two (2) pipeline flotation canals dug across subject property with the rights-of-way as follows:

**EXHIBIT A** – Right-of-way from Terrebonne Parish School Board to United Gas Pipeline Company (now Koch Gateway Pipeline Company) recorded in the Terrebonne Parish Courthouse under COB 253, Folio 646, Entry No. 173617, dated December 18, 1957.

**EXHIBIT B** – Right-of-way from Terrebonne Parish School Board to Columbia Gulf Transmission Company recorded in Terrebonne Parish Courthouse under COB 403, Folio 313, Entry No. 284018, dated August 4, 1965.

## PLAN #1

I recommend for restoration that both flotation canals be bulkheaded where they enter and exit the subject property and along the banks of Little Horn Bayou where the bayou crosses the Koch Flotation Canal.  I additionally recommend that river sand be barged to the site and the two flotation canals be filled to the elevation of test site no. 1 +1.34' NAVD after consolidation.  The existing spoil banks will be used as retention levees and they will be improved where necessary.  After consolidation of dirt, spoil banks will be degraded to +1.34' NAVD.  The excess spoil will be placed along side the existing spoil banks to an elevation of +1.34' NAVD.  The fill area and spoil banks will be covered with a straw mat and native vegetation planted 5' o.c.

**Exhibit "B"**

MR. WADE VISCONTE
Page 2 of 5

The following is my estimate of cost to restore the Columbia Gulf Transmission Company flotation canal:

| | |
|---|---|
| Bulkhead 270 linear ft. @ $300 per ft. | $    81,000.00 |
| Fill material 228,307 cu. yds. @ $20 per cu. yd. | $ 4,566,140.00 |
| Install 33.67 acs. of straw mat | $   215,184.00 |
| Plant native vegetation on 33.67 acs. @ 5' o.c. @ $1.70 per plant | $    99,082.00 |
| Improve spoil banks when necessary and degrade after consolidation | $    20,000.00 |
| Small bulldozer to spread fill material | $    15,000.00 |
| Estimated total project cost | $ 4,996,406.00 |

The following is my estimate of cost to restore the Koch Gateway Pipeline Company's flotation canal:

| | |
|---|---|
| Bulkhead 652 linear ft. @ $300 per ft. | $   195,600.00 |
| Fill material 139,632 cu. yds. @ $20 per cu. yd. | $ 2,792,640.00 |
| Install 26.31 acs. of straw mat | $   168,164.00 |
| Plant native vegetation on 26.31 acs. @ 5' o.c. @ $1.70 per plant | $    77,422.00 |
| Improve spoil banks when necessary and degrade after consolidation | $    20,000.00 |
| Small bulldozer to spread fill material | $    15,000.00 |
| Estimated total project cost | $ 3,268,826.00 |

MR. WADE VISCONTE
Page 3 of 5


## PLAN #2

I recommend that the Columbia Gulf Transmission Company Flotation Canal be bulkheaded to the original right-of-way width of 100'. River sand will be barged to the site and used to fill between the bulkheads and existing spoil bank to test site no. 1 elevation of +1.34' NAVD. After consolidation, the existing spoil banks will be used as retention levees and they will be improved where necessary. After consolidation of dirt, spoil banks will be degraded to +1.34' NAVD. The excess spoil will be placed along side the existing spoil banks to an elevation of +1.34' NAVD. The fill area and spoil banks will be covered with a straw mat and native vegetation planted 5' o.c.

The following is my estimate of cost to restore the Columbia Gulf Transmission Company flotation canal:

| | |
|---|---|
| Bulkhead 11,263 linear ft. @ $300 per ft. | $ 3,378,900.00 |
| Fill material 8,906 cu. yds. @ $20 per cu. yd. | $ 178,120.00 |
| Install 2.11 acs. of straw mat | $ 13,488.00 |
| Plant native vegetation on 2.11 acs. @ 5' o.c. @ $1.70 per plant | $ 6,210.00 |
| Improve spoil banks when necessary and degrade after consolidation | $ 20,000.00 |
| Small bulldozer to spread fill material | $ 5,000.00 |
| Estimated total project cost | $ 3,601,718.00 |

I recommend that the Koch Gateway Pipeline Company's Flotation Canal be bulkheaded to the original right-of-way width of 40', excluding Little Horn Bayou. River sand will be barged to the site and used to fill between the bulkheads and existing spoil bank to test site no. 1 elevation of +1.34' NAVD. After consolidation, the existing spoil banks will be used as retention levees and they will be improved where necessary. After consolidation of dirt, spoil banks will be degraded to +1.34' NAVD. The excess spoil will be placed along side the existing spoil banks to an elevation of +1.34' NAVD. The fill area and spoil banks will be covered with a straw mat and native vegetation planted 5' o.c.

