

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED JAN 10 2001
LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TERREBONNE PARISH SCHOOL BOARD | § | CIVIL ACTION NO. 00-0319 |
| VERSUS | § | SECTION:   B |
| COLUMBIA GULF TRANSMISSION COMPANY, KOCH GATEWAY PIPELINE COMPANY | § § | MAGISTRATE: 5 |
| FILED:_____ | § | _____ DEPUTY CLERK |

### SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE TESTIMONY OF KOCH GATEWAY PIPELINE COMPANY'S EXPERT, RICHARD DEVRIES

**MAY IT PLEASE THE COURT:**

Terrebonne Parish School Board ("TPSB"), plaintiff in this case, files this supplemental memorandum in support of TPSB's Motion in Limine to Exclude Testimony of Koch Gateway Pipeline Company's ("Koch") Expert, Richard Devries.

The facts and applicable law were stated in TPSB's original memorandum and are adopted by reference herein.

### Analysis of Testimony of Richard Devries

Richard Devries is an engineer who was hired as a hydrologist by Koch to



measure tidal velocities flowing from Koch's pipeline canal into the TPSB's marsh adjacent to a break in Koch's pipeline canal.[1] TPSB submits that Devries' testimony must be excluded in its entirety because his investigation and results do not meet the rigorous standards of scientific inquiry established by **Daubert** and **Kumho**.

Whether evidence assists the trier of fact is essentially a relevance inquiry. **Daubert**, 509 U.S. at 589-93, 113 S.Ct. at 2795-96. In order to be "helpful" under Rule 702, the evidence must possess validity when applied to the pertinent factual inquiry. **Posado**, 57 F.3d at 432, 433. The purpose for which the testimony is proffered must be evaluated. **Posado**, 57 F.3d at 432, 433 & n. 4. The testimony of Devries is not relevant to this case because Devries used an incorrect heavier "clay-ee" soil type to reach his conclusions. Devries' error as to the proper soil type is not surprising since Devries acknowledged he is not a freshwater flotant marsh expert and his only connection with freshwater marshes has been in the last year in the St. Martin case, this case, and another TPSB marsh damage case pending at the state court level.[2] Despite this fact, Devries' report clearly indicates that he did not bother to take soil samples to verify his conclusions that the marsh is made up of "clay-ee". Devries explained that he did not take soil samples because he didn't need to as, based on his experience, he knew the banks were made of heavier materials dredged out of the marsh and that it "just appeared to be clay in that bank."[3] Devries also testified that it didn't make a difference if silt and

---

[1] A copy of the CV of Richard Devries is attached with the TPSB's Motion in Limine as Exhibit "F."

[2] See pg. 36, lines 1-25, pg. 37, lines 1-16, of deposition of Richard Devries attached to this supplemental memorandum as Exhibit "A".

[3] See pg. 44, lines 5-25, pgs. 45, lines 1-18, of deposition of Richard Devries attached to this supplemental memorandum as Exhibit "A".

loam were present in the spoil banks because "hydraulics are hydraulics whether it's in the marsh or in the desert in Nevada."[4] As such, Devries' report and opinion do not meet the scientific standards established by **Daubert** and his report and opinion are not relevant as they apply to a soil that he has not verified as the only soil existing in the marsh root mat. Further, he did not eliminate the possibility that root mat is devoid of "clay-ee" material, but rather, is composed of lighter peat and silt particles that are subject to erosion at lower velocities. Finally, as discussed in depth in TPSB's prior memorandum, Devries has acknowledged that he is not licensed as an engineer in Louisiana.[5] As such, his opinions are the unauthorized practice of engineering in Louisiana and must be excluded as the opinions of a lay person. Fed. R. Civ. P., Rule 704 provides that an *expert witness* may testify to an "ultimate issue to be decided by the trier of fact." However, a *fact witness* is limited to testifying to opinions or inferences that are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Civ. P., Rule 701. In order for Mr. Devries's trial or deposition testimony to be admissible in evidence, he must qualify as an expert, but he cannot qualify as an expert because he does not meet the licensing requirements established by Louisiana law that apply in this diversity action. Consequently, his opinion on the ultimate issue of what has caused damage to TPSB's property is inadmissible pursuant to F.R.E. 702 as his testimony is based on "scientific, technical, or other specialized knowledge".

