FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

PLEASE FILE
IN RECORD

2001 JAN 11 PM 4:30

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TERREBONNE PARISH SCHOOL BOARD | * | CASE NUMBER: 00-0319 |
| | * | |
| VERSUS | * | SECTION: "B" |
| | * | |
| COLUMBIA GULF TRANSMISSION COMPANY AND KOCH GATEWAY PIPELINE COMPANY | * | MAGISTRATE: 5 |

****************************************

**COLUMBIA GULF TRANSMISSION COMPANY'S**
**SUGGESTED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Columbia Gulf Transmission Company ("Columbia Gulf") respectfully submits the following suggested findings of fact and conclusions of law in the captioned matter.

## *I. Suggested Findings of Fact*

1. On July 26, 1965, Terrebonne Parish School Board ("TPSB"), as grantor, executed in favor of Columbia Gulf Transmission Company ("Columbia Gulf"), as grantee, a certain "Right of Way and Servitude Agreement" affecting Section 16, Township 18 South, Range 13 East, Terrebonne Parish, Louisiana ("Section 16").

2. In return for a price of $685.20, the receipt of which is acknowledged in the Right of Way and Servitude Agreement, TPSB granted to Columbia Gulf:

Fee
Process
X Dktd
CtRmDep
Doc.No. 116

> A servitude, right of way, and easement to construct, lay, maintain, operate, alter, repair, remove, change the size of, and replace a pipe line and appurtenances thereto, including but not limited to fittings, tie-overs, valves, corrosion control equipment and other apparatus above or below ground, for the transportation of oil, gas, petroleum products or any other liquids, gases, or substances which can be transported through pipe lines, the grantee having the right to select, change, or alter the route of such pipe line under, upon, over and through lands which the undersigned owns or in which the undersigned has an interest . . . .

The Agreement further provided:

> The right of way granted herein shall be 100 feet wide, except however, Grantee shall be allowed to use for extra working space a width of 200 feet during construction. ***It is understood and agreed that Grantee shall not be required to backfill the open flotation ditch excavated during construction***.
>
> * * *
>
> This contract contains all of the representations, promises, terms and provisions of the agreements made by the parties hereto, and it is hereby understood that the party securing this grant in behalf of Grantee is without authority to make any covenant or agreement not herein expressed.
>
> It is hereby understood that the Grantee, its successors and assigns, shall not be obligated to pay Grantors or any subsequent owner of the herein above described premises, any damages resulting from the construction of the first pipe line authorized hereunder, such damages having been anticipated and paid in advance at the time of execution of this instrument.

(Emphasis added.)

3. The Agreement executed by TPSB specifically provides that Columbia Gulf has no obligation to backfill the flotation ditch.

4. Also on July 26, 1965, TPSB executed in favor of Columbia Gulf a document entitled "Damage Release".

5. The Damage Release provides in pertinent part:

> Received of Columbia Gulf Transmission Company Seven Thousand Eight Hundred Seventy-nine and 80/100 ------------- Dollars, ($7,879.80) in full payment and settlement for all damages of every kind and character (contractual, negligence or otherwise) caused to our interest(s) as owners by the construction, operation, maintenance of a pipe line and appurtenances across the following described lands, in the place and manner such pipe line and appurtenances have been constructed and laid, and we release and discharge Columbia Gulf Transmission Company and their Agents and Contractors, from all liability therefor. Being the property located in the Parish of Terrebonne, State of Louisiana, and being more fully described in that certain Right of Way agreement from Terrebonne Parish School Board to Columbia Gulf Transmission Company dated July 26, 1965, and recorded in Book _______, Page _______ of the Deed Records of said County and State.

6. Columbia Gulf excavated a flotation ditch within the Right of Way across TPSB Property. In the ditch it laid a pipeline for the transportation of natural gas.

7. During the excavation, Columbia Gulf deposited material removed from the ditch into embankments, commonly referred to as "spoil banks", one on each side of the flotation ditch.

