

PLEASE FILE
IN RECORD

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 JAN 11  PM 4: 18

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TERREBONNE PARISH SCHOOL BOARD** | § | **CIVIL ACTION NO. 00-0319** |
| **VERSUS** | § | **SECTION: B** |
| **COLUMBIA GULF TRANSMISSION COMPANY AND KOCH GATEWAY PIPELINE COMPANY** | §<br>§ | **MAGISTRATE: 5** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### PRETRIAL MEMORANDUM
### SUBMITTED BY PLAINTIFF
### TERREBONNE PARISH SCHOOL BOARD

---

     This case arises out of the relationship between a landowner whose property is burdened by servitudes. The pivotal questions involve the defendants, Columbia Gulf Transmission Company ("Columbia Gulf") and Koch Gateway Pipeline Company ("Koch"), and their obligations to maintain canals dredged on the property to benefit their natural gas pipeline operations and to preserve, restore, and maintain the coastal marsh property at issue. Plaintiff, Terrebonne Parish School Board ("TPSB") alleges that the defendants' use of and failure to maintain the canals has



caused erosion and other damage to the freshwater flotant marsh ecosystem present on its property in Section 16, Township 18 South, Range 13 East.

**Facts:**

TPSB is the owner of Section 16, Township 18 South, Range 13 East, ("School Board property") in Terrebonne Parish, Louisiana, originally comprising 640.92 acres of freshwater coastal marsh. TPSB's property in this case is freshwater marsh or wetlands.

Louisiana's dwindling wetlands, described by the United States Environmental Protection Agency as "national treasures" comparable to rainforests, provide innumerable benefits, including food and habitat for fish and wildlife; flood protection; shoreline erosion control; natural products for human use; water quality improvement; pollution control; and opportunities for employment, recreation, education, and research for millions of people.[1]  Our wetlands are homes to endangered or threatened species, such as the bald eagle and brown pelican, and the migratory arctic peregrine falcon.  They are also the breeding grounds that ensure the survival of Louisiana's huge fishing and seafood industry, which provides jobs and food for millions of people.

---

[1]    Environmental Protection Agency, *Values and Functions of Wetlands*, published at http://www.epa.gov/owow/wetlands; *Southe Wetlands, Status and Trends, mid 1970's to mid 1980's*, a 1994 cooperative publication by United States Department of the Interior  F and Wildlife Service and United States Environmental Protection Agency, published at http://www.nwi.fws.gov/sewet.

Prior to the activities complained of herein, TPSB's marsh was a healthy freshwater flotant marsh with consistent marsh vegetation. A flotant marsh is one in which a thick mat of vegetation floats on one to two feet of water that covers the land. Such marshes are considered a fragile and important ecosystem in coastal Louisiana. Before the defendants dredged their pipeline canals, virtually no surface ponds nor surface streams existed on the School Board property. The marsh was a stable hydrologic ecosystem.

The defendants are natural gas companies. They have operated the interstate natural gas pipelines traversing TPSB's property since the pipelines were constructed.

On December 18, 1957, Terrebonne Parish School Board granted a Right-of-Way to United Gas Pipeline Company that is recorded in the Terrebonne Parish Courthouse under COB 253, Folio 646, Entry No. 173617.[2] The Right of Way gave United Gas the authority to construct and operate a natural gas pipeline on the School Board property. The right of way also gave United Gas the limited authorization to dredge a pipeline canal "not to exceed forty feet in width." The right of way is considered a predial servitude under Louisiana law which attaches to the land and was transferrable to and binding on Koch as United Gas' successor or assignee. As such, the servitude allowed Koch to take over operations of the natural gas pipeline in 1992.

The Koch pipeline was constructed and the pipeline canal dredged in 1958. The pipeline canal was forty feet in width when originally dredged. Since 1958, the pipeline has been continuously operated.

Columbia Gulf did not obtain a right of way before constructing its natural gas pipeline and pipeline canal across the School Board's property. On February 18, 1964, TPSB gave public notice of an application by Columbia Gulf for a servitude across TPSB's land. On March 17, 1964, TPSB

_____

e Plaintiff's Exhibit 18.

adopted a resolution setting a minimum fee of $25.00 a rod for any pipeline right of way granted across the School Board property. On April 3 & 8, 1964, representatives from Columbia Gulf complained of the $25.00 rate.[3] Subsequent to this date, Columbia Gulf committed a trespass when it dredged its pipeline canal and constructed its pipeline on the School Board property even though it had not been granted a right of way.[4] Subsequently, Columbia Gulf negotiated a settlement only for damages arising out of the construction of its pipeline canal, and Columbia Gulf was granted a right of way that is recorded in the Terrebonne Parish Courthouse under COB 403, Folio 313, Entry No. 284018, dated August 4, 1965, in conjunction with the settling of the trespass claim.[5] The pipeline has been continuously operated since it was constructed and the pipeline canal was dredged. Based on the only document produced by Columbia Gulf, the Columbia Gulf pipeline canal was fifty feet in width when dredged.[6]

Insofar as the right of ways or servitudes on the property are concerned, TPSB is the grantor and owner. TPSB has not received revenue from the natural gas operations of either Koch or Columbia Gulf. TPSB has received no mineral royalties from production on T18S, R13E since a producing well has not been drilled on the property.

TPSB contends that gaps in the spoil banks flanking the defendants' canals allow water to flow into and out of its marsh, eroding the floating marsh mat and leaving open ponds. These open ponds disrupt the ecosystem, represent loss of the vegetative mat, and provide openings for invasive plant species. Aerial photographs taken before the dredging of the defendants' pipeline canals

---

ee Plaintiff's Exhibit 83.

ee Plaintiff's Exhibit 25, Bates stamp number CGT 0015-0016.

ee Plaintiff's Exhibit 19.

ee Plaintiff's Exhibit 25, Bates Stamp number CGT 0001.

reveals a lack of open-water ponds.[7]  Aerial photographs also show ponds and channels forming

adjacent to the breaches in the pipeline canals subsequent to the pipeline canals being dredged.[8]

On October 19, 1999, TPSB filed the instant case against Koch and Columbia Gulf.  TPSB

contends that defendants are liable under the following causes of action: the canal servitude

agreements, negligence-based tort, Louisiana Civil Code articles 667-69, and the public trust

doctrine. TPSB's Petition seeks restoration damages pursuant to a restoration plan for the marsh,

which would include constructing bulkheads along the canals and refilling the eroded areas.

