

**PLEASE FILE IN RECORD**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TERREBONNE PARISH SCHOOL BOARD | § | CIVIL ACTION NO. 00-0319 |
| VERSUS | § | SECTION: B |
| COLUMBIA GULF TRANSMISSION COMPANY AND KOCH GATEWAY PIPELINE COMPANY | § § | MAGISTRATE: 5 |

************************************************************************

### MEMORANDUM ON CONTESTED ISSUES OF LAW
### SUBMITTED BY PLAINTIFF
### TERREBONNE PARISH SCHOOL BOARD

**Servitude Agreements**

Both defendants point to their servitudes as not mandating that they are required to maintain their pipeline canals. They also claim that the servitudes and damage releases relieve them of any liability. The servitudes do not relieve the defendants from their duties and obligations of maintaining their pipeline canals. This duty was clearly established in *St. Martin v. Mobil*, 224 F.3d 402 (5th Cir. (La.) 2000), which serves as controlling authority in this case. In that case, the U.S. Fifth Circuit held the current servitude owner owed the current surface owner a duty to

maintain canals and to compensate the owner for any damage to surrounding freshwater flotant marsh caused by the servitude grantee's failure to maintain its canals. The U.S. Fifth Circuit ruled that since canal servitude agreements provided that rights granted under them, including surface owner's right to maintenance of canals, could be enforced until expiration of leases described in agreements, the surface owner's suit for failure to maintain or repair canals sounded in both tort and contract, and thus, the owner was entitled to rely on the contractual prescriptive period of ten years. On the issue of damages, the Court ruled that under Louisiana law, the plaintiffs were entitled to recover greater than market value damages. The Court awarded plaintiffs $10,000 an acre in restoration damages even though the market value of the land was $245.00 an acre. Consequently, Terrebonne Parish School Board ("TPSB") submits that the *St. Martin v. Mobil* case is controlling in this case.

Turning to this case, the Koch pipeline canal was forty feet in width when dredged. Despite the limiting provision in the December 18, 1957 right of way allowing a pipeline canal "not to exceed forty feet in width," Koch has acknowledged that it has taken no actions to maintain its pipeline canal. As a result, the pipeline canal has eroded significantly and now averages one hundred six (106) feet in width.

Columbia Gulf's right of way was limited to one hundred feet. Based on the only document produced by Columbia Gulf, its canal was fifty feet in width when dredged. Columbia Gulf has taken no actions to maintain its pipeline canal, including the spoil banks. As a result, the pipeline canal has eroded significantly and now averages roughly one hundred sixteen (116) feet in width in violation of the limits established in the August 4, 1965 right of way. Due to defendants' lack of maintenance, breaks or cuts have developed in the spoil banks of each defendant's pipeline canal and have continued to widen and deepen thereby creating a hydrologic connection that has damaged the marsh. Consequently, pursuant to the established jurisprudential authority of *St. Martin v. Mobil, supra*, each defendant is liable to TPSB for failing to maintain its pipeline canal, which, in turn, has led to destruction of TPSB's marsh. Additionally, as established by *St. Martin v. Mobil, supra*, the measure of damages due TPSB is not market value, but rather restoration value.

**Louisiana Servitude Law**

The Court must also interpret the terms of the servitudes allowing operations by the defendants to determine liability. Where a written agreement exists, it is the law between the parties and must be enforced according to its terms. See *Massie v. Inexco Oil Co.*, 798 F.2d 777, 779 (5th Cir.1986). When a servitude is created by contract, as in this case, the mode of use of the servitude is regulated by that contract. See *Ogden v. Bankston*, 398 So.2d 1037, 1040 (La.1981).

