

PLEASE FILE
IN RECORD

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TERREBONNE PARISH SCHOOL BOARD** | § | **CIVIL ACTION NO. 00-0319** |
| **VERSUS** | § | **SECTION: B** |
| **COLUMBIA GULF TRANSMISSION COMPANY AND KOCH GATEWAY PIPELINE COMPANY** | § § | **MAGISTRATE: 5** |

**************************************************************************

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
### SUBMITTED BY PLAINTIFF
### TERREBONNE PARISH SCHOOL BOARD

———————————————

This case arises out of the relationship between a landowner whose property is burdened by servitudes. The pivotal questions involve the defendants, Columbia Gulf Transmission Company ("Columbia Gulf") and Koch Gateway Pipeline Company ("Koch"), and their obligations to maintain canals dredged on the property to benefit their natural gas pipeline operations and to preserve, restore, and maintain the coastal marsh property at issue. Plaintiff, Terrebonne Parish School Board ("TPSB") alleges that the defendants' use of and failure to maintain the canals has

caused erosion and other damage to the freshwater flotant marsh ecosystem present on its property in Section 16, Township 18 South, Range 13 East.

**Proposed Findings of Fact:**

1.  TPSB is the owner of Section 16, Township 18 South, Range 13 East, ("School Board property") in Terrebonne Parish, Louisiana, originally comprising 640.92 acres of freshwater coastal marsh. By Act of U.S. Congress dated 4/21/1806, 2 Stat. 391 and Act of U.S. Congress dated 3/3/1811, 2 Stat. 622, the United States conveyed all Section 16 lands in every Township to the State of Louisiana to be used in trust for the benefit of educating the people of Louisiana.

2.  The defendants are natural gas companies. They have operated the interstate natural gas pipelines traversing TPSB's property since the pipelines were constructed.

3.  On December 18, 1957, Terrebonne Parish School Board granted a Right-of-Way to United Gas Pipeline Company that is recorded in the Terrebonne Parish Courthouse under COB 253, Folio 646, Entry No. 173617. The Right of Way gave United Gas the authority to construct and operate a natural gas pipeline on the School Board property. The right of way also gave United Gas the limited authorization to dredge a pipeline canal "not to exceed forty feet in width." The right of way is considered a predial servitude under Louisiana law

and attaches to the land and is transferrable to Koch as United Gas' successor or assignee. As such, the servitude allowed Koch to take over operations of the natural gas pipeline in 1992.

4.    The Koch pipeline was constructed and the pipeline canal dredged in 1958. The pipeline canal was forty feet in width when originally dredged. Since 1958, the pipeline has been continuously operated.

5.    Columbia Gulf did not obtain a right of way before constructing its natural gas pipeline and pipeline canal across the School Board's property. On February 18, 1964, gave public notice of an application by Columbia Gulf for a servitude across TPSB's land. On March 17, 1964, TPSB adopted a resolution setting a minimum fee of $25.00 a rod for any pipeline right of way granted across the School Board property. On April 3 & 8, 1964, representatives from Columbia Gulf complained of the $25.00 rate. Subsequent to this date, Columbia Gulf committed a trespass when it dredged its pipeline canal and constructed its pipeline on the School Board property even though it had not been granted a right of way. Subsequently, Columbia Gulf was able to negotiate a settlement for damages arising out of the construction of its pipeline canal, and Columbia Gulf was granted a right of way that is recorded in the Terrebonne Parish Courthouse under COB 403, Folio 313, Entry No. 284018, dated August 4, 1965, in conjunction with the settling of the trespass claim. The pipeline has been continuously operated since it was constructed and the pipeline canal was dredged. Based on the only document produced by Columbia Gulf, the Columbia Gulf pipeline canal was fifty feet in width when dredged.

6.    Insofar as the right of ways or servitudes on the property are concerned, TPSB is the grantor and surface owner. TPSB has not received revenue from the natural gas operations of either Koch or Columbia Gulf . TPSB has received no mineral royalties from production on T18S, R13E since a producing well has not been drilled on the property.

7.    TPSB's wetland specialist, Dr. Robert Chabreck provided facts on the formation of freshwater flotant marshes and conditions necessary to maintain such marshes. As he explained, a flotant marsh is one in which a thick mat of vegetation floats on one to two feet of water that covers the land. Such marshes are considered a fragile and important ecosystem in coastal Louisiana.

8.    Dr. Chabreck has mapped marsh types all across Louisiana for forty years. Marshes are classified as fresh, brackish, or salt. Based on his prior mapping of Louisiana, Dr. Chabreck testified that prior to construction of the canal system dredged by the Defendants, much of the marsh in Section 16 could be classified as flotant or floating freshwater marsh. Floating marshes in Terrebonne Parish are a product of subsidence (sinking of the land). These marshes actually began as wet prairies containing grasses, sedges, and other herbaceous plants growing on firm mineral soil (silts and clays) originally deposited as alluvial sediments by the Mississippi River. The plants were firmly rooted in the mineral soil and were able to resist water currents and erosion.

9.    Dr. Chabreck explained that after the Mississippi River abandoned this region, including Terrebonne Parish, and active sedimentation ceased, the region was subject to fairly rapid subsidence. After many years, the mineral soil deposited by the river had subsided to a depth in some areas that plant roots were unable to reach for attachment. As the mineral soil

subsided, residue from plants was deposited each year to form new soil. Wet soil produces anaerobic conditions that resist decomposition and allow plant residue to accumulate and form new soil. In the absence of river sediment, the new soil was highly organic and much lighter in weight than the original mineral sediment. In fact, according to Dr. Chabreck, plant debris is so light that it will only accumulate in an area that is free of tidal currents and water movement. With only a slight current, the plant particles will be carried away.

11.    As the mineral soil continued to subside, the organic layer continued to build and a floating mat of plant residue developed. The depth to the mineral soil below floating mats in some areas of Terrebonne Parish was as much as several feet. A band of water often exists between the floating mat and the mineral soil.

