# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

No. 01-30131

D.C. Docket No. 00-CV-319

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED    JUN 2 4 2002    Caq

LORETTA G. WHYTE
CLERK

U.S. COURT OF APPEALS
**FILED**

MAY 1 0 2002

CHARLES R. FULBRUGE III
CLERK

TERREBONNE PARISH SCHOOL BOARD

        Plaintiff - Appellant

   v.

COLUMBIA GULF TRANSMISSION COMPANY; KOCH GATEWAY PIPELINE
COMPANY

        Defendants - Appellees


Appeal from the United States District Court for the
Eastern District of Louisiana, New Orleans.

Before DUHE', WIENER, and BARKSDALE, Circuit Judges.

### J U D G M E N T

    This cause was considered on the record on appeal and was
argued by counsel.

    It is ordered and adjudged that the judgment of the District
Court is reversed, and the cause is remanded to the District Court for
further proceedings in accordance with the opinion of this Court.

    IT IS FURTHER ORDERED that each party bear its own costs on
appeal.


ISSUED AS MANDATE:  JUN 2 1 2002

Fee
Process
X Dktd ___
CtRmDep
Doc.No. 128

A true copy
Test
Clerk, U. S. Court of Appeals, Fifth Circuit

By Sabrina B Short
Deputy
New Orleans, Louisiana    JUN 2 1 2002

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

U.S. COURT OF APPEALS
**FILED**

MAY 1 0 2002

CHARLES R. FULBRUGE III
CLERK

No. 01-30131

TERREBONNE PARISH SCHOOL BOARD,

Plaintiff-Appellant,

versus

COLUMBIA GULF TRANSMISSION CO. and
KOCH GATEWAY PIPELINE CO.,

Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before DUHÉ, WIENER, and BARKSDALE, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellant the Terrebonne Parish School Board (the "Board"), as owner of a servient estate, appeals from the district court's summary judgment that the Board's causes of action against the two owners of separate dominant estates — Defendants-Appellees Koch Gateway Pipeline Company ("Koch") and Columbia Gulf Transmission Company ("Columbia") — have prescribed. Concluding that genuine issues of material fact exist with regard to prescription of the Board's possible causes of action under

Louisiana's law of delict (tort) and contract, we reverse the district court's grant of summary judgment and remand.

I.

FACTS AND PROCEEDINGS

Shortly after Louisiana gained statehood, Congress extended to Louisiana a policy of reserving, from among the public lands in newly created states, the sixteenth section of every township for the support of education.[1] This policy created a patchwork of reserved section sixteen lands ("sections sixteen") throughout each such state, as a result of uniform surveying according to the township-and-range system. (A township is six miles square and contains thirty-six sections, which are one mile square; thus each section sixteen is five miles distant from the nearest other sections sixteen, one in each of the four contiguous townships.)

Title to sections sixteen in Terrebonne Parish passed from the United States to the Board sometime during the nineteenth century.[2] The Board-owned section sixteen that is located in Township 18

---

[1]See Act of April 21, 1806, 2 Stat. 391, 394 (reserving sections sixteen in the western district of the territory of Orleans); Act of Feb. 15, 1811, 2 Stat. 617, 618-19 (extending the same policy to the eastern district of the territory of Orleans); Act of March 26, 1804, 2 Stat. 283, 283 (defining the "territory of Orleans" to be that portion of the Louisiana Purchase lying below the thirty-third parallel).

[2]See, e.g., Act of Feb. 15, 1843, 5 Stat. 600 (authorizing the Louisiana state legislature to convey in fee simple lands in the state reserved by Congress for the use of schools).

2

South, Range 13 East, Terrebonne Parish, Louisiana, and which contains about 641 acres, is the subject of this case and is hereafter referred to as "Section 16 (18-13)."

Before the events at issue here, much of Terrebonne Parish, including Section 16 (18-13), consisted of floating freshwater marsh. Typically, this kind of marsh comprises "marsh mats" that are as much as a foot thick and literally float several feet above the silt and clay bottom, unattached by roots.

Section 16 (18-13) is now traversed by two pipelines that exist pursuant to conventional (contractual) servitude agreements granted by the Board. The first was constructed pursuant to a "standard form" agreement executed by the Board in 1957 in favor of Koch's ancestor in interest. This servitude agreement (the "Koch Agreement") reads in part as follows:

> That for and in consideration of THREE HUNDRED SIXTY SIX AND 60/100 ($366.60) Dollars . . . Grantor does hereby Grant and Convey unto United Gas Pipeline Company . . . a right of way and easement one hundred feet in width to construct, maintain, operate, repair, replace, change the size of and remove pipe lines and appurtenances thereto, including the right at its election to lay such pipe line or lines in open ditches or canals not to exceed forty feet in width, which may be filled in or left open at the option of Grantee . . . .
> . . .
> TO HAVE AND TO HOLD unto Grantee, its successors and assigns, so long as the rights and easements herein granted, or any of them, shall be used by, or useful to Grantee for the purposes herein granted, with ingress to and egress from the premises, . . . for the purposes of construction, inspecting, repairing and replacing the

3

property of Grantee herein described . . . .
. . .
[S]aid Grantor shall not obstruct or permit to be
constructed any house, structures or obstructions, on or
over, or that will interfere with the maintenance or
operation of, any pipe line or appurtenances constructed
hereunder, and will not change the grade over such pipe
line.

Koch's pipeline canal was dredged and its pipeline built in 1958.

In 1964, Columbia entered into negotiations with the Board to

build the second pipeline across Section 16 (18-13). During

negotiations, however, Columbia built its pipeline. When, in 1965,

this trespass was discovered by the Board, it and Columbia

negotiated a servitude agreement using a somewhat different

standard form (the "Columbia Agreement"). In return for $685.20,

the Board granted Columbia

a servitude, right of way and easement to construct, lay,
maintain, operate, alter, repair, remove, change the size
of, and replace a pipe line and appurtenances thereto,
including but not limited to fittings, tie-overs, valves,
corrosion control equipment and other apparatus . . . .
. . .
     [S]aid Grantors shall not construct nor permit to be
constructed any house, structures, or obstructions and
shall not plant nor permit to be planted trees on or
over, or that will interfere with the construction,
maintenance or operation of any pipe line or
appurtenances constructed hereunder, and will not change
the grade over such pipe line.
     The right of way granted herein shall be 100 feet
wide . . . . It is understood and agreed that Grantee
shall not be required to backfill the open flotation
ditch excavated during construction.
     It is hereby understood that the Grantee, its
successors and assigns, shall not be obligated to pay
Grantors or any subsequent owner of [Section 16 (18-13)]

4

any damages resulting from the construction of the
[pipeline], such damages having been anticipated and paid
in advance at the time of execution of this instrument.

Koch and Columbia have continuously maintained the pipelines,
often using the canals to do so. Both concede, however, that they
have not maintained the canals or their banks.

The Board contends that, at least partly as a result of the
servitude holders' failure to maintain the canals or their banks,
the canals have widened and their banks have been breached. The
Board asserts that the Koch canal has widened to an average width
of 70 feet, almost double the 40-foot limit specified in the Koch
Agreement; and that the Columbia canal has widened beyond the
specified 100-foot right of way, to an average width of 135 feet.
Koch and Columbia (collectively, "the defendants") object that
there is no record evidence for these statistics, but a scaled
satellite photo tends to support the Board's assertion. There is
also causation evidence suggesting that breaches in the canals'
banks have exposed the floating marsh to tidal surges, which have
washed away, and continue to wash away, the light organic soil
necessary for the marsh mats to cohere. The record suggests that
this erosion may occur slowly — and vertically — from the water
bottom up, causing the marsh mats to thin out and eventually
disappear. Now, argues the Board, where there was once healthy
marsh, there is open water.

