

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2003 JAN 14 AM 10: 29

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TERREBONNE PARISH SCHOOL BOARD | § | CIVIL ACTION NO. 00-0319 |
| | | |
| VERSUS | § | SECTION: B |
| | | |
| COLUMBIA GULF TRANSMISSION COMPANY AND KOCH GATEWAY PIPELINE COMPANY | § § | MAGISTRATE: 5 |

## PRETRIAL STIPULATION
### and
### ORDER

1. **Pre-trial Conference Date:**

   The date of the pre-trial conference: January 8, 2003.

2. **Appearances:**

   The appearance of counsel identifying the party(s) represented:

   a.  A. J. Gray, III, T.A.
       Wade T. Visconte
       THE GRAY LAW FIRM (APLC)
       P. O. Box 1467
       Lake Charles, LA. 70602-1467
       Telephone (318) 494-0694
       Facsimile (318) 494-0697

   Attorneys for plaintiff, Terrebonne Parish School Board

DATE OF ENTRY
JAN 1 5 2003

Fee
Process
X Dktd
CtRmDep
Doc.No. 161

b.  Michael X. St. Martin
Joseph G. Jevic III
Conrad S.P. Williams III
ST. MARTIN & WILLIAMS (APLC)
Crescent Farm
4084 Highway 311
Post Office Box 2017
Houma, LA 70361-2017

Attorneys for plaintiff, Terrebonne Parish School Board

c.  Robert J. Young, III
Robert J. Young, Jr.
Young, Richaud & Myers
1515 Energy Centre
1100 Poydras Street, Suite 1515
New Orleans, LA 70163
(504) 585-7750

Attorneys for defendant, Koch Gateway Pipeline Company

d.  For Defendant, Columbia Gulf Transmission Company

Thomas R. Blum, T.A. (#3170)
James A. Burton (#3708)
Herman C. Hoffmann, Jr. (#6899)
Simon, Peragine, Smith & Redfearn, L.L.P.
1100 Poydras Street
Energy Centre - 30th Floor
New Orleans, Louisiana  70163
(504) 569-2030

3.  **Description of Parties:**

A description of the parties, and in cases of insurance carriers, their insured must be identified.  The legal relationships of all parties with reference to the claims, counterclaims, third-party claims and cross claims, etc.

a.  Plaintiffs:

**TERREBONNE PARISH SCHOOL BOARD** ("TPSB"), is a public body and agency of the Parish of Terrebonne.  TPSB owns the immovable property which is the subject to this litigation, i.e., Section 16, Township 18 South, Range 13 East.

b. Defendants:

  i. **KOCH GATEWAY PIPELINE COMPANY** ("Koch") is a foreign corporation qualified to do business in Louisiana. Insofar as this litigation is concerned, Koch is the successor to United Gas Pipeline Company. Koch operates a natural gas pipeline that is located on TPSB's property.

  ii. **COLUMBIA GULF TRANSMISSION COMPANY** ("Columbia Gulf") is one of two defendants in this case. It is a natural gas transporter incorporated in Delaware and with its principal place of business in the State of Texas. There are no cross claims, counterclaims or third party claims.

4. **Jurisdiction:**

This court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 having been removed to this court pursuant to 28 U. S. C. § 1441 from the Thirty-Second Judicial District Court, Parish of Terrebonne, State of Louisiana. This Court has jurisdiction under the provisions of 28 U.S.C. Section 1332 by reason of the diversity of citizenship between the plaintiff and the defendants, and because the amount or value in controversy under plaintiff's claims exceeds $75,000, exclusive of interest and costs.

a. Plaintiff, TPSB, is a public body and agency of the Parish of Terrebonne and is considered a Louisiana entity for purposes of jurisdiction. Defendant, Koch, is a foreign corporation qualified to do business in Louisiana with it principal place of business in Texas. Defendant, Columbia Gulf is a foreign corporation qualified to do business in Louisiana.

b. The parties stipulate that jurisdiction is proper in this case and a sum in excess of $75,000.00 is involved and such sum reasonably could be awarded.

5. **Pending Motions:**

A list and description of any motions pending or contemplated and any special issues appropriate for determination in advance of trial on the merits. If the Court at any prior hearing has indicated that it would decide certain matters at the time of pre-trial, a brief summary of those matters and the positions of each party with respect thereto should be included in the pre-trial order.

  TPSB has filed motions in limine to exclude evidence of rents and royalties on other TPSB lands, a motion in limine to exclude erosion studies, marsh management plans, and other studies or plans relating to other Section 16 lands owned by TPSB besides Section 16, T18S, R13E, and a motion in limine to exclude the testimony of Malcolm Poiencot, all of which are pending.

For defendant Columbia Gulf: Columbia Gulf has one motion in limine pending, and may file others to exclude various evidence and/or testimony offered by plaintiff.

6.    **Summary of Material Facts:**

A brief summary of the material facts claimed by:

a.    **Plaintiff, Terrebonne Parish School Board:**

In general plaintiff, Terrebonne Parish School Board, claims that:

This case arises out of the relationship between a landowner whose property is burdened by servitudes. The pivotal questions involve the defendants' obligations to maintain canals dredged on the property to benefit their natural gas pipeline operations and to preserve, restore, and maintain the coastal marsh property at issue.

TPSB is the owner of Section 16, Township 18 South, Range 13 East, ("School Board property") in Terrebonne Parish, Louisiana, originally comprising 640.92 acres of freshwater coastal marsh. Prior to the activities complained of herein, the marsh was healthy with consistent marsh vegetation. Virtually no surface ponds nor surface streams existed on the School Board property. The marsh was a stable hydrologic ecosystem.

On December 18, 1957, Terrebonne Parish School Board granted a Right-of-Way to United Gas Pipeline Company that is recorded in the Terrebonne Parish Courthouse under COB 253, Folio 646, Entry No. 173617. The Right of Way gave United Gas the authority to construct and operate a natural gas pipeline on the School Board property. The right of way also gave United Gas the limited authorization to dredge a pipeline canal "not to exceed forty feet in width." The right of way is considered a predial servitude under Louisiana law and attaches to the land and is transferrable to Koch as United Gas' successor or assignee. As such, the servitude allowed Koch to take over operations of the natural gas pipeline in 1992.

The Koch pipeline was constructed and the pipeline canal dredged in 1958. The pipeline canal was forty to fifty feet in width when dredged based on information currently available. Since that time the pipeline has been continuously operated. Despite the provision in the December 18, 1957 right of way allowing a pipeline canal "not to exceed forty feet in width," Koch has taken no actions to maintain its pipeline canal. As a result, the pipeline canal has eroded significantly and now averages over seventy (70) feet in width. Due to Koch's lack of maintenance, breaks or breaches have developed in the spoil banks of the pipeline canal and have continued to widen and deepen thereby creating a hydrologic connection that has damaged the marsh.

Columbia Gulf never even bothered to obtain a right of way before constructing its natural gas pipeline and pipeline canal across the School Board's property. On February 18, 1964, gave public notice of an application by Columbia Gulf for a servitude across TPSB's land.  On March 17, 1964, TPSB adopted a resolution setting a minimum fee of $25.00 a rod for any pipeline right of way granted across the School Board property.  On April 3 & 8, 1964, representatives from Columbia Gulf complained of the $25.00 rate.  Subsequent to this date and with conscious indifference to the landowner rights of TPSB, Columbia Gulf dredged its pipeline canal and constructed the pipeline on the School Board property even though it had not been granted a right of way thereby creating a trespass.  Subsequently, Columbia Gulf was granted a right of way that is recorded in the Terrebonne Parish Courthouse under COB 403, Folio 313, Entry No. 284018, dated August 4, 1965.  The pipeline has been continuously operated since it was constructed and the pipeline canal was dredged.

Columbia Gulf's environmental indifference has not changed since it constructed the pipeline and canal on TPSB's property.  Based on the only document produced by Columbia Gulf, the Columbia Gulf pipeline canal was fifty feet in width when dredged.  Columbia Gulf's right of way was limited to one hundred feet.  Columbia Gulf  has taken no actions to maintain its pipeline canal.  As a result, the pipeline canal has eroded significantly and now averages roughly one hundred thirty-five (135) feet in width in violation of the limits established in the August 4, 1965 right of way.  Furthermore, due to Columbia Gulf's lack of maintenance, breaks or cuts have developed in the spoil banks of the pipeline canal and have continued to widen and deepen thereby creating a hydrologic connection that has damaged the marsh.

TPSB, the landowner, recognizes that Koch and Columbia Gulf, as right of way or servitude owners, are entitled to reasonable use of the surface of the property for their natural gas operations. TPSB also recognizes that Koch had the right to construct the its pipeline canal.  However, TPSB contends that both the Koch and Columbia Gulf canals must be preserved and maintained to prevent continuous damage of TPSB's fragile marsh, and that the canals should be restored to the widths agreed to in the relevant right of ways.  The marsh adjacent to these canals which has been damaged and/or destroyed by the defendants failing to maintain their canals must also be restored and preserved in the future.

At a recent telephone conference, the Court raised concerns about whether the obligations to maintain the canals were issues of fact to be decided a trial.  Simply put, the duty to maintain the canals and cause the least possible damage to TPSB's property is included in the servitudes at issue as a matter of law.  As the Fifth Circuit noted on appeal, the "parties here are juridical acquaintances. The Board, Columbia, and Koch's predecessor decided to burden one estate for the benefit of two others. These decisions created conventional predial servitudes that the parties memorialized in servitude agreements. The proper place to begin analyzing this case is thus the servitude agreements themselves. Then we shall turn to obligations supplied or

imposed by the Civil Code." *Terrebonne Parish School Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 311 (C.A.5 (La.) 2002).

When there is a contract, it is law between the parties and must be performed in good faith and enforced according to its terms. When, as here, the contract creates a conventional predial servitude, the mode of use of the servitude is regulated by the contract. If, however, the contract is silent on a non-essential question, like the mode of use, Louisiana's law of conventional obligations in general and predial servitudes in particular supplies the answer, filling in the blanks. *Terrebonne Parish School Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 311 (C.A.5 (La.) 2002).

The Fifth Circuit ruled that the damage releases relied upon by Koch and Columbia Gulf released the defendants from damages resulting from construction of, not from continued use of or failure to maintain, the pipeline and canal. *Terrebonne Parish School Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 311 (C.A.5 (La.) 2002).

The Court then considered jurisprudence and the express provisions of the defendants' servitudes. The Court ruled that it did not "interpret the servitude agreements themselves as determining whether Koch and Columbia have a continuing duty to prevent marsh- erosion damage." *Terrebonne Parish School Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 311 (C.A.5 (La.) 2002). The Fifth Circuit then ruled that "under Louisiana law" this Court's "task shifts from plain-wording contract interpretation to application of Louisiana's suppletive rules for immovable property, --together with relevant case law--come into play when issues are not explicitly disposed of in the writings of the parties." *Terrebonne Parish School Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 315 (C.A.5 (La.) 2002).

The Fifth Circuit then noted that Civil Code article 697 establishes that when the parties creating a conventional servitude do not specify the use and extent of that servitude, Louisiana's suppletive rules of property law apply. *Terrebonne Parish School Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 315 (C.A.5 (La.) 2002). One principle of servitude jurisprudence is that ambiguity in a servitude agreement must be construed in favor of the servient estate--here, the interests of the Board. *Terrebonne Parish School Bd. v. Columbia Gulf Transmission Co.* , 290 F.3d 303, 315 (C.A.5 (La.) 2002). As the Louisiana Supreme Court has reasoned: Predial servitudes are in derogation of public policy because they form restraints on the free disposal and use of property. Therefore, servitudes are not entitled to be viewed with favor by the law and can never be sustained by implication. Any doubt as to the existence, extent or manner of exercise of a predial servitude must be resolved in favor of the servient estate. *Palomeque v. Prudhomme,* 95-0725, 7 (La.11/27/1995), 664 So.2d 88, 93.

Another well-established rule of servitude law is that the dominant estate owner – here, each defendant – must not "aggravate" the condition of the servient estate. As Professor A.N. Yiannopoulos has observed, the duty not to aggravate the condition of the servient estate, "correlative of the real right of servitude, is not grounded on negligence"; and, absent an express contractual exoneration for marsh erosion damages, "to the extent that the damage to the servient estate was caused by abuse of right, the damage should be compensable." *Terrebonne Parish School Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 316 (C.A.5 (La.) 2002). Furthermore, the duty not to aggravate the servient estate is a continuing duty. *Id.* at 316. It is clear that the Fifth Circuit is strongly suggesting to this Court that there is a continuing duty to maintain the canals as a matter of law. The issue of whether and to what extent the defendants' use of the canals and lack of maintenance caused the deterioration of TPSB's marsh property and aggravated (and continues to "aggravate") the servient estate are questions of fact. *Terrebonne Parish School Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 317 (C.A.5 (La.) 2002).

Insofar as the right of ways or servitudes on the property are concerned, TPSB is the grantor and surface owner. TPSB has not received revenue from the natural gas operations of Koch or Columbia Gulf. TPSB has received no mineral royalties from production on T18S, R13E since a producing well has not been drilled on the property by either Koch or Columbia Gulf. Furthermore, no producing well has ever been drilled on the property at issue.

The canals dredged on the School Board property have altered the hydrology of the marsh and have adversely impacted the marsh's ecology through the physical removal of marsh terrain and creation of spoil banks. The property has been damaged by erosion caused by breaches in the canal levee system/spoil banks. The pipeline canals have not been maintained and have widened due to erosion.

Defendants have allowed the numerous breaks or cuts in the spoil banks to enlarge which continue to cause erosion and destruction of the marsh. Tidal cycles and the hydrologic connection created by the pipeline canals has allowed significant water movement through the breaks in the spoil banks into and out of the marsh. Consequently, channels adjacent to the breaches or breaks developed allowing a direct hydrologic connection. TPSB retained a hydrologist, Alex McCorquodale, to measure velocity of water currents through these breaks and to take soil and/or root mat samples. Based upon the flow meter readings and soil and/or root mat samples taken, these flows into the School Board property have sufficient energy to erode or break up underlying sediment and organic material in the canal spoil banks.

According to TPSB's wetland specialist, Robert Chabreck, these flows into the School Board property have sufficient energy to erode or break up underlying sediment and organic material from beneath the root mat and destroy wetland area without killing vegetation first. This process is confirmed by the fact that the marsh root mat that has not been converted and that is damaged adjacent to canals is

significantly less thick in soil and root composition as opposed to normal healthy marsh. As the root mat is gradually eroded, vegetation dies. The dying of marsh vegetation results in increased erosion and leads to open water, and/or submergence of marsh vegetation and root mat. Native vegetation is replaced with pest plants like water hyacinths. Accordingly, due to the erosion and/or submergence of the School Board property as a result of the canals dredged by Defendants, the ecological regime of School Board marsh property changed.

Additionally, original vegetation, such as bull tongue and maiden cane, does not attract nutria and other herbivores. However, as the root mat dies, the original vegetation dies out and is replaced with vegetation such as penny wort. This vegetation, in turn, attracts nutria. However, the nutria are not the cause of the marsh erosion, but are instead a symptom of the marsh erosion as healthy original vegetation dies. It is undisputed that the property has not be damaged due to salt intrusion. Subsidence (or sinking of the land) is an issue affecting coastal Louisiana. However, as the marsh is a floating marsh, the subsidence of the land under the floating marsh does not mean that the marsh will also sink. One thing to note is that if the land subsides, this creates a greater water area for tides to surge in and out under the root mat. In turn, there is a greater possibility of erosion of the root mat. If the canals were maintained to prevent the surging of astronomical tides, the subsidence is a non-issue. Finally, Dr. Chabreck will testify that the canals have allowed excessive amounts of sediments to be transported into the marsh. When these sediments are deposited on the floating marsh, the marsh is unable to support the added weight of these sediments and thereby sinks.

Shea Penland is a geomorphologist and coastal wetlands expert, including their valuation. According to Penland, hurricanes can destroy or severely damage marsh property. However, Penland found no such evidence of any such destruction or damage in this case. Penland's interpretation of historical aerial photographs shows that the marsh has gradually deteriorated over the years where breaks have developed in the spoil banks of the Koch and Columbia Gulf canals. Moreover, CG's expert, Alan Ensminger, has completed a supplemental expert report noting that Hurricane Lili had no discernable effect on TPSB's property.

The erosion damage has increased over the years, although the erosion has gone undiscovered because the property has eroded from the bottom of the floating marsh up to the surface. The full extent of current damage is included in Charles Camp's expert report and will provided by Chabreck's trial testimony.

Dr. Chabreck and Mr. Camp, experts employed by TPSB, have developed three restoration plans. The first two plans provide this court with an option for ordering restoration. Plan 1 involves filling the pipeline canals. Plan 2 involves bulkheading the pipeline canals back to the widths provided for in the servitude at issue. Plan 3 outlines the cost to restore the open pond and channel areas which have developed as a result of the breaks or cuts in the defendants' pipeline canals. The plans of

TPSB's experts are reasonable and necessary for protection and restoration of the property.