MR. WADE VISCONTE
Page 4 of 5

The following is my estimate of cost to restore the Koch Gateway Pipeline Company's flotation canal:

| | |
|---|---|
| Bulkhead 11,604 linear ft. @ $300 per ft. | $ 3,481,200.00 |
| Fill material 61,288 cu. yds. @ $20 per cu. yd. | $ 1,225,760.00 |
| Install 8.74 acs. of straw mat | $     55,844.00 |
| Plant native vegetation on 8.74 acs. @ 5' o.c. @ $1.70 per plant | $     25,720.00 |
| Improve spoil banks when necessary and degrade after consolidation | $     20,000.00 |
| Small bulldozer to spread fill material | $      5,000.00 |
| Estimated total project cost | $ 4,813,524.00 |

## PLAN #3

Dr. Robert Chabreck recommends filling the open pond areas and damaged marsh areas with peat. The peat would be barged to the job site and unloaded within reach of the cutter head of a small hydraulic dredge. The hydraulic dredge would pump the peat to the open pond areas to a depth of approximately eighteen (18")  inches and to the damaged marsh areas to a depth of approximately nine (9") inches. A straw retention fence will be built along the east, south and west property lines to retain the peat. The fences would remain in place after completion of the project. Breaks in the existing spoil banks along the two (2) pipeline flotation canals would be repaired with hauled in river sand. After consolidation covered with straw mat and planted with native vegetation 5' o.c. any surface damage caused by these operations would be repaired upon completion of fill in marsh and pond areas.

Total estimated cost is $10,045,060.00.

Plan #3 is a Preliminary Report, a more detailed report will follow.

MR. WADE VISCONTE
Page 5 of 5

If you have any questions, please contact me.

Sincerely,

CHARLES M. CAMP, INC.

Charles M. Camp, P.L.S.

CMC/dth
Enclosures

STATE OF LOUISIANA

PARISH OF TERREBONNE

BEFORE ME, the undersigned, Notary Public, on this day

personally came and appeared _____ who being

by me duly sworn, stated under oath that he was one of the sub-

scribing witnesses to the foregoing instrument and that the same

was signed by _____

_____,

and _____ in his presence and in the presence

of the other subscribing witness.

SWORN TO AND SUBSCRIBED BEFORE ME
THIS ____ DAY OF DECEMBER 1957.
_____
NOTARY PUBLIC

STATE OF LOUISIANA

PARISH OF TERREBONNE

ON THIS ____ day of _____, 1957, before

me appeared _____, to me personally known

who being by me duly sworn, did say that he is the _____

of RADIO DISPATCH INC. and that said instrument was sitned in

behalf of said Corporation by authority of its Board of Directors

and said _____ acknowledged said instrument to be the

free act and deed of said Corporation.

_____
NOTARY PUBLIC

FILED FOR RECORD

JAN -2 ____
_____
CLERK OF COURT
PARISH OF
TERREBONNE, LA.

**173647**

Terrebonne Parish School Board
Terrebonne Parish, Louisiana

Form 56023

173647

THE STATE OF LOUISIANA

Parish ____ of TERREBONNE                    KNOW ALL MEN BY THESE PRESENTS

That for and in consideration of ____ THREE HUNDRED SIXTY-SIX AND 60/100 ____

($ 366.60 ____) Dollars to the undersigned (herein styled Grantor, whether one or more),
paid, the receipt of which is hereby acknowledged, the said Grantor does hereby Grant
and Convey unto UNITED GAS PIPE LINE COMPANY (herein styled Grantee), its successors and
assigns a right of way and easement one hundred feet in width to construct, maintain,
operate, repair, replace, change the size of and remove pipe lines and appurtenances
thereto, including the right at its election to lay such pipe line or lines in open ditches
or canals not to exceed forty feet in width, which may be filled in or left open at the
option of Grantee, together with the right to construct, maintain, operate, repair, re-
place and remove, in connection with the conduct of its business, telegraph, telephone/

CQB
253/646

EXHIBIT
A

64.

and power lines and appurtenances thereto, including the necessary poles, guy wires and
anchors, over and through the following described lands situated in _____
Parish
TERREBONNE  COUNTY, State of LOUISIANA _____, to-wit:

Section 16, Township 18 South, Range 13 East, Southeastern Land District of
Louisiana, West of the Mississippi River, Terrebonne Parish, Louisiana.

more fully described in deed _____ from ____ UNITED STATES OF AMERICA _____
to _____ recorded in Volume _____, Page _____,
Deed Records of said County, to which reference is here made for further description.