---

[4] See pg. 46, lines 1-14, of deposition of Richard Devries attached to this supplemental memorandum as Exhibit "A".

[5] See pg. 58, line 25, pg. 59, lines 1-5, of deposition of Richard Devries attached to this supplemental memorandum as Exhibit "A".

Respectfully submitted,

ST. MARTIN & WILLIAMS (APLC)

_____
MICHAEL X. ST. MARTIN #12365
JOSEPH G. JEVIC, III          #23145
Post Office Box 2017
Houma, Louisiana 70361-2017
(504) 876-3891      Telephone
(504) 851-2219      Facsimile

A. J. GRAY, III              #6253
WADE T. VISCONTE             #24734
THE GRAY LAW FIRM (APLC)
Post Office Box 1467
Lake Charles, LA 70602-1467
(337) 494-0694      Telephone
(337) 494-0697      Facsimile

**Attorneys for Terrebonne Parish School Board**

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing supplemental memorandum has been mailed to all counsel of record via facsimile and United States mail, postage prepaid on this _____ day of ___January____, 2001.

_____
JOSEPH G. JEVIC, III

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3                    NEW ORLEANS DIVISION
 4   TERREBONNE PARISH
     SCHOOL BOARD
 5
     VERSUS                              CA NO. 00-0319
 6
     COLUMBIA GULF TRANSMISSION              SECTION B
 7   COMPANY KOCH GATEWAY                    MAGISTRATE 5
     PIPELINE COMPANY
 8
 9         DEPOSITION OF RICHARD N. DeVRIES, Ph.D.,
10   10624 SOUTHEASTERN AVENUE, SUITE A401,
11   HENDERSON, NEVADA, 89052, TAKEN AT THE LAW
12   OFFICES OF SIMONE, PERAGINE, SMITH & REDFEARN,
13   1100 POYDRAS STREET, 30TH FLOOR, NEW ORLEANS,
14   LOUISIANA 70163, TAKEN ON DECEMBER 8, 2000,
15   BEGINNING AT 1:30 P.M.
16   APPEARANCES:
17        THE GRAY LAW FIRM
          (BY:  A. JACK GRAY)
18        (BY:  WADE T. VISCONTE)
          ONE LAKESHORE DRIVE, SUITE 900
19        LAKE CHARLES, LOUSIANA 70602-1467
20              ATTORNEYS FOR TERREBONNE PARISH
                              SCHOOL
21
          YOUNG, RICHAUD & MYERS
22        (BY:  ROBERT J. YOUNG,
          1100 POYDRAS STREET
23        SUITE 1515
          NEW ORLEANS, LOUISIANA
24
                ATTORNEY FOR KOCH GATEWAY PIPELINE
25                            COMPANY
```

COPY

EXHIBIT A

Page 34:

```
 1  through here.
 2      Q.   So what conclusions did you draw
 3  from these?
 4      A.   The conclusions I draw was that I
 5  believe the plaintiffs are mistaken in what they
 6  are claiming out there.
 7      Q.   That is?
 8      A.   Especially as to the flow of
 9  water.
10      Q.   What else have you done on this
11  project?
12      A.   I was asked to look into hydrology
13  and hydraulics.
14      Q.   Have you testified to everything
15  you did?
16      A.   Out in the field, but I haven't
17  testified to my opinions.
18      Q.   Did you review any other data?
19      A.   Yes.
20      Q.   What data did you review?
21      A.   I had Penland's report, I had
22  Chabreck's report, I had McCorquodale's report,
23  Camp's report.  I looked at Holloway's
24  photographs.  I recently just looked at the
25  reports from the expert of Columbia.  And then I
```

Page 35:

```
 1      Q.   Did you even consider the data?
 2      A.   I looked at the data, and it's
 3  just stage data.
 4      Q.   The physical work you did out here
 5  was on September 28th and 29th?
 6      A.   Basically, yes.
 7      Q.   The data that you used in forming
 8  your opinion was the data you gathered on that
 9  date?
10      A.   Yes.
11      Q.   Plus your review of these
12  reference materials?
13      A.   That's correct.
14      Q.   Anything else?
15      A.   Well, I taught hydraulics and
16  hydrology for 25 years.  I have a little
17  knowledge about it.
18      Q.   What is it that your opinion is?
19      A.   What?
20      Q.   What is your opinion?
21      A.   Well, that there is no major flow
22  or flushing flow or flow that goes in the swamp
23  and tears it up and brings it out.  That is just
24  not happening out there.
25      Q.   It's not happening?
```

Page 34 (cont.):

```
 1  had all those and --
 2      Q.   Recently, you said you looked at
 3  the report from Columbia?
 4      A.   Yes.
 5      Q.   Was that before or after you
 6  rendered your report?
 7      A.   After.
 8      Q.   It formed a part of the report
 9  that you rendered November 14, 2000?
10      A.   No, they were not.
11      Q.   I want to know as of November 14,
12  2000, what it was that you had done or reviewed?
13      A.   I listed my references here, the
14  reference page.
15      Q.   Did you study any of these water
16  elevations that Mr. Holloway testified to?
17      A.   I don't know which elevations you
18  are referring to.
19      Q.   Well, he testified that he
20  compared the aerial photographs and made some
21  sort of correlation to the water at a gauge on
22  the Atchafalaya River at Morgan City that
23  corresponded to the date of some aerial
24  photographs?
25      A.   I did not correlate those.
```

Page 36:

```
 1      A.   No.
 2      Q.   We have the statement of opinions
 3  here?
 4      A.   Yes.
 5      Q.   You state in Number 1, Koch
 6  Gateway and Columbia Gulf Pipeline Canal that
 7  cross the subject property do not pose a
 8  hydraulic or hydrologic problem for erosion of
 9  the marsh?
10      A.   That's correct.
11      Q.   What does that mean?
12      A.   There is not enough velocity in
13  the flows that are out there to do anything to
14  that mat.
15      Q.   What do you know about mats?
16      A.   Not much, but I can see what's out
17  there.
18      Q.   You say that.  Wait a minute.
19  What sort of studies did you make of the mats?
20      A.   Just visual studies out there in
21  the field.
22      Q.   As I remember, I've taken your
23  deposition before?
24      A.   That's right.
25      Q.   This was your first experience
```

## Page 37

1  with marsh; is it not?
2  A. This one is now my third.
3  Q. It's all within the year 2000; is
4  it not?
5  A. The year 2000.
6  Q. It's all in Terrebonne Parish?
7  A. Yes.
8  Q. So that although you have been
9  doing that for 40 years, it's only within a few
10 months of your retirement that you ever dealt
11 with a marsh?
12 A. That's correct.
13 Q. But even so, you formed the
14 opinion that there wasn't sufficient hydrologic
15 problem for erosion of the marsh?
16 A. That's right.
17 Q. Number 2, the two canals and the
18 marsh are hydraulically connected to the
19 Atchafalaya River system and the Gulf
20 Intercoastal Waterway through the Little Horn
21 Bayou drainage system. How did those
22 measurements tell you that?
23 A. How did they tell me that?
24 Q. Yes. You said that the
25 measurement told you it was connected by the

## Page 39

1  through the Little Horn?
2  BY MR. GRAY:
3  Q. That's right. We are talking
4  about opinion Number 2. You said this is one of
5  them. What are the others?
6  A. Here's the Bayou Little Horn and
7  here's our site. The mouth of the Little Horn
8  Bayou is at the AVOCA Island Cutoff Bayou
9  drainage. It's just obvious that it's
10 connected.
11 Q. You said there was some others.
12 What others?
13 MR. YOUNG:
14 What else did you look at? Speak
15 up so he can hear, Jack.
16 THE WITNESS:
17 The Morgan City Southwest USGS
18 Quandrangle sheet printed in 1994.
19 BY MR. GRAY:
20 Q. That shows the same property and
21 the same conclusion?
22 A. Same property Section 16 in the
23 lower right-hand corner, Little Horn Bayou close
24 up to the AVOCA Island Cutoff.
25 Q. Where is the Gulf Intracoastal

## Page 38

1  tide?
2  A. Yes.
3  Q. How did the measurements tell you
4  it was connected to the Atchafalaya River and
5  all that?
6  A. The aerial photographs and the
7  maps that I looked at.
8  Q. Were they referenced in your
9  opinion?
10 A. I want to know what maps and
11 aerial photographs they were. This is the
12 aerial photo map for Bayou Black.
13 Q. Does it have a date or something?
14 A. KCMXCIX.
15 Q. Who is it that prepared this map?
16 A. Standard Signs Technology Service
17 Mapping Service, copyright of Glen Schurr.
18 copyrighted. Can't be used without somebody's
19 permission.
20 Q. This is the map that tells you
21 that?
22 A. That's one of them.
23 MR. BLUM:
24 By that, you mean Section 16 is
25 hydraulically connected to the Atchafalaya

## Page 40

1  Waterway?
2  A. Gulf Coastal Waterway is off of
3  this map.
4  Q. It's not shown?
5  A. Not on this particular one.
6  Q. Is it shown on this one?
7  A. (Indicating.)
8  Q. So you think this is the
9  Intracoastal Waterway, and it's connected over
10 here to this property?
11 A. What?
12 Q. It's connected to the property
13 here?
14 A. It's connected through this
15 system. Intracoastal Canal and this water is
16 one.
17 Q. How far away is the Intracoastal
18 Canal?
19 A. It's near Morgan City.
20 Q. How far away is that?
21 A. I don't know.
22 Q. What's the significance of your
23 opinion Number 2, that the two canals and the
24 marsh are hydraulically connected to the
25 Atchafalaya Rivery system and the Gulf

41