8. After completion of the pipeline, Columbia Gulf did not backfill the flotation ditch.

9. Since 1965, Columbia Gulf has not performed any work to maintain the flotation ditch, including the spoil banks.

10. Until it filed this lawsuit, TPSB never asked Columbia Gulf to maintain the flotation ditch, including the spoil banks.

11. TPSB, as plaintiff in this litigation, alleges that its property has been damaged by the construction of the pipeline and the flotation ditch in which it lies (Petition, Paragraph 13); by the continued existence of the spoil banks erected during the process of dredging the flotation ditch and laying the pipeline (Petition, Paragraphs 10 and 11); by the mere existence of the flotation ditch (Petition, Paragraph 14); and by Columbia Gulf's failure to maintain the flotation ditch (Petition, Paragraphs 7, 8, 12, 13, 15, and 16).

12. There is no single cause for all of the marsh loss in coastal Louisiana.

13. Coastal marsh loss is occurring all across the wetlands of Louisiana and is the result of numerous factors including subsidence, relative sea level rise, the passage of hurricanes, including the elevated water levels and salt water intrusion, and herbivory.

14. Historical aerial photographs of the Section make clear that significant land loss and areas of open water on Section 16 preexisted the dredging of the flotation ditch and construction of the Columbia Gulf pipeline.

15. During the period 1931 through 1955, before either pipeline flotation ditch was dredged, formation of small interior ponds and enlargement of existing ponds occurred over the entire area of Section 16.

16. In the period of 1955 to 1957, the ponds continued to enlarge by approximately 1.7 acres per year.

17. Between 1957 and 1964, significant enlargement of interior marsh ponds was apparent from the aerial photographs. The rate of marsh loss for that period was 3.462 acres per year. This was after the Koch flotation ditch had been dredged but before the Columbia Gulf ditch was dredged.

18. An additional 22.3 acres of ponds appeared in the interior marsh between early 1964 and early 1965. The primary reason for this unusually large increase in open water was Hurricane Hilda, whose high winds, storm surge and high flood levels hit western Terrebonne Parish and, particularly, Section 16 in late September - early October, 1964.

19. From 1965 until 1971, there was some enlargement of the open water areas but the rate was relatively low: approximately some .790 acres/year.

20. From 1971 to 1980, aerial photographs demonstrate enlargement of existing water bodies, but again the rate was relatively low, only 1.702 acres/year.

21. During the period 1980 to 1994, there was a net gain in the total marsh even though some new open water appeared in the Section.

22. From 1994 to 1998, a similar pattern was shown: there was a total net gain of marsh even though some new areas of open water occurred.

23. The greatest addition of open water areas occurred between 1931 and 1964 before the Columbia Gulf flotation ditch was dredged. Comparing 1964 to 1998, the amount of open water within the interior marsh of Section 16 has remained relatively constant, despite some fluctuations.

24. In the last twenty years there has actually been a net gain, rather than a loss, of land on Section 16.

25. The dredging of the Columbia Gulf canal did have an impact on Section 16, but it is limited to the direct impact of the loss of marsh which was replaced by the flotation ditch.

26. Herbivory, especially muskrat and nutria eat outs, have severely stressed the marsh in Section 16.

27. Nutria in Section 16 have removed the surface vegetation and root material in significant areas, turning the emergent marsh into a quagmire of decomposing plant material and roots.

28. Another type of damage caused by herbivory in Section 16 is the deterioration of muskrat mounds which result in numerous small open water bodies that later merge into larger open water areas.

29. Overpopulation of nutria in this section has caused severe stress on the marsh in the areas that are deteriorating by the enlargement of small ponds, rather than by erosion of the flotant mats from currents underneath them as suggested by plaintiff.

30. Extensive stands of fresh water marsh plant communities that historically existed in Section 16, as well as the area surrounding it, were converted from thick mat floating marsh to thin mat floating marsh and open water during the period 1950 to 1964.

31. The primary factor that caused the thinning of floating mat and the appearance of open water was an enormous population of nutria in the Louisiana coastal marshes during that time.

32. In the last ten years, the nutria population has again exploded, posing the damage of increased marsh loss in Section 16.