Defendants contend the language of their servitude agreements and "damage release[s]"

relieve them of any liability to plaintiff in this case under any theory.  They contend that TPSB's

claims are prescribed as a matter of Louisiana law and that the canal servitude agreements do not

impose a continuing duty on defendants to maintain and repair their canal banks. Lastly, the

defendants argue that the damages awarded by the district court cannot exceed the market value of

the land.  The oil and gas industry's denial of any role in coastal land loss is reminiscent of the

tobacco industries' completely unrealistic and insupportable position denying any link between

cancer and cigarettes.  That stance has been revealed as a fraud upon the public.  It is high time that

the oil and gas industry accepted responsibility for the effects of its activities upon Louisiana's

living coast.

**Servitude Agreements**

Both defendants point to their servitudes as relieving them of the obligation and duty to

maintain their pipeline canals.  They also claim that the servitudes and damage releases relieve

them of any liability. Defendants are wrong.  First, correspondence attached with the damage

---

[7] Plaintiff's Exhibits 64 G-I.

[8] Plaintiff's Exhibits 64 J-P.

releases and the language of the damage releases themselves are clear that the releases were limited in scope to any damages caused directly as a result of the construction of the pipeline canals.[9] Koch's release is limited to damage to timber, crops, and fences caused by <u>construction</u> of the pipeline canal. Columbia Gulf's release also deals with damages caused by Columbia Gulf's pipeline canal <u>construction</u> as evidenced by Columbia Gulf's cover letter to TPSB attached with the release and settlement check. The releases did not settle claims due to negligence and breach of contract for defendants not maintaining their pipeline canals. Second, the releases do not relieve the defendants of maintaining their pipeline canals. This duty and obligation was clearly established in *St. Martin v. Mobil*, 224 F.3d 402 (5th Cir. (La.) 2000), which serves as controlling authority in this case. In that case, the U.S. Fifth Circuit held the current servitude owner owed the current surface owner a duty to maintain canals and to compensate the owner for any damage to surrounding freshwater flotant marsh caused by the servitude grantee's failure to maintain its canals.

Turning to this case, the Koch pipeline canal was forty feet in width when dredged. Despite the limiting provision in the December 18, 1957 right of way allowing a pipeline canal "not to exceed forty feet in width," Koch has taken no actions to maintain its pipeline canal. As a result, the pipeline canal has eroded significantly and now averages one hundred six (106) feet in width.[10]

Columbia Gulf's right of way was limited to one hundred feet. The Columbia Gulf canal was fifty feet in width when dredged. Columbia Gulf has taken no actions to maintain its pipeline canal, including the spoil banks. As a result, the pipeline canal has eroded significantly and now

---

See relevant portion of deposition of Charles Camp attached to this memorandum as Exhibit          "A".

averages roughly one hundred sixteen (116) feet in width in violation of the limits established in the August 4, 1965 right of way.[11]

TPSB recognizes that Koch and Columbia Gulf, as right of way or servitude owners, are entitled to reasonable use of the surface of the property for their natural gas operations. TPSB also recognizes that Koch had the right to construct its pipeline canal. However, as established in *St. Martin v. Mobil*, *supra,* both the Koch and Columbia Gulf canals must be preserved and maintained to prevent continuous damage of TPSB's fragile marsh, and canals that have eroded should be restored to the limiting widths established in the relevant right of ways. The marsh adjacent to these canals which has been damaged and/or destroyed by the defendants failing to maintain their canals must also be restored and preserved in the future.

TPSB will present testimony from various experts to prove its case. One of these experts is Dr. Robert Chabreck. Dr. Chabreck, a retired professor of wildlife at Louisiana State University, has studied marshland ecology extensively. He has published over 130 scientific and popular articles on wetlands and wildlife management and has planned and evaluated marsh development programs for marsh wildlife refuges for the State of Louisiana.[12] He has professional experience with the U.S. Fish and Wildlife Service, as a refuge and research biologist, and has garnered significant acclamation for his work and publishing on marsh ecology and management.

Dr. Chabreck is a specialist in the ecology of the region. He has spent many years in observation of coastal marshes in Louisiana and has visited and examined the marsh in question on several occasions. Defendants suggest that only a qualified hydrologist can testify as to whether canal water intrusion occurred at sufficient levels and speeds to erode the vegetative mat. While a

---

See relevant portion of deposition of Charles Camp attached to this memorandum as Exhibit          "A".

See Plaintiff's Exhibit 5.

hydrologist might be better trained than a marshland ecologist in the abstract physics of water forces, he would have less relevant expertise in the kinds and amounts of stresses on the organisms making up the vegetative mat that cause degradation of the marsh's root mat. As noted in *St. Martin v. Mobil*, *supra*, a hydrologist can testify as to observed speeds of canal water intrusion into the marsh through the gaps in the defendants' canals' spoil banks; however, the significance of that information for the health and stability of the vegetative mat would be within the expertise of a marshland ecologist such as Dr. Chabreck. Nonetheless, TPSB's hydrologist, Alex McCorquodale, will testify as to the results of flow velocities measuring tidal flows through the gaps in defendants' spoil banks.

Dr. Chabreck visited the property on four occasions, examining both the damaged areas near the spoil-bank gaps and identifying a test or control area. The test area did not exhibit the same damage to and erosion of the marsh mat as those areas exposed to gaps in the canal spoil banks. His direct observations of the marsh including visual confirmation of marsh being transported through the gaps in the canal spoil banks. Dr. Chabreck also used historical aerial photographs to track erosion of the marsh. He took samples of root mat to confirm his hypothesis. He verified that damaged areas next to open water areas had a thinner root mat than areas where the marsh was healthy.[13] He also noted changes from the original vegetation which covered the property.