The defendants are obligated to cause the least possible damage to plaintiff's property while carrying out rights provided them under their respective right of ways. Since the right of ways allow continuing operations, and defendants continue to carry out operations under their right of ways, they are each under a continuing obligation to cause the least possible damage to TPSB's property and maintain their pipeline canals. *Duet v. Louisiana Power and Light Company*, 169

F.Supp. 184 (E.D.La.1958); *Accord, Board of Comm'rs of Port of New Orleans v. Illinois Cent. Gulf R. Co.*, 379 So.2d 838 (La.App. 4 Cir. 1980) *writ denied* 380 So.2d 1210 (La. 1980). Stated another way, just as the defendants have a continuing duty to inspect their pipelines and make sure the pipelines are in good repair and not causing damage to TPSB's property, so are the defendants under the same continuing duty to repair and maintain the canals used in operations of their pipelines.

In the alternative, if the Court considers the servitudes ambiguous because they do not literally state that each defendant has a continuing obligation to maintain its pipeline canal, then doubt as to the existence, extent, or manner of exercise of each servitude shall be resolved in favor of the grantor of said servitude. La. Civ. Code art. 730. La. C.C. article 697 provides that: "The use and extent of such servitudes are regulated by the title by which they are created, and, in the absence of such regulation, by the following rules." Those rules, contained in La. C.C. articles 743 and 745 (formerly, Articles 771 and 774, respectively), were summarized by this Court in *Duet v. Louisiana Power and Light Company*, 169 F.Supp. 184 (E.D.La.1958), as follows:

> It is settled in Louisiana, as elsewhere, that one having an easement or servitude on another's land is bound to use that easement or servitude in such manner as not unreasonably to injure the right of the owner of the servient estate, and that if the owner of the easement or servitude uses it in a negligent, unauthorized or unreasonable manner, the owner of the servient estate may maintain an action for damages resulting from such use . . . The obligation of the owner of the servitude is not to cause no damage, but to cause 'the least possible damage'.

169 F.Supp. at 186. *Accord, Board of Com'rs of Port of New Orleans v. Illinois Cent. Gulf R. Co.*, 379 So.2d 838 (La.App. 4 Cir. 1980), *writ denied* 380 So.2d 1210 (La. 1980).

In case of doubt that cannot be otherwise resolved, a provision in a contract must be

interpreted against the party who furnished its text. A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party. La. C.C. art. 2056. Consequently, any ambiguity or question as to whether defendants had an obligation to maintain their canals at a width of no greater than forty feet and one hundred feet, and whether they had an obligation to maintain the spoil banks so that breaks did not form, must be resolved in favor of TPSB since defendants were responsible for drafting the standard form "Right-of-Ways and Easements" and Louisiana law makes clear that any ambiguity is interpreted against defendants as the drafters of the contracts.

The servitude agreement as to Koch provides that Koch is granted the authority to construct a pipeline canal "not to exceed forty feet in width." Since the levees are necessary for the Koch canal and Koch is still using the canal for natural gas operations, the limiting provision is therefore enforceable by TPSB. Koch's servitude also specifies the nature and uses of the Koch canal and provides that "Grantee further agrees to pay Grantor any damages which may arise . . . as a result of its operations."

The Columbia Gulf servitude provides that Columbia Gulf has the right "to construct, lay, *maintain*, operate, alter, repair, remove, . . . and replace a pipe line *and appurtenances thereto*, . . . ." Logic dictates that if Columbia Gulf undertook the responsibility to maintain its pipelines and its appurtenances, i.e., pipeline canal, then Columbia Gulf is responsible for any breach of this contractual obligation.

It is clear under *St. Martin v. Mobil, supra,* that the canal servitude agreements impose implied continuing obligations and duties on defendants which they breached. The Court must therefore fashion a remedy for damages suffered and designed to prevent future deterioration of the

marsh which would otherwise continue unabated.

However, even if the servitudes do not address the issues before the Court, when the parties to a contract make no provisions for a particular situation, it must be assumed that they intended to bind themselves not only to the expressed provisions of the contract, but also to whatever the <u>law</u>, <u>equity</u>, or usage regards as implied in the contract of that kind are necessary for the contract to achieve its purpose. La. C.C. art. 2054. The jurisprudence cited above and equitable considerations all favor imposing liability on defendants for failing to cause the least possible damage to TPSB's property. As such, it is clear that defendants had an obligation to maintain their pipeline canals and that defendants have unquestionably breached these obligations.