12.    The long-term maintenance of floating mats, like their creation, requires the absence of water movement or currents that will erode the light-weight organic particles from the floating mats. The greatest erosion is from the bottom of the floating mats where particles are less consolidated, and plant roots are not present to hold the particles together. Within a period of several months to a year, a large floating mat can erode away when subjected to frequent and strong water currents.

13.    Turning to TPSB's Section 16, Township 18 South, Range 13 East property, Dr. Chabreck testified that freshwater marsh and swamp on the Terrebonne Parish School Board property developed under wet and waterlogged conditions and with no water movement or currents to erode and export plant residue that fell to the marsh surface. As a result, organic matter accumulated in the soil and was the principal component of the upper layers of the soil.

14.   It is undisputed in scientific community that marsh is damaged or destroyed in two ways, by natural and man-made causes. One of the man-made causes is pipeline canals. The canals cause loss in two general ways. Marsh is destroyed when marsh is actually dredged out to create a canal and when spoil from dredging is placed to create levees that destroy the area of marsh where the levees are formed. These types of marsh loss are known as direct impacts.

15.   However, marsh loss can also be caused by indirect impacts. Erosion caused by a hydrologic connection with marsh through breaks in pipeline canals is one type of indirect impact. There are numerous natural and man-made causes that can lead to indirect impacts of wetlands. As Dr. Chabreck explained, the specific cause or causes of damage to each piece of property or area of marsh are individual and unique. In other words, just because one piece of property suffers from direct and indirect impacts due to one cause or causes does not mean that another piece of land will suffer direct and indirect impacts due to the same cause or causes.

16.   Dr. Chabreck testified that since every piece or area of marsh property owned by Terrebonne Parish School Board may be destroyed or damaged in a unique way, field studies and investigations must be conducted to determine the exact causes of marsh damage and extent of damage. Even though historical aerial photographs may show that a piece of property is apparently eroding and damaged as the result of oil and gas activities, theories of damage must be tested or confirmed through field work. For example, saltwater intrusion cannot be confirmed until water samples are taken in a freshwater marsh.

17.    Historical aerial photographs introduced into evidence at trial show that before the defendants dredged their pipeline canals, virtually no surface ponds nor surface streams existed on the School Board property.    The marsh was a stable hydrologic ecosystem. TPSB provided additional aerial photographs that show channels and open water and ponds areas forming subsequent to the pipeline canals being dredged in the adjacent interior marsh.

18.    On October 19, 1999, TPSB filed the instant case against Koch and Columbia Gulf.  TPSB contends that defendants are liable under the following causes of action: the canal servitude agreements, negligence-based tort, Louisiana Civil Code articles 667-69, and the public trust doctrine. TPSB's Petition seeks restoration damages pursuant to a restoration plan for the marsh, which would include constructing bulkheads along the canals and restoring the eroded areas.

**Proposed Conclusions of Law**

1.    TPSB contends that the damages to Section 16 are related to the pipeline canals dredged by the Defendants through Section 16 for the purpose of natural gas operations because gaps in the spoil banks flanking the defendants' canals allow water to flow into and out of its marsh, eroding the floating marsh mat and leaving open ponds. These open ponds disrupt the ecosystem, represent loss of the vegetative mat, and provide openings for invasive plant species.    Defendants acknowledged that the canals in Section 16 were not properly maintained, and levees along the canals were allowed to deteriorate, so that breaks or breaches were formed in the levees and allowed to remain over a period of several years.

2.      According to TPSB's experts, the breaches in the levees along the canals provided a
connection that hydrologically linked tidal waters of Little Horn Bayou, Atchafalaya River,
and Gulf of Mexico to sensitive, floating freshwater marsh in Section 16. The surging or
flushing action associated with tidal cycles has gradually eroded the organic soil of the
marsh and flushed it out through the levee openings. As a result of the erosive action,
healthy freshwater marsh in Section 16  has been converted to open water and has allowed
water hyacinths, an exotic pest plants, to spread over much of the Terrebonne Parish School
Board property.

3.      Defendants contend the language of their servitude agreements and damage releases
executed relieve them of any liability to plaintiff in this case under any theory.  Defendants
also argue that they cannot be held liable under Louisiana servitude or tort law. They
contend that TPSB's claims are prescribed as a matter of Louisiana law and that the canal
servitude agreements do not impose a continuing duty to maintain and repair their canal
banks. Lastly, the defendants argue that the damages awarded by this Court cannot exceed
the market value of the land.

**Servitude Agreements**

4.      Both defendants point to their servitudes as not mandating that they maintain their pipeline
canals.   They also claim that the servitudes and damage releases relieve them of any
liability. This Court disagrees. First, correspondence attached with the damage releases and
the language of the damage releases themselves are clear that the releases were limited in
scope to any damages caused directly as a result of the construction of the pipeline canals.
The releases do not relieve the defendants of maintaining their pipeline canals.  This duty

was clearly established in *St. Martin v. Mobil*, 224 F.3d 402 (5th Cir. (La.) 2000), which serves as controlling authority in this case. In that case, the U.S. Fifth Circuit held the current servitude owner owed the current surface owner a duty to maintain canals and to compensate the owner for any damage to surrounding freshwater flotant marsh caused by the servitude grantee's failure to maintain.

5.     Turning to this case, the Koch pipeline canal was forty feet in width when dredged. Despite the provision in the December 18, 1957 right of way allowing a pipeline canal "not to exceed forty feet in width," Koch acknowledged it has taken no actions to maintain its pipeline canal. As a result, the pipeline canal has eroded significantly and now averages one hundred six (106) feet in width.

6.     Columbia Gulf's right of way was limited to one hundred feet. The Columbia Gulf canal was fifty feet in width when dredged. Columbia Gulf has taken no actions to maintain its pipeline canal, including the spoil banks. As a result, the pipeline canal has eroded significantly and now averages roughly one hundred sixteen (116) feet in width in violation of the limits established in the August 4, 1965 right of way.