5

The Board sued several entities that operated on its sections sixteen, filing the instant action in state court in October 1999 against Columbia and Koch jointly, and seeking either the physical restoration of Section 16 (18-13) or compensatory damages. The Board's petition contains explicit tort and contract claims, the latter including an innominate property argument.[3] The defendants removed to the Eastern District of Louisiana and later moved for summary judgment.

The district court granted summary judgment to the defendants. It held, in contract, that the servitude agreements did not require Columbia and Koch to continue to maintain the canals' banks; therefore any contractual claim had prescribed. In tort, the district court reasoned that failure to maintain a canal is not conduct that can support a claim under a continuing tort theory. The district court also held that the Board's "failure to hire an expert or investigate the erosion at the time it became aware of the damage does not prevent prescription from commencing." Apparently viewing the defendants' liability as arising out of discontinuous violations, the court held that prescription of the

---

[3]The sum of the petition's property argument is this: "Defendants had a duty to use only so much of the School Board property as necessary to conduct operations," and they "breached their duty as reasonably prudent operators to cause the least possible damage" to Board property, and, in their failure to restore the property, they "unreasonabl[y] exercise[d their] rights without regard to those of plaintiff."

Board's delictual (tort) claims began to run when it learned of the damage to various of its sections sixteen. As the Board "was aware of the erosion of Section 16 in or before 1985," the district court reasoned, it cannot now maintain an action with respect to Section 16 (18-13). This timely appeal followed.

## II.

### ANALYSIS

Even though the district court approached this case as largely implicating tort claims, it actually involves equal or greater questions of contract and property rights. To review the district court's ruling, we must consider procedural and delictual issues, but the Louisiana law that governs this case is chiefly the civil law of servitudes — a mixture of contract interpretation and suppletive (gap-filling) rules of property law.

A.  Standard of Review

The Board appeals from summary judgment, which the district court characterized as turning on prescription. We review a grant of summary judgment de novo, applying the same standard as the district court.[4] A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact and the

---

[4]Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).

moving party is entitled to a judgment as a matter of law.[5]   An

issue is material if its resolution could affect the outcome of the

action.[6]   In deciding whether a fact issue has been created, the

inferences to be drawn from the evidence must be viewed in the

light most favorable to the nonmoving party.[7]

B.   Procedure

Initially, we must address one challenge that the Board raises

to the procedural propriety of summary judgment in the district

court.   The Board urges that summary judgment for Columbia was

improper because it did not seek summary judgment on the basis of

prescription.   Rather, notes the Board, the district court sua

sponte rendered summary judgment based on prescription of the

Board's claims against Columbia; and, in so doing, the court failed

to give the Board ten days' notice, which this Circuit requires.[8]

---

[5]FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[6]Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[7]See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Olabisiomotosho v. City of Houston, 185 F.3d 521, 525 (5th Cir. 1999).

[8]See Judwin Properties, Inc. v. United States Fire Ins. Co., 973 F.2d 432, 436-37 (5th Cir. 1992) (noting that a district court may grant summary judgment sua sponte, but that it must give the nonmovant ten days' notice; and finding error because even if summary judgment is proper on the merits, the nonmovant is entitled to an opportunity to defend against it).

We review the failure to furnish such notice for harmless error.[9]

Columbia counters that error, if any, was harmless, stating accurately that (1) Columbia pleaded prescription as an affirmative defense; (2) Koch moved for summary judgment on the basis of prescription; and (3) the Board filed a lengthy answer that responded to Koch's prescription argument.  Furthermore, Columbia did move for judgment on the pleadings, or in the alternative for partial summary judgment, with respect to the tort claims, even though this motion did not address prescription.  In addition, the district court granted summary judgment only five days before the bench trial was scheduled to begin, and the Board has not identified material evidence that it was unable to present to the district court because of the lack of notice.  Lastly, the legal theories and facts that the Board marshals against each defendant are quite similar.  In light of the foregoing, we conclude that the Board had ample opportunity to defend, so any procedural error in entering summary judgment for Columbia without ten days' advance notice was indeed harmless.  We therefore turn to the merits.

C.    Substance

Substantive analysis of this case requires first that we touch

---

[9]Washington v. Resolution Trust Corp., 68 F.3d 935, 939-40 (5th Cir. 1995) (citing Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 28 F.3d 1388, 1398 (5th Cir. 1994)).

on the distinction between contract and delict (or tort) under Louisiana law.[10] To paraphrase Planiol, contractual fault consists of violating a contractual obligation; delictual fault is an act between juridical strangers that violates some duty imposed by law, not by contract, and that requires reparation.[11] The parties here are juridical acquaintances. The Board, Columbia, and Koch's predecessor decided to burden one estate for the benefit of two others. These decisions created conventional predial servitudes that the parties memorialized in servitude agreements.[12] The proper place to begin analyzing this case is thus the servitude agreements themselves. Then we shall turn to obligations supplied or imposed by the Civil Code.

### 1. Contract

When there is a contract, it is law between the parties and must be performed in good faith and enforced according to its terms.[13] When, as here, the contract creates a conventional predial

---

[10]See, e.g., Davis v. Le Blanc, 149 So. 2d 252, 254 (La. App. 3 Cir. 1963).

[11]See State ex rel Guste v. Simoni, Heck & Associates, 331 So. 2d 478, 490 (La. 1976) (Summers, J., dissenting) (quoting 2 M. PLANIOL, TREATISE ON THE CIVIL LAW, Nos. 873-74 at 485-86 (11th ed. La. State. L. Inst. trans. 1939)).

[12]See LA. CIV. CODE ANN. art. 646 (West 1980) (defining "predial servitude").

[13]See LA. CIV. CODE ANN. art. 1983 (West 1987).

servitude, the mode of use of the servitude is regulated by the contract.[14]  If, however, the contract is silent on a non-essential question, like the mode of use, Louisiana's law of conventional obligations in general and predial servitudes in particular supplies the answer, filling in the blanks.[15]

The parties dispute two aspects of their contractual relationship: (1) whether the Board <u>released</u> Koch and Columbia from liability for marsh erosion; and (2) whether the contract imposes any <u>duties to maintain</u> the canal or its banks — stated differently, any duties to protect the servient estate against damage resulting from use of the servitude.

> a.  <u>Release</u>

Koch and Columbia contend that even if they (1) owed a duty, under any of the Board's theories, to prevent the canals from widening and their banks from being breached, (2) violated that duty, and (3) are liable on a cause of action that has not prescribed, Koch and Columbia were released by the Board.  When the Board executed the servitude agreements, it also executed standard-form releases.  The release obtained from the Board by Koch's

---

[14]<u>See</u> <u>Ogden v. Bankston</u>, 398 So. 2d 1037, 1040 (La. 1981).

[15]<u>See</u> LA. CIV. CODE ANN. art. 697 (West 1980) ("The use and extent of such servitudes are regulated by the title by which they are created, and, in the absence of such regulation, by the following rules.").

ancestor in title provided:

> This will acknowledge receipt of the sum of Fourteen
> Hundred Sixty-six & 40/100 ($1466.40) DOLLARS . . . paid
> by UNITED GAS PIPE LINE COMPANY in full and complete
> settlement and satisfaction in advance for all damages
> caused to crops, timber, fences, lands or other
> improvements owned or leased by the undersigned along and
> in the vicinity of the [pipeline across Section 16
> (18-13)], which said damages may be caused by reason of
> the construction of said line or operations in connection
> with the construction thereof.
>     [The Board] hereby acknowledges and declares that
> the above mentioned payment is made in full consideration
> of all damages which may be occasioned as above set forth
> by either United Gas Pipe Line Company or Contractor
> engaged in the building and construction of said pipe
> line.