The land in question is owned by the State of Louisiana through a political subdivision and is used to benefit the school children and people of Terrebonne Parish, i.e., the public. Based on his education, research, and prior and current work experience with Louisiana's government and the federal government, on the 14 billion dollar Coast 2050 program and the yearly multi-million dollar Coastal Wetlands Protection, Preservation and Restoration Act which seek to preserve and restore private and public coastal wetlands using public funds, Penland assesses the value of an acre of coastal marsh using private and social values at $86,040 to $143,400. The Coast 2050 and CWPPRA, both involving Louisiana state and federal agencies, have adopted this range of value for coastal wetlands. The restoration plan proposed by Dr. Chabreck and Mr. Camp proposes to protect and restore the coastal marsh property at issue for a fraction of the costs the land would be valued at under the multi-billion dollar coastal restoration plans. Since TPSB's land is held in trust for the benefit of the public and restoration of the land benefits the public, private and social values apply in this case. If this case were in north Louisiana and the defendants had destroyed left open a pit or spilled materials over the farmland, there would be no question that the land would have to be restored. The only difference is that this case involves freshwater flotant marsh, and the Courts are grappling with the restoration issue in these unique cases for the first time.

The defendants will claim that restoration is a waste of money because any restored land will be destroyed by other causes. Thus, any restoration would be an exercise in futility. The issue is not what might happen in the future. No one has a crystal ball that will show the future in this case after restoration. If this were the case, an insurance company would never have to pay to rebuild a house that burns down because the rebuilt house might be destroyed by a tornado, or hurricane, or another fire. The Court must not be distracted by what might or might not happen after the property is restored. Indeed, if restoring wetlands is an exercise in futility, then why has Congress set aside 14 billion dollars in the Coast 2050 program to preserve and restore wetlands? Should a Court not award a personal injury plaintiff damages for needed future surgery just because that surgery may not be successful in resolving the plaintiff's pain? As the Fifth Circuit pointed out, this Court must only concern itself with how damage has been caused due to the defendants' failure to maintain their canals and what sort of "damages" are to be awarded to TPSB.

The fact of the matter is that the restored wetlands will flourish and continue to provide numerous ecological, social, aesthetic, and spiritual benefits. Indeed, Dr. Chabreck conducted a study to verify that his restoration plan will work if the property is restored. The study was an unqualified success as documented in Figures 1-6 of Dr. Chabreck's September 20, 2002, expert report. Dr. Chabreck will also testify that under low energy conditions not subject to astronomical tide surges, TPSB's restored property will likely thrive and that the damage to TPSB's marsh

would not have occurred in this case but for the failure of Koch and Columbia Gulf to maintain their canals. The damages caused by Koch and Columbia Gulf and the proper remedy to be awarded to TPSB are the only issues properly before the Court.

Koch and Columbia Gulf have had every opportunity to properly maintain their canal spoil banks/levees. Since beginning operations, they have conducted inspections of their pipelines located in the pipeline canals once a year, at a minimum. Despite these inspections and notice that their canals are eroding, defendants never took steps to restore their canals. Neither defendant has performed any maintenance on their pipeline canal. Neither defendant has a company policy in place to maintain pipeline canals and preserve a landowner's land. Louisiana law requires defendants to cause the least possible damage to TPSB's property. The pattern of conscious environmental indifference exhibited by each defendant is a breach of their respective right of way contract and is a continuing tort.

b. **Defendants, Koch Gateway Pipeline Company and Columbia Gulf Transmission Company:**

In general, the defendants claim that:

Koch Gateway Pipeline Company:

Koch Gateway Pipeline Company is an interstate natural gas pipeline company that transports natural gas through a series of high pressure natural gas pipelines throughout southeastern United States. The gas as so transported is ultimately delivered to pipelines for distribution in a number of states throughout the south, which includes utilities in southeast Louisiana.

On December 18, 1957, Koch and TPSB entered into a right-of-way agreement, whereby Koch was given authority to construct and operate a natural gas pipeline on TPSB's Section 16 property. The Agreement gave Koch the authority to perform all activities associated with constructing and operating its pipeline. This included the dredging of open canals or ditches. The Agreement provides that the canals or ditches may be left open, at the sole option of Koch. The Agreement contains no provisions, whether express or implied, requiring Koch to "maintain" the ditch as alleged by TPSB, nor maintain the adjacent spoil banks, or even construct spoil banks in the first instance. Rather, as a matter of practice based upon construction procedures in effect at the time, Koch, through its independent contractor, Brown & Root, dredged the flotation ditch, placing spoil banks along either side of the ditch as the ditch was dredged.

At the same time that the School Board executed the right-of-way agreement, the School Board also executed a release agreement ("Release"). This Release provided for a full and complete release of any and all damages associated with construction of the pipeline.

*Page 10 of 70*

Koch submits that the right-of-way agreement and Release are binding contracts between TPSB and Koch, and, to the extent that TPSB has any claims, which are denied, they arise out of the contractual relationship between the parties. TPSB has absolutely no tort claims against Koch, nor any other delictual claims, whether based upon civil code servitude articles or otherwise. Both Louisiana law and federal Fifth Circuit law interpreting Louisiana law are clear that the contract between the parties governs any relationship in instances such as this, and both parties are bound by the express terms of the contract.

Koch denies that it has or had any obligation under the right-of-way agreement to "maintain" the ditch or the adjacent spoil banks, as asserted by TPSB. Koch submits that the only obligation imposed upon Koch pursuant to the right-of-way agreement is to maintain Koch's pipeline and appurtenances thereto. If the School Board had desired that any additional obligations be imposed upon Koch, such as the alleged duty to maintain the ditch or adjacent spoil banks, including any duty to prevent the alleged erosion or damage to the adjacent marshland, then such terms and conditions should have been set forth in the right-of-way agreement. Instead, Koch was given the sole option to leave open any open ditches which it dug on TPSB's property. To the extent that any damages have resulted as a result of the open ditch, whether by natural forces, third party activities, or otherwise, then such damages are the sole responsibility of TPSB, assumed under the terms of the contract.

Koch alternatively contends that, if there was some implied obligation to maintain the ditch or spoil banks, then Koch was relieved of that obligation pursuant to the Release signed by the School Board contemporaneously with execution of the servitude agreement. The release specifically discharged Koch from any damages which might occur as a result of the construction of the pipeline. It is undisputed that, ever since Koch and/or its independent contractor, Brown & Root, dredged the ditch in the late 1950's, there has been no additional "construction" or other activities by Koch or any parties on behalf of Koch with respect to TPSB's Section 16 property at issue. Accordingly, the release absolves Koch of the claims which TPSB has asserted herein.

In the further alternative, even if the release was not intended to cover all damages, past, present and future, including those asserted herein, then Koch submits that TPSB's claims have prescribed, whether based in contract or tort. Again, Koch denies that TPSB has any basis for tort claims, but even assuming so, such claims are prescribed. Testimony of School Board members, as well as School Board records, clearly demonstrate that the School Board was aware of erosion to Section 16 lands in general as early as 1981, and, with respect to the particular Section 16 involved herein, T18-R13, the School Board was aware the erosion problems thereon by the mid-1980's. School Board member Francis Voisin specifically overflew T18-R13 with Mr. Kent Willoughby, who at that time was in charge of Section 16 lands. This was performed in the mid-1980's, and Mr. Voisin noted erosion to the particular section at issue, which he associated with the two pipeline canals located thereon.

*Page 11 of 70*

Lastly, the School Board's own attorney in this case, Mr. Michael St. Martin, made a presentation to the School Board in August, 1996, relative to a particular piece of Section 16 property, T18-R17. In that presentation, Mr. St. Martin advised the School Board that, in his opinion, there was significant erosion taking place on T18-R17 because of pipeline canals, and that if this was "indicative of other Section 16 lands," then the School Board had a "monstrous problem." Notwithstanding this presentation by Mr. St. Martin, the School Board did nothing further to investigate the other Section 16 properties, but instead simply waited until October, 1999, to file the instant suit. In other words, the School Board obtained no new information which would justify interruption of prescription during this time period.

Finally, even if Koch has some duty to maintain the spoil banks or the ditch, whether such duty is contractual or delictual in nature, and even assuming Koch has breached that duty by allowing cuts or openings to occur in Koch's spoil bank, Koch vehemently denies that any such openings have caused or contributed to erosion of the adjacent marshland. TPSB's own expert has identified only three openings along Koch's ditch, one of which is not even on the Section 16 property. The width of these three openings total less than 30 to 35 feet on a ditch which is 5,500 feet in length. TPSB's primary damage experts, Drs. Chabreck and McCorquodale, have admitted that they performed no analyses of the flows inside the marsh to determine if they were sufficient to either transport organic material from the marsh, or even erode the organic root mat material in the first instance. The only measurements taken were at a single cut along Koch's ditch and another cut along Columbia's ditch. The most that Dr. McCorquodale, a hydrologist, could opine was that the flows at the cut along the Koch ditch "might be" sufficient to erode the organic material in the spoil bank itself. He gave absolutely no opinion about erosion of the interior marsh because of this hydrological flushing action as posited by Dr. Chabreck.

Koch's own experts, Dr. Holloway, a marsh expert, and Dr. DeVries, a hydrologist, studied the marsh very carefully. Dr. Holloway is of the opinion that the majority of the marsh deterioration and damage has been caused by nutria in the area, which have been there since the 1950's. Dr. DeVries took flow measurements up to 600 feet inside the marsh area where the Koch cut is located, and is of the opinion that any flows inside the marsh are nowhere near sufficient to cause erosion to the marsh or transportation of sedimentary material from the marsh. In fact, the studies done by TPSB's own expert, Dr. McCorquodale, revealed that there was a net flow of water into the marsh, which would mean a greater inflow of sedimentary and organic materials into the marsh, not out of the marsh. Koch's expert, Dr. Holloway, opines that this sedimentary material and freshwater input from the Atchafalaya River to the west is actually helping the marsh by allowing regeneration to take place. Nonetheless, until the nutria are eliminated, the marsh will never fully recover from its current state of damage.

As to the amount of damages, Koch submits that the restoration plans compiled by TPSB's experts, Dr. Chabreck and Mr. Camp, not awardable as a matter of law or

fact. One of the restoration plans calls for completely filling in the Koch and Columbia ditches, which is directly contrary to the servitude agreements, giving both parties the right to leave them open at their option. The second plan calls for bulkheading the sides of each ditch, purportedly to return the ditches to their original widths of 40 feet (Koch) and 100 feet (Columbia). The primary purpose of this bulkheading would be to restore the marsh which has allegedly been lost by erosion and widening of the canals, in Koch's case approximately 8 acres. The cost of this bulkheading restoration plan is $4.8 million, or over $600,000.00 per acre. This is completely disproportionate to the value of the property, less than $250.00 per acre. Louisiana law is clear that an owner whose property has been damaged can recover only the fair market value of that property where restoration costs would be disproportionate to said fair market value.

Columbia Gulf's Summary of Material Facts.

Columbia Gulf is a interstate natural gas pipeline company that transports natural gas through a series of high pressure natural gas pipelines from offshore and southern Louisiana through Louisiana, Mississippi, Tennessee and Kentucky. The gas so transported is ultimately delivered to receiving pipelines for distribution in a number of states in the midwest and northeast. In recent years, gas transported by Columbia Gulf has been delivered to utilities in southeast Louisiana, including those serving Orleans and Jefferson parishes.

Columbia Gulf is now and has always been regulated by agencies of the federal government, particularly the Federal Energy Regulatory Commission, as successor to the Federal Power Commission. As such, Columbia Gulf is endowed with power of expropriation under both Louisiana and federal law. Columbia Gulf is a responsible corporate citizen of Louisiana and of the other states in which it operates. It has never been cited for an environmental violation. It maintains a full time section to monitor its operations and to assess and correct environmental and safety problems in accordance with federal and local law, and good industry practices.

The School Board ("TPSB") alleges in its Petition that since the 1800's it has owned all of Section 16, Township 18 South, Range 13 East ("Section 16"), located in Terrebonne Parish, Louisiana. On or about July 26, 1965, TPSB granted to Columbia Gulf a certain Right of Way and Servitude Agreement (the "Agreement"). In return for a price of $685.20, the receipt of which was acknowledged in the Agreement, TPSB granted to Columbia Gulf:

> A servitude, right of way, and easement to construct, lay, maintain, operate, alter, repair, remove, change the size of, and replace a pipe line and appurtenances thereto, including but not limited to fittings, tie-overs, valves, corrosion control equipment and other apparatus above or below ground, for the transportation of oil, gas, petroleum products or any other liquids, gases, or substances which can be

*Page 13 of 70*

> transported through pipe lines, the grantee having the right to select, change, or alter the route of such pipe line under, upon, over and through lands which the undersigned owns or in which the undersigned has an interest . . . .

The Agreement further provided:

> The right of way granted herein shall be 100 feet wide, except however, Grantee shall be allowed to use for extra working space a width of 200 feet during construction. *It is understood and agreed that Grantee shall not be required to backfill the open flotation ditch excavated during construction.*

> It is hereby understood that the Grantee, its successors and assigns, shall not be obligated to pay Grantors or any subsequent owner of the herein above described premises, any damages resulting from the construction of the first pipe line authorized hereunder, such damages having been anticipated and paid in advance at the time of execution of this instrument.

*  *  *

(Emphasis added.)

A pipeline was in fact constructed by Columbia Gulf and placed in a flotation ditch in the above-mentioned right-of-way in Section 16. The flotation ditch as constructed was 75-80 feet wide.

On the same day that the Right-of-Way Agreement was executed, July 26, 1965, TPSB also executed in favor of Columbia Gulf a "Damage Release." The Damage Release provides in pertinent part:

> Received of Columbia Gulf Transmission Company Seven Thousand Eight Hundred Seventy-nine and 80/100 -------------- Dollars, ($7,879.80) in full payment and settlement for all damages of every kind and character (contractual, negligence or otherwise) caused to our interest(s) as owners by the construction, operation, maintenance of a pipe line and appurtenances across the following described lands, in the place and manner such pipe line and appurtenances have been constructed and laid, and we release and discharge Columbia Gulf Transmission Company and their Agents and Contractors, from all liability therefor.

Columbia Gulf contends that the language of the Servitude Agreement and Release relieve it of any liability to plaintiff in this case under any theory.

TPSB has sued Columbia Gulf Transmission Company and Koch Gateway for damages to Section 16. The section in question totals 640 acres, and consists of wetlands, primarily floating marsh. TPSB dresses up its claims in a variety of theories, but its entire complaint is founded on three sets of factual allegations: (1) that Columbia Gulf damaged the marsh by its activities in constructing its pipeline, including the dredging a flotation ditch (Petition, Paragraph 13) and placing of the excavated material in spoil banks along its sides, (Petition, Paragraphs 10 and 11); (2) that the mere existence of the flotation ditch over time has damaged the marsh (Petition, Paragraph 4); and (3) that Columbia Gulf's alleged failure to maintain the flotation ditch has damaged the marsh (Petition, Paragraphs 7, 8, 12, 13, 15 and 16).

Columbia Gulf has never taken any action to maintain the flotation ditch, including the adjoining spoil banks, because neither the condition of the ditch or spoil banks affects the safety or integrity of the submerged pipeline, and further because Columbia Gulf does not believe it has any obligation to do so. It is undisputed that the TPSB never asked Columbia Gulf to take any action to maintain the flotation ditch or spoil banks until the filing of this lawsuit. It is also undisputed that Columbia Gulf has not taken any action to cause the breaks in the spoil banks mentioned below or the widening in the floatation ditch which has occurred because of natural forces since 1965 when the pipeline was laid.

Plaintiff's primary expert, Dr. Robert Chabreck, has hypothesized that breaks in the Columbia Gulf (and Koch) spoil banks have hydrologically linked Section 16 with the Atchafalaya River and the Gulf of Mexico. That link, in his opinion, exacerbates tidal action and causes a surging or "flushing" action from the marsh into the flotation ditches, carrying sediment from the marsh away on the tide. Dr. Chabreck has been involved in 15-20 similar suits involving other Section 16's and two suits involving one of plaintiff's counsel personally, and Dr. Chabreck has so far enunciated the same "one size fits all" theory about the cause of erosion in these sections in question, although they are geographically distant from one another. Further, after years of authoring publications on coastal wetlands that acknowledge subsidence, sea level rise, man-made levees, river diversion, hurricanes, salt water intrusion and herbivory as causes of erosion in coastal Louisiana, Dr. Chabreck is nonetheless of the opinion that none of those factors is a cause of erosion in this Section 16: TPSB's properties have miraculously escaped the laws of physics and forces of nature according to Dr. Chabreck. Further, there have been no published studies to support Dr. Chabreck's hypothesis. His "flushing" action hypothesis was created in litigation, is not founded on any data, has not been objectively tested, has not been peer-reviewed, and is not generally accepted in his field.

Columbia Gulf's expert hydrologist, Dr. Joseph Suhayda, conducted a field study to determine whether there was sufficient current under the marsh in Section 16 to support Dr. Chabreck's "flushing action" theory. Dr. Suhayda excavated the marsh at six different locations and, using flow meters, attempted to measure water flow below the floatant that could account for the "erosion from below" theorized by

Dr. Chabreck. Not only did Dr. Suhayda not find any water current whatsoever, the marsh discovered at the six sites involved in his study all fit the classic description of healthy marsh as described in a volume relied on by Dr. Chabreck, a page of which is separately identified as an exhibit to his deposition because it has illustrations of the appearance of healthy versus damaged floatant marsh from the surface down to the hard base. Moreover, Dr. Suhayda's measurement of water flow in the bayou which has become connected to the CGT canal in the southeastern portion of Section 16, closely matched the water flow measured by plaintiff's expert hydrologist at the site. In all, Dr. Suhayda's study convincingly demonstrates that Dr. Chabreck's "flushing action" theory does not, in fact, exist in the real world.