The said Grantee will not give its permission for the canal dug hereunder to
be used by the public.

TO HAVE AND TO HOLD unto Grantee, its successors and assigns, so long as the
rights and easements herein granted, or any of them, shall be used by, or useful to,
Grantee for the purposes herein granted, with ingress to and egress from the premises,
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, for the
purposes of construction, inspecting, repairing, maintaining, and replacing the property
of Grantee herein described, and the removal of same at will, in whole or in part.

The said Grantor is to fully use and enjoy the said premises, except for the
purposes herein granted to the said Grantee and provided the said Grantor shall not con-
struct nor permit to be constructed any house, structures or obstructions, on or over,
or that will interfere with the maintenance or operation of, any pipe line or appurtenances
constructed hereunder, and will not change the grade over such pipe line. Grantee hereby
agrees to pay any damages which may arise to growing crops, fences or timber as a result
of its operations hereunder; said damages, if not mutually agreed upon, to be ascertained
and determined by three disinterested persons, one thereof to be appointed by the said
Grantor, one by the said Grantee, and the third by the two so appointed as aforesaid,
and the written award of such three persons shall be final and conclusive. Should more
than one pipe line be laid under this grant at any time, the sum of One Dollar ($1.00)
per lineal rod for each additional line shall be paid, besides the damages above provided
for.

It is hereby understood that the party securing this grant in behalf of Grantee
is without authority to make any covenant or agreement not herein expressed.

WITNESS the execution hereof on this the 11th day of December , A.D. 1957
Signed and delivered in the presence
of the undersigned witnesses:

_____          TERREBONNE PARISH SCHOOL BOARD
(Chas. C. LeBlanc)               By _____
                                        PRESIDENT

THE STATE OF LOUISIANA          )
PARISH OF   TERREBONNE          )

Before me, the undersigned authority, on this day appeared   Charles A.
Le Blanc                                                    (Insert Name of Sub-
scribing Witness)
who being duly sworn, deposed and said:

That he was one of the subscribing witnesses to the above and foregoing instrument;
that said instrument was executed by the grantor therein,   Charles C. Collins, Jr.,
President, Terrebonne Parish School Board       (Insert Name of Grantor or Grantors)
in his presence and in the presence of the other subscribing witness on the date thereof.

_____
(Signature of Subscribing Witness)
Sworn to and subscribed before me this  11th day of   December  , A.D. 195 7

_____
NOTARY PUBLIC in and for
AND EX OFFICIO _____, _____ Parish, Louisiana
PARISH OF TERREBONNE, LA.

CERTIFIED RESOLUTION
OF
THE TERREBONNE PARISH SCHOOL BOARD

On the motion of Mr. James W. Ledet, seconded by Mr. Stanley P.
Walther, unanimously carried, the Board granted and authorised the
President to sign a right of way agreement to the United Gas Pipe
Line Company across Section 16, Township 18 South, Range 13 East,
for the sum of $364.60, plus an additional consideration of



$1,444.40 for any damages occasioned in the laying of a pipe line in said right of way.

CERTIFICATE

I hereby certify that the above and foregoing is a true and correct copy of a Resolution adopted at a meeting of the TERREBONNE PARISH SCHOOL BOARD duly called and held at its office December 17, 1957, as same appears of record in the minute book of the Board.

WITNESS my signature as Secretary of the Terrebonne Parish School Board this 18th day of December, 1957.

_____
SECRETARY

FILED FOR RECORD
1958 JAN 2 AM 9:29
CLERK OF COURT
PARISH OF
TERREBONNE, LA.

RELEASE OF OIL AND GAS LEASE

173650                    173650

KNOW ALL MEN BY THESE PRESENTS:

That UNION PRODUCING COMPANY, a corporation, organized under the laws of the State of Delaware and represented herein by its duly authorized Executive Vice President, does hereby release, remise, and relinquish all of its right, title and interest in and to that certain oil, gas and mineral lease dated _____, _____, executed by _____

as lessors, to _____ as lessee, of record in _____ Ry No. 11711 Vol. 193, Page ___ of the _____ records of Terrebonne Parish, State of Louisiana, and all co-lessors' agreements relating thereto and ratifications thereof, if any, in so far and only in so far as said lease and other related instruments, if any, cover and include the following described property situated in said county and state, to-wit:

a certain tract of land comprised in Sections _____ E-19-2, Terrebonne Parish, Louisiana, fronting on the left descending bank of Bayou Terrebonne by ____ of curve, and bounded now or formerly, as follows: above by property of the Henry and below by property of Mercers Belanger.