```
 1  Intracoastal Waterway through the Little Horn
 2  Bayou drainage system? What is the significance
 3  of that?
 4       A.   The significance of that is in
 5  relation to what Dr. Holloway said, as they
 6  raise the Atchafalaya, the river, that reversed
 7  the flow. When the river is high, the flow
 8  flows from west to east instead of from east to
 9  west. That's very significant.
10       Q.   Now, Number 3 says the property is
11  subject to the ebb and flow of the coastal tide,
12  particularly at low flows of the Atchafalaya
13  River?
14       A.   Yes.
15       Q.   Now, I understand about the ebb
16  and flow because you said you measured that part
17  on --
18       A.   On the 29th.
19       Q.   -- the 29th or 28th, and you
20  formed that opinion. This situation with regard
21  to the low flows of Atchafalaya River, how did
22  you form that opinion?
23       A.   Well, for water to flow from west
24  to east, you have to have an energy gradient.
25  That tells me if the river is high and over here
```

42

```
 1  where it's sea level, if the river is at six
 2  foot above sea level, we have a gradient from
 3  that river over to here.
 4       Q.   I'm dealing with your opinion here
 5  that the property is subject to ebb and flow of
 6  the coastal tide, particularly at low flows of
 7  Atchafalaya River?
 8       A.   Yes.
 9       Q.   What is it about the low flows of
10  the Atchafalaya River?
11       A.   Because the Atchafalaya River is
12  basically at sea level, so the energy level is
13  only the tidal influence.
14       Q.   So is it your opinion that if the
15  Atchafalaya is not at low flow, that the
16  property is not subject to the ebb and flow of
17  the coastal tide?
18       A.   It's still subject to it, but it's
19  also subject to the energy coming from the
20  river.
21       Q.   What is the relationship between
22  the two?
23       A.   Well, the river may dominate the
24  tide and keep it going to the east.
25       Q.   You didn't study that, did you?
```

43

```
 1       A.   No. Just knowing hydraulics, that
 2  has to be true.
 3       Q.   You didn't attempt to quantify it
 4  in this case; you know it to be true?
 5       A.   What?
 6       Q.   You did not attempt to quantify
 7  that fact in this case?
 8       A.   No.
 9       Q.   Number 4, Flow velocity
10  measurements into and out of Section 16 show
11  that the velocities are less than critical
12  erodible velocities. You are saying a lot
13  there, aren't you?
14       A.   Yes.
15       Q.   What is a critical erodible
16  velocity?
17       A.   In McCorquodale's report, he said
18  up here at the northeast corner of Section 16 at
19  the out there, there was sufficient velocity to
20  erode the bank of the canal. That was one of
21  his findings, so I took a look at that. I went
22  out into the field and that bank was mucked up
23  from the bottom of the canal before they put the
24  pipeline in. It's a lot different material.
25  It's more of a clay material. And in his
```

44