33. Nutria are large rodents and tend to follow trails made though the marsh on their daily feeding activity. Over a short period of time, the trails turn into depressions on the surface of the marsh and can cause the marsh to break apart along these physically created openings. This problem is more pronounced in a floating marsh. Columbia Gulf's experts found ample evidence of this phenomenon in Section 16.

34. Currently, there is a huge population of nutria on Section 16.

35. The major components of wetland hydrology include precipitation, surface water flow, infiltration, and ground water flow and evapotranspiration.

36. The hydrology of flotant marsh is more complex than that for attached marsh. With flotant marsh the water flows through and under the marsh mat. The vegetative mats are resistant to the normal flows because water velocity is very low.

37. Under average conditions, the marsh mat will slowly rise as tidal flooding of the marsh takes place.

38. Under extreme flooding, such as during a hurricane or river flood, the mats may become detached. In this condition, the mats are subject to be moved and broken apart by winds, waves and currents that may be present.

39. The average velocity of water flowing through the flotant marsh is extremely low because of the frictional effects of the clayey substraight and the overlying vegetive mat.

40. The primary long term process causing major changes in marsh hydrology is the slow sinking and flooding of the land. This slow flooding or inundation is a result of the rise in long term water levels associated with sea level rise and the sinking of the land associated with subsidence. As the land sinks, there is an increase in the frequency duration and depth of flooding of the marsh surface. This inability of wetlands to maintain their surface elevation in the face of long term inundation threatens the sustainability of the marsh.

41. Eustacy or eustatic sea level rise refers to the increase in sea levels occurring worldwide. Relative sea level rise at a particular site includes eustacy (.12 centimeters per year) and local subsidence (actual sinking of the land).

42. Eustatic sea level has risen worldwide, and at coastal Louisiana, approximately 3.3 inches since 1931.

43. Over the period from 1931 to present, the subsidence in the area in which Section 16 is located caused the land to sink by approximately 36 inches. This lowering of the land under the flotant marsh has made it more susceptible to erosion by hydrologic process.

44. The main process maintaining marsh elevation is sedimentation. However, flood control levees along major natural waterways have prevented sediments from reaching coastal wetlands during flooding events. Marshes such as Section 16, which are close the Atchafalaya River, are an exception and do receive some sediments from that source. The input of sediments to marshes close to the Atchafalaya occurs during high water stages on the river.

45. The marshes in Section 16 have received varying amounts of sediment bearing water from the Atchafalaya River during the past several decades. The natural drainage bayous and man made channels have acted in the last 40 years as distribution conduits for water in sediments from the Atchafalaya. This process was enhanced in the late 1980s by the construction of the Wax Lake Weir. The introduction of riverine sediments into the

Section 16 marsh starting in the 1950s may explain the change in the marsh behavior from the loss condition before the mid-1960s to a stable condition after.

46. The 1973 flood from the Atchafalaya River was a single extreme event that caused prolonged high water levels and strong currents in the Western Terrebonne Parish marshes. The hydrology of the Section 16 marshes was highly altered during the 1973 flood. Prolonged high water levels tended to lift flotant marsh above its normal range of vertical motion and flooded other marshes. The flood likely caused a short term break up of marsh vegetation.

47. The man made alterations of the hydrology of the Section 16 marshes, i.e., the Columbia Gulf and Koch flotation ditches, have had a beneficial effect. The increase in the Atchafalaya River discharge and the presence of the Gulf Intracoastal Waterway have allowed sediment laden water to enter the Section 16 marshes through these canals.

48. Hurricanes have had a major impact on coastal wetlands of Louisiana. They cause marshes to be subjected to extreme water depths, high velocities of water flow, increased wave action and high salinities. Since 1964, Section 16 has been affected by Hurricanes Hilda, Betsy, Edith, Carmen, Bob, Danny, Juan, and Andrew.

49. Hurricane Andrew (1992) caused water levels to rise about 3 to 4 feet above normal levels at the site.

50. Hurricane Hilda (1964) flooded the site with almost six feet of surge and was associated with a major increase in the amount of open water at the site.