TPSB will establish that each marsh has different forces acting upon it, depending upon its specific location and its surroundings. Consequently, as Dr. Chabreck will establish in his testimony, field work is required before any causes of erosion can be determined with certainty.

---

See Plaintiff's Exhibit 51.

Marsh is damaged or destroyed in two ways, by natural and man-made causes. One of the man-made causes is pipeline canals.[14] The canals cause loss in two general ways. Marsh is destroyed when marsh is actually dredged out to create a canal and when spoil from dredging is placed to create levees that destroy the area of marsh where the levees are formed. These types of marsh loss are known as direct impacts.

However, marsh loss can also be caused by indirect impacts. There are numerous natural and man-made causes that can lead to indirect impacts of wetlands. The specific cause or causes of damage to each piece of property or area of marsh are individual and unique. In other words, just because one piece of property suffers from direct and indirect impacts due to one cause or causes does not mean that another piece of land will suffer direct and indirect impacts due to the same cause or causes.

For example, saltwater intrusion through breaks or breaches in pipeline canals may be the cause of destruction on one piece of land while waves from boat traffic through breaks or breaches in pipeline canals on another piece of marsh property may be the cause of marsh loss on that other piece of property. Since every piece or area of marsh property owned by Terrebonne Parish School Board may be destroyed or damaged in a unique way, field studies and investigations must be conducted to determine the exact causes of marsh damage and extent of damage. Even though historical aerial photographs may show that a piece of property is apparently eroding and damaged as the result of oil and gas activities, theories of damage must be tested or confirmed through field work.

TPSB submits that the canals dredged on the School Board property have altered the hydrology of the marsh and have directly impacted the marsh's ecology through the physical

---

See Plaintiff's Exhibits 95 & 96.

removal of marsh terrain and creation of spoil banks. The pipeline canals also have not been maintained and have widened well beyond their original widths.

As stated previously, Defendants have allowed the numerous breaks or cuts in the spoil banks to enlarge which continue to cause erosion and destruction of the marsh. The hydrologic connection created by tidal cycles has allowed significant water movement into and out of TPSB's marsh through the breaks in the spoil banks. Consequently, channels adjacent to the breaches or breaks developed causing a direct hydrologic connection with the interior marsh adjacent to and between the Koch and Columbia Gulf canals thereby leading to the formation of ponds and open water. TPSB retained a hydrologist, Alex McCorquodale, to measure velocity of water currents through these breaks and to take sediment/organic matter and/or root mat samples. Based upon the flow meter readings and sediment/organic matter and/or root mat samples taken, these flows into the School Board property have sufficient energy to erode or break up underlying sediment and organic material from beneath the root mat and destroy wetland area without killing vegetation first. This process is confirmed by the fact that the marsh root mat that has not been converted to open water and that is damaged adjacent to canals is significantly less thick in root mat composition compared to healthy marsh. In turn, according to TPSB's wetland specialist, Robert Chabreck, as the root mat is gradually eroded, vegetation dies. The dying of marsh vegetation results in increased erosion and leads to open water, and/or submergence of marsh vegetation and root mat. Native vegetation is replaced with invasive and exotic pest plants like water hyacinths. The erosion damage has increased over the years. Accordingly, due to the erosion and/or submergence of the School Board property as a result of the canals dredged by Defendants, the ecological regime of School Board marsh property changed.

Shea Penland is a geomorphologist and coastal wetlands expert, including their valuation. According to Penland, hurricanes can destroy or severely damage marsh property. However, Penland found no such evidence of any such destruction or damage in this case. Penland's analysis of historical aerial photographs shows that the marsh has deteriorated where breaks have developed in the spoil banks of the Koch and Columbia Gulf canals.

Defendants offer several alternative explanations for the deterioration of the marsh mat in issue. First, they contend that damage from hurricanes, and Hurricanes Juan and Hilda in particular, can be blamed for the marsh mat loss. However, based on previous research he has conducted, Dr. Penland concluded that the marsh in question was likely too far inland to experience significant loss of vegetation due to hurricanes. The defense expert, Dr. Joseph Suhayda, who will testify regarding hurricane damage on TPSB's property did not visit the property after Hurricane Andrew or any other hurricanes which defendants claim damaged the marsh. Dr. Suhayda can only testify regarding the possibility of hurricane damage based on his reading of general scientific literature on the subject and hypothetical computer generated simulations of water elevations.

Defendants acknowledge that salt water intrusion is not responsible for the TPSB's marsh mat loss. While all experts agree that salt water intrusion can damage freshwater marshes as a general principle, the salinity tests actually performed on TPSB's property indicate no significant salt water intrusion has in fact occurred. Significantly, the test areas identified by Dr. Chabreck, which would presumably be subject to intrusive salinity, did not show signs of deterioration.

Defendants also contend that nutria eat-outs damaged the TPSB's marsh. However, the evidence on nutria eat-outs does not clearly establish their responsibility for the damage. Dr. Chabreck will testify to his personal observations of the marsh for herbivory, as well as his previous studies of nutria behavior. According to Dr. Chabreck, a world renowned expert in nutria, nutria

numbers have declined in recent years.  Furthermore, nutria do not generally have a significant impact upon healthy marsh but rather are more attracted to marsh that has been damaged by another force.  Similarly, defendants' have not produced any evidence to indicate that herbicide spraying by government agencies could have contributed to the deterioration of the marsh.

Finally, defendants contend that subsidence and relative sea level rises contributed to the deterioration of the marsh.  Subsidence is a factor region-wide, but its effects on the area in issue are unsupported as defendants all rely on secondary information to conclude that subsidence has occurred over the last 40-50 years.

It is indisputable that man-made forces (including oil and gas activity and canals) are an identified factor in marsh loss in coastal Louisiana, the areas immediately surrounding TPSB's property, and TPSB's property.  This conclusion is supported by the fact that the Corp of Engineers had found that the area around TPSB's property and TPSB's property have undergone a change in hydrology as a result of natural gas operations.