TPSB believes Koch will cite the case of ***Ryan v. Southern Natural Gas Company***, 879 F.2d 162 (5 Cir. 1989), in support of its position. The ***Ryan*** case dealt with a claim by plaintiffs for damage to marsh land due to the gas company's failure to dam a pipeline canal they constructed on the plaintiffs' property. The U.S. Fifth Circuit held that because the servitude agreement absolves the gas company from the obligation to dam the canal, the appellant owed no duty to the appellees to dam the canal and was not responsible for resulting marsh damage.

First, the plaintiffs are not seeking to have defendants dam the mouths of the pipeline canals on the property at issue since defendants have installed bulkheads (although these bulkheads are decaying and are ineffective). Rather, TPSB is seeking to have the canals backfilled or restored back to the contractually agreed to width of not more than forty feet and one hundred feet. Defendants are also seeking restoration of marsh adjacent to breaks formed in the levees of the pipeline canals, not damages as the result of a failure to dam the pipeline canals where they enter and/or exit TPSB's property.

Furthermore, the *Ryan* case is distinguishable because the plaintiffs in that case had previously addressed the placing of dams in the pipeline canals when negotiating and executing the servitude agreements. Hence, the U.S. Fifth Circuit determined that the parties had turned their attention to whether the natural gas company would be required to construct dams in the canal, and the natural gas company was successful in negotiating an agreement that relieved it of this responsibility. No such evidence of prior negotiations is present in this case. Defendants" releases were limited only to damages caused by the <u>actual construction</u> of the pipeline canals, not future damages caused by each defendant's continuing tortious acts and continuing breach of a contractual obligation in failing to restore the canals needed for their operations.

**Prescription**

The defense of prescription has no merit. This result is supported by *St. Martin v. Mobil, supra*. In that case, the defendants also claimed that plaintiffs' claims were prescribed. The plaintiffs purchased the property in 1992. They were not parties to the mineral leases allowing operations or servitudes allowing canals to be dredged by defendants. This trial court rejected the prescription defense noting that "the mineral leases are still in effect, and defendants continue to use the canals under the [servitude] agreements. Therefore, the canal servitude agreements still impose certain obligations upon defendants which are capable of enforcement. These obligations, to maintain the canal and to pay for any damages occasioned by its use or maintenance, are continuing." In fact, this case is stronger than *St. Martin v. Mobil, supra,* because TPSB is the grantor of the right of ways granting defendants their rights to conduct operations on TPSB's property, not a plaintiff who was not a party to the servitude. Hence, as the contract is still in force, prescription has not started to toll.

The U.S. Fifth Circuit also noted that the damage alleged in that case was not the mere presence of the canals or a static condition related to their existence (e.g. diversion of water as part of their normal course of operation), but an ongoing and cumulatively increasing deterioration of plaintiffs' property adjoining the canals due to defendants' continuing conduct in their failure to maintain the canal banks. The U.S. Fifth Circuit added that the harm alleged by the St. Martins was an ongoing violation of the servitude agreements, not a one-time action or default on the part of defendants. Similarly, in this case, prescription does not apply because defendants are continuing operations on the TPSB property.

When, as here, the plaintiff's petition alleges a continuous cause of damage that has not ceased, the plaintiff's action is not prescribed on the face of the petition; hence, the burden of proof is on the defendant or the party pleading prescription to establish the facts necessary to sustain the plea. *Pearson v. Hartford Accident & Indemnity Co.*, 281 So.2d 724 (La.1973); *Strata v. Patin*, 545 So.2d 1180, 1189 (La.App. 4 Cir.), *cert. denied*, 550 So.2d 618 (La.1989); See also *Chaney v. State Through Dept. of Health and Human Resources*, 432 So.2d 256, 259-60 (La.1983) (applying similar rule regarding date on which it was alleged plaintiff acquired knowledge of tortious act) and *Bustamento v. Tucker*, 607 So.2d 532, 542 (La. 1992).