7.     Due to defendants' lack of maintenance, breaks or cuts have developed in the spoil banks of each defendant's pipeline canal and have continued to widen and deepen thereby creating a hydrologic connection that has damaged the marsh.

8.     The Court recognizes that Koch and Columbia Gulf, as right of way or servitude owners, are entitled to reasonable use of the surface of the property for their natural gas operations. The Court also recognizes that Koch had the right to construct the its pipeline canal. However, as established in *St. Martin v. Mobil*, *supra,* both the Koch and Columbia Gulf

canals must be preserved and maintained to prevent continuous damage of TPSB's fragile marsh, and canals that have eroded must be restored to the widths granted in the relevant right of ways.

**Causation**

9.      TPSB presented testimony from various experts to prove its case. One of these experts was Dr. Robert Chabreck. Dr. Chabreck, a retired professor of wildlife at Louisiana State University, has studied marshland ecology extensively. He has published over 130 scientific and popular articles on wetlands and wildlife management and has planned and evaluated marsh development programs for marsh wildlife refuges for the State of Louisiana. He has professional experience with the U.S. Fish and Wildlife Service, as a refuge and research biologist, and has garnered significant acclamation for his work and publishing on marsh ecology and management.

10.     Dr. Chabreck is a specialist in the ecology of the region. He has spent many years in observation of coastal marshes in Louisiana and had visited and examined the marsh in question on several occasions.

11.     Defendants suggest that only a qualified hydrologist could have testified as to whether canal water intrusion occurred at sufficient levels and speeds to erode the vegetative mat. This representation is absolutely incorrect. As the U.S. Fifth Circuit noted in *St. Martin v. Mobil, supra*: "Defendants' arguments on this point fail for several reasons. First, Dr. Chabreck's expertise in marshland ecology and in the erosion of vegetative mats in

particular, along with his personal observation of the St. Martins' property, *sufficiently qualified him to testify as an expert.*[1] (emphasis added).

12.    This Court agrees with the U.S. Fifth Circuit. While a hydrologist might be better trained than a marshland ecologist in the abstract physics of water forces, he would have less relevant expertise in the kinds and amounts of stresses on the organisms making up the vegetative mat that could cause degradation of the mat. TPSB's hydrologist, Alex McCorquodale, did testify as to observed speeds of canal water intrusion into the marsh through the gaps in the defendants' canals' spoil banks; however, the significance of that information for the health and stability of the vegetative mat would be within the expertise of a marshland ecologist such as Dr. Chabreck.

13.    Dr. Chabreck visited the property on several occasions, examining both the damaged areas near the spoil-bank gaps and identifying a test or control area. The test area did not exhibit the same damage to and erosion of the marsh mat as those areas exposed to gaps in the canal spoil banks. His direct observations of the marsh including visual confirmation of marsh being transported through the gaps in the canal spoil banks. Dr. Chabreck also used historical aerial photographs to track erosion of the marsh. He took samples of root mat to confirm his hypothesis. He verified that damaged areas next to open water areas had a thinner root mat than areas where the marsh was healthy. He also noted changes from the original vegetation which covered the property.

---

[1]    See *Michael X. St. Martin & Virginia Rayne St. Martin v. Mobil Exploration & Producing U.S., Inc., et al*" 224 F.3d 402, 405 (5th Cir. (I Aug 16, 2000).

14.    As stated previously, Defendants have allowed the numerous breaks or cuts in the spoil banks to enlarge which continue to cause erosion and destruction of the marsh. Tidal cycles and the hydrologic connection created by the pipeline canals has allowed significant water movement into and out of the marsh through the breaks in the spoil banks. Consequently, channels adjacent to the breaches or breaks developed allowing a direct hydrologic connection. TPSB's hydrologist, Alex McCorquodale, measured the velocity of water currents through the breaks in the defendants' pipeline canals. He also gathered sediment and/or root mat samples. Based upon the flow meter readings and sediment and/or root mat samples taken, Dr. McCorquodale concluded that flows into the School Board property have sufficient energy to erode or break up underlying sediment and organic material from beneath the root mat and destroy wetland area without killing vegetation first.

15.    This process was confirmed by Dr. Chabreck's field work which established that the marsh root mat that has not been converted and that is damaged adjacent to canals is significantly less thick in soil and root composition as opposed to normal healthy marsh. In turn, according to Dr. Chabreck, as the root mat is gradually eroded, vegetation dies. The dying of marsh vegetation results in increased erosion and leads to open water, and/or submergence of marsh vegetation and root mat. Native vegetation is replaced with pest plants like water hyacinths. The erosion damage increased over the years, although the erosion went undiscovered because the property eroded from the bottom of the floating marsh up to the surface. Accordingly, due to the erosion and/or submergence of the School Board property as a result of the canals dredged by Defendants, the ecological regime of School Board marsh property changed.

16.    Defendants offer several alternative explanations for the deterioration of the marsh mat in

issue. First, they contend that damage from hurricanes, and Hurricanes Juan and Hilda in

particular, can be blamed for the marsh root mat loss. TPSB's expert on hurricanes, Dr.

Shea Penland, addressed this defense. Shea Penland is a geomorphologist and coastal

wetlands expert, including their valuation. According to Penland, hurricanes can destroy or

severely damage marsh property. However, Penland found no such evidence of any such

destruction or damage in this case. Dr. Penland relied on previous research he had

conducted to conclude that the marsh in question was likely too far inland to experience

significant loss of vegetation due to hurricanes. Dr. Penland also flew in the area near

TPSB's property after Hurricane Andrew and did not find significant damage in the area.

Based on these findings, historical aerial photography, and recent field inspections, Dr.