It is clear that this agreement, by its express terms, released

United Gas (and thus Koch) only from claims for damage resulting

from the pipeline's construction.  The damages bargained for are

those that "may be caused by reason of the construction" of the

pipeline "or operations in connection with" its construction, "by

either United Gas Pipe Line Company or Contractor engaged in the

building and construction."  Only the phrase "in advance" has any

potential for ambiguity in this regard, and even that is easily

explained.  Use of this phrase merely acknowledged the simple fact

that the pipeline had yet to be built; it did not address the fact

that the damages released might actually result from a released

party's act or omission decades after the pipeline's construction.

    In releasing Columbia, the Board acknowledged that it was paid

12

$7,879.80

> in full payment and settlement for all damages of every
> kind and character (contractual, negligence or otherwise)
> caused to [the Board's] interest(s) as owner(s) by the
> construction, operation, [and] maintenance of a pipe line
> and appurtenances across [Section 16 (18-13)], in the
> place and manner such pipe line and appurtenances have
> been constructed and laid, and we release and discharge
> [Columbia] from all liability therefor.

At the time of this release, Columbia had already built its
pipeline across Section 16 (18-13), albeit as a trespasser.
Consequently, the release's verbs are in the past tense: "caused"
and "in the manner such pipe line and appurtenances have been
constructed and laid" entail no futurity.  Our interpretation —
that this release did not, and was not intended to, cover damages
that might be caused by acts or omissions decades later — is
confirmed by the servitude agreement itself, which states that

> [i]t is hereby understood that the Grantee, its
> successors and assigns, shall not be obligated to pay
> Grantors or any subsequent owner . . . any damages
> resulting from the construction of the first pipe line
> authorized hereunder, such damages having been
> anticipated and paid in advance at the time of execution
> of this instrument.

Once again, the language focuses on damages resulting from
construction of, not from continued use of or failure to maintain,
the pipeline and canal.

Koch and Columbia nevertheless argue that to the extent the
Board's causation theory is correct, the marsh erosion does result

13

(eventually) from "construction" of the pipeline. We disagree. This remote causation proposition may sound reasonable in hindsight, but nothing in the record supports the view that in signing these agreements and releases, the parties had any contemplation that erosion would occur. The agreements and releases are at best ambiguous as to whether the parties anticipated marsh erosion and intended to include marsh erosion damages caused decades later in their bargain.[16] One Louisiana court, in construing a similar release from claims arising from pipeline construction, held that the release applied only to claims existing when the release was executed, because the release was a standard form and was ambiguous with respect to the claims at issue.[17] We cannot read the ambiguous standard-form language here as encompassing the erosion damages of which the Board complains.

### b.  Continuing Contractual Duty to Maintain

The parties also debate whether the servitude agreements require Columbia and Koch to maintain the banks of the canals so as to prevent widening and breach. Although the district court stated that it granted the motion for summary judgment "only as to

---

[16]Compare the explicit letter of agreement in Ryan v. Southern Natural Gas Co., 879 F.2d 162 (5th Cir. 1989), which we discuss below.

[17]Vizinat v. Transcontinental Gas Pipeline Corp., 552 So. 2d 1237, 1238-39 (La. App. 3 Cir. 1989).

14

prescription of the claims," this characterization overlooks its own explicit ruling that the servitude agreements did not impose a continuing duty to maintain the canals.  This ruling flowed in turn from the court's understanding of St. Martin v. Mobil,[18] in which we affirmed a trial court's conclusion that such a duty existed. In that case, the servitude agreement provided that

> Grantor does hereby convey to [Grantee], its successors and assigns, the right and servitude to dredge, construct, maintain and use a canal having a width of 65 feet. . . . Grantee is also given the right to deposit spoils within a distance of 150 feet on each side of the banks of the canal, but shall do so in such manner as to cause as little interference as possible to drainage.[19]

Despite the implication from this language that the canal was meant to drain, we held that the agreement imposed a duty on Grantee to maintain the banks of the canal so as to prevent further marsh erosion.[20]  We also concluded, from the agreement's statement that the rights it created would exist until leases expired, that the ten-year prescriptive period in contract did not apply, and that the landowner's right to enforce the canal owner's duty to maintain the canal lasted for the length of the servitude.[21]

---

[18]St. Martin v. Mobil Exploration & Producing U.S. Inc., 224 F.3d 402 (5th Cir. 2000).

[19]Id. at 414 (Barksdale, J., dissenting).

[20]Id. at 408-10 (majority).

[21]Id. at 409 n.9.

15

In the instant case, the district court distinguished <u>St.</u> <u>Martin</u> on the ground that here "[t]here is no language regarding the continuing obligations of the defendants in either of the contracts." Therefore, reasoned the court, <u>St. Martin v. Mobil</u> did not apply, and the Board lacked a viable claim in contract. We agree with this distinction only in part, disagreeing in part as well.

One basis for this distinction, advanced on appeal by Koch and Columbia, is that the agreement in <u>St. Martin v. Mobil</u> was a <u>canal</u> servitude, unlike these agreements, which specify <u>pipelines</u>, not canals. This argument is an oversimplification. Each agreement at issue here grants a right of way and easement for a "pipe line and appurtenances thereto." The Koch Agreement specifically states that this grant "includ[es]" the right to lay the pipeline in "open ditches or canals." The Columbia Agreement specifically states that the "Grantee shall not be required to backfill the open flotation ditch excavated during construction." Both agreements provide that the Board "will not change the grade over such pipe line," so that the right to change the grade along the pipeline rests with Koch and Columbia, not the Board.

Both Koch and Columbia concede that they continue to use the canals to inspect and maintain the pipelines. We harbor no doubt, then, that if the Board were to try to fill in the canals, Koch and

16

Columbia would cry foul, and rightly so.  We therefore view the
canals not merely as vestiges of the pipelines' original
construction that have no relevance to the parties' continuing
relationship, but rather as "appurtenances"[22] to the pipelines and
essentials to their use.  The canals are part and parcel of these
conventional predial servitudes.

The more meaningful distinction between this case and St.
Martin v. Mobil is found in the answer to the question whether the
servitude agreements _require_ that the canals be maintained.  We
agree with the district court that the language in these agreements

---

[22]Webster's defines "appurtenance" as:
1: an incidental property right or privilege . . .
belonging to a principal right . . . 2: a subordinate
part, adjunct, or accessory . . . 3 appurtenances pl:
accessory objects used in any function: apparatus, gear.
WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 107 (1986).  American Heritage
gives the following:
1. Something added to another, more important thing; an
appendage. . . . 2. appurtenances.  Equipment, such as
clothing, tools, or instruments, used for a specific
purpose or task; gear. 3. Law. A right, privilege, or
property considered incident to the principal property
for passage of title, conveyance, or inheritance.
AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 91 (3d ed. 1992).  The
O.E.D. is similar:
1. Law and gen.  A thing that belongs to another, a
'belonging'; a minor property, right, or privilege,
belonging to another more important, and passing in
possession with it; an appendage.
2. A thing which naturally and fitly forms a
subordinate part of, or belongs to, a whole system; a
contributory adjunct, an accessory.
3. esp. in pl. The mechanical accessories employed
in any function or complex scheme; apparatus, gear.
1 OXFORD ENGLISH DICTIONARY 589-90 (2d ed. 1989).