Plaintiff has identified 59.3 acres of direct loss attributable to the actual presence of both floatation ditches and their banks and 56.2 acres of indirect loss, for a total of 115.5 acres. Dr. Chabreck attributes approximately 33 acres of direct loss and 21.96 acres of indirect loss to Columbia Gulf.

Conversely, Dr. James Coleman, the land loss expert for Columbia Gulf, attributes the marsh loss that has occurred in Section 16 from the 1930's forward to a complex mix of factors including delta switching, subsidence, sea level rise, lack of sedimentation due to levees, hurricanes and nutria eat outs. He has also shown that much of the damaged marsh and open water on Section 16 existed before the Columbia Gulf pipeline was laid.

TPSB hired Dr. Shea Penland to analyze aerial photographs to calculate land loss, which figures he used to determine the land loss acreage figures mentioned above. Dr. Penland found that there was virtually no net loss of marsh on Section 16 between 1965 when the Columbia Gulf pipeline was laid and 1998, the date of the last aerial photograph included in his analysis. Penland also agrees that the largest area of open water on Section 16 outside the pipeline canals existed before the Columbia Gulf canal was dredged and before any openings occurred in the spoil banks on Koch's canal.

TPSB also had a hydrologist, Dr. McCorquodale, conduct certain measurements of both the Koch and Columbia Gulf flotation ditches. With respect to Columbia Gulf, only an opening on the south bank near the eastern edge of the property was studied. McCorquodale concedes that his measurements show that the highest velocity of current recorded at the Columbia Gulf cut would not be sufficient to erode the spoil bank, and he admitted that he had no data to conclude that the current had sufficient velocity to erode the floating marsh mat or the marsh bottom. Moreover, McCorquodale's measurements with respect to both Columbia Gulf and Koch showed a net water flow into the marsh, rather than into the ditches. The net inflow into the marsh found by Dr. McCorquodale contradicts Dr. Chabreck's hypothesis that sediment laden water is being sucked out of the marsh down the canals and to the west. Also, plaintiff has no data to support Dr. Chabreck's opinion that the water

*Page 16 of 70*

in the canals is carrying a net outflow of sediment and thus causing erosion of interior marsh.

Dr. Joseph Suhayda, Columbia Gulf's expert hydrologist, has examined Dr. McCorquodale's data, made calculations based on that data using accepted methods in the science of hydrology, and concluded that the velocity of the current moving through the break in the spoil bank on Columbia Gulf's flotation ditch is far below that which would be required to erode either the bank or the marsh mat. These calculations are confirmed by the study conducted by Dr. Suhayda described above.

TPSB's expert Dr. Penland has also given an opinion that hurricanes have not been a cause of erosion in Section 16. The basis for that opinion is his lack of specific data on the effects of any hurricane on the section, as well as various studies of hurricane Andrew (1992), which found that the geomorphology and vegetation covering areas 25-30 miles from the project site were not significantly affected by Andrew. Columbia Gulf's hydrologist, Dr. Suhayda, is also a hurricane expert, and has determined through research and hurricane modeling that hurricane Andrew, as well as earlier hurricanes, did significant damage to the marsh in this Section.

Dr. Chabreck has proposed three restoration plans for the property. TPSB used a surveyor (Charles Camp) to price out these three options. Camp's testimony made it clear that these are not three separate plans; rather, plaintiff envisions that any restoration would require Plan 3 to be implemented, along with either Plan 1 or 2. The cost for implementing Plans 1 and 3 is estimated by plaintiff to be $14,255,046. The cost of implementing Plans 2 and 3 is estimated by plaintiff to be $12,590.358. Plan 3 involves filling some of the open ponds and "damaged marsh" in Section 16 with peat moss imported from Canada, in the hope of creating a new marsh. Plan 1 requires the Columbia Gulf canal to be filled with river sand and than re-vegetated. Plan 2 would install bulkheads along the entire Columbia Gulf canal at a 100' width across the Section.

Allan Ensminger, a wetlands management and restoration expert for Columbia Gulf, has found these three proposed plans neither appropriate, feasible nor economically justified. It is also his opinion that each plan would result in extensive damage to existing wetlands. Moreover, no project involving bulkheading, or using peat to fill open ponds or repair damaged marsh, has ever been attempted on such a large scale. Furthermore, bulkheading spoil banks, filling in spoil banks or other acts that would impede the flow of water are disfavored under current restoration practices - so much so that the Army Corps of Engineers now requires spoil banks to be built with breaks in them. Mr. Ensminger also determined that the Columbia Gulf canal had no role in causing the loss of marsh on Section 16. Rather, any such loss or damage to marsh resulted from nutria "eat outs" or other natural causes.

Columbia Gulf contends that many or all of TPSB's claims have prescribed. In the Fifth Circuit's opinion, the Court held that in order for TPSB to be charged with

knowledge sufficient to begin the running of prescription, either as applied to the contract claim or to the claim in tort, it must be shown that TPSB had "overt knowledge of damage to" this specific Section 16. Once such damage (i.e., erosion) is known, then the duty to investigate the cause of the damage arises. As the Court will recall, there is significant evidence that TPSB was aware that erosion in Section 16 lands was occurring and that this had been a concern for some time; and, further, that TPSB had conducted no investigation of the causes of such erosion prior to retaining the St. Martin firm to initiate this litigation. Columbia Gulf believes that this knowledge was more than sufficient to cause TPSB to investigate the causes of the erosion and disagrees with the standard apparently adopted by the Court of Appeal. Nonetheless, Columbia Gulf intends to show that TPSB did have knowledge of erosion damage to this Section 16 in the 1980s to a sufficient degree to commence the running of prescription.

As to continuing tort, the Fifth Circuit has found that the existence of such a tort can only arise if "aggravation" of TPSB's property is found. The Court stated that, if such a finding is made, the Court could also find that the pipeline defendants "violated a duty and thus acted unlawfully." In other words, this Court must first find that a duty existed and that Columbia Gulf breached that duty before it can then conclude that the defendants are charged with a "continuing tort." Columbia Gulf has not breached any such duty, should one be found to exist.

If it is determined that Columbia Gulf has breached its contract with TPSB and thereby caused damage to TPSB's property in Section 16, the appropriate measure of damages for such breach would be the fair market value of the property damaged - less than $300 per acre. TPSB is not entitled under Louisiana law to restoration damages, which its experts claim will exceed $10,000,000 in this case, because the cost of the proposed "restoration" is totally disproportionate to the value of the property. Claims that the value of wetlands exceed $10,000 an acre are inadmissible, and inappropriate as a measures of damages, because such a valuation, to the extent it is recognized as appropriate at all by economists, is available only to approximate the value of wetlands to society at large (so as to justify public projects or special taxes). It is totally inappropriate as a measure of value to an individual landowner.

In its Summary of Material Facts, above, TPSB has devoted significant space arguing the meaning of the Fifth Circuit's decision and its implications for the upcoming trial of this case. Columbia Gulf believes that this is not an appropriate place to set forth such arguments and will address plaintiff's contentions in this regard in its pretrial memorandum.

7.    **Uncontested Facts:**

A single listing of all uncontested material facts:

1.    On December 18, 1957, Terrebonne Parish School Board granted United Gas Pipe Line Company a right of way and easement giving United Gas the right to construct a natural gas pipeline and dredge a canal for placement of the natural gas pipeline. TPSB was paid $360.66 for the right of way and easement. The right of way is recorded in the Terrebonne Parish Courthouse under COB 253, Folio 646, Entry No. 173617.

2.    TPSB executed and granted a Right of Way and Servitude Agreement in favor of Columbia Gulf on July 26, 1965, for which it received the consideration stated in the Agreement subsequent to CG's canal being dredged.

3.    TPSB was paid $685.20 for the July 26, 1965, 100 foot wide right of way, and easement. The right of way is recorded in the Terrebonne Parish Courthouse under COB 403, Folio 313, Entry No. 284018.

4.    The right of ways granted to Columbia Gulf and Koch are still in effect today and terms of said instruments are binding on the parties.

5.    The defendants are natural gas companies. They have operated the interstate natural gas pipelines traversing TPSB's property since the pipelines were constructed.

6.    By Act of U.S. Congress dated 4/21/1806, 2 Stat. 391 and Act of U.S. Congress dated 2/15/1811, 2 Stat. 617, 618-19, the United States conveyed all Section 16 lands in every Township to the State of Louisiana for the benefit of educating the people of Louisiana.

8.    **Contested Issues of Fact:**

A single listing of the contested issues of fact:

a.    Whether TPSB's Section 16, Township 18 South, Range 13 East marsh property was damaged as a result of canals dredged by Koch and Columbia Gulf for the purpose of natural gas pipeline operations.

b.    Whether the canals dredged were properly maintained by Koch and Columbia Gulf, and whether levees along the canals were allowed to deteriorate, so that breaks or openings were formed in the levees and allowed to remain over a period of several years.

c.    Whether, as a result of erosive action caused by breaks in the canal levees, the healthy freshwater marsh property has been converted to open water and allowed water hyacinths, and exotic pest plant, to spread over much of the TPSB property.

d.    Whether the erosion problem on the TPSB property is continuing to cause damage.

e.    Whether the erosion damage to the TPSB property is increasing exponentially as more open water forms on the TPSB property.

f.    The extent of the damage to the marsh caused by the erosion of the canals at the time of trial.

g.    Whether the canal system is reasonably necessary for current and future operations of defendants.

h.    If the canal system is reasonably necessary for the current and future natural gas operations of defendants, whether such defendants should be responsible for future maintenance of the pipeline canals and whether such defendants should be responsible for damages and restoration of the TPSB property.

i.    Whether TPSB has an obligation or duty to maintain the TPSB property for continued use and benefit to the public.

j.    Whether there is reason to believe that TPSB will, in fact, restore the property if this court orders a money judgment against Koch and/or Columbia Gulf.

k.    Whether, if any damage to the TPSB property is of a continuing nature resulting from defendants' canals, should that circumstance be considered in determining the reasonableness of TPSB's restoration plan.

l.    Whether TPSB restoration plan is reasonably necessary to restore the TPSB property and to prevent damage from continuing to occur.

m.    The reasonableness in costs of the proposed restoration plan or the amount of damages due TPSB.

n.    Whether long term maintenance of a floating marsh requires the absence of water movement or currents that will erode the light weight organic particles that form the mat; and whether within a period of several months to a year, a large floating marsh can erode away when subjected to frequent and strong water currents.

o.    Whether Columbia Gulf initially constructed its canal pursuant to rights granted by its servitude or by trespass and whether a release executed by TPSB settled any claim for damages which may arise due to lack of maintenance of the canal and cuts in the pipeline canal.

*Page 20 of 70*

p.      Whether the dredged canals across TPSB's marsh property are within the width provided for in the terms of the right of way agreements.

q.      The extent to which land loss was sustained through other causes, including, without limitation, third persons, hurricanes, nutria herbivory, pesticide spraying, burning.

r.      The extent to which TPSB and its agents and permitees caused the land loss.

s.      The liability of Koch Gateway Pipeline Company.

t.      The liability of Columbia Gulf Transmission Company.

u.      The value of the property for purposes of determining restoration damages or reasonableness of the proposed restoration plan.

v.      The extent of land loss sustained by virtue of acts of God or nature.

w.      Whether TPSB has the right to restoration if the restoration efforts may interfere with the rights of other parties, including without limitation, the defendants.

x.      Whether the plaintiff has failed to mitigate damages and, if so, the extent to which it has failed to mitigate its damages.

y.      Whether the cost of restoration is economically wasteful and disproportionate to the value of the land.

z.      Whether the dredged canals across TPSB's marsh property must be restored to the width provided for in the right of way agreements.

aa.     Any issues of fact that are inherent in the contested issues of law listed below.

bb.     Whether the damage release executed on behalf of Columbia Gulf was limited to trespass damages created from the construction of the Columbia Gulf pipeline canal or was broad enough to include all future damage claims of TPSB, including the claims being made by TPSB in this case.

cc.     Whether Terrebonne Parish School Board is the owner of all of Section 16, Township 18 South, Range 13 East, located in Terrebonne Parish, Louisiana.

dd.     Whether Columbia Gulf originally sought a right of way from TPSB in February, 1964. Whether TPSB conditioned approval of the right of way upon Columbia Gulf paying $25.00 per rod, thereby leading to a decision by Columbia Gulf to consciously construct its pipeline and pipeline canal on the School Board's property without a right of way thereby giving rise to a trespass.

*Page 21 of 70*

ee.     Whether the Columbia Gulf right of way specifically gave Columbia Gulf the right to dredge a pipeline canal, and whether the right way provided that Columbia Gulf shall not be required to backfill the open flotation ditch excavated during construction.

ff.     Whether the Columbia Gulf pipeline and "flotation ditch" were constructed in 1965, and whether the natural gas pipeline operated by Columbia Gulf has been in continuous service since the pipeline was first completed and used by Columbia Gulf.

gg.     Whether the TPSB property contains floating freshwater marsh plus fresh water plant communities, and whether the freshwater marsh covers the property, except where Little Horn Bayou partially crosses the property and except where other pond and open water areas have developed.

hh.     Whether prior to construction of the Koch and Columbia Gulf canals, the TPSB property at issue was healthy with consistent marsh vegetation and was classified as a floating freshwater marsh, and whether virtually no surface ponds nor surface streams existed on the School Board property, i.e., the marsh was a stable hydrologic ecosystem.

ii.     Whether TPSB has suffered a direct loss of marsh property due to the dredging of the canals and placement of spoil thereby creating levees or spoil banks.

jj.     Whether the Koch and Columbia Gulf canals have breaks or cuts in the spoil banks, and whether the breaks or cuts create and allow a hydrologic connection between the marsh and tidal activity/cycles.

kk.     Whether TPSB has or has not restored the property at issue in the manner suggested by Robert H. Chabreck and Charles C. Camp.

ll.     The number of acres of TPSB's original 640.92 acre tract that will require restoration.

mm.     Whether TPSB currently receives or has ever received revenue generated from the transporting of natural gas through the Koch and Columbia Gulf pipelines.

nn.     Whether the Columbia Gulf canal was 50 feet in width when dredged and has eroded to a current average width of 116 feet.

oo.     Whether pursuant to the July 26, 1965, Servitude Agreement, Columbia Gulf laid a thirty inch pipeline across Section 16, and has continued to use that pipeline as part of its interstate natural gas transportation business ever since.

pp.     Whether the pipeline was laid in a "flotation ditch" as asserted by Columbia Gulf or a "pipeline canal" as asserted by TPSB.

qq.     Whether as contemplated by the Servitude Agreement, the pipeline was laid by construction of a flotation ditch across Section 16.

rr.     Whether Columbia Gulf has ever taken any action to maintain the flotation ditch, including the adjoining spoil banks, since the ditch was dug in late 1964.

ss.     Whether TPSB has ever notified Columbia Gulf to take any action to maintain the flotation ditch or spoil banks adjacent thereto until the filing of this lawsuit.

tt.     Whether western Terrebonne Parish, including Section 16, is sinking at the rate of 1.2 cm. per year and has subsided about 18" in the 35 years since the Columbia Gulf pipeline was installed.

uu.     Whether the presence of the Columbia Gulf canal has caused marsh loss.

vv.     Whether breaks in the spoil banks of the Columbia Gulf canal have caused marsh loss.

ww.     If marsh loss has occurred, the amount of such loss.

xx.     If marsh loss has occurred, the cause(s) of such loss.

yy.     If marsh loss has occurred, the amount of any such loss attributable to Columbia Gulf.

zz.     Whether implementation of the restoration plans proposed by plaintiff's expert will result in damage to the marsh.

aaa.    Whether implementation of the restoration plans proposed by plaintiff's expert are economically feasible.

bbb.    Whether implementation of the restoration plans proposed by plaintiff's expert have any likelihood of successfully combating erosion.

ccc.    The value of plaintiff's land.

ddd.    Whether plaintiff failed to mitigate its alleged damages.

eee.    Whether and how hurricanes have affected Section 16.

fff.    When various areas of allegedly damaged marsh and open water first appeared, and the extent and cause of such phenomena.