WITNESS the hand and seal of said corporation this 29 day of November, 19 57.

WITNESSES:                           UNION PRODUCING COMPANY

_____              By _____
                                        Executive Vice President
_____
C.O. Blah                            ATTEST:

COB 403/313

284018

CERTIFIED RESOLUTION OF THE TERREBONNE PARISH SCHOOL BOARD

On the motion of Mr. Charles A. Badeaux, seconded by Mr. Huey A. Authement, unanimously carried, the Board authorized the President to sign a right of way agreement with Columbia Gulf Transmission Company for a pipeline across Section 16, Township 18 South, Range 13 East.

C E R T I F I C A T E

I hereby certify that the above and foregoing is a true and correct copy of a resolution adopted by the Terrebonne Parish School Board at a meeting held on July 26, 1965, as same appears of record in the minute book of the Board.

WITNESS my signature as Secretary of the Terrebonne Parish School Board this 4th day of August, 1965.

CHAS. A. LE BLANC, Secretary

EXHIBIT
B

R/W NO. _____
DRAFT NO. 8490

# RIGHT OF WAY AND SERVITUDE AGREEMENT    284018

STATE OF LOUISIANA  }
PARISH OF Terrebonne }                 KNOW ALL MEN BY THESE PRESENTS:

That for and in consideration of Six Hundred Eighty-five and 20/100-------------------
($685.20_____) Dollars to the undersigned (herein styled Grantors, whether one or more), in hand paid, the receipt of which is hereby acknowledged, the said Grantors do hereby grant, bargain, sell, convey and warrant unto COLUMBIA GULF TRANSMISSION COMPANY (a Natural Gas Company under the Act of Congress of June 21, 1938, 15 U.S.C.A. 717), a Delaware Corporation (herein styled Grantee), its successors and assigns, a servitude, right of way and easement to construct, lay, maintain, operate, alter, repair, remove, change the size of, and replace a pipe line and appurtenances thereto, including but not limited to fittings, tie-overs, valves, corrosion control equipment and other apparatus above or below ground, for the transportation of oil gas, petroleum products or any other liquids, gases, or substances which can be transported through pipe lines, the Grantee to have the right to select, change, or alter the route of such pipe line under, upon, over and through lands which the undersigned owns or in which the undersigned has an interest, situated in the Parish of Terrebonne State of Louisiana, described as follows:

Section 16, Township 18 South, Range 13 East.

It is understood and agreed that in the event Grantor, the State of Louisiana, or other public body, should decide to make some work of public improvement within the area of the right-of-way herein granted, the Grantee shall lower the pipe line to whatever depth is required to construct and complete said work of public improvement, the entire cost of lowering the pipe line to be borne by the Grantee.

The general public may have full ingress and egress over, across and through said right-of-way situated in said Section 16.

more fully described in deed from United States of America _____ to _____ recorded in Volume _____, Page _____ Deed Records of said Parish and State, to which reference is here made. It is the intention of the parties that the right of way and easement herein granted shall also extend across the lands of Grantors contiguous to the lands particularly described above along the route selected by Grantee

TO HAVE AND TO HOLD unto Grantee, its successors and assigns with warranty and with ingress to and egress from the premises, for the purposes herein granted. The rights herein granted may be assigned in whole or in part

The said Grantors are to fully use and enjoy the said premises, except for the purposes granted to the said Grantee and provided the said Grantors shall not construct nor permit to be constructed any house, structures or obstructions and shall not plant nor permit to be planted trees on or over, or that will interfere with the construction, maintenance or operation of any pipe line or appurtenances constructed hereunder, and will not change the grade over such pipe line.

...of way granted herein shall be 100 feet wide, except however, Grantee ...allowed to use for extra working space a width of 200 ft. during construction. ...rstood and agreed that Grantee shall not be required to backfill the open ...itch excavated during construction.

...hereby understood that the Grantee, its successors and assigns, shall not be obligated to pay Grantors or ...sequent owner of the hereinabove described premises, any damages resulting from the construction of the first ...line authorized hereunder, such damages having been anticipated and paid in advance at the time of execution of ...instrument.