```
 1  report, he said only eroded the bank, so I
 2  wanted to look at that. The material I saw out
 3  there, the two feet per second he measured is
 4  not erodible velocity at that bank.
 5       Q.   The material you saw?
 6       A.   The material I saw.
 7       Q.   Now, do you know something about
 8  the materials?
 9       A.   Just that it appeared to be clay
10  in that bank.
11       Q.   Does your expertise deal with
12  these critical erodible velocities?
13       A.   Well, yes.
14       Q.   Is there some sort of standard?
15       A.   Yes.
16       Q.   Is it somewhat published material
17  that we know what a critical erodible velocity
18  is?
19       A.   Yes.
20       Q   This flow of the critical erodible
21  velocity, does it relate to the type of
22  materials?
23       A.   Yes.
24       Q.   Is it some sort of published
25  material?
```

45

```
 1    A.    Yes.
 2    Q.    Where can I find the published
 3 material?
 4    A.    In Ven Te Chow's book,
 5 Open-Channel Hydraulics.
 6    Q.    That book will tell us what the
 7 velocity you need to erode whatever it is on
 8 this bank?
 9    A.    Yes.
10    Q.    What is it that you think is on
11 the bank of that canal?
12    A.    What?
13    Q.    What do you think is on the bank
14 of that canal?
15    A.    It's a clay-ee material.
16    Q.    A clay material?
17    A.    It's clay-ee.
18    Q.    Clay-ee?
19    A.    Other things there, too.
20    Q.    What are there?
21    A.    There some silt and loam.
22    Q.    Silt and loam?
23    A.    Yes.
24    Q.    Are there different critical
25 erodible velocities for silt and loam?
```

46

```
 1    A.    If it's all silt and loam.
 2    Q.    If it's a mixture?
 3    A.    You have to use experience if it's
 4 a mixture.
 5    Q.    You don't have experience with
 6 silt, loam, and clay?
 7    A.    Sure, I do. I have designed a lot
 8 of channels.
 9    Q.    Not in marsh?
10    A.    Not in the marsh, no. Hydraulics
11 are hydraulics whether it's in the marsh or in
12 the desert in Nevada.
13    Q.    You think so?
14    A.    Yes.
15    Q.    I know you said that to me before.
16    A.    Yes.
17    Q.    I'm familiar with you saying that.
18 Number 5 you say, the remedial action proposed
19 by Camp, et al, will not solve the perceived
20 problem. Let's start off what is a remedial
21 action?
22    A.    He wanted to fill the canals.
23    Q.    Why will filling the canals not
24 solve the perceived problem?
25    A.    I don't see the perceived problem
```

47

```
 1 as being a problem. Other than that, you only
 2 look at one piece of that section. They are
 3 claiming the whole section is damaged. So if
 4 you fill that section, there is other avenues
 5 for water to enter and leave that section.
 6    Q.    But at less than critical erodible
 7 velocity?
 8    A.    I don't know. I didn't measure
 9 any other parts of the section. I was only
10 interested in the Koch Canal.
11    Q.    Adjacent property have a larger
12 influence on the ebb and flow of water in
13 Section 16 than do the two pipeline canals.
14 Now, what are you talking about?
15    A.    I'm talking about if you go around
16 the section, there is four miles around. The
17 Koch Canal is only across a mile. You have got
18 four boundaries, four miles of boundaries that
19 are open to the whims of nature.
20    Q.    Did you take any measurements or
21 velocities in any of those four miles?
22    A.    No.
23    Q.    You didn't take any at all of any
24 of the boundaries?
25    A.    Just at Little Horn boundary.
```

48