51. Hurricane Juan (1985) caused water levels to rise about five feet at the site.

52. After Hurricane Andrew, aerial observations by investigators indicated an area east of the Atchafalaya Delta and Four League Bay, which is the area where Section 16 is located, as receiving extensive physical damage. Investigators reported that storm surge and winds accompanying Andrew dramatically altered floating marsh.

53. Extreme wind, wave action and water levels associated with hurricanes are factors in the marsh loss in Section 16.

54. The primary long term hydrologic factor causing marsh loss in Section 16 is inundation, i.e., a combination of subsidence and sea level rise.

55. Short term more intense land loss was caused by hurricanes, primarily Hurricane Hilda, and by flooding by the Atchafalaya River in 1973.

56. The causes of erosion and marsh damage in Section 16 are nutria eat outs, subsidence, sea level rise and hurricane damage caused by flooding, winds, and salt water intrusion.

57. The Columbia Gulf flotation ditch runs along the southern part of Section 16 in a roughly east-west direction. It has been blocked off since its dredging at each end of the Section with a bulkhead that somewhat restricts the flow of water and also restricts boat access.

58. The Section 16 marshes to the north and south of the Columbia Gulf flotation ditch are open to large scale hydrologic processes associated with natural bayous and open water areas to the east, south and southeast of Section 16.

59. Two small openings – one on the north bank and one on the south bank, represent an extension of Little Horn Bayou, a naturally occurring waterway that has transversed Section 16 since before 1931. The opening on the south bank occurred after 1994.

60. A third small opening has recently developed along the southern bank of the Columbia Gulf flotation ditch near the eastern border of Section 16.

61. The aforementioned openings allow a small amount of exchange of water between the canal and the marshes and produce very low velocities of flow in the interior marshes.

62. TPSB's experts measured the flow of water between the Columbia Gulf ditch and the marshes to the south of the canal in the south spoil bank opening near the eastern border of the Section, referred to as Cut #3. The measurements showed very low velocities in the opening, with maximum values of slightly less than .2 feet per second or 2.4 inches per second for flow both into the marsh and into the canal. These velocities are not sufficient to erode either the bank, the marsh or the bottom soil.

63. TPSB provided no data on the velocity of water flow in the interior marsh.

64. Columbia Gulf's hydrology expert, Dr. Joseph Suhayda, using the measurements of TPSB's hydrologist Mr. McCorquodale, calculated the average velocity of flow beneath

the floating marsh adjacent to Cut #3 at .00077 feet per second from the ditch into the marsh and at .00064 feet per second from the marsh toward the ditch.

65. Dr. Suhayda's calculation of the velocity of current under the marsh mat at the period of maximum velocity was .00077 feet per second.

66. These extremely low velocities of flow through the spoil bank at cut number 3 are insufficient to erode interior marsh as TPSB has suggested.

67. Plaintiff's expert, Robert Chabreck, testified that a pipeline canal, such as the one in which the Columbia Gulf pipeline is laid, will damage adjacent marshes only when there has been a cut in the spoil bank which allows the exchange of water between the canal and the adjacent floating marshes.

68. Considering the low velocities of water exchange between the canal and the interior marsh to the south through the cut in the southern spoil bank, the fact that the cuts on the southern spoil bank did not occur until recently, and the fact that there was significant open water in both the southwest and southeast parts of Section 16 prior to 1994, the court finds that the Columbia Gulf canal has not caused any loss or damage to marsh on plaintiff's property south of the canal.

69. As to the area north of the Columbia Gulf canal, between that canal and the Koch canal, the court finds that much of the open water shown on the aerial photograph of 1998 existed in 1964, before the Columbia Gulf pipeline was laid and more recent open water near the

intersection of the two canals is related to the action of Bayou Little Horn, which has become a much more active distributor of the Atchafalaya River following the flood of 1973. The court accordingly finds that the Columbia Gulf pipeline canal did not cause or contribute in any way to the loss of or damage to the floating marsh north of the canal.

70. To summarize, the Columbia Gulf flotation ditch has had a negligible effect on the hydrologic processes affecting the Section 16 marsh, and has not caused a loss of marsh in areas adjacent to it.