**Liability**

**La. C.C. arts. 2315 & 667-669**

As the Louisiana Supreme Court noted in ***Inabnet v. Exxon Corp.***, 93-0681 (La. 9/6/94), 642 So.2d 1243, while the owner of immovable property (or a person deriving his rights from the owner) generally has the right to use the property as he pleases, the owner's right may be limited if the use causes damage to neighbors (and others).  The corresponding rights and obligations of neighboring proprietors, arising from that relationship, are principally governed by La.Civ.Code arts. 667-669. ***Inabnet***, 642 So.2d at 1250.

Article 667 is clear: "Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own,

or which may be the cause of any damage to him." Article 668 provides, however, that the damage must be more than an inconvenience. Article 669, which regulates nuisances, by its very terms, permits recovery by "those in the same or neighboring houses." See *Salter v. B.W.S. Corp.*, 290 So.2d at 821 (La. 1966). Article 669, properly translated, applies to "different inconveniences," not only to "smoke or nauseous smell." Yiannopolous, Louisiana Civil Law Treatise, Vol. 4 (predial servitudes) sec. 58 (1983 & Supp. 1987).[15]

In the instant case, articles 667-669 provide grounds for defendants' liability. Defendants, by refusing to maintain their canals and, thus, causing the loss of TPSB's property, have deprived TPSB of the liberty of enjoying its property. The damage occasioned, including the loss of land, is certainly more than an inconvenience. The poorly maintained leaking canals, which, far exceed the permitted scope of the canal servitudes, most definitely constitute a trespass and a nuisance. Defendants have also not maintained their canals on Section 15, an adjacent and contiguous Section owned by Continental Land and Fur, and their canals have deteriorated on this Section which in turn has led to massive open water which has intruded into TPSB's marsh.

Defendants' use of the property in such a manner as to injure TPSB constitutes fault under Article 2315 and Articles 667-669. Defendants are liable for their negligence, including *res ipsa loquitor*, upon proof of causation and damages.

**Servitude Agreements**

Defendants argue that they cannot be held legally responsible for any damage to the TPSB's marsh, regardless of causation. Defendants argue that (a) the canal servitude agreements do not

---

[15]  Louisiana courts have applied not only article 667, but also article 669 in cases involving damage caused by canals. See *Bruning v N Orleans Canal and Banking Co.*, 12 La. Ann. 541 542-43 (1857) (canal resulting in flooding of dry land); *Shneidau v Louisia Highway Commission*, 206 La. 754, 20 So.2d 14 (1944) (canal built "with no protection against the sloughing of the banks).

contain an implied obligation to construct or maintain canal banks, (b) prescription under Louisiana law bars the TPSB's claim.

The Court must interpret the terms of the servitudes allowing operations by the defendants to determine liability. Where a written agreement exists, it is the law between the parties and must be enforced according to its terms. See *Massie v. Inexco Oil Co.*, 798 F.2d 777, 779 (5th Cir.1986). When a servitude is created by contract, as in this case, the mode of use of the servitude is regulated by that contract. See *Ogden v. Bankston*, 398 So.2d 1037, 1040 (La.1981). Doubt as to the existence, extent, or manner of exercise of a servitude shall be resolved in favor of the grantor of said servitude. La. Civ. Code art. 730. La. C.C. article 697 provides that: "The use and extent of such servitudes are regulated by the title by which they are created, and, in the absence of such regulation, by the following rules." Those rules, contained in La. C.C. articles 743 and 745 (formerly, Articles 771 and 774, respectively), were summarized by this Court in *Duet v. Louisiana Power and Light Company*, 169 F.Supp. 184 (E.D.La.1958), as follows:

> It is settled in Louisiana, as elsewhere, that one having an easement or servitude on another's land is bound to use that easement or servitude in such manner as not unreasonably to injure the right of the owner of the servient estate, and that if the owner of the easement or servitude uses it in a negligent, unauthorized or unreasonable manner, the owner of the servient estate may maintain an action for damages resulting from such use . . . The obligation of the owner of the servitude is not to cause no damage, but to cause 'the least possible damage'.

169 F.Supp. at 186. *Accord, Board of Com'rs of Port of New Orleans v. Illinois Cent. Gulf R. Co.*, 379 So.2d 838 (La.App. 4 Cir. 1980), *writ denied* 380 So.2d 1210 (La. 1980).

Furthermore, since the defendants' servitudes are ambiguous, they must be construed against defendants. In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. A contract executed in a standard form

of one party must be interpreted, in case of doubt, in favor of the other party. La. C.C. art. 2056. Consequently, any ambiguity or question as to whether defendants had an obligation to maintain their canals at a width of no greater than forty feet and one hundred feet must be resolved in favor of TPSB since defendants were responsible for drafting the standard form "Right-of-Ways and Easements" and Louisiana law makes clear that any ambiguity is interpreted against defendants as the drafters of the contracts.

The servitude agreement as to Koch provides that Koch is granted the authority to construct a pipeline canal "not to exceed forty feet in width." Since the levees are necessary for the Koch canal and Koch is still using the canal for natural gas operations, the limiting provision is therefore enforceable by TPSB. Koch's servitude also specifies the nature and uses of the Koch canal and provides that "Grantee further agrees to pay Grantor any damages which may arise . . . as a result of its operations." The Columbia Gulf servitude provides that Columbia Gulf has the right "to construct, lay, *maintain*, operate, alter, repair, remove, . . . and replace a pipe line *and appurtenances thereto*, . . . ." Logic dictates that if Columbia Gulf undertook the responsibility to maintain its pipelines and its appurtenances, i.e., pipeline canal, then Columbia Gulf is responsible for any breach of this contractual obligation.

It is clear under *St. Martin v. Mobil, supra,* that the canal servitude agreements impose continuing obligations and duties on defendants which they breached. The Court must therefore fashion a remedy for damages suffered designed to restore the property to the condition it was in prior to the defendants operations and to prevent future deterioration of the marsh which would otherwise continue unabated.