*South Central Bell Telephone Co. v. IMC, Inc.,* 418 So.2d 531 (La. 1982), is analogous to the instant case. In that case, the telephone company experienced continuing problems with gasoline leaks causing damage to its cables. It was discovered that some gasoline tanks were leaking. When the leaking tanks were replaced, the damages caused by those leaks soon ceased. The court ruled the leaks were a continuous tort thereby holding that prescription commenced from the date the tanks were replaced. *South Central Bell Telephone Co.*, 418 So. 2d at 533. The

Louisiana courts have consistently ruled since *South Central Bell Telephone v. Texaco, Inc.*, 418 So.2d 531 (La. 1982), that prescription does not begin until the situation causing the damage is abated.

Defendants, in effect, are arguing to this court that they can dredge and use pipeline canals on the School Board property for continuing natural gas operations and not be responsible for the ensuing and continuous damage which only becomes apparent years later. TPSB's tort claim has not prescribed because the defendants are continuing to commit tortious acts and those acts are continuing to cause damage. Where the cause of the injury is a continuous one giving rise to successive damages, prescription dates from cessation of the wrongful conduct causing the damage. *Id.* Because both the conduct -- the failure to maintain the pipeline canals and restore the property -- and the damages continue to this date, the tort is a continuous one and thus prescription has not begun. *See Badalamenti v. Chevron Chemical Co.,* 1995 WL 386868, (E.D. La. 1995). The defendants' actions are continuing when we consider the operations of defendants. But for the pipelines being operated by the defendants, there would be no pipeline canals on TPSB's property. Every year from beginning operations until present, defendants have inspected their pipelines at least once for maintenance purposes. Columbia Gulf has inspected its pipeline every month. Hence, every year they have been put on notice of the condition of the pipeline canals containing the pipelines in question. These pipeline canals are allowed under the right of ways authorizing defendants to operate the natural gas pipelines on TPSB's property. Again, logic dictates that if defendants are required under continuing contractual obligations to maintain their pipelines and appurtenances, i.e., pipeline canal, then defendants are responsible for any continuing breaches of these contractual obligations.

**La. C.C. arts. 2315 & 667-669**

As the Louisiana Supreme Court noted in *Inabnet v. Exxon Corp.*, 93-0681 (La. 9/6/94), 642 So.2d 1243, while the owner of immovable property (or a person deriving his rights from the owner) generally has the right to use the property as he pleases, the owner's right may be limited if the use causes damage to neighbors (and others). The corresponding rights and obligations of neighboring proprietors, arising from that relationship, are principally governed by La.Civ.Code arts. 667-669. *Inabnet*, 642 So.2d at 1250.

Article 667 is clear: "Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him." Article 668 provides, however, that the damage must be more than an inconvenience. Article 669, which regulates nuisances, by its very terms, permits recovery by "those in the <u>same</u> or neighboring houses." See *Salter v. B.W.S. Corp.*, 290 So.2d at 821 (La. 1966). Article 669, properly translated, applies to "different inconveniences," not only to "smoke or nauseous smell." Yiannopolous, Louisiana Civil Law Treatise, Vol. 4 (predial servitudes) sec. 58 (1983 & Supp. 1987).[1]

In the instant case, articles 667-669 provide grounds for defendants' liability. Defendants, by refusing to maintain their canals and, thus, causing the loss of TPSB's property, have deprived TPSB of the liberty of enjoying its property. The damage occasioned, including the loss of land, is certainly more than an inconvenience. The poorly maintained leaking canals, which far exceed the permitted scope of the canal servitudes, most definitely constitute a trespass and a nuisance.

---

[1] Louisiana courts have applied not only article 667, but also article 669 in cases involving damage caused by canals. See *Bruning v N Orleans Canal and Banking Co.*, 12 La. Ann. 541 542-43 (1857) (canal resulting in flooding of dry land); *Shneidau v Louisia Highway Commission*, 206 La. 754, 20 So.2d 14 (1944) (canal built "with no protection against the sloughing of the banks).