Penland concluded that TPSB's property was not damaged by Hurricane Andrew. He also

found no evidence of damage being caused by other hurricanes in the last fifty years in the

historical aerial photographs. The defense expert, Dr. Joseph Suhayda, who testified

regarding hurricane damage on TPSB's property admitted that he had not visited the

property after Hurricane Andrew or any other hurricanes which defendants claim damaged

the marsh. Dr. Suhayda could only testify regarding the possibility of hurricane damage

based on his reading of general scientific literature on the subject and use of a computer

model simulation intended to recreate water elevations caused by various hurricanes over

the last fifty years. Defendants also claimed that flooding in the past, including a flood of

the Atchafalaya in 1973, destroyed much of TPSB's property. Again, this defense was

completely based on computer modeling and general scientific literature on the subject dealing with the effects of various floods on Terrebonne Parish in general.

17.    Defendants acknowledged that salt intrusion was not responsible for the TPSB's marsh root mat loss. While all experts agreed that salt intrusion can damage freshwater marshes as a general principle, the salinity tests actually performed on the TPSB's property indicated no significant salt intrusion had in fact occurred. Significantly, the test areas identified by Dr. Chabreck, which would presumably be subject to the same salinity, did not show signs of deterioration.

18.    Defendants also contend that nutria eat-outs damaged the TPSB's marsh. However, the evidence on nutria eat-outs did not clearly establish their responsibility for the damage. Dr. Chabreck, a world renowned expert in nutria, testified to his personal observations of the marsh as well as his previous studies of nutria behavior, and noted that their numbers had declined in recent years. He also explained that they do not generally have a significant impact upon healthy marsh but rather may be more visible in and more attracted to marsh mat that has already been damaged by another force. Dr. Chabreck explained that healthy marsh usually has vegetation, like maiden cane and bull tongue, which nutria do not find attractive for purposes of feeding. However, as root mat is damaged, this original vegetation is often replaced with vegetation which nutria do find attractive such as penny wort and spike rush. Dr. Chabreck testified that the presence of nutria is a sign that the marsh has been damaged, and the nutria are analogous to vultures feeding on the carcass. Dr. Chabreck's opinion was supported by maps produced by defendants and TPSB. Defendants produced a map showing herbivory sites in the general area of TPSB's property,

but none were specific to the School Board's property. However, TPSB produced a Corp of Engineers map indicating that the damage to a much larger area, known as Penchant Basin, is due to oil and gas operations. Consequently, it appears that oil and gas operations have been negatively impacting TPSB's property and surrounding areas for quite some time and nutria have only recently moved in as the marsh has deteriorated. Similarly, defendants' suggestion that herbicide spraying by government agencies could have contributed to the deterioration of the marsh in issue was contradicted by Dr. Chabreck's explanation of the effects of the herbicide, i.e. that it would not affect the dominant plants in healthy marsh mat.

19. Finally, defendants contend that subsidence or submergence and relative sea level rises contributed to the deterioration of the marsh. Subsidence or submergence is a factor region-wide, but its effects on the area in issue were not clearly demonstrated at trial. While not denying that subsidence can affect coastal marshes, Dr. Chabreck pointed again to the test areas which were unaffected by any of the systemic explanations offered by defendants. Defense experts also conceded that man-made forces (including oil and gas activity and canals) were an identified factor in marsh loss in coastal Louisiana and the areas immediately surrounding the property in issue. It is also important to note that Dr. Chabreck pointed out that subsidence is neutralized if an active sediment source is supplied. It would seem that the Little Horn Bayou and canals would serve as a sediment delivery source thereby rendering subsidence inapplicable, but the source of sedimentation is negated by the high velocity flows which carry sediment but also are so swift and forceful

that they flush out the same sediment along with the marsh's existing sediment and organic matter in the interior of the marsh.

## Liability

20. Defendants argue that they cannot be held legally responsible for any damage to the TPSB's marsh, regardless of causation. Defendants argue that (a) the canal servitude agreements do not contain an implied obligation to construct or maintain canal banks, (b) prescription under Louisiana law bars the TPSB's claim.

## Prescription

21. The Court finds the defense of prescription has no merit. This result is supported by *St. Martin v. Mobil*, 1998 WL 474211, *affirmed*, 224 F.3d 402. In that case, the defendants claimed that plaintiffs' claims prescribed. The plaintiffs purchased the property in 1992. They were not parties to the mineral leases allowing operations and canals by defendants. The trial court rejected the prescription defense noting that "the mineral leases are still in effect, and defendants continue to use the canals under the agreements. Therefore, the canal servitude agreements still impose certain obligations upon defendants which are capable of enforcement. These obligations, to maintain the canal and to pay for any damages occasioned by its use or maintenance, are continuing." In fact, this case is stronger than *St. Martin v. Mobil, supra,* because TPSB is the grantor of the right of ways granting defendants their rights to conduct operations on TPSB's property. As the servitudes are still in effect, prescription has not started to toll.

22. The U.S. Fifth Circuit noted that the damage alleged in that case was not the mere presence of the canals or a static condition related to their existence (e.g. diversion of water as part of

their normal course of operation), but an ongoing and cumulatively increasing deterioration of plaintiffs' property adjoining the canals due to defendants' continuing conduct in their failure to maintain the canal banks. The harm alleged by the St. Martins was an ongoing violation of the servitude agreements, not a one-time action or default on the part of defendants.

23.  Similarly, in this case, prescription does not apply because defendants are continuing operations on the TPSB property. Hence, prescription has not tolled because prescription has not begun to run. When, as here, the plaintiff's petition alleges a continuous cause of damage that has not ceased, the plaintiff's action is not prescribed on the face of the petition; hence, the burden of proof is on the defendant or the party pleading prescription to establish the facts necessary to sustain the plea. *Pearson v. Hartford Accident & Indemnity Co.*, 281 So.2d 724 (La.1973); *Strata v. Patin*, 545 So.2d 1180, 1189 (La.App. 4 Cir.), *cert. denied*, 550 So.2d 618 (La.1989); See also *Chaney v. State Through Dept. of Health and Human Resources*, 432 So.2d 256, 259-60 (La.1983) (applying similar rule regarding date on which it was alleged plaintiff acquired knowledge of tortious act) and *Bustamento v. Tucker*, 607 So.2d 532, 542 (La. 1992).