17

is much less explicit and more ambiguous than the language in the St. Martin v. Mobil agreement. As a matter of contract interpretation alone, the mere grant of a right to maintain a canal does not necessarily impose the duty to maintain it or to take other steps to prevent the canals from widening and the surrounding marsh mat from eroding. But neither do the agreements clearly contemplate that the canals will widen; nor do they either explicitly or implicitly permit Koch and Columbia simply to stand by and let this happen while continuing to use the canals in connection with their use of the pipeline servitudes.

Indeed, on this point each agreement contains an internal contradiction: Each specifically allows the grantee to keep the canals open and bars the Board from regrading; but the Koch Agreement gives the grantee the right to dig a canal "not to exceed forty feet in width," and the entire width of each servitude is only one hundred feet. The parties variously contend that these provisions resolve the marsh-erosion question one way or the other, but in light of what the summary-judgment evidence tells us about the delicate hydrology of floating marshes, we view these provisions as being in internal conflict, to whatever extent they bear on the question. This conflict suggests that the parties either did not anticipate erosion damage in drafting and signing the agreements or did not intend the explicit language of the

18

agreements to resolve the liability question one way or the other.

This case, therefore, does not at all resemble <u>Ryan v. Southern Natural Gas Co.</u>,[23] on which Columbia relies heavily. As here, the landowner in <u>Ryan</u> sued the pipeline servitude owner for damages caused by the erosion of marshland and the widening of a pipeline canal.[24] We held that language of the servitude agreement governed the parties' relationship, "reliev[ing the pipeline owner] of any duty to dam the canal," and therefore the landowner could not recover either in tort or in contract, at least on the servitude agreement itself.[25] The best factual support for our <u>Ryan</u> holding was <u>not</u> the servitude agreement's provision (as in the Koch Agreement here) that the pipeline canal could be left "open,"[26] but rather, as the district court noted, the pipeline owner's signature on and the landowner's acceptance of a "letter agreement" that bound the former to pay the latter $400 per acre of land encroached on by the canal in the event that it widened.[27] The intent of the <u>Ryan</u> parties, as evidenced by this letter agreement, precluded

---

[23]<u>Ryan v. Southern Natural Gas Co.</u>, 879 F.2d 162 (5th Cir. 1989).

[24]<u>Id.</u> at 163.

[25]<u>Id.</u> at 165.

[26]<u>Id.</u> at 164.

[27]<u>Ryan v. Southern Natural Gas Co.</u>, 1987 WL 19044, *2 (E.D. La.).

19

recovery by the _Ryan_ plaintiffs on the servitude agreement, irrespective of the underlying legal theory advanced.  _Ryan_ is therefore clearly distinguishable from the instant case, as there is no provision in either the Koch Agreement or the Columbia Agreement — or any side agreement — that demonstrates how the parties intended to treat claims of marsh erosion.

As we do not understand the pertinent kind of erosion to have been within the parties' contemplation for release purposes, it should come as no surprise that we do not interpret the servitude agreements themselves as determining whether Koch and Columbia have a continuing duty to prevent marsh-erosion damage.  Therefore, under Louisiana law, our task shifts from plain-wording contract interpretation to application of the Louisiana Civil Code's suppletive rules for immovable property, which — together with relevant case law — come into play when issues are not explicitly disposed of in the writings of the parties.[28]

### c.  Louisiana's Suppletive Law — Conventional Servitudes

Civil Code article 697 establishes that when the parties creating a conventional servitude do not specify the use and extent

---

[28]Given our uncertainty as to whether the Board had notice of erosion in Section 16 (18-13), which we discuss below, we do not accept, for summary-judgment purposes, Koch's and Columbia's arguments that the Board acquiesced in a course of performance that evinces the intention of the parties with respect to marsh erosion.

of that servitude, Louisiana's suppletive rules of property law apply.[29] Because the district court did not apply any of them, we shall address them only to the extent necessary to determine whether the district court correctly granted Koch and Columbia summary judgment on the basis of prescription.

One principle of servitude jurisprudence is that ambiguity in a servitude agreement must be construed in favor of the servient estate[30] — here, the interests of the Board.  As the Louisiana Supreme Court has reasoned:

> Predial servitudes are in derogation of public policy because they form restraints on the free disposal and use of property.  Therefore, servitudes are not entitled to be viewed with favor by the law and can never be sustained by implication.  Any doubt as to the existence, extent or manner of exercise of a predial servitude must be resolved in favor of the servient estate.[31]

This principle militates in favor of our interpretation of the servitude agreements and suggests that they do not govern marsh-erosion claims.

Another well-established rule of servitude law is that the dominant estate owner — here, each defendant — must not

---

[29]LA. CIV. CODE ANN art. 697.

[30]LA. CIV. CODE ANN. art. 730 (West 1980) ("Doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate."); McGuire v. Central Louisiana Electric Co., 337 So. 2d 1070, 1072 (La. 1976).

[31]Palomeque v. Prudhomme, 95-0725, 7 (La. 11/27/1995), 664 So. 2d 88, 93 (citations omitted).

21

"aggravate" the condition of the servient estate.[32]  As Professor

A.N. Yiannopoulos has observed, the duty not to aggravate the

condition of the servient estate, "correlative of the real right of

servitude, is not grounded on negligence"; and, absent an express

contractual exoneration for marsh erosion damages, "to the extent

that the damage to the servient estate was caused by abuse of

right, the damage should be compensable."[33]

_____

[32]See LA. CIV. CODE ANN. art. 743 (West 1980) ("Rights that are
necessary for the use of a servitude are acquired at the time the
servitude is established.  They are to be exercised in a way least
inconvenient for the servient estate."); LA. CIV. CODE ANN. art. 745
(West 1980) ("The owner of the dominant estate . . . may deposit
materials to be used for the works and the debris that may result,
under the obligation of causing the least possible damage."); Duet
v. Louisiana Power & Light Co., 169 F. Supp. 184, 186 (D. La.
1958):

> It is settled in Louisiana . . . that one having an
> easement or servitude on another's land is bound to use
> that easement or servitude in such manner as not
> unreasonably to injure the right of the owner of the
> servient estate, and that if the owner of the easement or
> servitude uses it in a negligent, unauthorized, or
> unreasonable manner, the owner of the servient estate may
> maintain an action for damages resulting from such use.

See also Stephens v. Int'l Paper Co., 542 So. 2d 35, 39 (La. App.
2 Cir. 1989); Board of Commissioners v. Ill. Cent. Gulf R.R. Co.,
379 So. 2d 838, 841 (La. App. 4 Cir. 1980); A.N. YIANNOPOULOS, 4
LOUISIANA CIVIL LAW TREATISE: PREDIAL SERVITUDES § 156 (West 1997) ("The
owner of the dominant estate may not make a use of the servitude
that aggravates the condition of the servient estate."); id. § 152
("The propositions that the owner of the dominant estate may only
use the servitude within the limits established by title or
possession and that he cannot make changes in the manner of use of
the servitude that aggravate the condition of the servient estate
are self-evident and do not require legislative affirmation.").

[33]YIANNOPOULOS, PREDIAL SERVITUDES, supra, § 156.