*Page 23 of 70*

ggg.    The role of herbivory, especially nutria, in causing marsh loss in Section 16.

hhh.    The right of way provided that United Gas would not "give its permission for the canal dug hereunder to be used by the public," and also provided that the pipeline canals "shall not exceed forty feet in width".

iii.    The natural gas pipeline operated by Koch has been in continuous service since the pipeline was first completed and placed into operation in 1958.

jjj.    The Koch canal is now an averages at least 70 feet in width.

kkk.    In 1958, United Gas constructed a natural gas pipeline on TPSB's property and dredged a canal for placement of the natural gas pipeline. In 1992, Koch Gateway Pipeline Company took over as operator of the natural gas pipeline.

lll.    Whether the Release executed by the School Board in favor of Koch releases any and all damages, whether contractual or otherwise, for which Koch may be liable.

mmm.    Whether the right-of-way agreement specifically gives Koch the option to leave open any open canals or ditches dug on the property, and, if so, whether Koch is then liable for any damages as alleged by plaintiff.

nnn.    Whether the Koch canal was 40 feet in width when originally dredged, and whether it has since eroded to an average width of 70 feet.

ooo.    Whether Koch has ever taken any action to maintain the flotation ditch, including spoil banks, since the ditch was dug in the late 1950's.

ppp.    Whether TPSB has ever notified Koch to take any action to maintain the flotation ditch or spoil banks adjacent thereto at any point prior to filing this lawsuit.

qqq.    Whether Koch's pipeline was laid by construction of a flotation ditch across the Section 16 property, as provided in the right-of-way agreement.

rrr.    Whether the presence of the Koch canal has caused marsh loss, either direct or indirect.

sss.    Whether there are any breaks in the spoil banks of the Koch canal, and, if so, whether they have caused or resulted in any marsh loss.

ttt.    If any marsh loss has occurred, the amount of such loss attributable to Koch.

uuu.    Whether Columbia Gulf dredged its canal without a right of way and without the consent of TPSB after negotiations for a right of way were unsuccessful.

*Page 24 of 70*

vvv.   Columbia Gulf Transmission Company and Koch Gateway Pipeline Company have used the canals dredged by them at least once a year since the canals were constructed to inspect and/or maintain their pipelines.

www.   Whether insofar as the right of ways or servitudes on the property are concerned, TPSB is the grantor and surface owner and whether TPSB has received revenue from the natural gas operations of Koch or Columbia Gulf or any other mineral royalties from production.

xxx.   Whether oil and gas operations have directly and indirectly impacted Louisiana's wetlands resulting in lost freshwater marsh.

yyy.   Whether prior to the filing of this suit, TPSB called on Columbia Gulf or Koch to repair or maintain the pipeline canals in question and their associated spoil banks.

zzz.   Whether Columbia Gulf Transmission Company and Koch Gateway Pipeline Company have maintained the canals dredged by them nor the spoil banks of the canals.

9.   **Contested Issues of Law:**

A single listing of the contested issues of law:

a.   Whether the natural gas operations of defendants extend beyond what is reasonably necessary to effectively transport natural gas across TPSB's property.

b.   Whether defendants should maintain and restore the TPSB property to the condition in which they found the property.

c.   Plaintiffs assert as an issue: The extent of defendants' obligation to maintain canals dredged on the TPSB property to benefit their natural gas operations and to maintain the canals and restore adjacent damaged and destroyed property.

d.   Defendants assert as an issue: Whether TPSB's damages should be limited to the market value of the property actually damaged as of the date of trial.

e.   Whether the revenue defendants have earned from their natural gas operations should be considered in determining the reasonableness of TPSB's restoration plan.

f.   Whether, if any damage to the TPSB property is of a continuing nature resulting from defendants' canals, should that circumstance be considered in determining the reasonableness of TPSB's restoration plan.

g.   Whether defendants have been negligent in the construction, maintenance and operation of the natural gas pipeline canals on the TPSB property.

h.   Whether defendants breached their duty as a reasonably prudent operators to plaintiffs to cause the least possible damage to the TPSB property.

i.   Whether defendants' failure to maintain the canals reasonably needed for its operations, and their failure to restore the property and canals no longer needed for their operations, constitute an unreasonable exercise of rights without regard to those of TPSB.

j.   Whether the proper measure of damages in this case is: (1) restoration, (2) the difference between the value of the property before and after the "damage", or (3) the replacement cost of the property, less depreciation.

k.   Whether the plaintiffs are entitled to restoration if restoration efforts will interfere with the rights of other parties, including defendants.

l.   Any issues of law inherent in the contested issues of fact listed above.

m.   Whether any award of damages (including restoration costs) must be proportionately reduced to the extent damages were caused by third parties, acts of nature, or TPSB.

n.   Whether a continuing duty is imposed on defendants by law requiring them to maintain their pipeline canals at widths no greater than as specified in defendants' right of ways.

o.   Whether defendants must restore the pipeline canals back to the widths specified in their right of ways if the defendants have breached their duty and have allowed the pipeline canals to erode beyond the maximum widths specified in their right of ways.

p.   Whether plaintiffs' claims have prescribed.

q.   Whether a continuing duty is imposed on defendants by law requiring them to repair and restore breaks or breaches in the levees of their pipeline canals at widths no greater than as specified in defendants' right of ways.

r.   Whether the release signed by plaintiff in favor of Columbia Gulf in July, 1965 bars all or some of the claims it has brought in this suit.

s.   Whether the Servitude Agreement executed in favor of Columbia Gulf by TPSB imposes on Columbia Gulf the duty to maintain the flotation ditch and adjoining spoil banks.

t.   Whether plaintiff's claims are limited to those sounding in breach of contract rather than in tort.

u.   Whether all or some of plaintiff's claims are prescribed.

*Page 26 of 70*

v.    Whether Columbia Gulf has breached the terms of its right of way agreement, and, if so, whether such breach was the cause of any damage to plaintiff.

w.    The apportionment of liability, if any, between the two defendants, plaintiff and third parties.

x.    Whether cost of restoration is a measure of damages available to plaintiff.

y.    The proper measure of damages, if any, available to plaintiff.

z.    Whether Dr. Penland is qualified to testify on economic valuation issues.

aa.    Whether Dr. Chabreck's opinions and methodologies satisfy the requirements of F.R.E. 702.

bb.    Whether the Release signed by TPSB in favor of Koch in December, 1957, bars all or some of the claims brought in this lawsuit.

cc.    Whether the right-of-way agreement executed in favor of Koch in December, 1957, imposes any legal duties upon Koch to maintain the flotation ditch and/or the adjoining spoil banks and/or renders Koch liable for any alleged damage to the interior marsh.

dd.    Whether Mr. Camp is qualified to testify regarding his restoration plans under F.R.E. 702, 703 and 704.

ee.    Whether Mr. Camp's restoration plans may be awarded as a matter of law, whether pursuant to specific performance or monetary damages.

ff.    Whether Dr. McCorquodale's opinions and methodologies satisfy the requirements of F.R.E. 702, 703 and 704, whether with regard to any alleged erosion of the spoil banks and/or alleged erosion of the interior marsh property.

10.    **Exhibits:**

For each party, a list and description of exhibits intended to be introduced at the trial.

a.    **Plaintiff, Terrebonne Parish School Board:**

## EVIDENTIARY OBJECTIONS

Terrebonne Parish School Board has not yet seen some of the exhibits listed by Columbia Gulf and/or Koch Gateway Pipeline Company. Terrebonne Parish School Board therefore objects to the admissibility of any such exhibits on the grounds of lack of relevance, hearsay, and lack of authenticity.

*Page 27 of 70*

1.  Responses of Columbia Gulf Transmission Company to Plaintiff's First Set of Interrogatories and First Set of Requests for Production of Documents.

2.  Plaintiff's First Set of Interrogatories and First Set of Requests for Production of Documents to Columbia Gulf Transmission Company.

3.  Responses of Koch Gateway Pipeline Company to Plaintiff's First Set of Interrogatories and Requests for Production of Documents.

4.  Plaintiff's First Set of Interrogatories and First Set of Requests for Production of Documents to Koch Gateway Pipeline Company.

5.  Curriculum Vitae of Robert Chabreck, Ph.D.

6.  Curriculum Vitae of Shea Penland, Ph.D.

7.  Curriculum Vitae of Charles Camp, Land Surveyor.

8.  Curriculum Vitae of Alex McCorquodale, Ph.D., P.E.

9.  Report entitled "Assessment of Coastal Wetland Values" by Shea Penland, Ph.D. together with all maps, photographs, demonstrative aids and other exhibits attached to and included in the Report.

10. Report entitled "Assessment of Potential Hurricane Damage To Terrebonne Parish School Board Section 16, Township 18 South, Range 13 East Property" prepared by Shea Penland, Ph.D., together with all maps, photographs, demonstrative aids and other exhibits attached to and included in the Report.

11. December 15, 2000 Report entitled "Assessment of the Direct and Indirect Impacts of Pipelines in Section 16, Township 18 South, Range 13 East, Terrebonne Parish, Louisiana, *Revised*" prepared by Shea Penland, Ph.D. together with all maps, photographs, demonstrative aids, and other exhibits attached to and included in the Report.

12. Report entitled "Evaluation of Damages to Property of the Terrebonne Parish School Board in Township 18 South, Range 13 East," by Robert H. Chabreck, Ph.D., together with all maps, photographs, demonstrative aids, and other exhibits attached to and included in the report.

13. Report entitled "Field Survey of Wetland Damage Associated with Pipelines in Section 16, Township 18 South, Range 13 East, Terrebonne Parish, Louisiana," by Robert H. Chabreck, Ph.D., together with all maps, photographs, demonstrative aids, and other exhibits attached to and included in the report.

*Page 28 of 70*

14.    Report entitled "Thickness of the Root Mat in Section 16, Township 18 South, Range 13 East, Terrebonne Parish, Louisiana," by Robert H. Chabreck, Ph.D., together with all maps, photographs, demonstrative aids, and other exhibits attached to and included in the report.

15.    Expert report prepared by Charles M. Camp dated October 31, 2000, outlining the proposed restoration of Section 16, Township 18 South, Range 13 East, together with all maps, photographs, demonstrative aids, and other exhibits attached to and included in Camp's report.

16.    Right-of-Way from Terrebonne Parish School Board to United Gas Pipeline Company recorded in the Terrebonne Parish Courthouse under COB 253, Folio 646, Entry No. 173617, dated December 18, 1957.

17.    Right-of-Way from Terrebonne Parish School Board to Columbia Gulf Transmission Company recorded in the Terrebonne Parish Courthouse under COB 403, Folio 313, Entry No. 284018, dated August 4, 1965.

18.    September 12, 2000, map entitled "Section 16 Township 18 South, Range 13 East Restoration Project No. 2 Plan Overview" outlining the restoration of the pipeline canals dredged by Koch and Columbia Gulf.

19.    September 12, 2000, map entitled "Section 16 Township 18 South, Range 13 East Restoration Project No. 1 Plan Overview" outlining the restoration of the pipeline canals dredged by Koch and Columbia Gulf.

20.    Map for restoration plan #3, "Section 16 Township 18 South, Range 13 East Restoration Project No. 3 Plan Overview" outlining the restoration of the marsh damaged and destroyed as a result of the eroding pipeline canals dredged by Koch and Columbia Gulf.

21.    Report entitled "Assessment of Flow Between the Boundary Canals and the Marshes of Section 16, No. 18-13" prepared by Alex McCorquodale, Ph.D., P.E. and Robert Simmons, P.E., together with all maps, photographs, demonstrative aids, and other exhibits attached to and included in the report.

22.    Any exhibits referred to in or attached to any depositions taken in this matter.

23.    All maps, photographs, demonstrative aids, publications, and other documentation used, referred to, or relied upon by Alex McCorquodale in preparing his expert report and forming his expert opinion.

24.    All maps, photographs, demonstrative aids, publications, and other documentation used, referred to, or relied upon by Robert Chabreck in preparing his expert reports and forming his expert opinion.

25.    All maps, photographs, demonstrative aids, publications, and other documentation used, referred to, or relied upon by Charlie Camp in preparing his expert report and forming his expert opinion.

26.    All maps, photographs, demonstrative aids, publications, and other documentation used, referred to, or relied upon by Shea Penland in preparing his expert report and forming his expert opinion.

27.    Any depositions taken in the captioned matter.

28.    Any pleadings filed in the captioned matter.

29.    Columbia Gulf's documents Bates number CGT 0001 through CGT 0247 produced in response to the Terrebonne Parish School Board's first request for production of documents.

30.    Koch's documents Bates number K-0001 through K-0416 produced in response to the Terrebonne Parish School Board's first request for production of documents.

31.    Any exhibits listed by Koch Gateway Pipeline Company.

32.    Any exhibits listed by Columbia Gulf Transmission Company.

33.    Any documents hereinafter produced by Koch Gateway Pipeline Company and/or Columbia Gulf Transmission Company and/or plaintiffs.

34.    Any exhibits necessary for rebuttal or impeachment of any witnesses called by Koch Gateway Pipeline Company and/or Columbia Gulf Transmission Company.

35.    Figure 1 attached and included in the McCorquodale and Simmons expert report, said Figure is entitled "Assessment of Flow Between the Boundary Canals and the Marshes of Section 16, No.18-13" which is identified as "T18S,R13E, S16 Flow Meter Site Location Map".

36.    Figure 2 attached and included in the McCorquodale and Simmons expert report, said Figure is entitled "Assessment of Flow Between the Boundary Canals and the Marshes of Section 16, No.18-13" which is identified as "Measured Cross-Section at Cut 18-13 #1 on the Northeast Side of the Property (view looking into the marsh), August 24, 2000 at 10:01 AM".

37.    Figure 3 attached and included in the McCorquodale and Simmons expert report, said Figure is entitled "Measured Cross-Section at Transect 18-13#2 at Little Horn Bayou (view looking upstream-northwest), August 24, 2000 at 1:34 PM".

38.   Figure 4 attached and included in the McCorquodale and Simmons expert report, said Figure is entitled "Cross-section of Cut 18-13#3 on the Southeast Side of the Property (view looking into the Columbia Gulf Canal, October 31, 2000 at 10:30 AM)".

39.   Figure 5 attached and included in the McCorquodale and Simmons expert report, said Figure is entitled "Recorded Velocity and Stage at Cut 18-13#1 (Northeast side of the Property)".

40.   Figure 6 attached and included in the McCorquodale and Simmons expert report, said Figure is entitled "Initial Uncorrected Flow and Flow Corrected for Vertical and Lateral Boundary Effects at Cut 18-13#1 (Q in cfs) (Positive Values Refer to Flow into the Marsh)".

41.   Figure 7 attached and included in the McCorquodale and Simmons expert report, said Figure is entitled "Hydrograph Corrected for Clogging and Unclogging of Probe at Cut 18-13#1".

42.   Figure 8 attached and included in the McCorquodale and Simmons expert report, said Figure is entitled "Recorded Velocity and Stage at Transect 18-13#2 (August 24, 2000)".

43.   Figure 9 attached and included in the McCorquodale and Simmons expert report, said Figure is entitled "Initial Uncorrected Flow and Corrected for Vertical and Lateral Boundary Effects at Transect 18-13#2 (Q in cfs) (Positive Values Indicate Downstream Flow)".

44.   Figure 10 attached and included in the McCorquodale and Simmons expert report, said Figure is entitled "Hydrograph Corrected for Clogging and Unclogging of Probe at Transect 18-13#2".

45.   Figure 11 attached and included in the McCorquodale and Simmons expert report, said figure is entitled "Recorded Velocity and Stage at Cut 18-13#3 (Southeast Part of the Property)".

46.   Figure 12 attached and included in the McCorquodale and Simmons expert report, said figure is entitled "Initial Uncorrected Flow and Corrected for Vertical and Lateral Boundary Effects at Cut 18-13#3 (Q in cfs) (Positive Values Indicate Flow into the Columbia Gulf Canal)".

47.   Appendix A attached and included in the McCorquodale and Simmons expert report, said Appendix is entitled "Calibration Certificates for Flow Meters".

48.   Appendix F attached and included in the McCorquodale and Simmons expert report, said Appendix is entitled "Sample of Field Data for Section 18-13#1".

49.  Appendix G attached and included in the McCorquodale and Simmons expert report, said Appendix is entitled "Sample of Field Data Reduction for Section 18-13#1".

50.  Appendix H attached and included in the McCorquodale and Simmons expert report, said Appendix is entitled "Settling Velocity Analysis at Section 18-13#1".

51.  Appendix I attached and included in the McCorquodale and Simmons expert report, said Appendix is entitled "Suspended Solids Analysis by Youchao Wang and Sample Custody Documents".

52.  Appendix J attached and included in the McCorquodale and Simmons expert report, said Appendix is entitled "Sample of Field Data for Section 18-13#2".

53.  Appendix K attached and included in the McCorquodale and Simmons expert report, said Appendix is entitled "Sample of Field Data Reduction for Section 18-13#2".

54.  Appendix L attached and included in the McCorquodale and Simmons expert report, said Appendix is entitled "Sample of Field Data for Section 18-13#3".

55.  Appendix M attached and included in the McCorquodale and Simmons expert report, said Appendix is entitled "Sample of Field Data Reduction for Section 18-13#3".

56.  February 23, 1998 photograph altered to show the five (5) stops by Dr. Chabreck in association with his field survey of wetland damage and attached to his report entitled "Field Survey of Wetland Damages Associated with Pipelines in Section 16, Township 18 South, Rage 13 East, Terrebonne Parish, Louisiana."

57.  Table 1 of the report prepared by Robert H. Chabreck, Ph.D., entitled "Thickness of Marsh Root Mat in Section 16, Township 18 South, Range 13 East, Terrebonne Parish, Louisiana."

58.  Photograph dated February 23, 1998 altered to show the eight (8) "Soil Sample Stations" attached with the report prepared by Robert H. Chabreck, Ph.D., entitled "Thickness of Marsh Root Mat in Section 16, Township 18 South, Range 13 East, Terrebonne Parish, Louisiana."

59.  Eight (8) color photographs of root mat samples attached with the report prepared by Robert H. Chabreck, Ph.D., entitled "Thickness of Marsh Root Mat in Section 16, Township 18 South, Range 13 East, Terrebonne Parish, Louisiana."