...All payments hereunder to Grantors may be made by check or draft of Grantee direct or by mail to _____ _____ at _____ ...appointed agent and is authorized to receive and receipt for the same. No change of ownership shall be ...Grantee until notice thereof in writing is given to Grantee.

...contract contains all of the representations, promises, terms and provisions of the agreements made by the ...e, and it is hereby understood that the party securing this grant in behalf of Grantee is without authority ...covenant or agreement not herein expressed.

WITNESS WHEREOF, the Grantors have executed this conveyance this 26 day of July

WITNESSES
_____
_____

TERREBONNE PARISH SCHOOL BOARD
By _____
President

STATE OF _____

PARISH OR COUNTY OF _____

On this _____ day of _____, 19___, before me personally

appeared _____

_____, to me known to be the person

described in and who executed the foregoing instrument, and acknowledged

that _____ executed the same

_____ free act and deed.

_____
Notary Public

## PROOF BY WITNESS

STATE OF LOUISIANA,
PARISH OF_____

BEFORE ME, the undersigned authority, this day personally appeared_____

personally known to be the identical person whose name is subscribed to the foregoing instrument as an attesting witness  who first being

sworn, on his oath, says: That he subscribed his name to the foregoing instrument as a witness, and that he knows_____

the Grantor_____named in said instrument, to be the identical person_____described therein, and who executed the same, and saw_____

_____sign the same as_____voluntary act and deed, and that he, the said_____

_____subscribed his name to the same at the same time as an attesting witness.

Sworn to and subscribed before me, this_____

day of_____19___

_____

Notary Public in and for_____Parish.

LINE NO.

RIGHT OF WAY AND SERVITUDE AGREEMENT

FROM

TO

COLUMBIA GULF TRANSMISSION COMPANY

STATE OF LOUISIANA

PARISH OF_____

ss.

This instrument was filed for record on the

day of_____(19___, at_____o'clock

_____M. and duly recorded in Book_____

page_____of the records of this office.

_____
County Clerk

By:_____
Deputy Clerk

NUMBER

## CORPORATE ACKNOWLEDGMENT

STATE OF LOUISIANA,
PARISH OF_____Terrebonne_____

BEFORE ME, the undersigned, a Notary Public in and for said____Parish_____and State, on this the____26th

of____July____19 65  personally came and appeared____Charles C. Collins, Jr.

the presence of me, said authority, and of the undersigned competent witnesses, declared and acknowledged that he is the identical party

executed the foregoing instrument in writing; that his signature thereto is his own true and genuine signature; and that he executed said

ment in his capacity as____President____of____Terrebonne Parish School Board

of his own free will and accord and as the act and deed of____in Terrebonne Parish School Board____for the pur

considerations therein set forth and expressed.

THUS DONE AND PASSED on the day and date hereinabove written in the presence of the undersigned competent witnesses

subscribed their names, together with said appearer and me, said Notary, after reading the whole.

WITNESSES:

_____
Chas. C. LeBlanc

_____
Charles C. Collins, Jr., President



TERREBONNE PARISH, LOUISIANA

Sta.1409123.5 ▲ 04°/0.8′Lt.
X = 2,061,484.59
Y = 303,681.98

CONTINENTAL
LAND & FUR CO., INC.
15

Sta.145320.02
X = 2,065,730.57
Y = 302,565.46

FLOW

16

PROPOSED 30″LIRETTE LATERAL

17

S 75°15.4′E-4,390.52
S 71°04.6′E-1,262.75

STA.1396+66.75
X=2,060,290.09
Y=304,089.85

CONTINENTAL
LAND & FUR CO., INC.

22

FILED FOR RECORD
1965 AUG-5 AM 9:46
CLERK OF COURT
PARISH OF
TERREBONNE, LA.

21

20

LL-64-37
LOUISIANA SCHOOL LAND
342.6 RODS

| COLUMBIA GULF TRANSMISSION COMPANY | | |
|---|---|---|
| PROPOSED 30″ LIRETTE LATERAL CROSSING PROPERTY OF LOUISIANA SCHOOL LAND TERREBONNE PARISH, LOUISIANA | | |
| DATE 2-10-1964 | | SCALE 1″=2000′ |
| DRAWN BY C.M.H. | | APPROVED |
| CHECKED BY | | BOOK NO. |
| APPROVED V. Saint | | |