```
 1    Q.    In the Koch Canal?
 2    A.    Yes. In the Little Horn Bayou,
 3 yes.
 4    Q.    When you say that the adjacent
 5 property has a larger influence on the ebb and
 6 flow of water than do the two, what is that
 7 based on?
 8    A.    Just looking at the maps and
 9 looking out there and riding around in the boat
10 out there, you have got four miles of boundary
11 as opposed to one mile of Koch Canal.
12    Q.    Koch Canal is one mile?
13    A.    What?
14    Q.    The Koch Canal is one mile?
15    A.    Roughly.
16    Q.    The Columbia Canal is one mile?
17    A.    Roughly.
18    Q.    They got two banks on each one?
19    A.    Two banks on each side.
20    Q.    Is that four miles?
21    A.    No.
22    Q.    That's not four miles?
23    A.    Not to me. That's just two banks
24 of a canal.
25    Q.    One bank is a mile long. Another
```

57

1   A.   No.
2   Q.   The only times you were there
3   measuring?
4   A.   Yes.
5   Q.   I want to make sure I got copies
6   of this.
7   MR. YOUNG:
8        It's attached to McCorquodale's
9   deposition as well.
10  MR. GRAY:
11       I need it attached to this man's
12  deposition as well.
13  MR. BLUM
14       Why don't we attach it to the
15  deposition so we all have it?
16  BY MR. GRAY:
17  Q.   We know what your expertise is?
18  A.   Yes.
19  Q.   We know that you have 40 years as
20  a hydrologist; is that a good word?
21  A.   What's that?
22  Q.   Did I call you a hydrologist?
23  A.   I'm really a civil engineer with a
24  specialty in hydrology.
25  Q.   You have 40 years experience?

58

1   you were not a registered engineer in the State
2   of Louisiana. Are you licensed to practice
3   engineering in the State of Louisiana at this
4   time?
5   A.   No, sir.
6   Q.   The next thing is the 28th and the
7   29th of September were the dates that you took
8   measurements. However, your report indicated
9   that you had been on the property some other
10  times?
11  A.   Yes, sir.
12  Q.   What were you doing on the
13  property on those other times?
14  A.   The first time was an orientation.
15  I accompanied Dr. Holloway and scoped out this
16  area to make sure that we knew, in fact, that
17  the water was flowing from east to west instead
18  of from west to east in the overall picture.
19  Q.   That's what you did on those other
20  days?
21  A.   What?
22  Q.   That's what you did on those other
23  days?
24  A.   Yes. And then I flew it.
25  Q.   What type of equipment did you fly

59

1   A.   Yes.
2   Q.   Now retired?
3   A.   Now retired.
4   Q.   We have gone over the methodology
5   you used and the shiny new meter that you used,
6   and the reports and opinions that you formed?
7   A.   Yes.
8   Q.   Do you have any other opinions?
9   A.   No. I've stated my opinions.
10  Q.   That's it. Is there any other
11  basis for your opinions other than set forth in
12  this report?
13  A.   I looked pretty strongly at
14  McCorquodale's report.
15  Q.   Favorably?
16  A.   No.
17  Q.   How is it that his report formed
18  your opinions, if you didn't look at it
19  favorably?
20  A.   It reinforced my opinions. It
21  says that I think his opinions are somewhat
22  narrow.
23       (Off the record.)
24  BY MR. GRAY:
25  Q.   When I spoke with you previously,

60

1   over?
2   A.   Airplane. I don't know.
3   Q.   Was it a chartered plane that you
4   got --
5   A.   Yes, chartered out of Houma.
6   Q.   -- for the purpose of flying over
7   this property?
8   A.   Yes.
9   Q.   Was it a float plane?
10  A.   No.
11  Q.   Fixed wing? Was it a helicopter?
12  A.   No.
13  Q.   Regular airplane. Did you do the
14  measurements of the salinity?
15  A.   Took one measurement.
16  Q.   What did you determine?
17  A.   It's in my report. I think it was
18  200 parts per million.
19  Q.   Is 200 parts per million
20  considered fresh or salt?
21  A.   Fresh.
22  Q.   What day did you do that?
23  A.   I marked it here. Probably, the
24  29th. I don't know if I marked it here. Yes,
25  the 29th.