71. None of the three restoration plans submitted by TPSB is appropriate, feasible or economically justified. Each plan would have an adverse impact on the existing ecosystem by creating extensive damage to existing wetlands, subjecting plant communities to turbity and covering established marsh plant communities with a layer of peat material. Further, repeated access by barges and large machinery to accomplish any of these plans would destroy existing plants and thereby require additional restoration efforts.

72. The current average width of the Columbia Gulf flotation ditch is 116 feet. Thus, the Columbia Gulf flotation ditch has now occupied only about 2.4 acres outside the one hundred foot right of way granted to Columbia Gulf.

73. Restoration Plan No. 1, which requires the Columbia Gulf canal to be filled with river sand and then re-vegetated, is impractical and disproportionate in cost to the value of the

land allegedly damaged by the canal. Further, Restoration Plan No. 1 is not permissible because Columbia Gulf is not required to fill the flotation ditch in which its pipeline is laid.

74. Over its approximate 5,000 foot length across Section 16, the Columbia Gulf canal now occupies only about 2.4 acres outside of the 100 foot right-of-way. The cost of Restoration Plan No. 2 is $3,601,718, which translates to more than $1.5 million per acre restored and protected pursuant to the plan. This is grossly disproportionate to the value of the property occupied by the canal and any benefits to be derived from this activity. This is especially so in light of the court's finding that any damage to adjacent marsh related to the pipeline canal could be prevented by filling the cuts in the existing spoil banks, which would be a much less expensive operation, but would have the same effect. Thus, the court finds that Restoration Plan No. 2 is impractical and grossly disproportionate to the value of the land allegedly damaged.

75. Plaintiff's Restoration Plan No. 3 calls for filling some of the open ponds and "damaged marsh" in Section 16 with peat moss imported from Canada, in the hope of creating a new marsh. The cost of this plan is $9,258,640. This plan would supposedly "restore" about 208 acres of lost or damaged marsh. Such a project has never been attempted in Louisiana (or anywhere else as far as the witnesses knew) on such a large scale. The likelihood that the plan will succeed has not been established. The cost of the plan is more than $45,000 per acre restored. Accordingly, the court finds that plaintiff's Restoration Plan No. 3 is

neither appropriate nor feasible, and its cost is grossly disproportionate to the value of the property to be restored.

76. The property value loss estimates presented by Farber, Costanza and Penland are not appropriate for use in a cost-benefit analysis focusing on Section 16.

77. The market value of Section 16 at present is approximately $150 to $250 per acre.

78. Present and former School Board employees were consistent in their testimony that (1) erosion of the Section 16 lands has been a concern for some time and certainly was a concern more than one year prior and even ten years prior to the suit; (2) the board has never commissioned an investigation, survey or study to determine the cause of the erosion, nor has it hired anyone to periodically inspect the lands for erosion damage; (3) financial constraints precluded such studies or investigations; (4) none of them has personally investigated the alleged erosion damage or the pipeline canals in question except for Mr. Voisin, a former member who specifically recalled visiting this section some time before he left the Board in 1990; and (5) no investigation was authorized or performed prior to the board's retaining Michael St. Martin's firm to pursue the litigation.

***II. Proposed Conclusions of Law***

1. The Damage Release, in return for valuable consideration, TPSB specifically released Columbia Gulf from any liability for any damage that might be caused "construction,

operation, maintenance" of a pipeline and appurtenances. The language is specific, and as a negotiated, arms length settlement, is the law between the parties.

2. Principles of *res judicata* therefore preclude TPSB from recovering from Columbia Gulf for any damages caused by the construction, operation or maintenance of the pipeline and its appurtenances. TPSB's claims for marsh loss or damages attributable to the actual presence of the flotation ditch are therefore dismissed.

3. With respect to Columbia Gulf's alleged liability for any damage that might be deemed the result of Columbia Gulf's failure to "maintain" the flotation ditch, the only mention of the flotation ditch in the Agreement is a specific provision that Columbia Gulf is not required to backfill the ditch. This mention does not imply an obligation to maintain the ditch. The specific negation of any obligation to backfill the ditch implicitly negates any obligation to maintain the ditch in any particular condition.