**Damages**

      **Defendants have presented no solution to the problems they have created, the costs for canal repair and restoration of the property**. Rather, defendants rely on their legal argument that TPSB is entitled only to an award of damages equivalent to the decrease in market value of the property or value the property would have if sold in an open market. Indeed, in some cases, Louisiana courts have found that a proper measure of damages to immovable property was the diminution of market value of the property. However, defendants' rote application of this principle is simplistic and unfounded, for three main reasons. First, this case involves a servitude, and restoration of damaged land is required under the *St. Martin v. Mobil, supra*. Second, this case involves wetlands, which are invaluable natural resources subject to the Public Trust doctrine, requiring restoration. And third, TPSB's property has significant value in excess of its appraised monetary value not only to TPSB, but to all citizens of this state, mandating restoration.

      The full extent of current damage was staked out pursuant to a survey performed by Charles Camp, a registered land surveyor, and Dr. Chabreck. The total direct loss attributable to erosion of the canals and spoil banks is 59.3 acres. The total wetland loss of adjacent marsh is 56.2 acres. Additionally, 152.3 acres of interior marsh adjacent to the pipeline canals are damaged. Dr. Chabreck and Mr. Camp have developed three restoration plans. The first two plans provide this court with an option for ordering restoration. Plan 1 involves backfilling the open pipeline canals. Plan 2 involves bulkheading the pipeline canals back to the widths provided for in the servitudes at issue. Plan 3 outlines the costs to restore the open pond and channel areas which have developed as a result of the breaks or cuts in the defendants' pipeline canals. The plans of TPSB's experts are reasonable and necessary for protection and restoration of the property.

The land in question is owned by a public body and political subdivision and is used to benefit the school children and people of Terrebonne Parish and Louisiana, i.e., the public. Based on his prior and current work experience with Louisiana's government and the federal government on the 14 billion dollar Coast 2050 program and the yearly 40 million dollar Coastal Wetlands Protection, Preservation and Restoration Act ("CWPPRA") which seek to preserve and restore private and public coastal wetlands using public funds, Dr. Penland assesses the value of an acre of coastal marsh using private and social values at $86,040 to $143,400. Dr. Penland's opinion is based on his prior work experience in the Coast 2050 and CWPPRA programs where he has been involved in numerous wetland valuations. Coast 2050 and CWPPRA, both involving Louisiana state and federal agencies, have adopted this range of value for coastal wetlands. The restoration plan proposed by Dr. Chabreck and Mr. Camp proposes to protect and restore the coastal marsh property at issue in line with the costs the land would be valued at under the Coast 2050 and CWPPRA coastal restoration programs.

Since TPSB's land is held in trust for the benefit of the public and restoration of the land benefits the public, private and social values apply in this case. Contrary to defendants' assertions, market value is not the measure of damages. To conclude otherwise, is to undervalue the property and relieve defendants' of their actions as it will set a precedent allowing future servitude owners to destroy the property of other marsh owners throughout Louisiana with impunity since these servitude owners will have essentially no financial and legal liability for their actions. Moreover, an award of damages including only the diminution of property values, rather than restoration, would render similar enforcement attempts futile, would violate national and local policy, and certainly would provide no deterrent value to prevent further damage to the resources involved.

TPSB holds the land in trust for the public. Consequently, liability is warranted pursuant to the Public Trust Doctrine. The development of natural resources law, particularly in the last two decades, clearly demonstrates an increasing emphasis on protection and restoration of natural resources. That emphasis has been premised on the assumption that privately owned land imbued with certain natural resources is not totally owned by private individuals despite fee simple title. Pursuant to this widely recognized doctrine, natural resources, even those on private property, "are considered too important to society to be owned by one person," and, as such, have gradually evolved into the corpus of the public trust. Gregg L. Spyridon, Sam A. LeBlanc, III, *The Overriding Public Interest in Privately Owned Natural Resources: Fashioning a Cause of Action*, 6 Tul. Envtl. L.J. 287-289, 303 (Summer, 1993).

The Public Trust Doctrine clearly applies in this case, in which a government entity and political subdivision of the State of Louisiana seeks to enforce its own and the public's interest and national and local policies regarding the protection of the environment and invaluable and irreplaceable natural resources. "When property damage claims include injury to natural resources, traditional property damage concepts become grossly inadequate to carry out the state and national policies of protecting and restoring natural resources." Gregg Spyridon and Sam LeBlanc, *The Overriding Public Interest in Privately Owned Natural Resources: Fashioning a Cause of Action*, 6 Tul. Envtl. L.J. 287, 311-312 (Summer, 1993). Richard B. Stewart et al., *Evaluating the Present Natural Resource Damages Regime: The Lawyer's Perspective,* in Natural Resource Damages: A Legal, Economic and Policy Analysis 171 (Richard B. Stewart ed., 1995), states, in accord, that: "[t]he tort model of damage liability is... inappropriate for environmentally significant public resources". Id., at p. 171 n. 33.

Environmental statutes such as CERCLA and OPA express a strong preference for restoration over compensatory type damages. For example, CERCLA provides that parties responsible for hazardous substance releases "shall be liable for ... damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss...." Moreover, "[t]he measure of damages ... shall not be limited by the sums which can be used to restore or replace such resources." 6 Tul. Envtl. L.J. at 312.

The Courts have borrowed from these analogous environmental statutes in awarding costs for the restoration of wetlands natural resources, even in a case where the restoration cost far exceeded the fair market value of the land. In *Puerto Rico v. S.S. Zoe Colocotroni*, 628 F.2d 652, 671 (1st Cir. 1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981), the Commonwealth of Puerto Rico sought to recover approximately $13 million in damages for the restoration of approximately forty acres of a mangrove forest which had been contaminated by an oil spill. The forty-two acres of contaminated mangrove forest had a commercial market value of approximately $200,000 but, like many wetlands, was found to serve many noncommercial ecological functions such as: 1) protecting the shoreline from erosion, storms, tides and high winds; 2) providing a habitat for wildlife; 3) providing a protected breeding ground for fish and shellfish; and 4) acting as a food source for aquatic creatures of all kinds. Puerto Rico sought full restoration and recovery of the total value of the damages caused to the environment and/or natural resources.