Defendants have also not maintained their canals on Section 15, an adjacent and contiguous Section owned by Continental Land and Fur, and their canals have deteriorated on this Section which in turn has led to massive open water which has intruded into TPSB's marsh.

Defendants' use of the property in such a manner as to injure TPSB constitutes fault under La. C.C. Article 2315 and La. C.C. Articles 667-669. Defendants are liable for their negligence, including *res ipsa loquitor*, upon proof of causation and damages.

**Market Value or Restoration Damages**

Since TPSB's land is held in trust for the benefit of the public and restoration of the land benefits the public, private and social values apply in this case. Market value is not the measure of damages. This conclusion is supported by **St. Martin v. Mobil, supra,** holding that the plaintiffs were entitled to restoration damages and rejecting defendants' arguments that market value of the property was the proper measure of damages. To conclude otherwise, is to undervalue the property and relieve defendants' of their actions as it will set a precedent allowing future servitude owners to destroy the property of other marsh owners throughout Louisiana with impunity since these servitude owners will have essentially no legal liability for their actions. An award of damages including only the diminution of property values, rather than restoration, would render also render similar enforcement attempts futile, would violate national and local policy, and certainly would provide no deterrent value to prevent further damage to the resources involved.

TPSB holds the land in trust for the public. Consequently, liability is warranted pursuant to the Public Trust Doctrine. The development of natural resources law, particularly in the last two decades, clearly demonstrates an increasing emphasis on protection and restoration of natural resources. That emphasis has been premised on the assumption that privately owned land imbued

with certain natural resources is not totally owned by private individuals despite fee simple title. Pursuant to this widely recognized doctrine, natural resources, even those on private property, "are considered too important to society to be owned by one person," and, as such, have gradually evolved into the corpus of the public trust. Gregg L. Spyridon, Sam A. LeBlanc, III, *The Overriding Public Interest in Privately Owned Natural Resources: Fashioning a Cause of Action*, 6 Tul. Envtl. L.J. 287-289, 303 (Summer, 1993).

The Public Trust Doctrine clearly applies in this case, in which a government entity and political subdivision of the State of Louisiana seeks to enforce its own and the public's interest and national and local policies regarding the protection of the environment and invaluable and irreplaceable natural resources. "When property damage claims include injury to natural resources, traditional property damage concepts become grossly inadequate to carry out the state and national policies of protecting and restoring natural resources." Gregg Spyridon and Sam LeBlanc, *The Overriding Public Interest in Privately Owned Natural Resources: Fashioning a Cause of Action*, 6 Tul. Envtl. L.J. 287, 311-312 (Summer, 1993). Richard B. Stewart et al., *Evaluating the Present Natural Resource Damages Regime: The Lawyer's Perspective,* in Natural Resource Damages: A Legal, Economic and Policy Analysis 171 (Richard B. Stewart ed., 1995), states, in accord, that: "[t]he tort model of damage liability is... inappropriate for environmentally significant public resources". Id., at p. 171 n. 33.

Environmental statutes such as CERCLA and OPA express a strong preference for restoration over compensatory type damages. For example, CERCLA provides that parties responsible for hazardous substance releases "shall be liable for ... damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury,

destruction, or loss...." Moreover, "[t]he measure of damages ... shall not be limited by the sums which can be used to restore or replace such resources." 6 Tul. Envtl. L.J. at 312.

The Courts have borrowed from these analogous environmental statutes in awarding costs for the restoration of wetlands natural resources, even in a case where the restoration cost far exceeded the fair market value of the land. In ***Puerto Rico v. S.S. Zoe Colocotroni***, 628 F.2d 652, 671 (1st Cir. 1980), ***cert. denied***, 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981), the Commonwealth of Puerto Rico sought to recover approximately $13 million in damages for the restoration of approximately forty acres of a mangrove forest which had been contaminated by an oil spill. The forty-two acres of contaminated mangrove forest had a commercial market value of approximately $200,000 but, like many wetlands, was found to serve many noncommercial ecological functions such as: 1) protecting the shoreline from erosion, storms, tides and high winds; 2) providing a habitat for wildlife; 3) providing a protected breeding ground for fish and shellfish; and 4) acting as a food source for aquatic creatures of all kinds. Puerto Rico sought full restoration and recovery of the total value of the damages caused to the environment and/or natural resources.