24.  TPSB's tort claim has not prescribed because the defendants are continuing to commit tortious acts and those acts are continuing to cause damage. Where the cause of the injury is a continuous one giving rise to successive damages, prescription dates from cessation of the wrongful conduct causing the damage. *Id.*   Because both the conduct -- the failure to maintain the pipeline canals and restore the property -- and the damages continue to this date, the tort is a continuous one and thus prescription has not begun. *See Badalamenti v.*

*Chevron Chemical Co.,* 1995 WL 386868, (E.D. La. 1995). The defendants' actions are continuing when we consider the operations of defendants. But for the pipelines being operated by the defendants, there would be no pipeline canals on TPSB's property. Every year from beginning operations until present, Koch has inspected its pipeline at least once for maintenance purposes. Columbia Gulf has inspected its pipeline at least once a month. Hence, every year they have been put on notice of the condition of the pipeline canals containing the pipelines in question. These pipeline canals are allowed under the right of ways authorizing defendants to operate the natural gas pipelines on TPSB's property. The defendants are obligated to cause the least possible damage to plaintiff's property while carrying out rights provided them under their respective right of ways. Since the right of ways allow continuing operations, and defendants continue to carry out operations under their right of ways, they are under a continuing obligation to cause the least possible damage to TPSB's property and maintain their pipeline canals. *Duet v. Louisiana Power and Light Company,* 169 F.Supp. 184 (E.D.La.1958); *Accord, Board of Comm'rs of Port of New Orleans v. Illinois Cent. Gulf R. Co.,* 379 So.2d 838 (La.App. 4 Cir. 1980) *writ denied* 380 So.2d 1210 (La. 1980). Stated another, just as the defendants have a continuing duty to inspect their pipelines and make sure the pipelines are in good repair and not causing damage to TPSB's property, so are the defendants under the same continuing duty to repair and maintain the canals used in operations of their pipelines.

**La. C.C. arts. 2315 & 667-669**

25.     As the Louisiana Supreme Court noted in *Inabnet v. Exxon Corp.*, 93-0681 (La. 9/6/94), 642 So.2d 1243, while the owner of immovable property (or a person deriving his rights

from the owner) generally has the right to use the property as he pleases, the owner's right may be limited if the use causes damage to neighbors (and others). The corresponding rights and obligations of neighboring proprietors, arising from that relationship, are principally governed by La.Civ.Code arts. 667-669. *Inabnet*, 642 So.2d at 1250.

26.    Article 667 is clear: "Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him." Article 668 provides, however, that the damage must be more than an inconvenience. Article 669, which regulates nuisances, by its very terms, permits recovery by "those in the <u>same</u> or neighboring houses." See *Salter v. B.W.S. Corp.*, 290 So.2d at 821 (La. 1966). Article 669, properly translated, applies to "different inconveniences," not only to "smoke or nauseous smell." Yiannopolous, Louisiana Civil Law Treatise, Vol. 4 (predial servitudes) sec. 58 (1983 & Supp. 1987).[2]

27.    In the instant case, articles 667-669 provide grounds for defendants' liability. Defendants, by refusing to maintain their canals and, thus, causing the loss of TPSB's property, have deprived TPSB of the liberty of enjoying its property. The damage occasioned, including the loss of land, is certainly more than an inconvenience. The poorly maintained leaking canals, which far exceed the permitted scope of the canal servitudes, most definitely constitute a trespass and a nuisance. Defendants have also not maintained their canals on Section 15, an adjacent and contiguous Section owned by Continental Land and Fur, and

---

[2]    Louisiana courts have applied not only article 667, but also article 669 in cases involving damage caused by canals. See *Bruning v N Orleans Canal and Banking Co.*, 12 La. Ann. 541 542-43 (1857) (canal resulting in flooding of dry land); *Shneidau v Louisia Highway Commission*, 206 La. 754, 20 So.2d 14 (1944) (canal built "with no protection against the sloughing of the banks).

their canals have deteriorated on this Section which in turn has led to massive open water which has intruded into TPSB's marsh.

28.    Defendants' use of the property in such a manner as to injure TPSB constitutes fault under Article 2315 and Articles 667-669. Defendants are liable for their negligence, including *res ipsa loquitor*, upon proof of causation and damages.

**Servitude Provisions**

29.    The Court must also interpret the terms of the servitudes allowing operations by the defendants to determine liability. Where a written agreement exists, it is the law between the parties and must be enforced according to its terms. See ***Massie v. Inexco Oil Co.***, 798 F.2d 777, 779 (5th Cir.1986). When a servitude is created by contract, as in this case, the mode of use of the servitude is regulated by that contract. See ***Ogden v. Bankston***, 398 So.2d 1037, 1040 (La.1981).

30.    Doubt as to the existence, extent, or manner of exercise of a servitude shall be resolved in favor of the grantor of said servitude. La. Civ. Code art. 730. La. C.C. article 697 provides that: "The use and extent of such servitudes are regulated by the title by which they are created, and, in the absence of such regulation, by the following rules." Those rules, contained in La. C.C. articles 743 and 745 (formerly, Articles 771 and 774, respectively), were summarized by this Court in ***Duet v. Louisiana Power and Light Company***, 169 F.Supp. 184 (E.D.La.1958), as follows:

> It is settled in Louisiana, as elsewhere, that one having an easement or servitude on another's land is bound to use that easement or servitude in such manner as not unreasonably to injure the right of the owner of the servient estate, and that if the owner of the easement or servitude uses it in a negligent, unauthorized or unreasonable manner, the owner of the servient estate may maintain an action for

> damages resulting from such use . . . The obligation of the owner of
> the servitude is not to cause no damage, but to cause 'the least
> possible damage'.

169 F.Supp. at 186. *Accord, Board of Com'rs of Port of New Orleans v. Illinois Cent.*

*Gulf R. Co.,* 379 So.2d 838 (La.App. 4 Cir. 1980), *writ denied* 380 So.2d 1210 (La. 1980).