Furthermore, the duty not to aggravate the servient estate is a continuing duty. This is the lesson of <u>Lewis v. Sohio Petroleum Co.</u>,[34] in which the Louisiana Supreme Court evidently found merit in a claim similar to the one advanced by the Board, tersely reversing a summary judgment that the plaintiff's causes of action had prescribed.[35] <u>Lewis</u> involved a canal servitude agreement that provided that the canal "shall not be more than sixty-five feet wide."[36] In 1957, the canal exceeded its permissible width by thirty feet.[37] When the landowner sued, in 1985, the intermediate appellate court affirmed summary judgment on the ground that the plaintiff's claims had prescribed.[38] The Louisiana Supreme Court, however, granted certiorari, reversed the summary judgment, and remanded the case to the district court with instructions to refer the exception of prescription to the merits.[39] From this result, we conclude that the life of the duty of a servitude owner not to aggravate the condition of the servient estate by allowing a canal

---

[34]<u>Lewis v. Sohio Petroleum Co.</u>, 532 So. 2d 754 (La. 1988).

[35]<u>Id.</u>

[36]<u>Lewis v. Sohio Petroleum Co.</u>, 528 So. 2d 1084, 1086 (La. App. 3 Cir. 1988).

[37]<u>Id.</u> at 1087.

[38]<u>Id.</u> at 1085, 1090.

[39]<u>Lewis</u>, 532 So. 2d at 754 (La.).

23

to widen is coextensive with the life of the servitude. When such a duty exists, it is continuous.

Whether and to what extent the defendants' use of the canals caused the deterioration of the Board's property and aggravated the servient estate are questions to be determined in the light of this case's particular circumstances.[40] As the district court made no factual findings on this point, even a de novo appellate review of this issue would be improvident. It is enough for us to conclude that it was improper for the district court to grant summary judgment on the basis that, because the contracts did not expressly impose a continuing duty, any contract claim had prescribed.

      d.   Damages Recoverable; Prescriptive Period

Even if the district court determines, on remand, that Koch and Columbia are under a continuing duty not to aggravate the servient estate, effectively rendering prescription irrelevant for liability purposes, prescription may nevertheless matter when it comes to damages.[41] The prescriptive period governing a claim for

---

[40]YIANNOPOULOS, PREDIAL SERVITUDES, supra, § 156. See also Chevron U.S.A., Inc. v. Common L.P., 1999 WL 1021831 (E.D. La.) ("[C]ourts should take into account the situation of the estates, the agreement of the parties, the needs of the dominant estate at the time of the creation of the servitude, and the prejudice sustained by the owner of the servient estate."). This is a fact-intensive inquiry best left to the district court or jury.

[41]See R. J. Reynolds Tobacco Co. v. Hudson, 314 F.2d 776, 781 (5th Cir. 1963) (stating that where alleged offense was a continuing tort, parties may recover for the damages sustained

aggravation of a servient estate is not yet well established in Louisiana.

When adjudicating a claim for which state law provides the rule of decision, federal courts are bound to apply the law as interpreted by the state's highest court; but if the state's highest court has not spoken on a particular issue, we must make an "Erie guess" and determine as best we can what the highest court of the state would be most likely to decide.[42] The district court's task on remand will be to "attempt to predict state law, not to create or modify it."[43] In making that attempt, a federal court "may look to the decisions of intermediate state courts for guidance."[44] Indeed, "a decision by an intermediate appellate state court is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."[45]

---

within the applicable prescriptive period before suit was filed).

[42]Barfield v. Madison County, Miss., 212 F.3d 269, 271-72 (5th Cir. 2000).

[43]United Parcel Service, Inc. v. Weben Industries, Inc., 794 F.2d 1005, 1008 (5th Cir. 1986).

[44]Howe ex rel. Howe v. Scottsdale Ins. Co., 204 F.3d 624, 627 (5th Cir. 2000).

[45]First Nat'l Bank of Durant v. Trans Terra Corp., 142 F.3d 802, 809 (5th Cir. 1998).

Only one intermediate appellate Louisiana court has ruled on the length of the prescriptive period for a claim of aggravation to the servient estate. In Stephens v. Int'l Paper Co.,[46] the court held that the duty not to aggravate the servient estate was a "general duty rather than a specific contractual duty or obligation assumed by the owner of the servitude," making the action ex delicto and thus prescriptable in one year, rather than ex contractu and thus prescriptable in ten years.[47] This distinction — between general legal duties and specific contractual ones — is foundational for the distinction in Louisiana between delictual and contractual actions:

> The classical distinction between "damages ex contractu" and "damages ex delicto" is that the former flow from the breach of a special obligation contractually assumed by the obligor, whereas the latter flow from the violation of a general duty owed to all persons.[48]

The Stephens court, however, may have misapplied this fundamental principle, and the district court may be persuaded that if the Louisiana Supreme Court were to consider this issue, it would adopt the opposite rule. For even though the servitude

---

[46]Stephens v. Int'l Paper Co., 542 So. 2d 35 (La. App. 2 Cir. 1989).

[47]Stephens, 542 So. 2d at 39. This result has received some criticism. See YIANNOPOULOS, PREDIAL SERVITUDES, supra, § 156 (discussing the prescription holding in Stephens) ("One may, of course, be critical of this analysis.").

[48]Davis, 149 So. 2d at 254.

26

agreements here do not expressly impose on the grantees an affirmative duty actively to prevent the canals from widening, the duty to avoid aggravating a servient estate is not one that is owed to all persons under the law, but is one that is owed only to the servient estateholder by the grantee as a result of the conventional (contractual) relationship of the parties. Here, the parties are not neighbors, and the property interests involved here are not two contiguous but separately owned estates that have reciprocal obligations of vicinage. The fact that, as imposed here, the duty to avoid aggravation is supplied by the Civil Code and is also applicable to all servitudes may not mean that the parties' relationships and the duties they owe each other are general. Rather, as we observed at the outset, this case arises out of free choices to enter into conventional relationships.

When faced with this issue, the Louisiana Supreme Court might determine that ten years is the appropriate prescriptive period for an action by the grantor of a servitude against the grantee for aggravation of the servient estate. If it did so, that conclusion would be bolstered by the fact that prescription of the servitude itself for nonuse is a ten-year prescription[49]: A coextensive prescription period for damage to the servient estate by the neglect of the dominant estateholder would be logical. On remand,

---

[49]LA. CIV. CODE ANN. art. 753 (West 1980).

27

the district court should address whether, for damages-calculation purposes, the Board's cause of action for aggravation of its servient estate is governed by a prescriptive period of one year or of ten years.

## 2.  Delict (Tort)

The district court also granted summary judgment on the determination that the Board's delictual (tort) claims had prescribed. Louisiana law permits a party to maintain actions in tort as well as contract,[50] and we have not resolved whether aggravation of the servient estate occurred here. We must therefore review this summary judgment under a tort analysis as well as a contractual one.

Regarding tort, the parties differ as to (1) whether summary judgment was proper in a case of prescription that turns on notice; (2) whether general notice about erosion in some sections sixteen started the running of prescription with respect to all such sections owned by the Board; (3) whether the doctrine of contra non valentem prevented the running of prescription from commencing; and (4) whether there is any continuing tort.

---

[50]Saul Litvinoff, Contract, Delict, Morals, and Law, 45 Loy. L. Rev. 1, 28 (1999) ("Since an early time, Louisiana courts have been aware that a particular wrongful act could be a breach of contract and also a quasi-delict, and that such an act would prompt the aggrieved party to seek a contractual remedy or a delictual one.").

a.    Summary Judgment on Subjective Knowledge

The Board argues that summary judgment was improper on an issue such as prescription that turns on subjective knowledge or notice.    Although federal courts often grant summary judgment because a statute of limitations has expired, they

> refuse to grant summary judgment for defendant if there is an issue of fact as to when the limitations period began, such as in products-liability actions in which the statutory period begins to run when plaintiff knew or should have known that the injury was caused by defendant's product.[51]

Endeavoring to establish such an issue, the Board points to the opinion of its expert, Dr. Chabreck, that the causes of marshland erosion vary and are specific to each individual plot of land.[52] Therefore, the Board urges, knowledge or notice of erosion occurring generally in some of its sections sixteen cannot suffice to give either actual or constructive notice of the Board's causes of action against these defendants for erosion to Section 16 (18-13).    Koch responds that it has introduced objective, documentary evidence that the Board knew of erosion generally in its sections sixteen in the early 1980s.    This issue therefore

---

[51]10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2734 & nn.9, 21 (West 1998) (discussing Reynolds, 314 F.3d at 776 (5th Cir.), at length).