60.  Actual samples of root mat collected by Dr. Chabreck in preparing his report entitled "Thickness of Marsh Root Mat in Section 16, Township 18 South, Range 13 East, Terrebonne Parish, Louisiana."

61.    Photographs dated 1935, 1951, 1953, 1955, 1957, 1965, 1980, 1990 and 1998 referred to and reviewed by Robert Chabreck in preparing his report entitled "Evaluation of Damages to Property of the Terrebonne Parish School Board in Township 18 South, Range 13 East."

62.    Table 1 attached with "Assessment of Louisiana Coastal Wetland Values" prepared by Shea Penland, Ph.D., which is entitled "Estimates of the Environmental Value of Coastal Wetlands."

63.    Table 2 attached with "Assessment of Louisiana Coastal Wetland Values" prepared by Shea Penland, Ph.D., which is entitled "Wetland Ecosystem Services and Function."

64.    Table 3 attached with "Assessment of Louisiana Coastal Wetland Values" prepared by Shea Penland, Ph.D., which is entitled "Annual Wetland Ecosystem Service Values (1994 U.S. $ AC$^{-1}$ YR$^{-1}$)."

65.    Table 1 attached to "Assessment of Potential Hurricane Damage to Terrebonne Parish School Board Section 16, Township 18 South, Range 13 East Property" prepared by Shea Penland, Ph.D., which is entitled "The Saffir-Simpson Scale of Hurricane Intensity."

66.    Figure 1 attached to "Assessment of Potential Hurricane Damage to Terrebonne Parish School Board Section 16, Township 18 South, Range 13 East Property" prepared by Shea Penland, Ph.D., which is entitled "General Effect of Track and Circulation on Wind Intensity."

67.    Table 2 attached to "Assessment of Potential Hurricane Damage to Terrebonne Parish School Board Section 16, Township 18 South, Range 13 East Property" prepared by Shea Penland, Ph.D., which is entitled "Hurricanes Passing within 60 Miles of Project Site [1900-1999]."

68.    Figure 3 attached to "Assessment of Potential Hurricane Damage to Terrebonne Parish School Board Section 16, Township 18 South, Range 13 East Property" prepared by Shea Penland, Ph.D., which is entitled "Hurricanes Passing within 60 Miles of the Project Site [1920-1939]."

69.    Figure 4 attached to "Assessment of Potential Hurricane Damage to Terrebonne Parish School Board Section 16, Township 18 South, Range 13 East Property" prepared by Shea Penland, Ph.D., which is entitled "Hurricanes Passing within 60 Miles of the Project Site [1940-1959]."

70.    Figure 5 attached to "Assessment of Potential Hurricane Damage to Terrebonne Parish School Board Section 16, Township 18 South, Range 13 East Property"

prepared by Shea Penland, Ph.D., which is entitled "Hurricanes Passing within 60 Miles of the Project Site [1960-1979]."

71.    Figure 6 attached to "Assessment of Potential Hurricane Damage to Terrebonne Parish School Board Section 16, Township 18 South, Range 13 East Property" prepared by Shea Penland, Ph.D., which is entitled "Hurricanes Passing within 60 Miles of the Project Site [1980-1999]."

72.    Figure 7 attached to "Assessment of Potential Hurricane Damage to Terrebonne Parish School Board Section 16, Township 18 South, Range 13 East Property" prepared by Shea Penland, Ph.D., which is entitled "Extent of Hurricane Force Winds During Hurricane Andrew."

73.    Figures 1 - 23 attached with Shea Penland, Ph.D. December 15, 2000, report entitled "Assessment of Direct and Indirect Impacts of Pipelines in Section Township 18 South, Range 13 East, Section 16 in Terrebonne Parish, Louisiana, *Revised*".

74.    Nine (9) photointerpretative maps from photographs dated 1931, 1951, 1957, 1965, 1980, 1983, 1990, 1995, and 1998 attached to the Penland December 15, 2000, report entitled "Assessment of Direct and Indirect Impacts of Pipelines in Township 18 South, Range 13 East, Section 16 in Terrebonne Parish, Louisiana, *Revised*".

75.    Interpreted map comparison between 1931 and 1951 attached to Penland 12/15/00 report entitled "Assessment of Direct and Indirect Impacts of Pipelines in Township 18 South, Range 13 East, Section 16 in Terrebonne Parish, Louisiana, *Revised*".

76.    Interpreted map comparison between 1951 and 1957 attached to Penland 12/15/00 report entitled "Assessment of Direct and Indirect Impacts of Pipelines in Township 18 South, Range 13 East, Section 16 in Terrebonne Parish, Louisiana, *Revised*".

77.    Interpreted map comparison between 1957 and 1965 attached to Penland 12/15/00 report entitled "Assessment of Direct and Indirect Impacts of Pipelines in Township 18 South, Range 13 East, Section 16 in Terrebonne Parish, Louisiana, *Revised*".

78.    Interpreted map comparison between 1965 and 1980 attached to Penland 12/15/00 report entitled "Assessment of Direct and Indirect Impacts of Pipelines in Township 18 South, Range 13 East, Section 16 in Terrebonne Parish, Louisiana, *Revised*".

79.    Interpreted map comparison between 1980 and 1983 attached to Penland 12/15/00 report entitled "Assessment of Direct and Indirect Impacts of Pipelines in Township 18 South, Range 13 East, Section 16 in Terrebonne Parish, Louisiana, *Revised*".

80.    Interpreted map comparison between 1983 and 1990 attached to Penland 12/15/00 report entitled "Assessment of Direct and Indirect Impacts of Pipelines in Township 18 South, Range 13 East, Section 16 in Terrebonne Parish, Louisiana, *Louisiana*".

81.  Interpreted map comparison between 1990 and 1995 attached to Penland 12/15/00 report entitled "Assessment of Direct and Indirect Impacts of Pipelines in Township 18 South, Range 13 East, Section 16 in Terrebonne Parish, Louisiana, *Revised*".

82.  Interpreted map comparison between 1995 and 1998 attached to Penland 12/15/00 report entitled "Assessment of Direct and Indirect Impacts of Pipelines in Township 18 South, Range 13 East, Section 16 in Terrebonne Parish, Louisiana, *Revised*".

83.  Tables and/or Demonstrative Aides by Robert Chabreck, Ph.D., indicating marsh vegetation, soil charts.

84.  Marsh Maps created by Chabreck for last 30 - 40 years indicating marsh types.

85.  Maps and reports prepared by Louisiana Department of Fish & Wildlife and/or other agencies indicating areas of marsh damaged and/or destroyed by nutria in Terrebonne Parish, Louisiana.

86.  Photographs 1 - 19 taken during field work conducted by Alex McCorquodale and Robert Simmons, and attached to the expert report of McCorquodale and Simmons.

87.  Six (6) color photographs attached to the expert report prepared by Robert H. Chabreck, Ph.D. entitled "Field Survey of Wetland Damages Associated with Pipelines in Section 16, Township 18 South, Range 13 East, Terrebonne Parish, Louisiana."

88.  Tides chart for August 2000 entitled "Tides-Atchafalaya Bay, Shell Island" attached to the expert report of McCorquodale and Simmons.

89.  Correspondence between Terrebonne Parish School Board and Koch Gateway Pipe Line Company or United Gas Pipe Line Company.

90.  Correspondence between Columbia Gulf Transmission Company and Terrebonne Parish School Board.

91.  Plaintiff's Second Set of Interrogatories and Second Set of Requests for Production of Documents to Columbia Gulf Transmission Company.

92.  Plaintiff's Second Set of Interrogatories and Second Set of Requests for Production of Documents to Koch Gateway Pipeline Company.

93.  Responses of Columbia Gulf Transmission Company to Plaintiff's Second Set of Interrogatories and Second Set of Requests for Production of Documents.

94.  Responses of Koch Gateway Pipeline Company to Plaintiff's Second Set of Interrogatories and Requests for Production of Documents.

95.  Video taken during the field work of Alex McCorquodale and Robert Simmons in preparing their expert report for Section 16, Township 18 South, Range 13 East property.

96.  Financial records and documentation indicating the revenue generated by Koch and Columbia Gulf as a result of transporting natural gas through the pipelines constructed by Columbia Gulf and Koch.

97.  Logs, records and documentation, including gauge records and run tickets, indicating measurements of volume and quality of natural gas transported through the Columbia Gulf and Koch pipelines since defendants began operations.

98.  Logs, Records and documentation related to safety inspections and maintenance inspections for the Columbia Gulf and Koch pipelines being operated on Section 16, Township 18 South, Range 13 East property since defendants began operations.

99.  May 31, 1965 letter from TPSB to District Attorney re: retaining DA to prosecute trespass by Columbia Gulf.

100.  June 10, 1957, correspondence from United Gas to Terrebonne Parish School Board regarding laying of Koch pipeline.

101.  July 26, 1965, Resolution authorizing right of way by Terrebonne Parish School Board in favor of Columbia Gulf Transmission Company.

102.  December 17, 1957, Resolution authorizing right of way by Terrebonne Parish School Board in favor of United Gas Pipe Line Company.

103.  All coastal land loss maps, photographs, demonstrative aids, and other documentation referred to or relied on by Shea Penland, Ph.D., in preparing the report entitled "Assessment of the Direct and Indirect Impacts of Pipelines in Section 16, Township 18 South, Range 13 East, Terrebonne Parish, Louisiana".

104.  Terrebonne Parish Land Loss Base Map highlighting land loss in Coastal Louisiana, Terrebonne Bay, Louisiana, Technical Report GL-90-2, Map 4 of 7, U.S. Corp. of Engineers.

105.  Report of the Louisiana Coastal Wetlands Conservation Restoration Task Force and the Wetlands Conservation and Restoration Authority entitled "Coast 2050: Report of Sustainable Coastal Louisiana."

106.  Executive Summary of Report entitled "Coast 2050: Toward a Sustainable Coastal Louisiana."

107.    Historical aerial photographs showing progressive land loss of the Terrebonne Parish School Board's property made the subject of the captioned matter.

108.    Finding of No Significant Impact by the Department of the Army with attached Environmental Assessment, LaBranche Wetlands..

109.    "Restoration of a Marsh in the LaBranche Ponds - A Case Study" by Suzanne Hawes.

110.    "Construction of a Marsh in the LaBranche Ponds of Louisiana" by Suzanne Hawes.

111.    Abstract of Bids - LaBranche Wetlands Restoration Project.

112.    Plans & Specs for the LaBranche Wetlands Restoration Project for U.S. Army Corps of Engineers.

113.    Map captioned "Louisiana Coastal Land Loss Study-Terrebonne Bay-Process Classification" prepared by Natural and Human Causes of Coastal Land Loss in Louisiana project.

114.    Louisiana Land Loss Classification Map, Process Classification of Coastal Land Loss between 1932-1990 in the Mississippi River Delta Plain, South East Louisiana, U.S. Geologic Survey.

115.    Louisiana Land Loss Classification Map, Geomorphic Classification of Coastal Land Loss between 1932-1990 in the Mississippi River Delta Plain, South East Louisiana, U.S. Geologic Survey.

116.    Resolution of Terrebonne Parish School Board dedicating monies received in this case to restoration of School Board lands and/or Section 16, Township 18 South, Range 13 East.

117.    Any and all reports prepared by Expert Witnesses for Koch Gateway Pipeline Company and Columbia Gulf Transmission Company, together with all maps, photographs, demonstrative aids, and other exhibits attached to the Reports.

118.    Any and all pleadings and the exhibits attached thereto filed by Koch Gateway Pipeline Company or Columbia Gulf Transmission Company, in the instant proceeding.

119.    Depositions of Koch Gateway Pipeline Company's or Columbia Gulf Transmission Company's Expert Witnesses to be taken in the future in the captioned matter.

120.    Agricultural Information Bulletin 513 entitled "Soil Erosion by Water" prepared by the United States Department of Agriculture, Soil Conservation Service.

121.    Any Exhibits referred to in or attached to any Depositions taken in the captioned matter.

122.    Any Exhibits listed by Defendants, Koch Gateway Pipeline Company or Columbia Gulf Transmission Company.

123.    Appendix B attached and included in the McCorquodale and Simmons expert report entitled "Transcribed Field Notes Taken by Dr. Alex McCorquodale, P.E.".

124.    Appendix C attached and included in the McCorquodale and Simmons expert report entitled "Transcribed Field Notes Taken by David A. Waitz Inc. (Surveyor)".

125.    Appendix D attached and included in the McCorquodale and Simmons expert report entitled "Transcribed Field Notes Taken By Mr. Robert Simmons, P.E.".

126.    Appendix E attached and included in the McCorquodale and Simmons expert report entitled "Transcribed Field Notes Taken by Mr. Carl W. Hultgren".

127.    CV of Robert Simmons, P.E.

128.    CV of Joshua Johnson.

129.    CV of Carl Hultgren.

130.    CV of Youchao Wang.

131.    Any materials or documents contained in TPSB's file for Section 16, T18S, R13E.

132.    Any documents hereinafter produced by Koch Gateway Pipeline Company and/or Columbia Gulf Transmission Company and/or plaintiffs.

133.    Any exhibits necessary for rebuttal or impeachment of any witnesses called by Koch Gateway Pipeline Company and Columbia Gulf Transmission Company.

134.    Any sources used by experts for any parties in preparing expert reports, including but not limited to scientific literature.

135.    Scenic photographs of marsh plants and animals.

136.    Insurance policy declaration sheets for Koch.

137.    Publication "Coastal Marshes, Ecology and Wildlife Management," by Robert A. Chabreck.

138.  Map entitled "Louisiana Coastal Land Loss Study-Terrebonne Bay-Process Classification."

139.  Evidence of criminal convictions of Koch Gateway Pipeline Company and related entities.

140.  September 20, 2002 Report of Robert Chabreck, Ph. D., entitled "Experimental Creation of a Floating Island of Marsh in a Freshwater Pond," and Figures 1-6 attached thereto.

141.  Charts and diagrams illustrating the soil types and layers for freshwater flotant marshes.

142.  60 Minutes II videotape – Blood & Oil – Koch Family – segment aired 11/28/2000.

143.  September 19, 2002 Report of Robert Chabreck, Ph. D., entitled "Additional Evaluation of Wetland Damages Caused by Pipeline Canals in Section 16, T18S-R13E, Terrebonne Parish, Louisiana."

b.  **Defendant, Koch Gateway Pipe Line Company:**

Koch has not yet seen some of the exhibits listed by plaintiff. Koch therefore objects to the admissibility of any such evidence on the grounds of lack of relevance, hearsay, and lack of authenticity.

1.  Expert report of John C. Mattingly, T. Baker Smith & Son, Inc., depicting survey measurements taken by T. Baker Smith & Son, Inc. of the property in question.

2.  Expert reports of Luther F. Holloway, Ph.D., together with all attachments thereto, including but not limited to, photographs taken of the marsh, videotape of the marsh, Atchafalaya River stages coincident with aerial photographs, and any and all other attachments thereto.

3.  Expert report of Marc Rogers, contained within the expert report of Luther Holloway, regarding alternative restoration plans and costs.

4.  Expert reports of Richard N. DeVries, Ph.D., together with all attachments thereto, including, but not limited to, data measurements taken during field inspections.

5.  Expert report of Kenneth J. Boudreaux, Ph.D.

6.  Expert report of Carr T. Dowell, III, together with all attachments thereto, including, but not limited, comparable sale prices and any and all other attachments or inclusions.

7.     Curriculum Vitae of Luther F. Holloway, Ph.D.

8.     Curriculum Vitae of Richard N. DeVries, Ph.D.

9.     Curriculum Vitae of Kenneth J. Boudreaux, Ph.D.

10.    Curriculum Vitae of Carr T. Dowell, III.

11.    Curriculum Vitae of John C. Mattingly, P.L.S.

12.    Curriculum Vitae of Marc Rogers, Sr., P.E.

13.    Right-of-Way Agreement dated 12/18/57 between TPSB and United Gas Pipe Line Company.

14.    Release Agreement dated 12/18/57 between TPSB and United Gas Pipe Line Company.

15.    Historical and aerial photographs of Section 16, Township 18 South, Range 13 East, and Atchafalaya River Stages at Morgan City, Louisiana, on the following specific dates:

   a.    Aerial photograph taken 02/20/31 by the Corps of Engineers;
   b.    Aerial photograph taken 03/04/31 by the Corps of Engineers;
   c.    Aerial photograph taken 11/25/35 by Tobin;
   d.    Aerial photograph taken in 1953 by the USDA-SCA;
   e.    Aerial photograph taken 12/09/55 by Tobin;
   f.    Aerial photograph taken 12/14/55 by the Corps of Engineers;
   g.    Aerial photograph taken 10/22/60 by the Corps of Engineers;
   h.    Aerial photograph taken 01/65 by Tobin;
   i.    Aerial photograph taken 04/28/73 by the Corps of Engineers;
   j.    Aerial photograph taken 10/74 by NASA;
   k.    Aerial photograph taken in 1978 by Earth Science Info. Center;
   l.    Aerial photograph taken 10/31/80 by USDA-SCS;
   m.    Aerial photograph taken 03/09/81 by Gulf Coast Aerial Mapping;
   n.    Aerial photograph taken in 1983 by USDA-SCS;
   o.    Aerial photograph taken 10/28/83 by Earth Science Info. Center;
   p.    Aerial photograph taken 10/15/87 by Tobin;
   q.    Aerial photograph taken 10/11/90 by USDA-SCS;
   r.    Aerial photograph taken 11/23/94 by the Corps of Engineers;
   s.    Aerial photograph taken 01/07/95 by Earth Science Info. Center;
   t.    Aerial photograph taken 12/29/95 by the Corps of Engineers;
   u.    Aerial photograph taken 05/01/96 by Tobin;
   v.    Aerial photograph taken 02/23/98 by LOSCO (Western Data Systems);
   w.    Aerial photograph taken 10/10/00 by Gulf Coast Aerial Mapping;

16.    Proceedings of TPSB meeting on five Section 16 properties regarding erosion and subsidence.

17.    Tape recording and/or transcription thereof of the proceedings of the Terrebonne Parish School Board dated 08/19/96.