4. The Agreement specifically provides that it contains all of the promises and agreements of the parties, thereby foreclosing the implication of any duty to maintain the flotation ditch.

5. Accordingly, Columbia Gulf has no liability to TPSB for its failure to maintain the flotation ditch.

6. Parol evidence is inadmissible in construing the release between TPSB and Columbia Gulf.

7. The pipeline flotation ditch is not an appurtenance of the pipeline as that term has been interpreted by Louisiana jurisprudence. *Parks v. Pine Bluff Sand & Gravel Co.*, 97-682

(La. App. 3rd Cir. 2/18/98), 712 So.2d 905; *Fontenot v. Louisiana Farm Bureau Casualty Ins. Co.*, 517 So.2d 1044 (La. App. 3rd Cir. 1987); *Union Ferry Company v. Southern Improvement & Ferry Company*, 124 La. 759, So.2d 704 (1909).

8. When a servitude is established by contract, the extent and mode of using the servitude is regulated by the contract. *Ryan v. Southern Natural Gas Company*, 879 F.2d 162, 164 (5th Cir. 1989).

9. A written agreement is the law between the parties and must be interpreted and enforced according to its terms. *Ryan*, *supra*; Louisiana Civil Code article 1983.

10. The *St. Martin v. Mobil Exploration & Producing U.S., Inc.*, 224 F.3d 405 (5th Cir. 2000), *rehearing en Banc denied by*, _____F.3d __________ (5th Cir. (La.) 2000). is inapposite to the instant case and is not controlling precedent.

11. The Columbia Gulf flotation ditch is not the proximate cause of the indirect marsh losses claimed by TPSB.

12. Any breach by Columbia Gulf of its Right of Way Agreement was not the proximate cause of the marsh loss alleged by TPSB.

13. Under governing principles of Louisiana law, the assertion of tort claims regarding directly governed and regulated by contracts is impermissible, and TPSB's tort claims should therefore be dismissed with prejudice.

14. The duty to act as a "reasonably prudent operator imposed on mineral lessees by Article 122 of the Louisiana Mineral Code" is clearly inapplicable to this case, as Columbia Gulf is not a mineral lessee, and accordingly, any claims based on Article 122 are dismissed.

15. Plaintiff's claims for breach of contract are limited to those breaches which allegedly occurred in the ten-year period immediately preceding the filing of suit. All other claims are prescribed.

16. TPSB failed to mitigate its damages in the captioned matter, and its damages, if any, for breach of contract must be reduced.

17. Dr. Shea Penland's qualifications to testify on economic valuation issues fail to satisfy the requirements of F.R.E. 702.

18. Dr. Chabreck's opinions and methodologies fail to satisfy the requirements of F.R.E. 702.

19. "Cost of restoration", being grossly disproportionate to the value of the land and economically wasteful, is not a measure of damages available to TPSB in this case.

20. The proper measure of damages, if any, in this case is the number of acres lost that are attributable to any breach of contract by Columbia Gulf based on viable claims which have not prescribed times $200 per acre.

21. The social values or "contingent valuation" theories espoused by TPSB for the value of wetlands are inappropriate as measures of damage in the captioned matter because those

theories, set forth in the work by Dr. Robert Costanza, do not meet the requirements of F.R.E. 702.

Respectfully submitted,

Thomas R. Blum

Thomas R. Blum, T.A. (#3170)
James A. Burton (#3708)
Christina H. Belew (#1244)
SIMON, PERAGINE, SMITH & REDFEARN, L.L.P.
1100 Poydras Street
30th Floor - Energy Centre
New Orleans, Louisiana 70163-3000
Telephone: (504) 569-2030

Attorneys for Columbia Gulf Transmission Company

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been served on all counsel of record by telecopier or by placing same in the United States mail, first-class postage prepaid and properly addressed, this 8th day of January, 2001.

Thomas R. Blum

K:\DATA\L\09700066\PLEADING\suggested findings.wpd