The *Zoe* court was faced with the task of determining whether federal laws supported the recovery of restoration costs which far exceeded the market value of the lands that were damaged. While noting that traditional property damage theories did not support such a recovery, the Court

noted that the federal statutes and their legislative history did, in fact, support such a recovery. 628 F.2d at 675.

Borrowing from the language and legislative history of OCSLA and the CWA which both express preferences for restoration or rehabilitation of damaged or destroyed natural resources, the court held that a strict application of the traditional property damage (diminution in value) rule would effectively deny any right to recover meaningful damages. 628 F.2d at 675. In fashioning a new measure of damage for injury to natural resources, the court held that "the appropriate primary standard for determining damages ... is the cost reasonably to be incurred ... to restore or rehabilitate the environment in the affected area to its pre-existing condition, or as close thereto as is feasible without grossly disproportionate expenditures." 628 F.2d at 675.

Following the rationale of the First Circuit and the much stronger preferences expressed by Congress in subsequent legislation such as Coast 2050 and CWPPRA, a plaintiff "should not be precluded from recovering restoration costs for damages to privately held natural resources even if they exceed the fair market value of the property...." Gregg L. Spyridon and Sam A. LeBlanc, III, *The Overriding Public Interest in Privately Owned Natural Resources: Fashioning a Cause of Action*, 6 Tul. Envtl. L.J. 287, 315 (Summer, 1993).

Fortunately for the environment, the law is a dynamic process. Not long ago, the destruction of the earth was accepted as part of progress. "Over the years, as our conception of the environment's value has changed, so have the laws." 6 Tul. Envtl. L.J. at 316. "Because of those changes and new attitudes regarding both landowners and governments, there now appears to be more opportunity to protect, preserve, enhance and restore our natural resources. It is not too late." *Id*. It is time to begin attempting new strategies of restoration, including " the enforcement of the

public's legally protected interest in damaged natural resources regardless of whether they are publicly or privately held." 6 Tul. Envtl. L.J. at 316.

In *Roman Catholic Church v. Louisiana Gas Service Co.*, 618 So.2d 874 (La. 1993), the Louisiana Supreme Court awarded the plaintiffs the full restoration cost of a burned building. In reaching its decision the Court ruled:

> ...[A]s a general rule of thumb, when a person sustains property damage due to the fault of another, he is entitled to recover damages including the cost of restoration that has been or may be reasonably incurred, or, at his election, the difference between the value of the property before and after the harm. If, however, the cost of restoring the property in its original condition is disproportionate to the value of the property or economically wasteful, unless there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs, damages are measured only by the difference between the value of the property before and after the harm. Consequently, if a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building.

618 So. 2d at p. 879-880. The Louisiana Supreme Court in *Inabnet, supra,* cited the *Roman Catholic Church* decision, and noted that the owners of damaged land are the proper parties to claim restoration damages. *Id.* at 1255.

In *Sercovich v. Chevron U.S.A., Inc.*, 626 So.2d 434 (La. App. 4 Cir. 1993), *reversed and remanded on other grounds*, 93-2927 (La. 10/28/94), 644 So.2d 379; *on remand to Sercovich v. Chevron U.S.A., Inc.*, 93-0046 (La. App. 4 Cir. 5/16/95), 655 So.2d 776, Chevron contended that the cost of restoring the property to its original condition was disproportionate to the value of the property and that the plaintiff was not entitled to restoration costs, but only to the difference in the value of the property before and after the harm. The Court ruled that an award of restoration was consistent with *Roman Catholic Church*:

> We do not believe that the award of restoration costs herein violates the principles of *Roman Catholic Church v. Louisiana Gas Service Company, supra.* That case involved the restoration of an apartment building damaged by fire, and the owner was ultimately awarded the full restoration costs. The instant case involves an oyster lease. It is obvious that the value of an oyster lease cannot be determined in exactly the same way as the value of an apartment building. An oyster lessee pays a nominal amount for his lease, usually expends a great deal of time, effort and resources to work the lease, and then, if he is lucky, makes a good profit. The amount paid for the lease is not an accurate reflection of its value.

626 So.2d 437-438.

The Supreme Court in **Roman Catholic Church** and **Inabnet** and the Fourth Circuit in **Sercovich** recognize that to fully compensate an owner, courts should not be limited to a simple diminution in market value of a small part of the property, but should consider the value of the property as a whole, the nature of the owner's use of the property, the reasons for wanting the land restored to its former condition, and the aesthetic or other intangible value placed on the property.

TPSB and the public have ample personal reasons for restoring the productive condition of the invaluable wetlands property at issue. As discussed *supra,* Louisiana's wetlands provide innumerable resources, livelihood, food and recreation for vast numbers of our residents. The property is a treasured natural resource. In the instant case, TPSB, a government body and political subdivision of the State of Louisiana, is not only acting on its own behalf, but as trustee for the citizens of Terrebonne Parish and Louisiana, who have a very great stake in preservation and continued vitality of Louisiana's wetlands. Defendants, who have damaged and destroyed vast acres of wetlands, are liable to TPSB as well as the public, to prevent further damage to these valuable natural resources and to restore them to a productive state.

Koch and Columbia Gulf have had every opportunity to properly maintain their canal spoil banks/levees. Since beginning operations, they have conducted inspections of their pipelines

located in the pipeline canals once a year, at a minimum. Despite these inspections and notice that their canals are eroding, defendants have never taken steps to restore their canals. Neither defendant has performed any maintenance on its pipeline canal. Neither defendant has a company policy in place to maintain pipeline canals and preserve a landowner's land. Louisiana law requires defendants to cause the least possible damage. The pattern of conscious environmental indifference exhibited by each defendant is a breach of each defendant's respective servitude and is a continuing tort.

Plan # 2 proposed by Camp proposes to bulkhead the canals and fill the eroded areas behind the bulkheads with sand. As defendants claim they are entitled to leave the pipeline canals open, they must restore the canals in line with Plan #2. Camp's restoration plan to bulkhead the Columbia Gulf canal will cost $3,601,718.00. This represents: (1) 11,263 linear feet of bulkhead at a cost of $300 per foot; (2) 8,906 cubic yards of fill material at $20 per cubic yard; (3) installation of 2.11 acres of straw mat at a cost of $13,488.00; (4) planting native vegetation on the 2.11 acres at $1.70 per plant; (5) improving spoil banks when necessary and degrading after consolidation at a cost of $20,000; and (6) use of a small bulldozer to spread fill material at a cost of $5,000.