The ***Zoe*** court was faced with the task of determining whether federal laws supported the recovery of restoration costs which far exceeded the market value of the lands that were damaged. While noting that traditional property damage theories did not support such a recovery, the Court noted that the federal statutes and their legislative history did, in fact, support such a recovery. 628 F.2d at 675.

Borrowing from the language and legislative history of OCSLA and the CWA which both express preferences for restoration or rehabilitation of damaged or destroyed natural resources, the

court held that a strict application of the traditional property damage (diminution in value) rule would effectively deny any right to recover meaningful damages. 628 F.2d at 675. In fashioning a new measure of damage for injury to natural resources, the court held that "the appropriate primary standard for determining damages ... is the cost reasonably to be incurred ... to restore or rehabilitate the environment in the affected area to its pre-existing condition, or as close thereto as is feasible without grossly disproportionate expenditures." 628 F.2d at 675.

Following the rationale of the First Circuit and the much stronger preferences expressed by Congress in subsequent legislation such as Coast 2050 and CWPPRA, a plaintiff should not be precluded from recovering restoration costs for damages to privately or publicly held natural resources even if they exceed the fair market value of the property.

In *Roman Catholic Church v. Louisiana Gas Service Co.*, 618 So.2d 874 (La. 1993), the Louisiana Supreme Court awarded the plaintiffs the full restoration cost of a burned building. In reaching its decision the Court ruled:

> ...[A]s a general rule of thumb, when a person sustains property damage due to the fault of another, he is entitled to recover damages including the cost of restoration that has been or may be reasonably incurred, or, at his election, the difference between the value of the property before and after the harm. If, however, the cost of restoring the property in its original condition is disproportionate to the value of the property or economically wasteful, unless there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs, damages are measured only by the difference between the value of the property before and after the harm. Consequently, if a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building.

618 So. 2d at p. 879-880. The Louisiana Supreme Court in *Inabnet, supra,* cited the *Roman Catholic Church* decision, and noted that the <u>owners</u> of damaged land are the proper parties to

claim restoration damages. *Id.* at 1255.

In ***Sercovich v. Chevron U.S.A., Inc.***, 626 So.2d 434 (La. App. 4 Cir. 1993), *reversed and remanded on other grounds*, 93-2927 (La. 10/28/94), 644 So.2d 379; *on remand to **Sercovich v. Chevron U.S.A., Inc.***, 93-0046 (La. App. 4 Cir. 5/16/95), 655 So.2d 776, Chevron contended that the cost of restoring the property to its original condition was disproportionate to the value of the property and that the plaintiff was not entitled to restoration costs, but only to the difference in the value of the property before and after the harm. The Court ruled that an award of restoration was consistent with **Roman Catholic Church**:

> We do not believe that the award of restoration costs herein violates the principles of *Roman Catholic Church v. Louisiana Gas Service Company, supra*. That case involved the restoration of an apartment building damaged by fire, and the owner was ultimately awarded the full restoration costs. The instant case involves an oyster lease. It is obvious that the value of an oyster lease cannot be determined in exactly the same way as the value of an apartment building. An oyster lessee pays a nominal amount for his lease, usually expends a great deal of time, effort and resources to work the lease, and then, if he is lucky, makes a good profit. The amount paid for the lease is not an accurate reflection of its value.