31.   In case of doubt that cannot be otherwise resolved, a provision in a contract must be

interpreted against the party who furnished its text.  A contract executed in a standard form

of one party must be interpreted, in case of doubt, in favor of the other party.  La. C.C. art.

2056.  Furthermore, if the defendants' servitudes are ambiguous as to their duty to maintain

the canals, then the servitudes must be construed against defendants.  Consequently, any

ambiguity or question as to whether defendants had an obligation to maintain their canals at

a width of no greater than forty feet and one hundred feet must be resolved in favor of

TPSB since defendants were responsible for drafting the standard form "Right-of-Ways and

Easements" and Louisiana law makes clear that any ambiguity is interpreted against

defendants as the drafters of the contracts.

32.   The servitude agreement as to Koch provides that Koch is granted the authority to construct

a pipeline canal "not to exceed forty feet in width." Since the levees are necessary for the

Koch canal and Koch is still using the canal for natural gas operations, the limiting

provision is therefore enforceable by TPSB.  Koch's servitude also specifies the nature and

uses of the Koch canal and provides that "Grantee further agrees to pay Grantor any

damages which may arise . . . as a result of its operations."

33.   The Columbia Gulf servitude provides that Columbia Gulf has the right "to construct, lay,

*maintain*, operate, alter, repair, remove, . . . and replace a pipe line *and appurtenances*

*thereto, . . . .*" Logic dictates that if Columbia Gulf undertook the responsibility to maintain its pipelines and its appurtenances, i.e., pipeline canal, then Columbia Gulf is responsible for any breach of this contractual obligation.

34.    It is clear under *St. Martin v. Mobil, supra,* that the canal servitude agreements impose continuing obligations and duties on defendants which they breached.  The Court must therefore fashion a remedy for damages suffered and designed to prevent future deterioration of the marsh which would otherwise continue unabated.

## Damages

35.    Louisiana's dwindling wetlands, described by the United States Environmental Protection Agency as "national treasures" comparable to rainforests, provide innumerable benefits, including food and habitat for fish and wildlife; flood protection; shoreline erosion control; natural products for human use; water quality improvement; pollution control; and opportunities for employment, recreation, education, and research for millions of people.[3] Our wetlands are homes to endangered or threatened species, such as the bald eagle and brown pelican, and the migratory arctic peregrine falcon.  They are also the breeding grounds that ensure the survival of Louisiana's huge fishing and seafood industry, which provides jobs and food for millions of people.

36.    Unfortunately, from 1970-1980 alone, Louisiana has lost 518,000 acres of wetlands, or 28% of its total.[4]  Dr. Coleman, defendants' expert in this case, confirmed that Louisiana, on the

---

nvironmental Protection Agency, *Values and Functions of Wetlands,* published at http://www.epa.gov/owow/wetlands; *Southeast Wetlands, Status a ʻnds, mid 1970's to mid 1980's,* a 1994 cooperative publication by United States Department of the Interior  Fish and Wildlife Service and United Sta vironmental Protection Agency, published at http://www.nwi.fws.gov/sewet.

*Southeast Wetlands, supra* n. 2, at http://www.nwi.fws.gov/sewet/introd.html.

average, is losing about 26,000 acres of wetlands per year. As of 1983, the rate of loss was fifty square miles per year, triple the rate of loss for 1970, and the losses continue to increase geometrically. Dr. Coleman stated that at the current rate, in approximately 30 to 50 years, there will be no St. Bernard Parish in Louisiana. At the loss rate documented in 1980 of 8,831 acres per year, it is estimated that Plaquemines Parish will be completely gone in 34 years. The demise of Terrebonne Parish will not be far behind.

37.    Turning to TPSB's property, the full extent of current damage was staked out pursuant to a survey performed by Charles Camp, a registered land surveyor, and Dr. Chabreck. The total direct loss attributable to erosion of the canals and spoil banks is 59.3 acres. The total wetland loss of adjacent marsh is 56.2 acres. Additionally, 152.3 acres of interior marsh adjacent to the pipeline canals are damaged. Dr. Chabreck and Mr. Camp have developed three restoration plans. The first two plans provide this court with an option for ordering restoration. Plan 1 involves backfilling the open pipeline canals. Plan 2 involves bulkheading the pipeline canals back to the widths provided for in the servitudes at issue. Plan 3 outlines the costs to restore the open pond and channel areas which have developed as a result of the breaks or cuts in the defendants' pipeline canals. The plans of TPSB's experts are reasonable and necessary for protection and restoration of the property.

38.    The land in question is owned by a public body and political subdivision and is used to benefit the school children and people of Terrebonne Parish and Louisiana, i.e., the public. Based on his prior and current work experience with Louisiana's government and the federal government on the 14 billion dollar Coast 2050 program and the yearly 40 million dollar Coastal Wetlands Protection, Preservation and Restoration Act ("CWPPRA") which seek to preserve and restore private and public coastal wetlands using public funds, Dr.

Penland assesses the value of an acre of coastal marsh using private and social values at $86,040 to $143,400. Dr. Penland has been involved in numerous wetland valuations in these programs. The Coast 2050 and CWPPRA, both involving Louisiana state and federal agencies, have adopted the same range of value for coastal wetlands. Consequently, the restoration plan proposed by Dr. Chabreck and Mr. Camp proposes to protect and restore the coastal marsh property at issue in line with the costs the land would be valued at under the Coast 2050 and CWPPRA coastal restoration programs.

39. Since TPSB's land is held in trust for the benefit of the public and restoration of the land benefits the public, private and social values apply in this case. Market value is not the measure of damages. To conclude otherwise, is to undervalue the property and relieve defendants' of their actions as it will set a precedent allowing future servitude owners to destroy the property of other marsh owners throughout Louisiana with impunity since these servitude owners will have essentially no legal liability for their actions. An award of damages including only the diminution of property values, rather than restoration, would render also render similar enforcement attempts futile, would violate national and local policy, and certainly would provide no deterrent value to prevent further damage to the resources involved.