[52]Chabreck's report states that "[J]ust because one piece of property suffers from direct and indirect impacts due to one cause or causes does not mean that another piece of land will suffer direct and indirect impacts due to the same cause or causes."

29

reduces to whether, on summary judgment, general knowledge of the existence of erosion problems in sections sixteen — none of which is closer than five miles to another — or specific knowledge of erosion in one or more <u>other</u> sections sixteen, is sufficient to charge the Board with notice of erosion in Section 16 (18-13) in particular.  To answer this question, we must examine delictual prescription in some detail.

      b.   <u>Prescription and Contra Non Valentem</u>

Generally, a claim in tort arising out of damage to immovable property is subject to a one-year period of liberative prescription which, under article 3493 of the Civil Code, begins to run "from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage."[53]  Nothing in this code article restricts its application to third parties not in privity with the landowner, yet the district court inexplicably failed to cite this article.  Rather, the court relied on the preceding article, 3492, for delictual prescription in general, which begins to run "from the day injury or damage is sustained."[54]  There is a palpable difference between these standards.  In cases of damage to land, the running of prescription commences when the owner gains either actual or constructive knowledge, not when the damage occurs, a

---

[53]LA. CIV. CODE ANN. art. 3493 (West 1994).

[54]LA. CIV. CODE ANN. art. 3492 (West 1994).

rule essentially congruent with the doctrine of <u>contra non valentem</u>.[55]

"[P]rescription statutes are to be strictly construed against prescription and in favor of the claim that is said to be extinguished. Of the two possible constructions, the one that maintains enforcement of the claim or action, rather than the one that bars enforcement, should be adopted."[56] The defendant has the initial burden of proving that a tort claim has prescribed, but if the defendant shows that one year has passed between the tortious acts and the filing of the lawsuit, then the burden shifts to the plaintiff to prove an exception to prescription.[57]

One such exception is found in the doctrine of <u>contra non valentem</u>, which prevents the commencement of the running of prescription "when the plaintiff does not know nor [sic] reasonably should know of the cause of action."[58] The doctrine applies even

---

[55]Short for <u>contra non valentem agere nulla currit praescriptio</u>: literally, "no prescription runs against one unable to act." <u>See</u> <u>Cartwright v. Chrysler Corp.</u>, 232 So. 2d 285, 287 (La. 1970).

[56]<u>Louisiana Health Serv. & Indem. Co. v. Tarver</u>, 93-2449,11-12 (La. 4/11/94); 635 So. 2d 1090, 1098.

[57]<u>See</u> <u>Miley v. Consolidated Gravity Drainage Dist. No. 1</u>, 98-1321, 4 (La. App. 1 Cir. 9/12/1994), 642 So. 2d 693, 696 (involving land erosion claims); <u>Dixon v. Houck</u>, 466 So. 2d 57, 59 (La. App. 2 Cir. 1985).

[58]<u>Picard v. Vermilion Parish Sch. Bd.</u>, 2000-1222, 4 (La. App. 3 Cir. 4/4/2001), 783 So. 2d 590, 594.

if the plaintiff's ignorance is not induced by the defendant.[59]
Furthermore, the cause of action is defendant-specific: under
contra non valentem, prescription does not necessarily begin to run
at the first indication that the plaintiff may have suffered harm,
but rather . . . 'when plaintiff has reasonable basis to pursue [a]
claim against [a] specific defendant.'"[60]  Once again, however,
because  contra non valentem  is a  judicial  exception  to  the
statutory rule of prescription, "Louisiana courts strictly construe
this doctrine and only extend its benefits up to 'the time that the
plaintiff has actual or constructive knowledge of the tortious
act.'"[61]

It is not apparent from the district court's opinion that the
court adverted to this law, or considered contra non valentem or
the effect of the idiosyncrasies of the township and range system

---

[59]Landreneau v. Fruge, 598 So. 2d 658, 662 (La. App. 3 Cir.
1992).

[60]Picard, 2000-1222 at 5, 783 So. 2d at 595 (citing Jordan v.
Employee Transfer Corp., 509 So. 2d 420, 424 (La. 1987), where the
court stated that "prescription did not begin to run until [the
plaintiff] had a reasonable basis to pursue a claim against a
specific defendant").

[61]Eldredge v. Martin Marietta Corp., 207 F.3d 737, 743 (5th
Cir. 2000) (citing Bergeron v. Pan Am. Assurance Co., 98-2421, 9
(La. App. 4 Cir. 4/7/1999), 731 So. 2d 1037, 1042); Picard, 2000-
1222 at 4, 783 So. 2d at 594; Harsh v. Calogero, 615 So. 2d 420,
422 (La. App. 4 Cir. 1993) ("Contra non valentem is an exceptional
remedy . . . which is in direct contradistinction to articles in
our Civil Code.  Therefore, it must be strictly construed.").

32

on this case.[62]   Without acknowledging the law noted above or

conducting a reasonableness analysis, the district court

nevertheless found that the Board "was aware of the erosion of

Section 16 in or before 1985," which, as we shall describe, was a

questionable result in summary-judgment proceedings, even if by

"Section 16" the court meant Section 16 (18-13).  The court did not

indicate which kind of notice — actual or constructive — that it

found the Board to have had; rather, the court simply stated that

the Board knew about "Section 16 land erosion."

### i.   Actual Notice

Even though the record is replete with evidence that the Board

knew that marsh erosion in its sections sixteen generally was a

serious problem,[63] no evidence in the summary-judgment record

---

[62]The court stated that "the plaintiff was aware of the erosion
of Section 16," described evidence of "the school board's knowledge
of Section 16 land erosion," and mentioned "the act/omissions of
the defendants on §16/T18/R13."   It is not clear from these
passages that the Board owns many sections sixteen in this vast
coastal parish, none closer to another than five miles, and many
separated by multiples of that distance.

[63]According to a newspaper report, a Board member opposed
further dredging in 1981 because "it would make an already bad
erosion problem worse," but nothing in the article indicates that
the section sixteen at issue was Section 16 (18-13).  Various Board
minutes from the 1980s show that the Board was aware of erosion of
section sixteen lands.  In 1982, the Board even commissioned a
study of erosion in five of its sections sixteen, but of these the
closest to Section 16 (18-13) was apparently fifteen miles distant.
As Columbia noted at oral argument, the Louisiana legislature has
enacted legislative responses to the problem of marshland erosion.
In 1996, a lawyer who owned land adjacent to another of the Board's

suggests that the Board actually knew that Section 16 (18-13) in particular had suffered or was suffering erosion. This case is thus distinguishable from Eldredge v. Martin Marietta Corp.[64], in which we held that contra non valentem did not apply because the landowner personally had observed the actual damage to his property caused by barge traffic.[65]

The parties have not pointed us to, nor have we located, a case standing for the proposition that actual knowledge of damage to one or more remote, noncontiguous tracts of land brings with it actual knowledge of the same kind of damage to yet another noncontiguous tract — even a similar one — lying miles away. We are satisfied that actual notice must result from overt knowledge of damage to the specific property at issue, particularly when, as here, the plaintiff landowner has long held title to many remote and scattered sections sixteen, only one of which is Section 16 (18-13), but many of which are located in the extensive, marshy, southern part of this coastal parish. This observation is bolstered by the recognition that the use and possession of these largely inaccessible sections are generally exercised not directly

---

sections sixteen made a presentation to the Board about widening of pipeline canals.