18.    Proceedings of the Terrebonne Parish School Board dated 12/03/85.

19.    Proceedings of the Terrebonne Parish School Board dated 10/20/88.

20.    Proceedings of the Terrebonne Parish School Board dated 03/25/94.

21.    Proceedings of the Terrebonne Parish School Board dated 09/17/96.

22.    Proceedings of the Terrebonne Parish School Board dated 12/17/96.

23.    Resolution of the Terrebonne Parish School Board adopted by TPSB on 10/20/98.

24.    Houma Courier Article dated 05/06/81.

25.    Letter dated 12/13/93 from Herb Carreker to School Board regarding U.S. Soil Conversation Services and their offer to study all Section 16 properties.

26.    Letter dated 08/23/94 from Herb Carreker to School Board regarding Penchant Basin Resource Plan.

27.    Evaluation report of Morris P. Hebert, Inc., surveyors, of Section 16 lands included in the Pension Basin Resource Plan, including T18-R13, dated 04/95.

28.    Handwritten report of School Board consultant of Malcolm Poiencot dated 03/04/98 regarding inspection of T18-R13 property on 03/03/98.

29.    Minutes of Terrebonne Parish School Board Meeting dated February 5, 1974.

30.    Minutes of Terrebonne Parish School Board Meeting dated November 9, 1976.

31.    Minutes of Terrebonne Parish School Board Meeting dated December 7, 1976.

32.    Minutes of Terrebonne Parish School Board Meeting dated April 5, 1977.

33.    Minutes of Terrebonne Parish School Board Meeting dated May 5, 1981.

34.    Minutes of Terrebonne Parish School Board Meeting dated August 18, 1981.

35.   Letter from Brian A. Brunet of T. Baker Smith & Son, Inc. to Terrebonne Parish School Board dated January 13, 1983.

36.   Minutes of Terrebonne Parish School Board Meeting dated April 13, 1982.

37.   Minutes of Terrebonne Parish School Board Meeting dated June 1, 1982.

38.   Resolution of Terrebonne Parish School Board dated August 17, 1982, regarding Avoca Island.

39.   Letter from Kent M. Willoughby of Terrebonne Parish School Board to Dr. Sherwood Gagliano of Coastal Environments, Inc. dated December 4, 1985.

40.   Minutes of Terrebonne Parish School Board Meeting dated April 7, 1987.

41.   Letter from Ed Fike of Coastal Environments, Inc. to Herb Carreker of Terrebonne Parish School Board dated March 12, 1993.

42.   Letter from Ed Fike of Coastal Environments, Inc. to Herb Carreker of Terrebonne Parish School Board dated April 21, 1993.

43.   Letter from Herb Carreker of Terrebonne Parish School Board to Members of Finance, Insurance and Section 16 Lands Committee dated April 26, 1993.

44.   Letter from the Finance, Insurance and Section 16 Lands Committee to Terrebonne Parish School Board Members dated June 1, 1993.

45.   Letter from the Finance, Insurance and Section 16 Lands Committee to Terrebonne Parish School Board Members dated May 4, 1993.

46.   Letter from Herb Carreker of Terrebonne Parish School Board to Surface Lease Holders - Terrebonne Parish School Board dated July 30, 1993.

47.   Minutes of Terrebonne Parish School Board Meeting dated April 25, 1994.

48.   Minutes of Terrebonne Parish School Board Meeting dated May 17, 1994.

49.   Letter from Herbert Carreker of Terrebonne Parish School Board to Members of Finance, Insurance and Section 16 Lands Committee dated August 23, 1994.

50.   Minutes of the Section 16 Committee dated October 4, 1994.

51.   Letter from Herbert Carreker to Section 16 Committee regarding Penchant Resource Plan dated September 26, 1994.

52.  Letter from Herbert Carreker of Terrebonne Parish School Board to Dr. Frank Fudesco dated October 10, 1994.

53.  Terrebonne Parish School Board Contractual Services for Penchant Basin Resource Plan Sixteenth Section Evaluation dated November 1, 1994.

54.  Letter from Herbert Carreker of Terrebonne Parish School Board to Members of the Finance, Insurance and Section 16 Lands Committee dated November 4, 1994.

55.  Letter from Herb Carreker to Morris P. Hebert, Inc. regarding evaluation of 18 Section 16 Lands dated January 12, 1995.

56.  Letter from Morris Hebert to Herbert Carreker of Terrebonne Parish School Board dated April 13, 1995.

57.  Minutes of Meeting of Terrebonne Parish School Board dated September 17, 1996.

58.  Letter from Constance A. Koury, First Assistant Attorney General, to Dr. Frank D. Fudesco, Superintendent of Terrebonne Parish School Board.

59.  Minutes of Meeting of the Finance, Insurance and Section 16 Lands Committee dated August 1996.

60.  Minutes of Meeting of Terrebonne Parish School Board dated May 4, 1989.

61.  Preliminary Erosion Study of Section 16 Lands prepared by T. Baker Smith & Son, Inc. dated January 13, 1982.

62.  Terrebonne Parish School Board Contractual Services for Penchant Basin Resource Plan Sixteenth Section Evaluation prepared by Morris P. Hebert, Inc dated November 1, 1994.

63.  Report of Penchant Basin Resource Plan Sixteenth Section Evaluation prepared by Morris P. Hebert, Inc. dated April 12, 1995.

64.  Any other documents produced from the Section 16 files of TPSB, including minutes of meetings of TPSB and/or the Section 16 lands committee and reports of consultants and/or third parties retained or hired by TPSB.

65.  Chabreck, R.A. and Linscombe, R.G., Vegetative type map of the Louisiana coastal marshes. Louisiana Department of Wildlife and Fisheries, New Orleans, LA, USA (1988).

66.  Chabreck, R.A. and Linscombe, R.G., Changes in vegetative types in the Louisiana coastal marshes over a 10-year period. Proc. La. Acad. Sci. 45:98-102 (1982).

67.    Chabreck, R.A. Coastal Marshes.  Ecology and Wildlife Management (1988).

68.    Kinler, N. and G. Linscombe, 1998, A survey of nutria herbivory damage in coastal Louisiana in 1998, La. Department of Wildlife and Fisheries, 8 pages plus figures.

69.    Linscombe, G. and N. Kinler.  1985.  Fur harvest distribution in coastal Louisiana. Pp. 187-99 in Bryan, C.F., P.J. Zwank, and R.H. Chabreck (eds).  Proc. 4th Coastal Marsh and Estuary Manage. Symp. La. State Univ., Baton Rouge.

70.    Linscombe, G. and N. Kinler, 1997, A survey of vegetative damage caused by nutria herbivory in the Barataria and Terrebonne Basins, Barataria-Terrebonne Natural Estuary Program, BTNEP-31, 17 pages plus figures.

71.    Field notes taken by T. Baker Smith & Son, Inc. surveyors reflecting measurements on the property.

72.    Oblique aerial photographs taken by Luther Holloway in connection with his inspection.

73.    T. Baker Smith & Son, Inc. erosion study of Section 16 properties.

74.    Any exhibit listed or utilized by any other party.

75.    Any documents or materials produced by plaintiff or by Columbia Gulf Transmission Company after the date of this list.

76.    Any document necessary for rebuttal or impeachment of any witness called by plaintiff or by Columbia Gulf Transmission Company.

77.    Servitude agreement by and between Koch and adjacent landowner, Continental Land & Fur, Inc., dated January 31, 1958, Entry No. 175248 in Terrebonne Parish Conveyance Office;

78.    Appeal briefs on behalf of Terrebonne Parish School Board in the matter entitled *Terrebonne Parish School Board v. Castex Energy, Inc., et. al.*, No. 2001-CA-2634, First Circuit Court of Appeals, State of Louisiana.

c.    **Defendant, Columbia Gulf Transmission Company:**

Columbia Gulf has not yet seen some of the exhibits listed by plaintiff.  Columbia Gulf therefore objects to the admissibility of any such exhibits on the grounds of lack of relevance, hearsay, and lack of authenticity.

1.    Right-of-way and servitude agreement between Columbia Gulf and Terrebonne Parish School Board dated July 26, 1965.

2.    Release between Columbia Gulf Transmission and Terrebonne Parish School Board dated July 26, 1965.

3.    CV of James M. Coleman.

4.    Map illustrating Louisiana coastal land loss occurring since early 1900's (Coleman report - Exhibit A4).

5.    Land Loss in Coastal Louisiana, Morgan City, Louisiana, Technical Report GL-90-2, Map 3 of 7, February 1996, by L. D. Britsch and J.B. Dunbar (excerpt - area east of Atchafalaya River).

6.    Definition of landloss (Coleman report - Exhibit A5).

7.    Regional map showing Section 16 (Coleman report - Exhibit A6).

8.    Listing of major factors causing coastal landloss (Coleman report - Exhibit A9).

9.    Map of Deltaic Lobes of Mississippi River Deltas showing delta switching and delta cycle (Coleman report - Exhibit A11).

10.    Satellite Photo of Deltaic Lobes of Mississippi River Deltas showing delta switching and delta cycle (Coleman report - Exhibit A13).

11.    Elements of relative sea level change (Coleman report - Exhibit A15).

12.    Relative sea level rise in coastal Louisiana by area (Coleman report - Exhibit A18).

13.    Map from Gagliano 1999 report - major geologic faults (Coleman report - Exhibit A20).

14.    Map, Subsidence Since Beginning of Holocene, Fisk and McFarlane, 1955 (Coleman report - Exhibit A22).

15.    Map - Terrebonne/Barrataria Basin, Roberts et al 1992 (Coleman report - Exhibit A23).

16.    Chart, Relative Sea Level Rise, Penland et al 1988 (Coleman report - Exhibit A26).

17.    Map, Subsidence Rates, Penland et al (Coleman report - Exhibit A27).

18.    Chart (RSL vs. Sediment Accumulation), Deficit in Terrebonne Parish (Coleman report - Exhibit A33).

19.    Satellite Photograph of Hurricane Andrew (Coleman report - Exhibit A36).

20.     List of Effects of Hurricanes (Coleman report - Exhibit A37).

21.     Photos of damaged marsh, Terrebonne Parish after Hurricane Andrew (Coleman report - Exhibit A40).

22.     Photo of marsh before Hurricane Andrew (Coleman report - Exhibit A41).

23.     Photo of same area after Hurricane Andrew - now open water (Coleman report - Exhibit A42).

24.     List of hurricanes in region since 1888 (Coleman report - Exhibit A43).

25.     Storm Track, Hurricane Hilda (Coleman report - Exhibit A52).

26.     Storm Track, Hurricane Betsy (Coleman report - Exhibit A53).

27.     Storm Track, Hurricane Carmen (Coleman report - Exhibit A54).

28.     Storm Track, Hurricane Babe (Coleman report - Exhibit A55).

29.     Storm Track, Hurricane Bob (Coleman report - Exhibit A56).

30.     Storm Track, Hurricane Juan (Coleman report - Exhibit A57).

31.     Storm Track, Hurricane Andrew (Coleman report - Exhibit A58).

32.     Chart, Comparative Take of Muskrat/Nutria, 1940-1997 (Coleman report - Exhibit A60).

33.     Blowup of 1931 aerial photo of part of Section 16 showing numerous muskrat huts (Coleman report - Exhibit A64).

34.     Blow up of 1964 aerial photo of part of Section 16 showing numerous muskrat huts (Coleman report - Exhibit A66).

35.     Map, Kinder & Linch, Nutria vegetative damage survey 1993-1996.

36.     Map, Kinder & Linch, 1998 - Nutria vegetative damage survey.

37.     Map, Linscomb & Kinler, 1999 - Nutria vegetative damage survey.

38.     Chart showing suspended sediment in Mississippi River (Coleman report - Exhibit A69).

38A.   Aerial Photo showing Western Terrebonne Parish, including Section 16, T18S, R13E (Coleman report - Exhibit B2A).

39.   Aerial Photo, March 4, 1931, Section 16, T18S, R13E (Coleman report - Exhibit B5).

40.   Aerial Photo, December 9, 1955, Section 16, T18S, R13E (Coleman report - Exhibit B6).

41.   Aerial Photo, March 7, 1957, Section 16, T18S, R13E (Coleman report - Exhibit B7).

42.   Aerial Photo, February 9, 1964, Section 16, T18S, R13E (Coleman report - Exhibit B8).

43.   Aerial Photo, January 24, 1965, Section 16, T18S, R13E (Coleman report - Exhibit B9).

44.   Aerial Photo, February 13, 1971, Section 16, T18S, R13E (Coleman report - Exhibit B10).

45.   Aerial Photo, October 31, 1980, Section 16, T18S, R13E (Coleman report - Exhibit B11).

46.   Aerial Photo, November 23, 1994, Section 16, T18S, R13E (Coleman report - Exhibit B12).

47.   Aerial Photo, January 31, 1998, Section 16, T18S, R13E (Coleman report - Exhibit B13).

47A.   Aerial Photo, October 16, 2002 (Coleman Report - Exhibit B13A).

48.   Interpretive Photo - comparative analysis of new open water and the rate of marsh loss, 1931-1955 (Coleman report - Exhibit B14).

49.   Interpretive Photo - comparative analysis of new open water and the rate of marsh loss, 1955-1957 (Coleman report - Exhibit B15).

50.   Interpretive Photo - comparative analysis of new open water and the rate of marsh loss, 1957-1964 (Coleman report - Exhibit B16).

51.   Interpretive Photo - comparative analysis of new open water and the rate of marsh loss, 1964-1965 (Coleman report - Exhibit B17).

52.   Interpretive Photo - comparative analysis of new open water and the rate of marsh loss, 1965-1971 (Coleman report - Exhibit B18).

53.   Interpretive Photo - comparative analysis of new open water and the rate of marsh loss, 1971-1980 (Coleman report - Exhibit B19).

54.   Interpretive Photo - comparative analysis of new open water and the rate of marsh loss, 1980-1994 (Coleman report - Exhibit B20).

55.   Interpretive Photo - comparative analysis of new open water and the rate of marsh loss, 1994-1998 (Coleman report - Exhibit B21).

55A.  Interpretive Photo - comparative analysis of new open water and the rate of marsh loss, 1998-2002 (Coleman report - Exhibit B22).

56.   Graph showing acres of interior marsh open water over time (Coleman report - Exhibit B23).

57.   Photo of Section 16 from air showing typical marsh (Coleman - 12/4/00).

58.   Photo of Section 16 showing tranasse west of Koch canal (Coleman - 12/4/00).

59.   Photo of broken marsh on Section 16 (Coleman - 12/4/00).
60.   Photo of broken marsh on Section 16 (Coleman - 12/4/00).

61.   Ground view of broken marsh on Section 16 south of Columbia Gulf Canal (Coleman - 12/4/00).

62.   Muskrat mounds on Section 16 (Coleman - 12/4/00).

63.   Nutria eat out area, two nutria on Section 16 (Coleman - 12/4/00).

64.   Enlargement of portion of photo of 1/24/65 showing Columbia Gulf Canal and Southeast corner of Section 16.

65.   Enlargement of portion of aerial photo of 2/13/71 showing Columbia Gulf Canal and Southeast corner of Section 16.

66.   Enlargement of portion of aerial photo of 10/31/80 showing Columbia Gulf Canal and Southeast corner of Section 16.

67.   Enlargement of portion of aerial photo of 11/23/94 showing Columbia Gulf Canal and Southeast corner of Section 16.

68.   Enlargement of portion of aerial photo of 1/31/98 showing Columbia Gulf Canal and Southeast corner of Section 16.

69.   CV of Joseph N. Suhayda.

70.    Map, Maximum Flood Elevation (Hurricane Hilda).

71.    Map, Hurricane Andrew, Maximum Water Elevation.

72.    Map, Maximum Flood Elevation (Hurricane Juan).

73.    Schematic Drawing of geometry of cut/bayou/marsh flow used in calculation, attached to Joseph N. Suhayda's December 21, 2000 report.

74.    Three dimensional schematic drawing of geometry of cut/bayou/marsh flow used in calculation.

75.    Excerpts (measurements at cut in Columbia Gulf canal) from Alex McCorquodale, November 3, 2000 report of Assessment of Flow between the Boundary Canals and the Marshes of Section 16, Number 18-13.