Similarly, Camp testified that the cost to bulkhead the Koch canal is $4,813,524.00. This represents: (1) 11,64 linear feet of bulkhead at a cost of $300 per foot; (2) 61,288 cubic yards of fill material at $20 per cubic yard; (3) installation of 8.74 acres of straw mat at a cost of $55,844.00; (4) planting native vegetation on the 8.74 acres at $1.70 per plant; (5) improving spoil banks when necessary and degrading after consolidation at a cost of $20,000; and (6) use of a small bulldozer to spread fill material at a cost of $5,000.

Camp's Plan #3 can be completed at a cost of $9,258,640.00. Plan #3 will restore the interior marsh which has been damaged and destroyed adjacent to the cuts in the Koch and Columbia Gulf canals. This represents: (1) filling 56.2 acres of pond area with 136,004 cubic yards of peat at a cost of $20 per cubic yard; (2) filling 152.3 acres of broken marsh area with 184,283 cubic yards of peat at $20 per cubic yard; (3) installing 8,785 linear feet of straw retention fencing at $20 per foot; (4) use of a small hydraulic dredge for 64 days at a cost of $7,500 per day; (5) mobilization and demobilization costs of $200,000; (6) use of a large bucket dredge for 70 days at a cost of $5,500 per day; (7) tugs, barges, and dock rental costs of $367,400; (8) bulkheading 360 linear feet for 3 slips at staging areas at a cost of $300 per foot; (9) filling 3 slips at staging areas with available peat and spoil at a cost of $222,000; (10) labor crews to remove plastic and pallets from peat for 64 days at a cost of $5,700 per day; (11) placement of river sand to repair levees at a cost of $50,000; (12) a quarterboat a cost of $100,000; (13) broadcasting of seeds with airplane at a cost of $50,000; (14) construction management, administration, contingencies, and monitoring at a cost of $350,000.

Each defendant is 50% liable for the costs of restoration Plan #3 since both canals have contributed to the destruction of the interior marsh. Hence, Koch is liable for $9,442,844 in restoration damages under Plans # 2 & 3. Columbia Gulf is responsible for $8,231,038 in restoration damages under Plans # 2 & 3.

Respectfully submitted,

ST. MARTIN & WILLIAMS (APLC)

_____

MICHAEL X. ST. MARTIN          #12365
JOSEPH G. JEVIC, III           #23145
Post Office Box 2017
Houma, Louisiana 70361-2017
(504) 876-3891          Telephone
(504) 851-2219          Facsimile

**A. J. GRAY, III                #6253**
**WADE T. VISCONTE              #24734**
**THE GRAY LAW FIRM (APLC)**
Post Office Box 1467
Lake Charles, LA 70602-1467
(337) 494-0694          Telephone
(337) 494-0697          Facsimile

**Attorneys for Terrebonne Parish School Board**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing Pretrial Memorandum has been mailed

to all counsel of record via facsimile and United States mail, postage prepaid on this

_____ day of _____, 2001.

_____

**JOSEPH G. JEVIC, III**

Charles Camp cond. deposition 11/03/00

## In The Matter Of:

### TERREBONNE PARISH SCHOOL BOARD   v.
### COLUMBIA GULF TRANSMISSION COMPANY, ET AL

---

### CHARLES M. CAMP
### November 3, 2000

---

### GAUDET, KAISER & PEPPER
### BOARD-CERTIFIED COURT REPORTERS
### 601 Poydras Street, Suite 2300
### Pan-American Life Center
### New Orleans, LA  70130
### (504) 525-9100   FAX: (504) 525-9109

Original File 01103CAM.ASC, 252 Pages
Min-U-Script® File ID: 1356543783

## Word Index included with this Min-U-Script®



EXHIBIT

A

---

Page 42

[1] tide or low tide.

[2] **Q:** Would the same be true for the
[3] Koch Canal?

[4] **A:** Certainly, yes, sir.

[5] **Q:** Where did you put the
[6] benchmark gauge on the Koch Canal?

[7] **A:** The same gauge was used. It
[8] was at the intersection of the two canals.

[9] **Q:** Okay. So that's the bulkhead
[10] on the western end of the Columbia Gulf
[11] Canal as it traverses Section 16?

[12] **A:** That's correct, sir.

[13] **Q:** And that's where, right where
[14] it meets the Koch Canal?

[15] **A:** If you'll look on the second
[16] page, sir, it shows Bulkhead A, that is
[17] the bulkhead that the TBM was set on, and
[18] if you'll look down on the bottom of the
[19] right-hand page there is concrete, I said
[20] bulkhead at Columbia Pipeline A, top of
[21] concrete gives you an elevation,
[22] et cetera.

[23] **Q:** You realize, of course, that
[24] Bulkhead A is off of Section 16?

[25] **A:** Yes, sir, but not much.

---

Page 43

[1] **Q:** So for your purposes, it
[2] didn't matter?

[3] **A:** No, sir. because the property
[4] line is well marked right there. The
[5] adjacent property owner, which is
[6] Continental Land and Fur Company, marks
[7] with signs, posted-signs, and they have
[8] two, three of them in that same area, but
[9] it was close enough, you know.

[10] **Q:** So if I go back to that page,
[11] I would see a series of readings at
[12] different times for the width of the
[13] Columbia Gulf Canal; is that correct?

[14] **A:** That's correct, sir.

[15] **Q:** So the first width taken at
[16] 9:30 would be of 117 feet?

[17] **A:** That is correct.

[18] **Q:** And then at 9:45, it's 115
[19] feet?

[20] **A:** Well, at that cross-section
[21] 00. You said up on the top here.

[22] **Q:** Cross-section 2 plus 00?

[23] **A:** Go back to the page.