626 So.2d 437-438.

The Louisiana Supreme Court in **Roman Catholic Church** and **Inabnet** and the Louisiana Fourth Circuit in **Sercovich** recognized that to fully compensate an owner, courts should not be limited to a simple diminution in market value of a small part of the property, but should consider the value of the property as a whole, the nature of the owner's use of the property, the reasons for wanting the land restored to its former condition, and the aesthetic or other intangible value placed on the property. TPSB and the public have ample personal reasons for restoring the productive condition of the invaluable wetlands property at issue. As discussed *supra*, Louisiana's wetlands

provide innumerable resources, livelihood, food and recreation for vast numbers of our residents. The property is a treasured natural resource.

In the instant case, TPSB, a government body and political subdivision of the State of Louisiana, is not only acting on its own behalf, but as trustee for the citizens of Terrebonne Parish and Louisiana, who have a very great stake in preservation and continued vitality of Louisiana's wetlands. Defendants, who have damaged and destroyed vast acres of wetlands, are liable to TPSB as well as the public, to prevent further damage to these valuable natural resources and to restore them to a productive state.

Koch and Columbia Gulf have had every opportunity to properly maintain their canal spoil banks/levees. Since beginning operations, they have conducted inspections of their pipelines located in the pipeline canals once a year, at a minimum. Despite these inspections and notice that their canals are eroding, defendants have never taken steps to restore their canals. Neither defendant has performed any maintenance on its pipeline canal. Neither defendant has a company policy in place to maintain pipeline canals and preserve a landowner's land. Louisiana law requires defendants to cause the least possible damage. The pattern of conscious environmental indifference exhibited by each defendant is a breach of each defendant's respective servitude and is a continuing tort, as well as a violation of public policy. Consequently, the proper measure of damages are restoration damages.

**Corp of Engineers Permit Process and its Lack of Effect on Damages and Liability**

Koch may erroneously argue the Court awarding restoration damages is subject to the granting of a permit by the U.S. Army Corps of Engineers to carry out the Charles Camp's restoration plans. The overriding issue before this Court is the liability of the defendants. The COE

plays no role in reaching that decision. A complete adjudication can be made absent the COE. The COE has no authority nor jurisdiction to adjudicate property rights and obligations. *Kliebert Educ. Trust v. Watson Marine Services*, 454 So. 2d 855 (La.App. 5th Cir. 1984), *writ denied*, 457 So. 2d 682 (La. 1984), *cert. denied*, 471 U.S. 1050, 105 S.Ct. 2108, 85 L.Ed.2d 474 (1985). In fact, the COE's regulations expressly forbid it to interfere with, authorize or grant property rights or privileges. See 33 C.F.R. § 320.4.

TPSB seeks a decision as to whether defendants are required to restore land damaged by their operations. A permit from the COE for a restoration project in a coastal zone and/or wetlands is certainly not a requirement for this Court finding each defendant liable for its breach of contractual obligations. Moreover, a permit from the COE is not required before this Court can decide liability. There is no claim to be filed with the COE which must be determined or resolved prior to this Court deciding the merits of this case. TPSB is not seeking damages or decisions as the result of COE activity. TPSB is not seeking a remedy pursuant to federal law, such as the Federal Tort Claim Act. The COE has authority to accept, alter, or reject the restoration project after this Court orders restoration of the pipeline canals. However, the COE has no authority to enforce the Right-of-Way and easement provisions requiring each defendant to maintain its pipeline canal.

Respectfully submitted,

ST. MARTIN & WILLIAMS (APLC)

_____
MICHAEL X. ST. MARTIN          #12365
JOSEPH G. JEVIC, III            #23145
Post Office Box 2017
Houma, Louisiana 70361-2017
(504) 876-3891     Telephone
(504) 851-2219     Facsimile

*end*

A. J. GRAY, III                    #6253
WADE T. VISCONTE                   #24734
THE GRAY LAW FIRM (APLC)
Post Office Box 1467
Lake Charles, LA 70602-1467
(337) 494-0694    Telephone
(337) 494-0697    Facsimile

**Attorneys for Terrebonne Parish School Board**

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing memorandum has been mailed to all counsel of record via facsimile and United States mail, postage prepaid on this _8th_ day of _January_, 2001.

_____
JOSEPH G. JEVIC, III