40. TPSB holds the land in trust for the public. Consequently, liability is warranted pursuant to the Public Trust Doctrine. The development of natural resources law, particularly in the last two decades, clearly demonstrates an increasing emphasis on protection and restoration of natural resources. That emphasis has been premised on the assumption that privately owned land imbued with certain natural resources is not totally owned by private individuals despite fee simple title. Pursuant to this widely recognized doctrine, natural

resources, even those on private property, "are considered too important to society to be owned by one person," and, as such, have gradually evolved into the corpus of the public trust. Gregg L. Spyridon, Sam A. LeBlanc, III, *The Overriding Public Interest in Privately Owned Natural Resources: Fashioning a Cause of Action*, 6 Tul. Envtl. L.J. 287-289, 303 (Summer, 1993).

41.  The Public Trust Doctrine clearly applies in this case, in which a government entity and political subdivision of the State of Louisiana seeks to enforce its own and the public's interest and national and local policies regarding the protection of the environment and invaluable and irreplaceable natural resources.

42.  "When property damage claims include injury to natural resources, traditional property damage concepts become grossly inadequate to carry out the state and national policies of protecting and restoring natural resources." Gregg Spyridon and Sam LeBlanc, *The Overriding Public Interest in Privately Owned Natural Resources: Fashioning a Cause of Action*, 6 Tul. Envtl. L.J. 287, 311-312 (Summer, 1993). Richard B. Stewart et al., *Evaluating the Present Natural Resource Damages Regime: The Lawyer's Perspective*, in Natural Resource Damages: A Legal, Economic and Policy Analysis 171 (Richard B. Stewart ed., 1995), states, in accord, that: "[t]he tort model of damage liability is... inappropriate for environmentally significant public resources". Id., at p. 171 n. 33.

43.  Environmental statutes such as CERCLA and OPA express a strong preference for restoration over compensatory type damages. For example, CERCLA provides that parties responsible for hazardous substance releases "shall be liable for ... damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss...." Moreover, "[t]he measure of damages ... shall not be limited

by the sums which can be used to restore or replace such resources." 6 Tul. Envtl. L.J. at 312.

44.     The Courts have borrowed from these analogous environmental statutes in awarding costs for the restoration of wetlands natural resources, even in a case where the restoration cost far exceeded the fair market value of the land. In **Puerto Rico v. S.S. Zoe Colocotroni**, 628 F.2d 652, 671 (1st Cir. 1980), **cert. denied**, 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981), the Commonwealth of Puerto Rico sought to recover approximately $13 million in damages for the restoration of approximately forty acres of a mangrove forest which had been contaminated by an oil spill. The forty-two acres of contaminated mangrove forest had a commercial market value of approximately $200,000 but, like many wetlands, was found to serve many noncommercial ecological functions such as: 1) protecting the shoreline from erosion, storms, tides and high winds; 2) providing a habitat for wildlife; 3) providing a protected breeding ground for fish and shellfish; and 4) acting as a food source for aquatic creatures of all kinds. Puerto Rico sought full restoration and recovery of the total value of the damages caused to the environment and/or natural resources.

45.     The **Zoe** court was faced with the task of determining whether federal laws supported the recovery of restoration costs which far exceeded the market value of the lands that were damaged. While noting that traditional property damage theories did not support such a recovery, the Court noted that the federal statutes and their legislative history did, in fact, support such a recovery. 628 F.2d at 675.

46.     Borrowing from the language and legislative history of OCSLA and the CWA which both express preferences for restoration or rehabilitation of damaged or destroyed natural resources, the court held that a strict application of the traditional property damage

(diminution in value) rule would effectively deny any right to recover meaningful damages. 628 F.2d at 675. In fashioning a new measure of damage for injury to natural resources, the court held that "the appropriate primary standard for determining damages ... is the cost reasonably to be incurred ... to restore or rehabilitate the environment in the affected area to its pre-existing condition, or as close thereto as is feasible without grossly disproportionate expenditures." 628 F.2d at 675.

47.     Following the rationale of the First Circuit and the much stronger preferences expressed by Congress in subsequent legislation such as Coast 2050 and CWPPRA, a plaintiff should not be precluded from recovering restoration costs for damages to privately or publicly held natural resources even if they exceed the fair market value of the property.

48.     Fortunately for the environment, the law is a dynamic process. Not long ago, the destruction of the earth was accepted as part of progress. Over the years, as our conception of the environment's value has changed, so have the laws. Because of those changes and new attitudes regarding both landowners and governments, there now appears to be more opportunity to protect, preserve, enhance and restore our natural resources.

49.     In ***Roman Catholic Church v. Louisiana Gas Service Co.***, 618 So.2d 874 (La. 1993), the Louisiana Supreme Court awarded the plaintiffs the full restoration cost of a burned building. In reaching its decision the Court ruled:

> ...[A]s a general rule of thumb, when a person sustains property damage due to the fault of another, he is entitled to recover damages including the cost of restoration that has been or may be reasonably incurred, or, at his election, the difference between the value of the property before and after the harm. If, however, the cost of restoring the property in its original condition is disproportionate to the value of the property or economically wasteful, unless there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs, damages are measured only by the difference between the value of

> the property before and after the harm. Consequently, if a building
> such as a homestead is used for a purpose personal to the owner, the
> damages ordinarily include an amount for repairs, even though this
> might be greater than the entire value of the building.

618 So. 2d at p. 879-880. The Louisiana Supreme Court in *Inabnet, supra,* cited the *Roman Catholic Church* decision, and noted that the <u>owners</u> of damaged land are the proper parties to claim restoration damages. *Id.* at 1255.