    [64]Eldredge v. Martin Marietta Corp., 207 F.3d 737 (5th Cir. 2000).

    [65]Id. at 743.

34

by the landowner but by licensees, invitees, or lessees. With
respect to actual notice, then, there was at least a genuine issue
of material fact sufficient to preclude summary judgment in favor
of Koch and Columbia grounded in prescription.

### ii. Constructive Notice

The question of constructive notice is more complex.
Generally, knowledge is imputed only when the plaintiff has
"information sufficient to excite attention and to prompt further
inquiry."[66] This sufficiency standard asks what is it that would
excite the attention of or prompt action by a reasonable person.
Thus, "[t]he heart of the inquiry into constructive knowledge is
the reasonableness of plaintiff's inaction."[67]

Extension by analogy is needed to make that analysis here,
because the parties have not directed us to, nor have we found, any
contra non valentem case that is directly comparable to the instant
action.    Applicable   Louisiana   jurisprudence   suggests,
unsurprisingly, that reasonableness of inaction depends almost
entirely on the particular circumstances, requiring a case-by-case
analysis.[68]

---

[66]Picard, 2000-1222 at 5, 783 So. 2d at 595.

[67]Id. (emphasis of "inaction" added; emphasis of
"reasonableness" original).

[68]For example, the seizure of a semisubmersible drilling rig
(evidenced by a posting thereon) was deemed sufficient to excite a

When the alleged fault is not obvious, delay may not be unreasonable. If, for example, a homeowner learned from an engineer's report that cracks in walls resulted from a contractor's failure to comply with city code provisions, only then did prescription begin to run on the homeowner's claim against the city, not months earlier when a mason had generally advised the homeowner that the cracks could indicate a structural problem.[69]

In medical tort and redhibition cases, Louisiana courts have explicitly disowned an inquiry-notice rule in favor of the reasonableness standard; constructive notice is thus acquired only after the plaintiff learns of not only the tortious act and the damage, but also "the causal relationship between the tortious act and the damage."[70]   Consequently, "[m]ere apprehension that

---

reasonable person's attention and prompt inquiry into whether a lawyer had committed malpractice by failing to file a preferred ship's mortgage for the rig. Carroll v. Wolfe, 98-1910, 6 (La. App. 1 Cir. 9/24/1999), 754 So. 2d 1038, 1041 (holding that observing U.S. Marshals' signs on the rig gave plaintiffs notice). Similarly, when the owner of a tractor knew immediately after retrieving it from a repair shop that it was still malfunctioning, the owner could not sue the repairer more than one year later: the owner's delay was not reasonable, amounting instead to willful neglect, which in turn rendered contra non valentem unavailable. K & M Enters. v. Richland Equip. Co., 96-2292 6-9 (La. App. 1 Cir. 9/19/1997), 700 So. 2d 921, 924-25.

[69]Rihner v. Chevalier, 98-1032, 4-5 (La. App. 5 Cir. 3/30/1999), 731 So. 2d 429, 431-32.

[70]Beth Israel v. Bartley, Inc., 579 So. 2d 1066, 1072 (La. App. 4 Cir. 1991).

something might be wrong does not make delay in filing an action unreasonable, nor does knowledge that one has a disease."[71]  In a medical case, for example, even the plaintiff's awareness that he "had sand in his lungs" and "had evidence of silicosis" did not suffice to start the running of prescription when doctors told the plaintiff that his medical condition had not yet deteriorated.[72] And, in a redhibition case, a synagogue that had knowledge that its roof was leaking need not have sued a contractor, architect, and roofing manufacturer before learning that the leaking had been caused by a faulty roofing system and not merely by inadequate maintenance.[73]  Neither did the buyers of a house have constructive knowledge of the causation element in their cause of action until an engineer told them that an elevation differential might be the cause of structural damage.[74]

---

[71]Ducre v. Mine Safety Appliances, 963 F.2d 757, 760 (5th Cir. 1992) (citations and quotation marks omitted) (citing Griffin v. Kinberger, 507 So. 2d 821, 823 (La. 1987) and Knaps v. B & B Chem. Co., 828 F.2d 1138, 1139 (5th Cir. 1987)); see also Beth Israel, 579 So. 2d at 1072.

[72]Ducre, 963 F.2d at 760-62.  We refused to charge the Ducre plaintiff with knowledge of his cause of action before he learned that his silicosis could have been caused by sand-blasting.  Until he did so learn, the question of his knowledge was one for the jury.  Id. at 761-62.

[73]Beth Israel, 579 So. 2d at 1072-77.

[74]Encalade v. Coast Quality Construction Corp., 2000-925 (La. App. 5 Cir. 10/31/2000), 772 So. 2d 244, 247.

Read together, these cases establish the proposition that when damage is evident but causation is reasonably mysterious, Louisiana courts sometime pretermit the running of prescription. It also appears that an investigation into causation need not be made, and constructive notice need not be imputed, until damage becomes apparent.[75] Because Columbia and Koch did not establish, on summary judgment, that the Board had actual knowledge, it was thus legal error for the district court to hold that the Board's "failure to hire an expert or investigate the erosion at the time it became aware of the damage does not prevent prescription from commencing."

In summary, viewing the summary-judgment evidence in the light most favorable to the Board as non-movant, the district court lacked any evidence of actual notice and failed to apply the appropriate legal standard of reasonableness to the question of

---

[75]See South Cent. Bell Tel. Co. v. Texaco, Inc., 418 So. 2d 531, 532 (La. 1982) ("Generally, the prescriptive period for damage to adjacent land commences when the damage becomes apparent and the injured party discovers who or what caused it."); Dean v. Hercules, Inc., 328 So. 2d 69, 73 (La. 1976) ("[D]amages from industrial emissions and the like may not become apparent until some years after the occurrence. Additionally, it might be impossible for the injured party to know what or who caused the damage, until an investigation can be made after the damage in fact becomes apparent. In such cases, the prescriptive period would run only from the date the damage becomes apparent."); YIANNOPOULOS, PREDIAL SERVITUDES, supra, § 63 (discussing obligations of vicinage) ("In accordance with Article 3493 of the Civil Code, prescription begins to run from the day the injured party acquired, or should have acquired, knowledge of the injury and other pertinent facts, namely, from the day the damage becomes apparent.").

constructive notice. The district court may also have missed the importance of the township-and-range system, and the nature and separation of the Board's properties, in determining whether there was a genuine issue of material fact. Summary judgment on the basis that <u>contra non valentem</u> did not prevent prescription of the Board's claims was therefore error.

    c.   <u>Continuing Tort</u>

The parties also disagree whether this case involves a continuing tort. A continuing tort presents another exception to Louisiana's one-year prescriptive period for delicts, because "when the tortious conduct and resulting damages continue, prescription does not begin until the conduct causing the damage is abated."[76] As the Louisiana Supreme Court has stated, "the continuous nature of the alleged conduct has the dual effect of rendering such conduct tortious and of delaying the commencement of prescription."[77] For a continuing tort to exist, however, there must generally be continuing wrongful conduct, coupled with

---

[76]<u>South Cent. Bell</u>, 418 So. 2d at 533 ("Where the cause of the injury is a continuous one giving rise to successive damages, prescription dates from cessation of the wrongful conduct causing the damage."); <u>Estate of Patout v. City of New Iberia</u>, 97-1097, 9 (La. App. 3 Cir. 3/6/1998), 708 So. 2d 526, 531 (citing <u>South Cent. Bell</u>).