76.    Exhibit (3 pages in globo) showing methodology used by Dr. Joseph Suhayda for hurricane modeling.

77.    Excerpt from Robinson and Crowe, Engineering Fluid Mechanics, Fourth Ed., showing formulae used by Dr. Joseph Suhayda in his calculations.

78.    Graph - Water Elevation vs. Time at Section 16 - Hurricane Hilda.

79.    Graph - Water Elevation vs. Time at Section 16 - Hurricane Juan.

80.    Graph - Water Elevation vs. Time at Section 16 - Hurricane Andrew.

81.    CV of David M. Richard.

82.    CV of Allan Ensminger.

83.    CV of Wade R. Ragas.

84.    Map of comparables in Terrebonne Parish relied upon by Dr. Wade Ragas.

85.    Table of comparables used in analysis of Dr. Wade Ragas: date, price, acres, price per acre.

86.    Table of selected hunting and fishing leases for Section 16 nearest subject.

87.    Table of four cases by West Jefferson Levee District.

88.    Table on Compensatory Mitigation Costs for Terrebonne Parish.

*Page 49 of 70*

89.   Table on Farber studies of Louisiana wetlands value estimates stated in per acre terms by category.

90.   CV of Leonard Shabman.

91.   Minutes of Terrebonne Parish School Board Meeting dated February 5, 1974 (TPSB 0901-0908).

92.   Minutes of Terrebonne Parish School Board Meeting dated November 9, 1976 (TPSB 1507-1510).

93.   Minutes of Terrebonne Parish School Board Meeting dated December 7, 1976 (TPSB 1499-1506).

94.   Minutes of Terrebonne Parish School Board Meeting dated April 5, 1977 (TPSB 0909-0916).

95.   Minutes of Terrebonne Parish School Board Meeting dated May 5, 1981 (TPSB 0926-0931).

96.   Newspaper Article, May 6, 1981, "School Board Defers Canal Action".

97.   Minutes of Terrebonne Parish School Board Meeting dated August 18, 1981 (TPSB 1485-1488).

98.   Letter from Brian A. Brunet of T. Baker Smith & Son, Inc. to Terrebonne Parish School Board dated January 13, 1982 (TPSB 1373).

99.   Preliminary Erosion Study of Section 16 Lands (School Board properties) in Terrebonne Parish, Louisiana, T. Baker Smith, January 13, 1982.

100.  Minutes of Terrebonne Parish School Board Meeting dated April 13, 1982 (TPSB 1475-1478).

101.  Minutes of Terrebonne Parish School Board Meeting dated June 1, 1982 (TPSB 1479-1484).

102.  Resolution of Terrebonne Parish School Board dated August 17, 1982 (TPSB 1355).

103.  Minutes of Terrebonne Parish School Board Meeting, December 3, 1985.

104.  Letter from Kent M. Willoughby of Terrebonne Parish School Board to Dr. Sherwood Gagliano of Coastal Environments, Inc. dated December 4, 1985 (TPSB 0644).

105.    Minutes of Terrebonne Parish School Board Meeting dated April 7, 1987 (TPSB 0932-0942).

106.    Letter from Ed Fike of Coastal Environments, Inc. to Herb Carreker of Terrebonne Parish School Board dated March 12, 1993 (TPSB 1357-1358).

107.    Letter from Ed Fike of Coastal Environments, Inc. to Herb Carreker of Terrebonne Parish School Board dated April 21, 1993 (TPSB 1359-1363).

108.    Letter from Herb Carreker of Terrebonne Parish School Board to Members of Finance, Insurance and Section 16 Lands Committee dated April 26, 1993 (TPSB 0480-0481).

109.    Letter from the Finance, Insurance and Section 16 Lands Committee to Terrebonne Parish School Board Members dated June 1, 1993 (TPSB 1073-1077).

110.    Letter from the Finance, Insurance and Section 16 Lands Committee to Terrebonne Parish School Board Members dated May 4, 1993 (TPSB 1078-1082).

111.    Letter from Herb Carreker of Terrebonne Parish School Board to Surface Lease Holders - Terrebonne Parish School Board dated July 30, 1993 (TPSB 0232).

112.    Letter from Herbert Carreker to Terrebonne Parish School Board dated December 13, 1993 (003675).

113.    Minutes of Terrebonne Parish School Board Meeting dated April 25, 1994 (TPSB 1341-1346).

114.    Minutes of Terrebonne Parish School Board Meeting dated May 17, 1994 (TPSB 0943-0955).

115.    Letter from Herbert Carreker of Terrebonne Parish School Board to Members of Finance, Insurance and Section 16 Lands Committee dated August 23, 1994 (TPSB 1374).

116.    Letter from Herbert Carreker of Terrebonne Parish School Board to Members of Finance, Insurance and Section 16 Lands Committee dated September 26, 1994 (TPSB 1375).

117.    Letter from Section 16 Lands Committee, October 4, 1994, (TPSB 1071- 1072).

118.    Letter from Herbert Carreker of Terrebonne Parish School Board to Dr. Frank Fudesco dated October 10, 1994 (TPSB 1376).

*Page 51 of 70*

119.   Terrebonne Parish School Board Contractual Services for Penchant Basin Resource Plan Sixteenth Section Evaluation dated November 1, 1994 (TPSB 1347-1353).

120.   Letter from Herbert Carreker of Terrebonne Parish School Board to Members of the Finance, Insurance and Section 16 Lands Committee dated November 4, 1994 (TPSB 1378-1380).

121.   Letter from Morris Hebert to Herbert Carreker of Terrebonne Parish School Board dated April 13, 1995 (TPSB 1088-1089, 1107-1110, 1176).

122.   Letter to Terrebonne Parish School Board Members Re: Meeting of The Finance, Insurance and Section 16 Lands Committee Meeting dated September 17, 1996 (TPSB 1049-1050).

123.   Spreadsheet of General Operating Fund - School Land Income.

124.   Minutes of Meeting of Terrebonne Parish School Board dated December 17, 1996 (TPSB 0977-0979).

125.   Letter from Malcolm Poiencot to Herbert Carreker dated March 4, 1998 (TPSB 0036 & 0038).

126.   Minutes of Meeting of Terrebonne Parish School Board dated September 17, 1996 (TPSB 0970 - 0971).

127.   Letter from Constance A. Koury, First Assistant Attorney General, to Dr. Frank D. Fudesco, Superintendent of Terrebonne Parish School Board (TPSB 1515 - 1518).

128.   Minutes of Meeting of the Finance, Insurance and Section 16 Lands Committee dated August 1996 (TPSB 1329-1340).

129.   Minutes of Meeting of Terrebonne Parish School Board dated May 4, 1989 (TPSB 0989-0990).

130.   Spreadsheet, Terrebonne School Board Section 16 land values (TPSB 0663 - 0664).

131.   Letter from Carl Edwards of Columbia Gulf to Terrebonne Parish School Board dated February 18, 1964 (CGT 0001).

132.   Letter from Edwin J. Upton of Columbia Gulf to Mr. Ralph T. Clark date June 10, 1965 (CGT 0006).

133.   Letter from Wilmore J. Brossard, Jr., District Attorney to Edwin J. Upton of Columbia Gulf dated June 20, 1965 (CGT 0021).

134.  Letter from Wilmore J. Brossard, Jr., District Attorney to Edwin J. Upton of Columbia Gulf dated July 28, 1965 (CGT 0019).

135.  Copies of Columbia Gulf check number 8491 dated July 29, 1965 in the amount of $7,879.80 and check number 8490 dated July 29, 1965 in the amount of $685.20 (CGT 0014).

136.  Certified Resolution of the Terrebonne Parish School Board, dated August 4, 1965 (CGT 0033).

137.  Allan Ensminger, November 16, 2000 report.

138.  Allan Ensminger, December 2000 report, Field Survey of Section 16, T18S-R13E, Terrebonne Parish, LA.

138A.  Allan Ensminger, November 7, 2002 report, Additional Field Survey.

139.  James M. Coleman, November 8, 2002, report, Landloss Processes in Sec 16 T18, R13E.

140.  James M. Coleman, December 9, 2000, Field Trip Report.

141.  Wade R. Ragas, November 14, 2000, report, Complete Appraisal Self Contained Report of Marshland Property Contained in and Adjoining the Columbia Gulf Transmission Company Located Within Terrebonne Parish, Louisiana.

142.  Wade R. Ragas, November 14, 2000, report, reviewing Charles Camp's and Shea Penland's reports.

143.  David M. Richard, November 16, 2000 report, Wetland Evaluation, Township 18 South, Range 13 East, Section 16, Terrebonne Parish, Louisiana.

144.  Leonard Shaman, November 13, 2000 report, Valuation of Coastal Louisiana Wetlands for the Case of Terrebonne Parish School Board v. Columbia Gulf et al.

145.  Joseph N. Suhayda, November 16, 2000 Expert Report.

146.  Joseph N. Suhayda, December 21, 2000 Expert Report.

146A.  Joseph N. Suhayda, November 10, 2002, Supplemental Expert Report.

146B  Photographs related to Dr. Suhayda's Supplemental Expert Report.

147.  Attachments to the reports of Dr. James Coleman.

*Page 53 of 70*

148.    Attachments to the reports of Dr. Joseph Suhayda.

149.    Attachments to reports and reference material utilized by Dr. Ragas.

150.    Attachments to report and reference material utilized by Dr. Shabman.

151.    Attachments to reports and reference material utilized by Mr. Ensminger.

152.    Photographs from the field trip of December 4, 2000.

152A.   Photographs from the field trip of October 25, 2002.

152B.   Photographs from Allan Ensminger's overflight trip of October 15, 2002.

153.    Chabreck, R.A. and Linscombe, R.G., Vegetative type map of the Louisiana coastal
        marshes.  Louisiana Department of Wildlife and Fisheries, New Orleans, LA, USA
        (1988).

154.    Chabreck, R.A. and Linscombe, R.G., Changes in vegetative types in the Louisiana
        coastal marshes over a 10-year period. Proc. La. Acad. Sci. 45:98-102 (1982).

155.    Chabreck, R.A. Coastal Marshes.  Ecology and Wildlife Management (1988).

156.    Comprehensive Management of Nutria Herbivory Damage in Coastal Louisiana and
        Coastwide Nutria Control Program (LA-03b), United States Department of
        Agriculture, September, 2002.

156A.   Fact Sheet, Coastwide Nutria Control Program (LA-03b).

157.    Ensminger, A. and G. Linscombe.  1980.  The fur animals, the alligator, and the fur
        industry in Louisiana. La. Dept. of Wildl. And Fish. Baton Rouge. 69pp.

158.    Ensminger, A.B. and L.G. Nichols. 1957. Hurricane damage to Rockefeller Refuge.
        Proc. Ann. Conf. Southeast. Assoc. Game and Fish Comm. 11:52-56.

159.    Evers, D.E., Sasser, C.E., Gosselink, J.G., The Impact of Vertebrate Herbivores on
        Westland Vegetation in Atchafalaya Bay, Louisiana (Estuaries Vol. 21, No. 1, p.
        1-13) (March, 1998).

160.    Fuller, D.A., Sasser, C.E., Johnson, W.B. and Gosselink, J.G.  1985.  The effects of
        herbivory on vegetation on islands in Atchafalaya Bay, Louisiana.  Wetlands 4:105-
        114.

161.    Gagliano, S.M. and Wicker, K.M.  1989.  Processes of wetland erosion in the
        Mississippi River Delta Plain.  In: Duffy, W.G. and Clark, D. (eds).  Marsh

management in coastal Louisiana; effects and issues ---- proceedings of a symposium, pps. 28-48. Baton Rouge, LA: U.S. Fish and Wildlife Service and Louisiana Department of Natural Resources.

162.  Gagliano, S.M.  2000.  Restructuring Coastal Louisiana: Issues and Problems. Reprinted from Proceedings of: American Bar Association, Section of Environment, Energy, and Resources, Gulf of Mexico Estuaries, Coastal Wetlands Loss and Coastal Restoration.

163.  Kinler, N. and G. Linscombe, 1998, A survey of nutria herbivory damage in coastal Louisiana in 1998, La. Department of Wildlife and Fisheries, 8 pages plus figures.

164.  Linscombe, G. and N. Kinler.  1985.  Fur harvest distribution in coastal Louisiana. Pp. 187-99 in Bryan, C.F., P.J. Zwank, and R.H. Chabreck (eds).  Proc. 4th Coastal Marsh and Estuary Manage. Symp. La. State Univ., Baton Rouge.

165.  Linscombe, G. and N. Kinler, 1997, A survey of vegetative damage caused by nutria herbivory in the Barataria and Terrebonne Basins, Barataria-Terrebonne Natural Estuary Program, BTNEP-31, 17 pages plus figures.

166.  Nichols, L.G.  1958.  Erosion of canal banks on the Rockefeller Wildlife Refuge. La. Wildl. Life and Fisheries Comm., New Orleans.  11 pp.

167.  O'Neil, T.  The muskrat in the Louisiana coastal marsh.  (La. Dept. of Wildlife and Fisheries, New Orleans.  152 pp.) (1949).

168.  Sasser, C.E., Coastal Ecology Institute, Center for Coastal, Energy and Environmental Resources, Louisiana State University, April, 1994, Vegetation Dynamics in Relation to Nutrients in Floating Marshes in Louisiana, USA, Floating Marshes in Louisiana.

169.  Sasser, C.E., Gosselink, J.G., Swenson, E.M. and Evers, D.E. 1995.  Hydrologic, vegetation, and substrate characteristics of floating marshes in sediment-rich wetlands of the Mississippi river delta plain, Louisiana, U.S.A.  Wetlands Ecology, Vol. 3, No. 3, pp. 171-187.

170.  Sasser, C.E., Gosselink, J.G., Swenson, E.M. and Evers, D.E. 1996.  Vegetation, substrate and hydrology in floating marshes in the Mississippi river delta plain wetlands, USA.  Vegetation 122: 129-142 (1996).

171.  Visser, J.M., Sasser, C.E., Chabreck, R.A., and Linscombe, R.G. 1999.  Long-term Vegetation Change in Louisiana Tidal Marshes, 1968-1992. Wetlands, Vol. 19, No. 1, March 1999, pp. 1168-175, The Society of Wetland Scientists.

172.  Any documents produced from the Section 16 files of the Terrebonne Parish School Board.

173.  Minutes of various meetings of the Terrebonne Parish School Board.

174.  Any document produced by Koch Gateway.

175.  Any document produced by Columbia Gulf from its files (CGT 01-247).

176.  Documents, data, photographs and any other source of information used or relied upon by Columbia Gulf's various experts in the formulations of their reports and opinions.

177.  Photographs and/or videotape of the site at issue in this litigation.

178.  Discovery answers of plaintiff.

179.  Discovery answers of Koch Gateway Pipeline.

180.  Any documents produced by plaintiff or by Koch Gateway Pipeline after the date of this exhibit list.

181.  Any document necessary for rebuttal or impeachment of any witness called by plaintiff or by Koch Gateway Pipeline.

182.  Any document listed by another party.

11.  **Deposition Testimony:**

A list of all deposition testimony to be offered into evidence:

a.  Plaintiff, Terrebonne Parish School Board:

TPSB will offer the expert reports of Dr. Shea Penland in lieu of live testimony. TPSB may also offer the depositions of the defendants' corporate representatives if no representative are called by defendants to provide live testimony. As the parties have not agreed on the deposition testimony that will be introduced, TPSB reserves the right to introduce additional deposition testimony to be determined hereafter. TPSB submits that Mr. Poiencot is available for trial and that his deposition testimony is not admissible. Furthermore, for the reasons outlined in its Motion in Limine previously filed with this Court, TPSB objects to either Koch or Columbia Gulf offering the testimony of Malcolm Poiencot at trial in deposition form. Mr. Poiencot's deposition testimony is inadmissible evidence as Poiencot is a lay person whose testimony will be submitted to prove nutria damage in violation of F.R.E. 702 & 704.

b.    Defendant, Koch Gateway Pipe Line Company:

None at this time. However, in the event School Board consultant Malcolm Poiencot is unable to testify at trial because of personal reasons (wife with cancer), Koch reserves the right to use his deposition testimony in lieu of his live presence.

c.    Defendant, Columbia Gulf Transmission Company:

1.    None at this time. Columbia Gulf reserves the right to use deposition testimony if witnesses are unavailable.

12.    **Non-Evidentiary Demonstrative Aids:**

A list and brief description of any charts, graphs, models, schematic diagrams, and similar objects which, although not to be offered in evidence, respective counsel intend to use in opening statements or closing arguments:

a.    Plaintiff, Terrebonne Parish School Board:
Counsel for Terrebonne Parish School Board may use certain demonstrative charts, graphs or photographs prepared by its experts.

b.    Defendant, Koch Gateway Pipe Line Company:

Koch intends to use some of the aforementioned exhibits as demonstrative evidence, to be blown up or expanded as may be applicable.

c.    Defendant, Columbia Gulf Transmission Company:

Counsel for Columbia Gulf may use certain demonstrative charts, graphs, photographs or computer assisted presentations prepared by its experts. These will be produced for inspection prior to trial.