[24] **Q:** And the other one is 0 plus
[25] 00?

---

Page

[1] **A:** Right. And this is where we
[2] started at 0.

[3] **Q:** Where was 0, Mr. Camp?

[4] **A:** It was on the west side of
[5] the, at the property line on the west side
[6] of the — the west section line.

[7] **Q:** The west section line. So
[8] this would have been right on the other
[9] side —

[10] **A:** Of the bulkhead.

[11] **Q:** — of the bulkhead, but
[12] basically —

[13] **A:** I'm sorry, yeah.

[14] **Q:** — where the Koch, on the
[15] other side of the Koch Canal from — let's
[16] look at your map on Page Number 2 of this
[17] document. And would 00 have been closer
[18] to Bulkhead A?

[19] **A:** Yes, sir. It would be — no,
[20] sir, I'm sorry. 00 was started right
[21] there at the intersection of the two
[22] canals, and then we later took another
[23] section back on the west side. But, you
[24] see, the 00 —

[25] **Q:** Yeah, I see station 00, would

---

Page

[1] be slightly west of Bulkhead Number C?

[2] **A:** Right, and that is the
[3] intersection of the two pipeline canals.
[4] Just a point of beginning.

[5] **Q:** And 0 plus, 2 plus 00 would be
[6] moving east or west?

[7] **A:** Easterly. Easterly, sir. If
[8] you see the station on Page 2 there of 54
[9] plus 73, the bulkhead station, you'll see
[10] that these are cross-sections taken every
[11] 200 feet. It goes two plus 00, four plus
[12] 00 and on and on —

[13] **Q:** Got you.

[14] **A:** — until 54 plus 00. And the
[15] way that the average width, I guess you
[16] would say of the Columbia Gulf Canal is
[17] 116 feet, if I remember correctly.

[18] **Q:** Looking at the sheet that says
[19] 54 plus 57 on the top, which is about five
[20] or six from the back, Mr. Camp. It's the
[21] seventh sheet from the back, sir.

[22] **A:** Okay, sir.

[23] **Q:** And so you notice at the top
[24] it says, 54 plus 57?

[25] **A:** That's correct, sir.

---

Page 46

[1]   Q: That would indicate that this
[2] particular reading, for lack of a better
[3] word, was taken right, right east of the
[4] Bulkhead D as shown on Page 2 of this
[5] Exhibit-6?
[6]   A: 54 plus 57 versus —
[7]   Q: 54 plus 73 is the bulkhead?
[8]   A: Excuse me, Excuse me. But on
[9] Page 2 you got 54 plus 73 is the
[10] bulkhead. And then the cross-section is
[11] 54 plus 57, which is a difference of four
[12] feet. That's where the last, I think
[13] probably that bulkhead was built a little
[14] bit inside the property line. The last
[15] cross-section of 54, 57 was taken at the
[16] property line, but taken perpendicular,
[17] obviously, to the pipeline canal.
[18]   Q: I think the bulkhead is right
[19] off the property line. It's on the next
[20] section over.
[21]   A: I think this one is inside of
[22] the 6 and 16 property.
[23]   Q: So it's right there?
[24]   A: Four feet, you know.
[25]   Q: And that would indicate that

Page 47

[1] the width at that point would be 115 feet,
[2] if we look at that page again, correct?
[3]   A: Yes, sir, that is correct.
[4]   Q: Well, I understand what this
[5] is all about, now, so if I wanted to do
[6] the same thing for the Koch Canal, we
[7] would —
[8]   A: Same scenario.
[9]   Q: Same scenario?
[10]   A: Yes, sir.
[11]   Q: Just for the record, because
[12] I'm sure that Mr. Young is going to be
[13] interested in this, where do you begin
[14] your measurements on the Koch Canal?
[15] Where do you start and where do you end
[16] up?
[17]   A: Okay. On Page 3 of the notes,
[18] begin at 00, which is on the south side of
[19] the marked Bulkhead B, and we proceed
[20] northeasterly every 200 feet to the
[21] property line.
[22]   Q: Bulkhead B is south of the
[23] intersection of the two canals, so —
[24]   A: That is correct, sir. And
[25] again, the bulkhead is — all bulkheads

Page 48

[1] normally are built at right angles to the
[2] pipeline canal, and here the property line
[3] is crossing the two canals at a diagonal.
[4]   Q: And the last reading for the
[5] Koch Canal would be what, Mr. Camp?
[6]   A: The bulkhead is at 54 plus 27.
[7]   Q: So it would be 54 plus 00?
[8]   A: That is correct. That's the
[9] last profile of the Koch Canal.
[10]   Q: Do you remember what the
[11] average width of the Koch Canal was?
[12]   A: If my memory serves me
[13] correct, sir, it's 106 feet.
[14]   Q: This set of notes marked as
[15] Camp Exhibit-6 that we have just been
[16] talking about was the last bit of material
[17] in the folder that you produced today; is
[18] that right?
[19]   A: That is correct, sir.
[20]   Q: Now, does this complete your
[21] production of documents in response to the
[22] request?
[23]   A: Yes, sir. It does.
[24]   Q: Are these all of the documents
[25] that you reviewed or relied on in

Page 49

[1] preparing your reports?
[2]   A: To the best of my knowledge,
[3] sir, yes, sir.
[4]   Can we go off the record just
[5] a second?
[6]   (Off-the-record discussion)
[7]         EXAMINATION BY MR. BLUM:
[8]   Q: Did you keep records of the
[9] time that you spent on this project?
[10]   A: Yes, sir, I did.
[11]   Q: Are you charging by time that
[12] you spend or are you just using some other
[13] basis for your fee in this case?
[14]   A: Charging by the hour, sir.
[15]   Q: Did you bring with you your
[16] time records or your billing records for
[17] this case?
[18]   A: Yes, sir, I do have them, but
[19] I haven't sent out an invoice at this
[20] time. I never send an invoice until the
[21] job is over with.
[22]   Q: I see.
[23]   A: So probably I'm not very good
[24] at accounting so I am my own accountant so
[25] I have a tendency to procrastinate when it