50. In *Sercovich v. Chevron U.S.A., Inc.*, 626 So.2d 434 (La. App. 4 Cir. 1993), *reversed and remanded on other grounds,* 93-2927 (La. 10/28/94), 644 So.2d 379; *on remand to Sercovich v. Chevron U.S.A., Inc.,* 93-0046 (La. App. 4 Cir. 5/16/95), 655 So.2d 776, Chevron contended that the cost of restoring the property to its original condition was disproportionate to the value of the property and that the plaintiff was not entitled to restoration costs, but only to the difference in the value of the property before and after the harm. The Court ruled that an award of restoration was consistent with *Roman Catholic Church*:

> We do not believe that the award of restoration costs herein violates
> the principles of *Roman Catholic Church v. Louisiana Gas Service
> Company, supra.* That case involved the restoration of an apartment
> building damaged by fire, and the owner was ultimately awarded the
> full restoration costs. The instant case involves an oyster lease. It is
> obvious that the value of an oyster lease cannot be determined in
> exactly the same way as the value of an apartment building. An
> oyster lessee pays a nominal amount for his lease, usually expends a
> great deal of time, effort and resources to work the lease, and then, if
> he is lucky, makes a good profit. The amount paid for the lease is
> not an accurate reflection of its value.

626 So.2d 437-438.

51. The Louisiana Supreme Court in *Roman Catholic Church* and *Inabnet* and the Louisiana Fourth Circuit in *Sercovich* recognized that to fully compensate an owner, courts should not

be limited to a simple diminution in market value of a small part of the property, but should consider the value of the property as a whole, the nature of the owner's use of the property, the reasons for wanting the land restored to its former condition, and the aesthetic or other intangible value placed on the property. TPSB and the public have ample personal reasons for restoring the productive condition of the invaluable wetlands property at issue. As discussed *supra,* Louisiana's wetlands provide innumerable resources, livelihood, food and recreation for vast numbers of our residents. The property is a treasured natural resource.

52. In the instant case, TPSB, a government body and political subdivision of the State of Louisiana, is not only acting on its own behalf, but as trustee for the citizens of Terrebonne Parish and Louisiana, who have a very great stake in preservation and continued vitality of Louisiana's wetlands. Defendants, who have damaged and destroyed vast acres of wetlands, are liable to TPSB as well as the public, to prevent further damage to these valuable natural resources and to restore them to a productive state.

53. Koch and Columbia Gulf have had every opportunity to properly maintain their canal spoil banks/levees. Since beginning operations, they have conducted inspections of their pipelines located in the pipeline canals once a year, at a minimum. Despite these inspections and notice that their canals are eroding, defendants have never taken steps to restore their canals. Neither defendant has performed any maintenance on its pipeline canal. Neither defendant has a company policy in place to maintain pipeline canals and preserve a landowner's land. Louisiana law requires defendants to cause the least possible damage. The pattern of conscious environmental indifference exhibited by each defendant is a breach

of each defendant's respective servitude and is a continuing tort, as well as a violation of public policy.

53.  Plan # 2 proposed by Camp proposes to bulkhead the canals and fill the eroded areas behind the bulkheads with sand. As defendants claim they are entitled to leave the pipeline canals open, they must restore the canals in line with Plan #2. Camp's restoration plan to bulkhead the Columbia Gulf canal will cost $3,601,718.00.   This represents: (1) 11,263 linear feet of bulkhead at a cost of $300 per foot; (2) 8,906 cubic yards of fill material at $20 per cubic yard; (3) installation of 2.11 acres of straw mat at a cost of $13,488.00; (4) planting native vegetation on the 2.11 acres at $1.70 per plant; (5) improving spoil banks when necessary and degrading after consolidation at a cost of $20,000; and (6) use of a small bulldozer to spread fill material at a cost of $5,000.

54.  Similarly, Camp testified that the cost to bulkhead the Koch canal is $4,813,524.00.  This represents: (1) 11,64 linear feet of bulkhead at a cost of $300 per foot; (2) 61,288 cubic yards of fill material at $20 per cubic yard; (3) installation of 8.74 acres of straw mat at a cost of $55,844.00; (4) planting native vegetation on the 8.74 acres at $1.70 per plant; (5) improving spoil banks when necessary and degrading after consolidation at a cost of $20,000; and (6) use of a small bulldozer to spread fill material at a cost of $5,000.

55.  Camp's Plan #3 can be completed at a cost of $9,258,640.00. Plan #3 will restore the interior marsh which has been damaged and destroyed adjacent to the cuts in the Koch and Columbia Gulf canals. This represents: (1) filling 56.2 acres of pond area with 136,004 cubic yards of peat at a cost of $20 per cubic yard; (2) filling 152.3 acres of broken marsh area with 184,283 cubic yards of peat at $20 per cubic yard; (3) installing 8,785 linear feet

of straw retention fencing at $20 per foot; (4) use of a small hydraulic dredge for 64 days  at

a cost of $7,500 per day; (5) mobilization and demobilization costs of $200,000; (6) use of a

large bucket dredge for 70 days at a cost of $5,500 per day; (7) tugs, barges, and dock rental

costs of $367,400; (8) bulkheading 360 linear feet for 3 slips at staging areas at a cost of

$300 per foot; (9) filling 3 slips at staging areas with available peat and spoil at a cost of

$222,000; (10) labor crews to remove plastic and pallets from peat for 64 days at a cost of

$5,700 per day; (11) placement of river sand to repair levees at a cost of $50,000; (12) a

quarterboat a cost of $100,000; (13) broadcasting of seeds with airplane at a cost of

$50,000; (14) construction management, administration, contingencies, and monitoring at a

cost of $350,000.

**56.**   Each defendant is 50% liable for the costs of restoration Plan #3 since both canals have

contributed to the destruction of the interior marsh.  Hence, Koch is liable for $9,442,844 in

restoration damages under Plans # 2 & 3.  Columbia Gulf is responsible for $8,231,038 in

restoration damages under Plans # 2 & 3.

THUS RENDERED AND SIGNED this _____ day of _____, 2000, at

New Orleans, Louisiana.

_____

U.S. DISTRICT JUDGE