[77]<u>Bustamento v. Tucker</u>, 607 So. 2d 532, 539 (La. 1992).

continuing damage.[78]  Both continuing damage and continuing conduct are at issue here.

The district court made no ruling with respect to continuing damage:  It discussed the distinction between continuous and discontinuous damages, but it did not identify which, in its opinion, was occurring here.  On appeal, Koch and Columbia assert that the Louisiana Supreme Court's decision in Crump v. Sabine River Authority[79] establishes that marsh erosion is discontinuous damage.  We disagree; in fact our precedent holds otherwise.  In Crump, the plaintiff alleged that excavation of a canal permanently drained water from her property, depriving her of marine access to a nearby lake.[80]  We have distinguished such water diversion, however, from marsh erosion:

> In [Crump], the continuing presence of a canal was not
> sufficient to preclude prescription.  However, the damage
> alleged in this case is not the mere presence of the
> canals or a static condition related to their existence
> (e.g. diversion of water as part of their normal course
> of operation), but an ongoing and cumulatively increasing
> deterioration of plaintiffs' property adjoining the
> canals due to defendants' continuing conduct in their
> failure to maintain the canal banks.[81]

---

[78]South Cent. Bell, 418 So. 2d at 533.

[79]Crump v. Sabine River Auth., 98-2326 (La. 6/29/1999), 737 So. 2d 720.

[80]Crump, 98-2326 at 1-3, 6-7 (La. 6/29/99); 737 So. 2d at 723, 726.

[81]St. Martin v. Mobil, 224 F.3d at 409 n.8.

40

<u>Crump</u> itself distinguishes between continuous and discontinuous damage as follows:

> [A] distinction is made between continuous and discontinuous causes of injury and resulting damage. When the <u>operating cause of the injury</u> is 'not a continuous one of daily occurrence', there is a multiplicity of causes of action and of corresponding prescriptive periods. Prescription is completed as to each injury, and the action is barred upon the lapse of one year from the date in which the plaintiff acquired, or should have acquired, knowledge of the damage.... [This is to be distinguished from the situation where] the '<u>operating cause of the injury</u> is a continuous one, giving rise to successive damages from day to day....'[82]

In the latter case, the treatise quoted in <u>Crump</u> suggests, "it may be that prescription does not begin to run from the date the injury was first inflicted, but it ought to run at least from the date the damage was completed and the injured party acquired knowledge of it."[83] Here, erosion of the Board's marsh allegedly continues even unto this day. The damage is not yet "completed," but rather continues, albeit slowly and imperceptibly.

With respect to the continuing conduct prong of the continuing tort doctrine, the district court held that "[f]ailure to maintain a canal and its levees is not 'conduct' of the type necessary to

---

[82]<u>Crump</u>, 98-2326 at 7 (La. 6/29/99); 737 So. 2d at 726 (citing YIANNOPOULOS, PREDIAL SERVITUDES, <u>supra</u>, § 63); <u>see also</u> <u>Estate of Patout v. City of New Iberia</u>, 2001-0151, 4 (La. App. 3 Cir. 4/3/02), 2002 WL 535037, *4 (citing same).

[83]YIANNOPOULOS, PREDIAL SERVITUDES, <u>supra</u>, § 63 (internal quotations and footnotes omitted).

41

support a claim under the continuing tort theory," citing <u>St. Martin v. Quintana Petroleum Corp.</u>[84] in support of this proposition. We recently affirmed <u>St. Martin v. Quintana</u> in an unpublished, and therefore nonprecedential,[85] decision in which we said that <u>Ryan</u> controlled.[86]    As we have stated above, however, <u>Ryan</u> is distinguishable from the instant case, as here there are no side agreements supplementing the servitude agreements at issue and specifically providing for the contingency of marsh erosion.

The Louisiana Supreme Court has summarized the continuing tort exception by explaining that a continuing tort "is occasioned by continual unlawful acts and for there to be a continuing tort there must be a continuing duty owed to the plaintiff and a continuing breach of that duty by the defendant."[87]  This formulation does not exclude the possibility that "unlawful acts" may include omissions that breach a duty.  To the extent that aggravation of the servient estate might be found to have occurred as a result of such omissions or failures to act, a reasonable factfinder could determine that Koch and Columbia, by using the canals but failing

---

[84]2001 WL 175226 (E.D. La).

[85]<u>See</u> 5TH CIR. RULE 47.5.

[86]<u>St. Martin v. Quintana Petroleum Corp.</u>, No. 01-30315 (5th Cir. Feb. 20, 2002).

[87]<u>Crump</u>, 98-2326 at 10 (La. 6/29/99), 737 So. 2d at 728.

42

to protect them against resulting breaches and widening, violated a duty and thus "acted" unlawfully.    Indeed, summary-judgment evidence suggests that the defendants might be continuing to do so. If so, such conduct could be wrongful for the purposes of a continuing-tort analysis.    These are additional genuine issues of material fact that preclude summary judgment grounded in tort prescription.

D.    <u>Poiencot Deposition</u>

Lastly, as a collateral matter, the Board has moved to strike Columbia's appellate record excerpt number five and any references to it in Columbia's brief.    This excerpt is the deposition of Malcolm Poiencot, which is in the record.    The Board argues that the deposition (1) was not considered on summary judgment by the trial court because the Board's motion in limine to exclude the deposition was pending; (2) was given by a witness who would not qualify as an expert; (3) is not newly discovered and previously unknown evidence, as it was taken three weeks before the district court rendered summary judgment; and (4) is untimely, because it was not made part of the record within ten days of the summary judgment motion, as required by Rule 56(c).    Poiencot's deposition testimony,    which    focuses    on    the    nutria,[88]    goes    mostly    to

---

[88]For anyone who might not be familiar with this exotic emigré from South America that now is a ubiquitous resident of the marshes of South Louisiana, nutria are large aquatic rodents that feast on

43

proportional causation, which (as we understand <u>contra non</u> <u>valentem</u>) is not an issue in this appeal of the trial court's summary judgment on prescription grounds. As the subject deposition is therefore irrelevant to our disposition of this appeal,[89] we deny the motion as moot.

III.

CONCLUSION

We agree with the district court that the servitude agreements here at issue do not expressly impose on Columbia and Koch the duty to prevent the canals from widening and eroding adjoining marshland. Whether, in the absence of an express contractual duty, the suppletive law of Louisiana might here impose such a duty remains to be resolved, as does the question whether such a duty might in turn render the failure to maintain canal banks a continuing tort. Because this case presents several genuine issues of material fact — not the least of which implicate actual or

_____

marsh grasses and roots.

[89]The defendants assert that Poiencot's statements that he warned the Board that nutria were eating the marsh in Section 16 (18-13) are further evidence supporting the conclusion that the Board had notice of marsh deterioration in the 1980s. Nutria damage, however, is different from hydrological erosion, and knowledge of the former does not give constructive notice of a cause of action based on the latter. In fact, notice of nutria damage may make the failure to investigate into possible hydrological erosion more reasonable, not less. <u>See</u> our foregoing discussion of Louisiana <u>contra non valentem</u> cases.

44

constructive knowledge of damage and its causation — with respect to prescription as well as duty, in tort and in contract, summary judgment was not providently granted. We remand this action for further proceedings consistent with this opinion.

REVERSED and REMANDED; MOTION DENIED.