13.    **Witnesses:**

a.    A list of witnesses for all parties, including the names, addresses and statement of the general subject matter of their testimony (it is not sufficient to designate the witness simply "fact," "medical" or "expert"), and an indication in good faith of those who will be called in the absence of reasonable notice to opposing counsel to the contrary:

I.    **Plaintiff, Terrebonne Parish School Board:**

1.    Dr. Robert H. Chabreck, Ph.D.
1821 Cloverdale Avenue
Baton Rouge, LA 70808

Dr. Chabreck is an expert in coastal marshes and coastal ecology. He will testify as to the evaluation of damages to the property, causes of damages to the property, condition of the property currently and in the future as a result of the field surveys conducted, and will testify as to the results of a root mat study performed on the property, feasibility of restoration, and any matters contained in Dr. Chabreck's original and supplemental reports.

2.    Mr. Charles M. Camp
      205 Raywood Drive
      Houma, LA 70360

      Mr. Camp is a registered land surveyor who will provide expert testimony on the results of a survey on the property. Mr. Camp will also provide expert testimony on the restoration plan he prepared with Dr. Chabreck, as well as the results of a search of public records for documents allowing operations by Koch Gateway Pipeline Company and Columbia Gulf Transmission Company on the property.

3.    Alex J. McCorquodale, Ph.D., P.E.
      Department of Civil & Environmental Engineering
      University of New Orleans
      New Orleans, LA 70148

      Dr. McCorquodale is a hydrologist who will testify as to the assessment of flow in, out of, and between the pipeline canals on Section 16, Township 18 South, Range 13 East.

4.    Shea Penland, Ph.D.
      Department of Geology and Geophysics
      University of New Orleans
      1029 Geology Bldg.
      New Orleans, LA 70148-2850

      Dr. Penland is an expert who will testify as to coastal geomorphology prior to and after activities by defendants on the property, coastal processes, photo interpretation of historical aerial photography, and value of property considering social values to be taken into account in determining restoration and/or preservation value.

5.    Any witnesses listed or called by defendants, Koch Gateway Pipeline Company or Columbia Gulf Transmission Company.

6.    Any witnesses necessary for rebuttal or impeachment of any witness called by Koch Gateway Pipeline Company or Columbia Gulf Transmission Company.

7.    Any current and/or former members of the Terrebonne Parish School Board and/or other witnesses necessary to authenticate any exhibit or document.

8.    Robert Simmons, P.E.
Environmental Science Services
Post Office Box 84408
Baton Rouge, LA 70809-4408

Mr. Simmons assisted Dr. McCorquodale in his assessment of flow in, out of, and between the pipeline canals. He will provide fact and expert testimony on the flow assessment study conducted.

9.    Joshua Johnson
Environmental Science Services, Inc.
9441 Common Street, Suite A
Baton Rouge, LA 70809

Mr. Johnson was involved in taking soil samples on the property and his testimony will involve his role in taking soil samples used in the flow assessment study conducted by Simmons and McCorquodale.

10.    Carl Hultgren
Environmental Science Services, Inc.
9441 Common Street, Suite A
Baton Rouge, LA 70809

Mr. Hultgren was involved in taking soil samples on the property and his testimony will involve his role in taking soil samples used in the flow assessment study conducted by Simmons and McCorquodale.

11.    Youchao Wang
Environmental Science Services, Inc.
9441 Common Street, Suite A
Baton Rouge, LA 70809

Youchao Wang performed the analysis on the soil and water samples taken from the property and may give expert testimony on the results of said test results.

12. Herbert Carreker
201 Stadium Drive
Houma, LA 70360

Current Section 16s Land Manager for Terrebonne Parish School Board, regarding his role and duties as land manager, authentication of documents, TPSB policies and procedures regarding management and supervision of Section 16 lands.

13. Any witness listed on the witness list of any other party, which list is hereby adopted and incorporated by reference.

14. Any witness subsequently identified through discovery or whose deposition has been or may be hereinafter taken.

ii.    **Defendant, Columbia Gulf Transmission Company:**

Will Call:

1. James Coleman, Ph.D.
Coastal Studies Institute
Louisiana State University
Baton Rouge, LA 70803

Dr. Coleman is an expert in coastal wetlands and processes. He will testify as to land loss in the Section 16 in question as well as in Terrebonne Parish in general, the causes of the land loss, the current and future condition of the property, and interpretation of historical aerial photographs.

2. Joseph Suhayda, Ph.D.
285 Sunset Blvd.
Baton Rouge, LA 70808

Dr. Suhayda is a hydrologist who will provide expert testimony on the flow of water in the Section 16 in question, his study as to the validity of Dr. Chabreck's "flushing action" theory and the effect of hurricanes on the property.

3. Leonard Shabman, Ph.D.
P. O. Box 47
Reedville, VA 22539

Dr. Shabman is an economist who will provide expert testimony on the value of the property and the correct theories and methodology for use in such valuation.

*Page 60 of 70*

4.    Wade Ragas, Ph.D.
      Real Property Associates, Inc.
      P. O. Box 74233
      Metairie, LA 70033

      Dr. Ragas is an expert in real estate valuation and appraisal, who will testify
      on valuation of the Section 16 land in question.

5.    Mr. Alan Ensminger
      246 Alan Ensminger Road
      DeRidder, LA 70634

      Mr. Ensminger is an expert in wetlands and wildlife management who will
      provide expert testimony on restoration issues and causes of marsh loss or
      damage in Section 16.

May Call:

6.    Mr. David Richard
      Stream Companies
      P. O. Box 40
      Lake Charles, LA 70602

      Mr. Richard is a biologist who may provide fact and expert testimony as to
      the flora and fauna on the property and the conditions of the property.

7.    John B. Benoit
      Fenstermaker & Associates
      135 Regency Square
      Lafayette, LA 70508

      Mr. Benoit is a registered land surveyor who may provide fact and expert
      testimony on the results of a survey on the Section 16 at issue.

8.    Robert Ganzak
      Fenstermaker & Associates
      135 Regency Square
      Lafayette, LA 70508

      Mr. Ganzak is an environmental specialist with C.H. Fenstermaker who may
      provide fact and expert testimony on the current condition of the property.
      He is a biologist by education.  He shot a video of the canal and spoil banks.

9.    Wayne Gripp
      Aero-Data Corp.
      9213 Interline Avenue
      Baton Rouge, Louisiana 70809

      Mr. Gripp may testify about the digitization and geo-referencing of the aerial
      photographs used by Dr. James Coleman.

10.   Randal Gripp
      Aero-Data Corp.
      9213 Interline Avenue
      Baton Rouge, Louisiana 70809

      Mr. Gripp may testify about the digitization and geo-referencing of the aerial
      photographs used by Dr. James Coleman.

11.   Wayne Crocker
      Vice President-Field Services
      Columbia Gulf Transmission

      Mr. Crocker may testify generally about Columbia Gulf's line 300, its
      pipeline inspection practices and its maintenance policies with respect to
      rights-of-way and bulkheads.

12.   Nelson Kramer
      Columbia Gulf Transmission
      Houma, Louisiana.

      Mr. Kramer is a utility man with Columbia Gulf's Houma office. He may
      testify about his knowledge of the section in question, as well as about
      Columbia Gulf's maintenance practices with respect to rights-of-way and
      bulkheads. Mr. Kramer may also testify in his capacity as a former School
      Board member.

13.   Malcolm Poiencot
      Field Inspector
      Terrebonne Parish School Board

      Mr. Poiencot may testify about his knowledge of the section at issue and his
      inspections thereof.

*Page 62 of 70*

14.     Randy Donaldson
        Hunting Lessee
        514 Crochetville Road
        Montegut, LA 70377

        Mr. Donaldson may testify about his knowledge of the section at issue.

15.     Patrick Bussey
        Hunting lessee
        c/o PATCO
        3502 Industrial Avenue "A"
        Houma, LA 70363

        Mr. Bussey may testify about his knowledge of the section at issue.

16.     Herbert Carreker

        Mr. Carreker, a TPSB employee, may be called to testify as to issues on
        which he was examined in his deposition.

        The following former or current School Board members may be called to
        testify:

17.     Donald Duplantis

18.     Clark Bonvillain

19.     Ricky Pitre

20.     L.P. Bordelon

21.     Francis Voisin

22.     Alfred Cooley

23.     Hayes Badeaux

24.     Charlie Vandercook

25.     Michael Veazey

        Mr. Veazey, a consultant to the School Board, may testify about the School
        Board's income from mineral leases, and other matters dealt with in his
        deposition.

*Page 63 of 70*

26.    Any individual who performed work in support of an expert's opinion.

27.    Any current or past member of the Terrebonne Parish School Board.

28.    Any current or past employee or consultant of the Terrebonne Parish School Board.

29.    Any witness listed by plaintiff.

30.    Any witness listed by Koch Gateway Pipeline Company.

31.    Any witness necessary to authenticate any document.

32.    Any witness necessary for rebuttal or impeachment.

33.    Any witness needed to authenticate business records.

iii.    **Defendant, Koch Gateway Pipe Line Company:**

<u>WILL CALL</u>:

1.    Luther F. Holloway, Ph.D.
HC-86, Box 31
Harrisonburg, LA    71340
(318) 744-5638

Dr. Holloway is a wetlands expert who will testify as to the state of plaintiffs' property, and general issues regarding plaintiffs' marshland property. He will testify as to the sources of damage to the property, TPSB's proposed restoration thereof, alternative restoration plans, and, in general, the results of his inspections of the property.

2.    Dr. Richard DeVries
RICHARD N. DeVRIES & ASSOCIATES
10624 S. Eastern Avenue, Suite A-401
Henderson, NV    89052
(702) 614-4947

Dr. DeVries is a professional engineer, with specific emphasis in hydrology and hydraulic areas. He will testify regarding measurements which he took inside the marsh, and his opinion that there are insufficient forces to either erode or transport organic material from the marsh.

*Page 64 of 70*

3.    Carr T. Dowell, III
       Max J. Derbes, Appraisers & Real Estate Consultants, Inc.

       3045 Ridgelake Drive, Suite 300
       Metairie, LA 70002
       (504) 833-2020

       Mr. Dowell is a certified real estate appraiser who will testify as to the fair
       market value of the property, and why Dr. Penland's economic theories are
       not generally accepted for purposes of property evaluation.

4      Kenneth J. Boudreaux, Ph.D.
       CONSULTING ECONOMIST
       1424 Bordeaux Street
       New Orleans, LA   70115

       Dr. Boudreaux has a Ph.D. in economics.  He will testify as to the property's
       economic value and why TPSB's restoration plans are not economically
       proper.

5.    John C. Mattingly, P.L.S. or other expert surveyor,
       T. BAKER SMITH & SONS
       412 South Van Avenue
       Houma, LA   70363
       (504) 868-1050

       Mr. Mattingly is a registered land surveyor with T. Baker Smith & Son, Inc.
       who will provide expert testimony on the results of a survey done of the
       property.

6.    Mr. Marc Rogers, Sr., P.E.
       T. BAKER SMITH & SONS
       412 South Van Avenue
       Houma, LA   70363
       (504) 868-1050

       Mr. Rogers is a civil engineer who will testify as to the costs of Koch's
       alternative restoration plan, designed to enhance, not cause further to, TPSB's
       marsh property.

7.      Mr. Francis Voisin
        1789 Bayou Dularge Road
        Theriot, LA  70397

        Mr. Voisin is a former School Board member, who will testify regarding
        erosion of Section 16 properties due to oil or pipeline canals and the School
        Board's efforts and/or lack thereof regarding same.

8.      Mr. Donald Duplantis
        313 Hialeah Avenue
        Houma, LA  70363

        Mr. Duplantis is a former School Board member, who will testify regarding
        erosion of Section 16 properties due to oil or pipeline canals and the School
        Board's efforts and/or lack thereof regarding same.

9.      Mr. Herb Carreker
        1700 Terre Houte
        Houma, LA  70364

        Mr. Carreker is a current School Board employee, who will testify regarding
        erosion of Section 16 properties due to oil or pipeline canals and the School
        Board's efforts and/or lack thereof regarding same.

10.     Mr. Malcolm Poiencot
        843 Bayou Dularge Road
        Houma, LA  70363

        Mr. Poiencot is a former and/or current School Board consultant, who will
        testify regarding erosion of Section 16 properties due to oil or pipeline canals
        and the School Board's efforts and/or lack thereof regarding same.

MAY CALL:

1.      Mr. Joseph Breaux
        KOCH GATEWAY PIPELINE COMPANY
        716 Highway 90 East
        Houma, LA

        Mr. Breaux is a current employee of Koch, who will testify regarding Koch's
        activities and/or the lack thereof relative to the canal at issue.

*Page 66 of 70*

2.    Michael Edward Martin
      KOCH GATEWAY PIPELINE COMPANY
      2300 Verot School Road
      Lafayette, LA  70508
      (318) 981-6699

      Mr. Martin is a current employee of Koch, who will testify regarding Koch's
      activities and/or the lack thereof relative to the canal at issue.

3.    Mr. A. J. Voissement
      118 Ouiski Bayou Drive
      Houma, LA 70360
      (504) 872-3102

      Mr. Voissement is a former Employee of Koch, who will testify regarding
      Koch's activities and/or the lack thereof relative to the canal at issue.

4.    Mr. Michael Veazey

      Mr. Veazey a former and/or current School Board consultant, who will testify
      regarding the School Board's policies on Section 16 properties, as well as
      revenues derived therefrom.

5.    Patrick Bussey
      Hunting lessee
      c/o PATCO
      3502 Industrial Avenue "A"
      Houma, LA 70363

      Mr. Bussey may testify about his knowledge of the section at issue.

6.    Randy Donaldson
      Hunting Lessee
      514 Crochetville Road
      Montegut, LA 70377

      Mr. Donaldson may testify about his knowledge of the section at issue.

7.    Clark Bonvillian.

8.    Alfred Cooley.

9.    Any individual who performed work in support of an expert's opinion.

10.   Any current or past member of the Terrebonne Parish School Board.

*Page 67 of 70*

11.   Any current or past employee or consultant of the Terrebonne Parish School Board.

12.   Any witness listed by plaintiff.

13.   Any witness listed by Columbia Gulf Transmission Company.

14.   Any witness necessary to authenticate any document.

15.   Any witness necessary for rebuttal or impeachment.

16.   Any witness needed to authenticate business records.

b.   The above witness list was filed in accordance with prior court orders. Counsel certify that they have exchanged expert reports in accordance with prior court orders.

c.   Except for good cause shown, the Court will not permit any witness to testify unless with respect to such witness there has been complete compliance with all provisions of the pre-trial order and prior court orders.

d.   Counsel shall not be allowed to ask questions on cross-examination of an economic expert which would require the witness to make mathematical calculations in order to frame a response unless the factual elements of such questions shall have been submitted to that expert witness not less than three full wording days before trial.

14.   **Jury Status:**

This case is a non jury case.

b.   In a nonjury case, suggested findings of fact and conclusions of law and a separate trial memorandum are required, unless the Court enters an order that such is not required. Same are to be submitted not less than five full working days prior to trial.

15.   **Bifurcation:**

"The issue of liability **will not** be tried separately from that of quantum."

16.   **Expedited Disposition:**

Other matters that might expedite a disposition of the case: TPSB will submit the testimony of Dr. Shea Penland via his expert reports. TPSB may also introduce deposition testimony in lieu of live testimony, but no final decisions have been made on this issue.

*Page 68 of 70*

17. **Trial Date:**

Trial shall commence on January 27, 2003 at 9:30 a.m. Plaintiff states that a realistic estimate of the number of trial days required is two-three days. Defendant Columbia Gulf estimates 8-10 trial days. Defendant Koch Gateway estimates 6-7 days.

18. **Personal Meeting:**

"This pre-trial order has been formulated after conference at which counsel for the respective parties have appeared in person. Reasonable opportunity has been afforded counsel for corrections, or additions, prior to signing. Hereafter, this order will control the course of the trial and may not be amended except by consent of the parties and the Court, or by order of the Court to prevent manifest injustice."

19. **Settlement Discussion:**

"The possibility of settlement of this case was considered."

20. **Signatures:**

The proposed pre-trial order must contain appropriate signature spaces for counsel for all parties and the Judge.

A. J. GRAY, III (Bar No. 6253)
Wade T. Visconte (Bar No. 24734)
THE GRAY LAW FIRM (APLC)
One Lakeshore Drive, Suite 1700
Post Office Box 1467
Lake Charles, Louisiana 70602-1467
Telephone (318) 494-0694
Facsimile (318) 494-0697

Michael X. St. Martin (Bar No. 12365)
Joseph G. Jevic III (Bar No. 23145)
Conrad S.P. Williams III
ST. MARTIN & WILLIAMS (APLC)
Crescent Farm 4084 Highway 311
Post Office Box 2017
Houma, LA 70361-2017

**Attorneys for plaintiff, Terrebonne Parish School Board**

*Page 69 of 70*

Robert J. Young, Jr. (Bar No. 13763)
Robert J. Young, III (Bar No. 19230)
Young, Richaud & Myers
1515 Energy Centre
1100 Poydras Street, Suite 1515
New Orleans, LA 70163
**Attorneys for Koch Gateway Pipeline Company**


Thomas R. Blum
James A. Burton
Herman C. Hoffman, Jr.
Simon, Peragine, Smith & Redfearn, L.L.P.
1100 Poydras Street
30th Floor - Energy Centre
New Orleans, LA 70163-3000
**Attorneys for Columbia Gulf Transmission Company**


New Orleans, Louisiana

1/8/03

_____
UNITED STATES DISTRICT JUDGE